VESTIGANT

In the Matter of:

Harry Kamin, et al v. Valeria Gunkova, et al.

# EXPERT REPORT OF J. CHRISTOPHER RACICH

**April 25, 2024**

PLAINTIFF'S EXHIBIT

E

# TABLE OF CONTENTS

**I. BACKGROUND** ..... **3**

**II. SUMMARY OF CONCLUSION** ..... **5**

**III. QUALIFICATIONS** ..... **6**

**IV. COMPENSATION** ..... **7**

**V. MATERIALS REVIEWED** ..... **7**

**VI. ANALYSIS** ..... **9**

A. Discovery Document Review ..... 9

(ii) Ransomware Claims ..... 10
(iii) Kamin Physical Signature Review ..... 11
(iv) Notary Physical Signature Review ..... 11
(v) Kamin Electronic Signature Review ..... 12

B. Computer/Media Analysis ..... 15

(i) IT001 ..... 15
(ii) IT002 ..... 18
(iii) IT003 ..... 20
(iv) IT005 ..... 21
(v) IT027 External USB Thumb Drive ..... 22

**VII. CONCLUSION** ..... **24**

## I. BACKGROUND

1. Vestigant, LLC ("Vestigant") was engaged by Bethune Benes, PLLC ("Bethune Benes") as counsel for Plaintiff Harry Kamin ("Plaintiff"). I was asked to 1) perform a forensic analysis of certain PDF files that were produced by Defendant Valeria Gunkova ("Gunkova") during discovery; and 2) conduct forensic analyses of computers, mobile devices and external storage media produced by Gunkova. This included the acquisition and investigation of electronic devices ("Devices") provided by Gunkova pursuant to the Order entered in the Loudoun County Circuit Court on October 25, 2022 ("Order") in the matter of *Kamin v. Gunkova,* Case No. CL-21-1557 (the "Loudoun Case").

2. I was provided with documents produced by Gunkova in discovery in PDF format that appeared to have Plaintiff's signatures upon them. I was asked to conduct forensic analysis on these documents and their metadata in order to determine if these documents could be authenticated based upon the metadata. I was also asked to do a comparison of the signatures that existed in particular documents and determine if it was possible these were authentic or electronic copies of the same signatures.

3. On October 25, 2022, Vestigant was present at a hearing in the Loudoun Case on Plaintiff's Motion to Compel Forensic Inspection. The Loudoun Court granted the Motion and entered the Order compelling a forensic analysis of Devices.

4. On November 1, 2022, Vestigant received (i) a letter from Bethune Benes identifying proposed search terms to be applied to the Devices; and (ii) a letter from Jay McDannell, then counsel for Gunkova, identifying five Devices pursuant to the Order.

5. On November 9, 2022, Vestigant received a letter from Bethune Benes to Jay McDannell relating to certain deficiencies within Gunkova's November 1 identification of Devices.

6. On November 10, 2022, Vestigant received an email sent by Jay McDannell relating to the Devices. Among other things, the email informed that BNG utilized DropBox.

7. On November 16, 2022, I sent an email to Jay McDannell confirming that Vestigant would appear on November 22, 2023, to conduct the forensic imaging of the Devices. Jay McDannell responded the same day, "My client is aware and has it on the calendar."

8. On November 22, 2022, Vestigant employees traveled to the building located at 2 Pidgeon Hill Drive, Sterling, Virginia (the "Building") to conduct a forensic imaging of the Devices identified by Gunkova. Gunkova turned over four Dell Desktop computers, two iPhone devices, and two iCloud accounts. Vestigant forensically imaged the aforementioned Devices. Gunkova did not turn over the credentials for any DropBox account at that time, and therefore Vestigant could not conduct its imaging and/or examination of the account.

9. Pursuant to the Order, Vestigant performed forensic investigations of the four Dell Desktop computers for any evidence that other devices could be available that could possibly contain data. This review identified at least sixteen USB devices that had been attached to the forensically imaged computers, including at least three external hard drives that had not previously been identified. Vestigant identified these USB devices to counsel on December 1, 2023.

10. On December 8, 2023, Vestigant and Gunkova, by counsel Jay McDannell, agreed to have Vestigant return to the Building on December 14, 2022 to collect and image the USB devices not previously turned over by Gunkova.

11. On December 14, 2022 Gunkova provided access to nineteen additional media devices not previously identified by Gunkova under the Order. There were no external hard drives provided on this date.

12. On December 16, 2022 Gunkova provided access to one SSD hard drive that was identified by Gunkova as being stored in Philadelphia and had not been previously identified by Gunkova or provided on December 14, 2022 with other USB devices. The make/model/serial number of this SSD hard drive did not match the make/model/serial number of any of the previously identified external hard drives.

## II. SUMMARY OF CONCLUSION

13. Based upon the forensic investigation that I conducted on the data provided to me, I can conclude to a reasonable degree of scientific certainty that:

(a) Analysis of certain Documents produced by Gunkova in electronic format indicate that there is no way to authenticate the documents being in existence prior to their Last Modification Date.

(b) Analysis of twenty-one documents produced by Gunkova in electronic format indicate that certain files existed in Gunkova's systems prior to an alleged ransomware attack that Gunkova stated occurred in November, 2020 and were not encrypted by a ransomware attack.

(c) Analysis of the three documents bearing bates numbers GUNKOVA_000045, GUNKOVA_000049 and GUNKOVA_000054 indicate that Plaintiff's signatures are identical and were likely embedded within the documents electronically and not signed by hand.

(d) Analysis of the two documents bearing bates numbers GUNKOVA_000131 and GUNKOVA_000333 indicate that the Notary signature and seal are identical and were likely embedded within the documents electronically and not signed by hand.

(e) Analysis of computers provided by Gunkova show that USB devices were attached to computers provided for forensic imaging and investigation, however, not all of the identified USB devices were turned over to Vestigant.

(f) There is evidence of data destruction being performed on multiple devices after (i) the initial demand letter was sent to Gunkova on February 10, 2021; (ii) the Complaint was filed on March 8, 2021; (iii) Plaintiff filed a Motion to Compel the Inspection of Electronic Devices on September 9, 2022; (iv) the Loudoun Court's

October 25, 2022 Order compelling a forensic analysis of the Devices (as defined in the Order); and (v) after the date was scheduled with Gunkova to perform the forensic analysis**.** This included the use of data destruction tools such as CCleaner and the deletion of data, that based on file name, would contain data that is responsive to search terms under the Order.

(g) There is evidence that the IP address 71.126.149.50 is an IP address under the custody and control of Gunkova, and that at least one document with Valeria Gunkova's electronic signature and at least three documents purportedly bearing the electronic signature of Harry Kamin were signed by a device using this IP address.

14. I reserve the right to supplement my report or opinions should I receive additional information.

## III. QUALIFICATIONS

15. I am the President of Vestigant LLC ("Vestigant"). Vestigant is a technology and computer forensic consulting firm that assists clients with fact-finding in litigation, regulatory reviews, and business decisions. I founded Vestigant in 2009, and since that time, clients have retained Vestigant to provide expertise on hundreds of cases involving computer forensic and e-discovery issues.

16. I am a 1993 graduate of Cornell University, where I received my Bachelor of Arts degree in Biology. I later attended law school at the Washington College of Law at American University, graduating with a Juris Doctor degree in 1997. I have been practicing in the field of computer forensics since 1997.

17. I have taken numerous courses and attended multiple seminars in the field of computer forensics over the past twenty-five (25) years.

18. I have taught computer forensics courses at the High Tech Crimes Investigation Association, an international non-profit professional organization devoted to the prevention, investigation, and prosecution of crimes involving advanced technologies.

19. I have been an adjunct Professor of Law at the Washington College of Law at American University where I have taught courses concerning electronic discovery.

20. During my career in the computer forensics field, I have provided computer forensics expert testimony before numerous courts, including the United States District Court for the Eastern District of Virginia, International Trade Commission, the United States District Court for the Southern District of Florida, the United States District Court for the Southern District of Texas, the Supreme Court of the State of New York, County of New York, the Superior Court for the District of Columbia, the Missouri Circuit Court, the Larimer County District Court in Colorado, the Court of Chancery of the State of Delaware and the Pennsylvania Court of Common Pleas. I have also provided computer forensics expert testimony in connection with numerous administrative proceedings, including before the National Labor Relations Board. I have been qualified at least forty-eight (48) times in a court of law or arbitration proceeding as an expert in computer forensics. I have attached a true and correct copy of my curriculum vitae, which further shows my experience and expertise in the field of computer forensics, as **Exhibit 1**.

## IV. COMPENSATION

21. Vestigant's hourly rate is between $350 to $550 per hour, depending on the tasks performed. Vestigant's compensation is not related to the outcome of this matter.

## V. MATERIALS REVIEWED

22. For the purposes of this report, I reviewed the following:

(a) Documents produced in discovery by Gunkova with the metadata listed in **Exhibit 2**.

(b) Documents produced in discovery by Gunkova in the Loudoun Case with the following Bates Numbers:

i) GUNKOVA_000045

ii) GUNKOVA_000051

iii) GUNKOVA_000054

iv) GUNKOVA_000131

v) GUNKOVA_000333

(c) Documents produced in discovery by Bank Five Nine in the Loudoun Case with the Bates Number BANKFIVENINE 520.

(d) Documents received pursuant to FOIA request by Bethune Benes and produced in discovery in the Loudoun Case bearing the bates labels FOIA 0093-112; FOIA 0229-0248; FOIA 0020-0039; and FOIA 0353-0372 showing Docusign E-Signature metadata for documents allegedly signed by Harry Kamin on 6/20/2020, 6/25/2020, 6/26/2020, and 8/28/2020.

(e) An email with full header information sent to racich@vestigant.com by bngl7847@gmail.com on November 16, 2022 and ccing jmcdannell@berliklaw.com

(f) A forensic image of a Dell Optiplex 7040 with a hard drive bearing serial number 03242218E0378. Vestigant assigned this computer an identification number of "IT001". The primary user of this computer appears to be "frontdesk."

(g) A forensic image of a Dell Optiplex 7040 with a hard drive bearing serial number 03242218C0154. Vestigant assigned this computer an identification number of "IT002". The primary user of this computer appears to be "ilavtsevich."

(h) A forensic image of a Dell Optiplex 3020 with a hard drive bearing serial number S1BHJ9AS914160. Vestigant assigned this computer an identification number of "IT003". The primary user of this computer appears to be "frontdesk."

(i) A forensic image of a Dell Optiplex 7050 desktop computer with a hard drive bearing serial number AS21030802731. Vestigant assigned this computer an identification number of "IT005". The primary user of this computer appears to be "Jacob.ARIAMEDSPA."

(j) A forensic image of a USB Thumb drive without an internal serial number. Vestigant assigned this computer an identification number of "IT027". It is my understanding this device belongs to Mr. Jacob Bogatin.

(k) The Order executed in the above case on October 25, 2022 regarding forensic imaging and searching of Gunkova's devices ("Order").

(l) The Deposition Transcript of Valeria Gunkova conducted on September 30, 2021.

(m) Three email messages from the email address valeria@ariamedspa.com to bbenes@bethunebenes.com sent between June 15, 2023 and June 16, 2023 provided to me by Bethune Benes.

## VI. ANALYSIS

### A. Discovery Document Review

i) Date/Time Metadata

23. On October 4, 2021, I received from Bethune Benes PDF documents that I was informed had been produced by Gunkova in the Loudoun Case (the "October 4 Documents"). I investigated both the content of the documents and the available metadata in order to determine if these documents could be authenticated as legitimate documents. A spreadsheet of the document names and available metadata is attached as **Exhibit 3**.

24. Metadata is typically described as "data about data". Metadata is not necessarily included in the content of a document, but rather describes information about the document, including dates/times when the document was created or modified, who the author is, location of the document and underlying changes of the document.

25. I investigated the October 4 Documents for metadata that could indicate the earliest time frame in which they existed. Typically, the earliest date/time metadata field that exists in a document can being used to determine at least the earliest time when the document existed. For example, if the Last Modified Date of a document is a particular date, and that is the earliest

available date found within the document, one can state that it is likely that the document existed at that point.

26. For the October 4 Documents, the metadata analysis was done by extracting out date/times stamps from both internal and external metadata fields utilizing forensic software.

27. Exhibit 3 shows that based upon the metadata, the earliest date/time the documents could be authenticated to have been in existence is the "ModifyDate (Internal)".

**(ii) Ransomware Claims**

28. I reviewed the deposition transcript of Gunkova taken on September 30, 2021. Based upon that testimony, Gunkova stated that all the files in the Aria network were lost to a ransomware attack in November, 2020. Due to this, there were no files available that predated the November 2020 timeframe. [1]

29. As part of the Computer/Media analysis (described in further detail below) Vestigant was unable to find any evidence of a RansomWare attack on the computers provided by Gunkova. In fact, certain of the computers were in use prior to November 2020 indicating that the computers were not actually reset after an alleged RansomWare attack.

30. It is my understanding that Gunkova produced certain documents (see Exhibit 2) to Plaintiff on September 9, 2021 in native format. I was asked to review the metadata of certain of these files. Included in this native document production were at least five documents that showed that they had been created on dates prior to November 2020. If these files had been on a computer

[1] Transcript of Valeria Gunkova, September 30, 2021, pp. 320-325

or server that was affected by a RansomWare attack, these five files would be encrypted and been made inaccessible in November 2020. A copy of these files' metadata is attached as Exhibit 2.

**(iii) Kamin Physical Signature Review**

31. I was provided with electronic versions of documents that contained the alleged signature of Plaintiff on signature pages that were allegedly hand signed. I was asked to compare these signatures in the electronic documents and attempt to determine if there was any information that determined if the signatures were unique or electronic copies of each other.

32. I reviewed documents bearing bates number GUNKOVA_0000045, GUNKOVA_0000052 and GUNKOVA_0000054. I extracted out the alleged signature of Plaintiff ("Harry Kamin") and using imaging software overlayed these signatures upon each other. My review of these overlayed signatures show that they are identical indicating that they were not hand signed on the document but rather all had a similar origin and were likely copied in electronic format to the document at some point prior to their current iteration in the PDF document. A copy of these overlays is attached as **Exhibit 4**.

33. There are numerous ways in which a signature can be copied and embedded within a document. For example, it is a simple process to scan a paper document with a signature and convert the signature to an image that can be copied and pasted into any document. This can be done with PDF files, Word files or as images themselves.

**(iv) Notary Physical Signature Review**

34. I was provided with electronic versions of documents that contained the alleged Notary signatures/stamps of Fatima El-Hage on signature pages that were allegedly hand signed. I was asked to compare these Notary signatures/stamps in the electronic documents and attempt to

determine if there was any information that determined if the Notary signatures/stamps were unique or electronic copies of each other.

35. I reviewed documents bearing bates number GUNKOVA_000131 and GUNKOVA_000333. I extracted out the alleged signature/stamp of the Notary ("Fatima El-Hage") and using imaging software overlayed these signatures/stamps upon each other. My review of these overlayed signatures/stamps show that they are identical indicating that they were not hand signed on the document but rather all had a similar origin and were likely copied in electronic format to the document at some point prior to their current iteration in the PDF document. A copy of this overlay is attached as **Exhibit 5**.

36. There are numerous ways in which a signature can be copied and embedded within a document. For example, it is a simple process to scan a paper document with a signature and convert the signature to an image that can be copied and pasted into any document. This can be done with PDF files, Word files or as images themselves.

**(v) Kamin Electronic Signature Review**

37. I was provided with electronic signature document metadata for three Docusigned documents allegedly signed by Plaintiff (**Exhibit 6**). Electronically signed documents include information that help identify information about the person electronically signing a document. For users using the Docusign platform, this includes the email address to which the Docusign request was sent, the type of signature (i.e. pre-selected from existing font, drawn with mouse, etc…) and the Internet Protocol (IP) address of the device used to sign the document.

38. An IP address is a unique address for a computer or bridge to a network that is uniquely held at any particular time. IP address can be dynamically assigned to computers or

bridge to a network and thus change occasionally over time or they can be static, meaning they will be consistently used by the same computer or bridge to a network and are not changed over time.

39. The metadata of each of the esigned documents is as follows:

| Name | IP Address | Signature Adoption | Email Address | Date |
|---|---|---|---|---|
| Sterling Esigned (FOIA 0093-0112) | 71.126.149.50 | Pre-Selected | harry@ariamedspa.com | 6/20/2020 |
| SNB Esigned (FOIA 0229-0248) | 71.126.149.50 | Pre-Selected | Grishak301@gmail.com | 6/25/2020 |
| Breeze Esigned (FOIA 0020-0039) | 71.126.149.50 | Pre-Selected | Grishak301@gmail.com | 6/26/2020 |
| MNAP Esigned (FOIA 0353-0372) | 71.126.149.50 | Pre-Selected | Grishak301@gmail.com | 8/28/2020 |

40. This metadata shows each document was electronically signed from a computer accessing the internet through the IP address 71.126.149.50. The signature that was used for each of the four documents is "pre-selected" meaning that it is simply a font that Docusign offers to be used as a signature by typing the name. The email address refers to the email address where the Docusign request was sent to. It is my understanding that Plaintiff does not control or use either of the email addresses found within this Docusign metadata.

41. I reviewed a document produced in discovery with bates number BANKFIVENINE 520. This is a Docusing signature of completion that shows similar metadata for a document that had the following metadata:

| Name | IP Address | Signature Adoption | Email Address | Date |
|---|---|---|---|---|
| BANKFIVENINE 520 | 71.126.149.50 | Pre-Selected | Valeria@ariamedspa.com | 2/24/2021 |

42. This metadata shows that this document was electronically signed from a computer accessing the internet through the IP address 71.126.149. The signature that was used for the document is "pre-selected" meaning that it is simply a font that Docusign offers to be used as a signature by typing the name. The email address refers to the email where the Docusign request was sent to. It is my understanding that the email address valeria@ariamedispa.com is under the control of Gunkova.

43. I also reviewed an email sent to me by Gunkova's boyfriend, Jacob Bogatin ("Bogatin") and ccing Jay McDannell on November 16, 2022. Embedded in the email is certain email header metadata that logs what computers the email has passed through from the moment of being sent to my receipt of the email. This email header information shows that Bogatin sent the email from the Static IP address 71.126.149.50. These facts indicate that this IP address is under the custody and control of Gunkova and Bogatin. A copy of the raw email source is attached as **Exhibit 7**.

44. Finally, I was provided three email messages sent from the email account valeria@ariamedispac.com to bbenes@bethunebenes.com between June 15, 2023 and June 16, 2023. Embedded in the email is certain email header metadata that logs what computers the email has passed through from the moment of being sent to my receipt of the email. This email header information shows that the email account valeria@ariamedispa.com sent the email from the Static

IP address 71.126.149.50. These facts further indicate that this IP address is under the custody and control of Gunkova. A copy of the raw email source is attached as **Exhibit 8**.

45. Taken together, this shows that at least between 2021 and 2023, Gunkova and Bogatin conducted electronic activity from the fixed IP address 71.126.149.50 and that this same IP address was used to connect to the internet in order to sign the four Docusign documents in June and August, 2020.

**B. Computer/Media Analysis**

**(i) IT001**

46. On November 22, 2022, Gunkova provided access to a Dell Optiplex 7040 desktop computer with a hard drive bearing serial number 03242218E0378 ("IT001"). While onsite, Vestigant utilized forensic acquisition tools to create a sector by sector forensic image of the hard drive within IT001. The forensic image completed successfully, and all data was captured. After completion of the forensic imaging, Vestigant created a working copy of the device, and all subsequent work was performed on the working copy.

47. As per paragraph (v) of the Order, Vestigant ran search terms in order to identify any active data that existed on IT001 that contained search hits. In addition, paragraph (v) of the Order stated that "Vestigant, LLC shall also conduct a forensic examination of the devices." Vestigant conducted such a forensic examination of IT001.

48. One primary part of a forensic exam of a computer is to attempt to establish a timeline of activity on the device. This timeline of activity can include determining information about the opening or use of documents, the attachment of external devices and/or the destruction of data.

49. I reviewed JumpList and LnkFile entries that showed a Western Digital USB hard drive was attached to IT001 on February 7, 2020. A JumpList entry is a Windows logging function that can show information about files that are opened by a user. This can include the date the file opening occurred, the location of the file, what application was used to open the document and other metadata. LnkFiles are similar artifacts that can indicate when a file is opened by a user. The Western Digital USB hard drive, at the time of connection to the computer had a recorded Volume Serial number of 28CEE36F. Volume Serial numbers are unique identifiers of storage devices. At present, no Western Digital USB hard drive or any hard drive bearing the Volume Serial number of 28CEE36F has been provided to Vestigant for review under the Order. Attached as **Exhibit 9** are artifacts showing the connection and other information gathered from the Western Digital USB hard drive.

50. This also indicates that IT001 was not affected by a RansomWare attack in November, 2020, because if it had been and the computer had been reset (to make the computer "open" or "work")[2], the logs showing the attachment of the USB hard drive on February 7, 2020 would not have been available.

51. I reviewed the Prefetch and UserAssist artifacts on IT001. These artifacts are items that are generated by the Windows operating system that track information about when and what applications are executed on a Windows machine. The review of the Prefetch and UserAssist artifacts show that the application named CCleaner was installed on IT001 CCleaner was run on IT001 at least four times from October 1, 2022 to November 10, 2022. Attached as **Exhibit 10** are artifacts showing the installation and running of CCleaner.

[2] Transcript of Valeria Gunkova, September 30, 2021, p. 324

52. CCleaner is an application that is designed to remove data from a computer and/or other media. Data can be targeted for destruction, including files and folders, temporary files, internet history, as well as other data sources typically containing historical usage of a computer. The use of CCleaner can make it difficult, if not impossible, to know exactly what data has been deleted from a computer or external media. Based upon review of the IT001, it appears that the user has a subscription to CCleaner.

53. Due to the fact that there is evidence that CCleaner was run on IT001 on October 1, 2022 and again on November 10, 2022, it is impossible to know specifically what files and/or artifacts were deleted using the application up to that time or the volume of the files deleted. Any artifacts and/or files deleted are unrecoverable.

54. Typically, a computer running the Windows Operating System keeps track of the USB storage devices being attached to the computer in the System Registry Key. This typically gives information about when the first and last time a USB storage device is attached. In IT001, the only information found in this System Registry Key is for a Generic Flash USB device being attached on November 5, 2022. As noted in paragraph 22, I was able to determine that the user attached Western Digital external hard drive on multiple occasions to IT001. Because there is no entry for a Western Digital external hard drive in this System Registry Key, and a function of CCleaner is to delete this information, it is likely that this connection information was deleted due to the use of CCleaner. As a result, it is impossible to know specifically what files and/or artifacts were transferred to the Western Digital external hard drive.

**(ii) IT002**

55. On November 22, 2022, Gunkova provided access to a Dell Optiplex 7040 desktop computer with a hard drive bearing serial number 03242218C0154 ("IT002"). While onsite, Vestigant utilized forensic acquisition tools to create a sector by sector forensic image of the hard drive within IT002. The forensic image completed successfully and all data was captured. After completion of the forensic imaging, Vestigant created a working copy of the device and all subsequent work was performed on the working copy.

56. As per paragraph (v) of the Order, Vestigant ran search terms in order to identify any active data that existed on IT002 that contained search hits. In addition, paragraph (v) of the Order stated that "Vestigant, LLC shall also conduct a forensic examination of the devices." Vestigant conducted such a forensic examination of IT002.

57. I reviewed JumpList and LnkFile entries that showed a Western Digital USB Hard drive was attached to IT002 on April 10, 2021. The Western Digital USB hard drive, at the time of connection to the computer had a recorded Volume Serial number of 28CEE36F, indicating that this is the same Western Digital USB hard drive attached to IT001 on February 7, 2020. Attached as **Exhibit 11** are artifacts showing the connection and other information gathered from the Western Digital USB hard drive. Based on my review of the LnkFiles, a folder called "BNG" was accessed from the Western Digital USB hard drive. There is evidence of at least 28 files/folders within the "BNG" folder that were accessed from the Western Digital USB hard drive. Without a review of the Western Digital USB hard drive, I am unable to determine the total number of files contained within the "BNG" folder. At present, no Western Digital USB hard drive or any hard drive bearing the Volume Serial number of 28CEE36F has been provided to Vestigant for review under the Order.

58. I reviewed the Prefetch and UserAssist artifacts on IT002. These artifacts are items that are generated by the Windows operating system that track information about when and what applications are executed on a Windows machine. The review of the Prefetch and UserAssist artifacts show that the application CCleaner was installed on or about June 16, 2022. CCleaner was run on IT002 at least 18 times between June 16, 2022 to October 26, 2022. Attached as **Exhibit 12** are artifacts showing the installation and running of CCleaner. Due to the fact that CCleaner was run, it is impossible to know specifically what files and/or artifacts were deleted using the application up to that time or the volume of the files deleted. Any artifacts and/or files deleted are unrecoverable.

59. I reviewed the Recycle Bin on IT002. Typically, when a file or folder is placed in the Recycle Bin, the metadata field known Entry Modified will reflect the date and time the item was placed in the Recycle Bin. There are approximately 85,000 files and folders located within the Recycle Bin. The Entry Modified date of these files and folders is October 26, 2022. This indicates that these approximately 85,000 files were placed in the Recycle Bin on October 26, 2022.

60. I was able to determine the original path of the above-mentioned files in the Recycle Bin. These files were originally located in the path “C:\Users\frontdesk”, another user profile on the computer. It is not technically possible to delete a user profile by placing it in the Recycle Bin while logged in as that user. Therefore, in order for the User folder “frontdesk” to be deleted, the computer had to be logged into the User “ilavtsevich” and that User placed the approximately 85,000 files in the Recycle Bin and emptied it on October 26, 2022.

61. Based on filenames contained within the Recycle Bin with the Entry Modified date of October 26, 2022, there are files and folders that would be responsive to search terms run in accordance to the Order. A spreadsheet of the document names and available metadata is attached as **Exhibit 13**.

**(iii) IT003**

62. On November 22, 2022, Gunkova provided access to a Dell Optiplex 3020 desktop computer with a hard drive bearing serial number S1BHJ9AS914160 ("IT003"). While onsite, Vestigant utilized forensic acquisition tools to create a sector by sector forensic image of the hard drive within IT003. The forensic image completed successfully and all data was captured. After completion of the forensic imaging, Vestigant created a working copy of the device and all subsequent work was performed on the working copy.

63. I reviewed JumpList and LnkFile entries that showed that a Western Digital USB Hard drive was attached to IT003 between September 14, 2020 and November 10, 2022. The Western Digital USB hard drive, at the time of connection to the computer had a recorded Volume Serial number of 64D14DA0, indicating that this is the different Western Digital USB hard drive that was attached to IT001 and IT002. Attached as **Exhibit 14** are artifacts showing the connection and other information gathered from the Western Digital USB hard drive. Without a review of the Western Digital USB hard drive, I am unable to determine the total number of files or folders on the Western Digital USB hard drive. At present, no Western Digital USB hard drive or any hard drive bearing the Volume Serial number of 64D14DA0 has been provided to Vestigant for review under the Order.

64. I reviewed the registry on IT003. The Windows Registry maintains certain information that can indicate when a USB thumb drive is attached to a computer. I was able to determine that a generic USB device with the Volume serial number of 3017966403&0 was attached to IT003 on October 28, 2022. While Vestigant was provided with USB thumb drives in December 2022, a USB thumb drive with the Volume serial number 3017966403&0 was not and to date, has not been provided for review. Without a review of the USB thumb drive, I am unable to determine the total number of files or folders on the USB thumb drive.

**(iv) IT005**

65. On November 22, 2022, Gunkova provided access to a Dell Optiplex 7050 desktop computer bearing serial number AS21030802731 ("IT005"). While onsite, Vestigant utilized forensic acquisition tools to create a sector by sector forensic image of the hard drive within IT005. The forensic image completed successfully and all data was captured. After completion of the forensic imaging, Vestigant created a working copy of the device and all subsequent work was performed on the working copy.

66. I reviewed the Prefetch and UserAssist artifacts on IT005. These artifacts are items that are generated by the Windows operating system that track information about when and what applications are executed on a Windows machine. The review of Prefetch and UserAssist artifacts show that the application CCleaner was installed on or around July 3, 2022. There is also evidence in the internet history of IT005 that CCleaner was downloaded on November 8, 2022. CCleaner was run on IT005 at least eight times from July 3, 2022 to November 8, 2022. Attached as **Exhibit 15** are artifacts showing the searching, downloading, installation and running of CCleaner. Due to the fact that CCleaner was run, it is impossible to know specifically what files and/or artifacts

were deleted using the application up to that time or the volume of the files deleted. Any artifacts and/or files deleted are unrecoverable.

67. CCleaner has a user selectable function that specifically deletes and overwrites all data about files and folders. This function must be set by the user and it causes all file and folder data to be securely overwritten beyond recovery, as well as change the operating system metadata of the files. Specifically, any file or folder that is deleted while this setting is enabled will have its name changed to some iteration of ZZZZZ.ZZZ. This specifically prevents a forensic examiner from being able to determine metadata about the deleted data and also makes the data unrecoverable.

68. I determined that there were at least 122,564 deleted files that had the naming convention of ZZZZZ.ZZZ. All deleted files with such naming convention had their date and time stamps updated on November 8, 2022. This indicates that the user ran CCleaner and deleted at least 122,564 files and folders utilizing the secure delete function on November 8, 2022, ensuring that this data could not be recovered or identified. A list of the files with this naming convention from IT005 is attached as **Exhibit 16**. Due to the fact that CCleaner was run in this fashion, it is impossible to know specifically what files and/or artifacts were deleted. These 122,564 artifacts and/or files deleted are unrecoverable.

**(v) IT027 External USB Thumb Drive**

69. On December 14, 2022 Gunkova provided access to a Generic USB Thumb Drive with no identifiable internal serial number ("IT027"). While onsite, Vestigant utilized forensic acquisition tools to create a sector by sector forensic image of the USB Thumb Drive IT027. The forensic image completed successfully and all data was captured. After completion of the forensic

imaging, Vestigant created a working copy of the device and all subsequent work was performed on the working copy.

70. I reviewed IT027 for evidence of data destruction on the device. Based upon the metadata of files on IT027, it appears that the tool CCleaner was run in order to overwrite Unallocated Space on the device.

71. When a file is deleted, until the data contained within the file is overwritten by new data, it may be possible to recover the file. The data of a deleted file resides in "Unallocated Space", or the area of the device where new data is allowed to be written. CCleaner has a function that allows for a user to write random data to Unallocated Space in order to prevent any deleted data from being recoverable. It does this by creating large (1GB) files filled with random data thus overwriting the space that these files now take up. These files created by CCleaner have a particular naming convention that is consistent with the use of the application.

72. On IT027, I determined that there were seven files with the CCleaner naming convention that existed on IT027. These files had a total size of 7.4GB. The total size of Unallocated Space was 7.4 GB. These files were Created and Deleted on December 14, 2022 at 9:03 AM. This indicates that CCleaner was run to overwrite Unallocated Space on December 14, 2022 at 9:03 AM which would prevent the recovery of any deleted files on IT027. Given that the forensic image of this device was made on December 14, 2022 at 10:27 AM, this activity occurred immediately prior to Vestigant taking possession of the device. A full file listing of this device is attached as **Exhibit 17.** Due to the fact that CCleaner was run, it is impossible to know specifically what files and/or artifacts were deleted using the application up to that time or the volume of the files deleted.

## VII. CONCLUSION

73. There is evidence that certain documents produced by Gunkova in electronic format cannot be authenticated as existing prior to their internal Modify Date.

74. There is evidence that shows that Gunkova's statements about a RansomWare attack that corrupted/prevented access to all computers/media in November, 2020 are not accurate. Certain data and metadata indicate that information has been provided that existed prior to November, 2020 on devices in possession of Gunkova.

75. There is evidence that Plaintiff's signature was copied and embedded in documents in that were provided by Gunkova in discovery in the Loudoun Case.

76. There is evidence that the Notary signature and stamp of Fatima El-Hage was copied and embedded in documents that were provided by Gunkova in discovery in the Loudoun Case.

77. There is evidence that the IP address 71.126.149/50 is under custody and control of Gunkova and that multiple documents were electronically signed from the IP address, including documents allegedly esigned by Plaintiff.

78. There is evidence that the data destruction tool CCleaner was used on IT001, IT002, IT005 and IT027 to permanently overwrite data on these devices. Based upon my review, all such activity took place between June 2021 and December 2022. Any data that was destroyed and overwritten is unrecoverable.

79. There is evidence that at least 85,000 files/folders and an entire user profile were manually placed into the Recycle Bin for deletion on October 26, 2022.

80. There is evidence that multiple USB external hard drives were attached to computers between March 2020 and 2022 and these USB external hard drives were not provided by Gunkova as required under the Order. There is evidence in some cases, files were opened that existed on these USB external hard drives that had file names and/or paths that would have been responsive to search terms run in accordance to the Order. As a result of Gunkova's failure to identify and turn over the devices, the responsive data contained on those devices is not available.

J. Christopher Racich
Vestigant, LLC