IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)

| | | |
|---|---|---|
| In re | ) | Case No. 23-01062-BFK |
| | ) | Alexandria, Virginia |
| VALERIA V. GUNKOVA, | ) | |
| | ) | |
| Debtor. | ) | June 18, 2024 |
| | ) | 11:04 AM |
| -------------------------------- | ) | |
| HARRY KAMIN, | ) | Adv. Proc. 23-01062-BFK |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| VALERIA V. GUNKOVA, | ) | |
| | ) | |
| Defendant. | ) | |
| -------------------------------- | ) | |

TRANSCRIPT OF HEARING ON
FINAL PRE-TRIAL CONFERENCE
#53 PLAINTIFF'S MOTION FOR SANCTIONS DUE TO DEFENDANT'S
SPOLIATION OF EVIDENCE
BEFORE THE HONORABLE BRIAN F. KENNEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: NANCY GREENE, ESQ.
N D GREENE PC
3977 Chain Bridge Road
Suite 1
Fairfax, VA 22030

For the Plaintiff: BETHANY R. BENES, ESQ.
TRACEY M. OHM, ESQ.
BETHUNE BENES, PLLC
3975 Fair Ridge Drive
South Building 246
Fairfax, VA 22033

Transcription Services: eScribers, LLC
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

THE COURT: Good morning. Let's call our 11:00 matters, please.

THE CLERK: Item Number 19 and 20, Kamin vs. Gunkova, adversary case number 23-1062.

THE COURT: All right. Ms. Greene, good morning.

MS. GREENE: Good morning, Your Honor. Nancy Greene, on behalf of the debtor, Valeria Gunkova.

MS. BENES: Good morning, Your Honor. Bethany Benes, on behalf of Harry Kamin, individually, and derivatively on behalf of BNG Group, LLC.

THE COURT: Okay. Good morning.

MS. OHM: And good morning, Your Honor. Tracy Ohm, also on behalf of Harry Kamin and BNG.

THE COURT: All right. Good morning everybody.

MS. BENES: Good morning.

THE COURT: We have two things on the matter, on the docket this morning, the first of which is the final pre-trial in this adversary proceeding. And then we have the motion for a sanctions due to alleged spoliation of evidence. So let's start with the pre-trial.

MS. GREENE: Yes, Your Honor.

THE COURT: And how long do you expect this case to take for a trial, Ms. Greene?

MS. GREENE: Well, I will defer the initial estimate to Plaintiffs.

THE COURT: Okay. Ms. Benes, how long do you think it'll take?

MS. BENES: Your Honor, I know that it was set in the Loudoun County Court, and there's a much overlap with that case. It was set for ten days, and it was argued by the Debtor in that case that they needed fourteen days. I don't --

THE COURT: There's no way. There's no way.

MS. BENES: I don't think it --

THE COURT: I'll tell you what we -- here's what we can do. Because I just don't have fourteen -- I never have fourteen days in a row on my calendar.

MS. BENES: Agreed.

THE COURT: We can either set it for two or three days with the expectation that it should be tried within that period of time. Or I can just set it for a first day, and then we just keep going from day-to-day until we're finished. But I warn you about that, both sides. I'm not negotiating dates once we start a trial. In other words, I might tell you to be here at 9:30 the next morning. I might tell you to be here 9:30 on Monday, Tuesday, Wednesday, whatever. I'm just going to tell you that you have to be here because we're in the middle of a trial. And as I say, I'm not ever -- I'm not negotiating trial dates every time we hit 5:00 in the afternoon.

So what would you prefer to do, Ms. Benes? Ms.

Benes --

MS. BENES: I'm fine with either way, Your Honor, I don't have a preference, to be honest.

THE COURT: But you're telling me it's a fourteen-day trial?

MS. BENES: Well, that was the position that was taken by Ms. Gunkova in the Loudoun County case. I disagree with that.

THE COURT: But you're the plaintiff. What's your estimate of trial time?

MS. BENES: I would say four days.

MS. GREENE: Yeah, I would have said that this was a three-day objection to discharge trial at four at the very tops. Not knowing the Loudoun --

THE COURT: All right, we can accommodate that.

MS. GREENE: The one thing in setting it is we do have a motion for protective order and to quash on two subpoenas outstanding. We have not gotten dates from Ms. Benes as to her availability to have that heard, which will impact, obviously, on getting a trial date set, because if we owe her the responses on those subpoenas, or -- then that will impact their ability a little bit. And I know we're having trouble with July and August dates as to travel schedules.

THE COURT: Well, we'll set it out far enough to accommodate that or --

MS. GREENE: Because I do have the calendar this time.

THE COURT: I'm happy to hear that.

MS. GREENE: Me too. See the number of double checking on that is a little obscene.

THE COURT: All right. How about starting with October 17 and 18 and then going into -- let's set it for three days. And if we need a fourth, we'll have a fourth. October, 17, 18, 21.

MS. BENES: That works for Mr. Kamin.

MS. GREENE: Yeah, I'm just returning from India on the 14th, but I can make the 17, 18, and 21 work.

THE COURT: All right.

MS. GREENE: Ms. Gunkova, does that work for you? Okay.

THE COURT: All right. So this is getting written down in stone, as they say. October 17, 18, and 21.

MS. BENES: Thank you, Your Honor.

MS. GREENE: Thank you, Your Honor.

THE COURT: And --

MS. GREENE: What time to start?

THE COURT: They all start at 9:30.

MS. GREENE: Okay.

THE COURT: And I will require that exhibit lists and exhibits be exchanged and witness lists by October 11th.

MS. GREENE: Okay.

THE COURT: With objections due, if any, by October 15th, and if no objections to a particular exhibit, the exhibit will be admitted into evidence without further seeking to admit it into evidence. All right. Anything else that you can think of, Ms. Greene to cover in a final pre-trial order?

MS. GREENE: No. Like I said, the only thing outstanding that would have affected the date was, again, the outstanding motion to quash on the subpoenas. But we're far enough out that even if we have to push to a later motions date on that in August we should be fine.

THE COURT: Again, we can deal with that.

Ms. Benes, anything else that you think we should cover?

MS. BENES: No. We're still waiting for deposition dates for Ms. Gunkova but I think between counsel, we can work that out. And there's plenty of time, if necessary, for motions practice to be heard on that.

THE COURT: Okay. Well, hopefully --

MS. GREENE: Hopefully not.

THE COURT: -- we won't have motions practice over agreeing on a date for a deposition.

MS. BENES: I agree.

MS. GREENE: We should be able to do that while we're here. The only concern is one of the dates provided was a date that was potentially available -- that everyone was available

for the hearing on the disclosure statement. And so I didn't want to book that for a deposition, if that's the only date that everyone's available for the disclosure statement, because the July 30th date you proposed to move that too is a day I'm in court in another court, so --

THE COURT: Well, we suggested that it might be available. But all right. You have a motion pending to continue the disclosure statement --

MS. GREENE: Right.

THE COURT: -- hearing, which is set for when?

MS. GREENE: The 25th. But Ms. Ohm and Ms. Benes are both not available on that date. So we were trying to look at another date that that could -- by agreement.

THE COURT: Well, I would think that you could be able to --

MS. GREENE: Have their avoid dates.

THE COURT: -- agree on calendar dates.

And Ms. Ohm, you're with a pretty big law firm, aren't you?

MS. OHM: I am, Your Honor. And also --

THE COURT: And you're not the only bankruptcy lawyer in your law firm, I think.

MS. BENES: She is our favorite though.

MS. GREENE: Fair enough.

THE COURT: Good point.

MS. OHM: Your Honor. And on Tuesday, if the Court might entertain an application to appear remotely. I could do that. I'm out on vacation.

THE COURT: I will entertain that. Go ahead. And we have a form for that.

MS. OHM: Yeah.

THE COURT: Go ahead and submit that as soon as you can.

MS. OHM: Thank you, Your Honor.

THE COURT: That's fine.

MS. GREENE: Okay.

MS. BENES: Alternatively, Your Honor all the attorneys in the case had provided Ms. Greene with July 24th as an available date, if that worked for the Court.

MS. GREENE: Yes.

MS. BENES: If that worked for the Court then we --

THE COURT: The 24th is a Wednesday? That's not a motions day.

MS. BENES: The 24th, correct. If it could be specially set, everybody is available that day. If not, we will have the appropriate attorneys appear on June 25th.

THE COURT: All right. Well --

MS. GREENE: With calendars.

THE COURT: -- it's set for the motion to continue the disclosure statement hearing is set for the 25th.

MS. BENES: Yes.

THE COURT: I'm going to leave it where it is.

MS. BENES: Okay.

THE COURT: I will entertain a -- I'll just tell you up, I'll allow a remote appearance. I don't have a problem with that.

MS. GREENE: All right.

THE COURT: So go ahead and submit that form, though, so we know that you're going to be calling in.

MS. OHM: Yeah.

THE COURT: And we'll leave that where it is, and the Court will issue an order on the trial dates.

MS. GREENE: Thank you, Your Honor.

MS. BENES: Thank you, Your Honor.

THE COURT: Okay. Thank you. All right.

Then, let's turn to the spoliation motion, Ms. Benes?

MS. BENES: Yes. Your Honor, first I'd ask for the rule on witnesses pursuant to Federal Rule of Evidence 615. Specifically --

THE COURT: Ms. Greene, any opposition to that?

MS. GREENE: Not at all.

THE COURT: All right. That'll be granted. Anybody who's in the courtroom who is not a party, the parties are entitled to stay at the table. Ms. Gunkova, you're entitled to stay in the courtroom or experts. Experts, I don't think this

is true in state court, but in federal court, experts are entitled to stay in the courtroom.

Mr. Bogatin, if you're going to be a witness, then I'll ask you to go out and wait in our witness room in the hallway. We'll call you when needed. In the meantime, we might be taking breaks. We'll probably take a lunch break. Do not discuss the case with any of the lawyers, Mr. Bogatin --

MS. GREENE: Hold up, Jacob.

THE COURT: In the meantime, do not discuss the case with any of the lawyers or any of the other people who are in the courtroom. Do you understand, Mr. Bogatin?

MR. BOGATIN: (Indiscernible).

THE COURT: Could you come forward, please, to the podium so that you can hear me? All right. Can you hear me?

MS. GREENE: You have to say yes --

MR. BOGATIN: Yes.

MS. GREENE: -- or no.

THE COURT: All right. I'm asking you to go out to our witness room and wait until you're called. In the meantime, do not discuss the case with any of the lawyers or any of the people who are still in the courtroom. Do you understand?

MR. BOGATIN: Yes.

THE COURT: Okay. Thank you, sir.

MS. GREENE: Thank you, Your Honor.

THE COURT: All right. Ms. Benes.

MS. BENES: Your Honor, we're here on a motion for sanctions due to the Defendant, Ms. Gunkova's spoliation of evidence. Ms. Gunkova's, opposition filed with this Court admits that she did spoliation evidence. She admits the CCleaner was installed and run. And she then admits, "It should have been turned off and its use suspended upon receipt of the litigation hold letter in February 2021." That's at opposition page 2. She then asserts that, "It simply wasn't due to inadvertence."

So at issue before, Your Honor, is not whether she had a duty to preserve. She admits that she did. And at issue is not whether CCleaner was installed and run. She admits that it was the timing and volume of the spoliation in this case tells the Court that it wasn't just due to inadvertence, as she alleges. You will hear from expert Christopher Racich (sic) of Vestigant, LLC. Mr. Racich is an expert in computer forensics. He has extensive experience in spoliation cases.

THE COURT: Well, what's the last name? I'm sorry.

MS. BENES: Racich, R-A-C-I-C-H.

THE COURT: Okay.

MS. BENES: He is in the first row of the courtroom this morning. He has an extensive experience in spoliation cases, including cases in the Eastern District of Virginia and the bankruptcy court. He has a history with this case. He has

seen us through this case, including the prior state court litigation that is directly tied to this case. He will tell you the relevant background of the Loudoun County case and Ms. Gunkova's duty to preserve, including the numerous compel orders that were entered, the forensic order that was entered by the Loudoun County Court that she was under a duty to preserve as early as February 2021, and that all along the way she failed to comply with the Court's orders. She failed to comply with the forensic order, she failed to comply with the forensic process. And Mr. Racich will tell you that ultimately, he was able to determine an egregious data destruction that took place at the hands of Ms. Gunkova.

There were eight relevant physical devices that Mr. Racich will tell you about. Four desktop computers, one thumb drive, three external hard drives, numerous cloud services, including email addresses identified by Ms. Gunkova under oath in her prior depositions that Ms. Gunkova indicated were used to conduct BNG business that were not turned over to Mr. Racich for analysis. Mr. Racich will tell you about the three external hard drives that Ms. Gunkova did not identify pursuant to the order, which she was required to do, but that Vestigant was able to uncover as part of the forensic process.

He will tell you that it was attached to Ms. Gunkova's devices that were subject to the order eleven times, at least eleven times, after the litigation was filed. Yet it was --

these hard drives were never turned over. To date, standing here today, they have never been turned over notwithstanding that we also requested them in discovery in this case.

Mr. Racich will tell you about the CCleaner installation and running. CCleaner is a data destruction software. Its sole purpose is to destroy evidence. He will tell you that he was able to find through the forensic process, that the software was not run on a regular maintenance schedule as alleged. Instead, it was installed and run manually. On some devices it was installed and inactive for months until conveniently, the forensic motion was filed in September of 2022. And not only installed and run after the forensic motion was filed and pending, but then after the Loudoun County Circuit Court entered the forensic order compelling Ms. Gunkova to turn over all devices.

The devices were subject to the forensic order and Ms. Gunkova, through the use of CCleaner, intentionally destroyed evidence through the features of CCleaner, including manually-selected features such as the secure delete function, and the deletion unallocated space, all of which Mr. Racich will explain the relevance and importance of.

He will tell you that he found that an entire user profile and 85,000 files were deleted through the recycle bin feature on Ms. Gunkova's computer, the day after the forensic order was entered.

THE COURT: Can you give me the date of the forensic order, please?

MS. BENES: October 25th, 2022.

THE COURT: Thank you.

MS. BENES: And we do have a demonstrative, Your Honor. I'll hand out of a timeline that will help piece all of these pieces together.

THE COURT: Okay. Thank you.

MS. BENES: Mr. Racich will tell you that we know that the data lost some of what we're able to tell was relevant because while the recycle bin items were placed, the 85,000 files were placed in the recycle bin. Mr. Racich was able to retrieve those files. And through the file names that Your Honor will see, the file names matched the search terms subject to the October 25th, 2022 forensic order. The day after that order she attempted -- she ran CCleaner, and attempted to delete material that was specifically responsive to the search terms.

We are still missing key data and documents, including originals of the forged documents in this case. I think the last count we were at was fifty-nine. We are asking for default judgment, Your Honor, which I know is a harsh sanction, but in this case it is more than appropriate. The standard before the Court is either that the conduct was egregious, or the effect of the spoliation was so prejudicial. Here, we have

both. Here, we are confident that the evidence will show that default judgment is appropriate. And we ask, in closing, Your Honor, that the Court grant the motion.

THE COURT: Thank you. Ms. Greene?

MS. GREENE: One of the critical things to note in this case is that the computers that we're talking about here are not Ms. Gunkova's personal computers. They are BNG's, and Aria, well, Skin Logic LLC's, commonly known as Aria's (sic). The Loudoun County order specifically required Ms. Gunkova to turn over, "Electronic devices and cloud services containing or used to conduct the business of BNG Group, LLC." It did not require to turn over USB drives, did not require her to turn over external hard drives. Those aren't electronic devices. When the issue came up, you'll see that Vestigant noticed that they were, the USB drives, were attached to the computers on December 1st, 2022. They asked for USB drives, eighteen were identified and one hard drive. And that next day on December 2nd and were made available for Vestigant to come and source.

This is not a Defendant who is hiding information. What you will also find is that approximately a year before the Court ordered investigation, Ms. Gunkova offered to have a third party come in and copy all emails related to be BNG, and at proposed a method where they would do that for all Ms. Gunkova's and BNG's communications, and Mr. Kamin's communications. And that proposal was rejected by the

Plaintiff because they didn't want to share the cost for it.

Again, this is not the conduct of a Defendant who is trying to hide information. In fact, she produced over 66,000 pages of documents in the underlying case and 35,000 documents through the SI production -- sorry, the forensic imaging. You'll find -- you'll hear testimony that there was problems with the Vestigant production because what they were hired to do was a forensic examination on the ESI poll.

THE COURT: Could you say that again?

MS. GREENE: They were hired to do a forensic imaging and examination and not an ESI poll. So once the doc -- once Vestigant did their job and imaged the drives, more had to be done before that information could be usable. And that there was significant communications between counsel for the parties, Vestigant, and then the third-party ESI provider that Ms. Gunkova had to hire to make that database accessible so she could do the privilege review and turn it -- and release that 35,000 documents.

Ms. Benes referenced that there was a file folder that was found in a recycle bin. Well, that's not lost or spoiled documents. Those documents were available. Ms. Benes talks about well, we found fifty-nine documents that were forged. Those documents aren't filed. They're available. In fact, Ms. Benes has gone through her forty, almost forty subpoenas. This isn't a party who can't prove their case.

And while Silvestri is written in the disjunctive, when you look at the cases, in fact, the only time the draconian sanction of spoilation and default has happened is when it's actually conjunctive. Right, egregious conduct and the party can't prove their case because and the reason for that is the party who's the injury is to the judicial system. Right? You weigh that into effect.

This is not a Defendant who has thumbed its nose at the system. This is a Defendant who has worked tirelessly. You're going to see those efforts, including monthly voluntary statements to BNG and Kamin as to what's going on, and providing emails voluntarily as to supplementations that get real granular as to what Bates number per lender that they were providing. Yes, I mean, we're not arguing that CCleaner was some of the computers and CCleaner should have been turned off. We can't. Right? But that's not because Ms. Gunkova intended to destroy evidence.

It's because Ms. Gunkova is not an IT person and had an IT person in house. I mean, we can't, so -- right. We're not even arguing. There's omissions in the Loudoun case as to which documents that she's admitted Mr. Kamin did not personally sign. That's in front of you. That will be in front of you. That have been asked as part of the admission. So this is a Defendant who's participated in discovery and every response she gives is well, that's the response she gets

back from Plaintiffs was that isn't enough. Give me more. She can't give any more.

Did she make a mistake in the discovery process? Absolutely. That's simple negligence. That's not the kind of conduct the courts have found are worthy of having her case taken away from her, especially in this context. So we would ultimately ask that the Court deny the type of sanctions that are being requested here. Thank you.

THE COURT: Okay. Thank you. Ms. Benes, your first witness?

MS. BENES: Yes, Your Honor, we'd like to call Christopher Racich.

THE COURT: Mr. Racich, would you come forward and raise your right hand, please?

(Witness sworn)

THE COURT: All right. Go to our witness stand over on this side, please.

MS. BENES: Your Honor, you should have a binder, Plaintiff's exhibits?

THE COURT: I do, thank you.

MS. BENES: Thank you. We will be referring to these extensively.

DIRECT EXAMINATION

BY MS. BENES:

Q. Good morning, Mr. Racich. Can you please introduce

yourself to the Court?
A. My name is John Christopher Racich. I'm the president and CEO of Vestigant, LLC.
Q. And can you explain to the Court what Vestigant, LLC is?
A. Vestigant is a computer forensic and electronic discovery consulting company that assists with computer forensic investigations, electronic discovery issues that come up dealing with spoliation, the transfer of data, and the use of computer devices with regard to litigation.
Q. Mr. Racich, you should have a binder in front of you entitled Plaintiff's Exhibits?
A. Yes.
Q. And I'd ask you to turn to tab 1.
A. Yes.
Q. And turn to the exhibit that is pre-marked for identification purposes as Exhibit 1?
A. Yeah.
Q. Can you tell the Court what exhibit one is?
A. This is my CV curriculum vitae. And this looks to be the most current one. Yes.
Q. Can you tell the Court, prior to opening Vestigant in 2009, your employment history with relevance to spoliation or computer forensics?
A. So I started working in the computer forensic field back in 1997 for Kroll Associates, which in turn, I left in 2001 and

began working with a investigation firm named Corefax (ph.) I worked with Corefax for about eight years, although it had been purchased by First Advantage in the meantime. Eventually being a vice president of computer forensics, essentially for First Advantage. And then I started Vestigant in 2009.

Q. And while you were at Kroll, did you engage in duties for computer forensics and spoliation issues?

A. Yes, I've done -- I've done a number of -- many, many cases dealing with those issues over the course of my entire career, all the way back to the beginning.

Q. Okay. Do you have any -- hold any licenses or certifications?

A. I'm currently barred in New York and the District of Columbia. And I have different certifications for different types of software specific forensic applications, X-Ways, encase. I also have had certifications like the Certified Computer Examiner dealing with the regional computer forensics group, the High Tech Crime Investigation Association. Over the course of my career.

Q. You said barred. Do you mean as an attorney?

A. Yes.

Q. Are you a practicing attorney?

A. I hold -- I hold the bar for those two jurisdictions as well as the Supreme Court bar, but I don't practice on a day-to-day basis. I don't -- I don't work as an attorney.

Q. Would you say that your main employment is computer forensics investigant (sic)?
A. Yes.
Q. Have you ever qualified as an expert in the field of computer forensics or eDiscovery?
A. Yes.
Q. How many times?
A. I think at last count, I was at fifty times I've qualified in different courts, arbitration bodies, international arbitration bodies.
Q. And does your work as an expert exceed the times you've qualified? For example, have you been deposed or designated but not necessarily come to give testimony in a case?
A. Deposed? Yes. I've been deposed in another forty odd times. I think I'm at about one hundred times where I've testified in some way, shape, or form. As far as been proffered as an expert, a lot more than that. There's a lot of -- a lot of times where it doesn't go to trial, so I don't actually get called.
Q. Have you ever been disqualified or not had your opinion accepted by a court or judicial body?
A. No.
MS. GREENE: Objection. Compound.
THE COURT: Overruled.
A. No.

Q. Thank you. Have you ever testified as an expert before in a matter involving spoliation of evidence or data destruction?
A. Yes.
Q. How many times?
A. Of the fifty times where I've qualified at least twenty-five of those probably have dealt with spoliation in some way, shape, or form.
Q. Have you ever testified as an expert before in the Eastern District of Virginia regarding spoliation issues?
A. Yes.
Q. Have you ever testified in a bankruptcy court involving spoliation issues?
A. Yes. Dealing with a lot of different issues. But yes, in the Southern District of New York, I did testify in a bankruptcy case.
MS. BENES: Your Honor, we'd move for Mr. Racich to be designated as an expert in the field of computer forensics and eDiscovery.
MS. GREENE: No object --
THE COURT: Is there any objection or would you like voir dire the witness?
MS. GREENE: No objection.
THE COURT: All right. He will be so qualified.
MS. BENES: We'd move for the admission of Exhibit 1.
THE COURT: Any objection?

MS. GREENE: No.

THE COURT: It will be admitted.

(Mr. Racich's CV was hereby received into evidence as Plaintiff's Exhibit 1, as of this date)

Q. Mr. Racich, were you engaged by Mr. Harry Kamin, that's my client, to perform certain analysis with regards to a case filed by Mr. Kamin against the Defendant here, Ms. Gunkova, in the Loudoun County Circuit Court?

A. Yes.

Q. Do you recall when that was?

A. I believe that was in -- we were engaged in June of -- of 2021, I believe.

Q. During your engagement, did you come to learn that Mr. Kamin had sent Ms. Gunkova a letter in February of 2021, prior to filing suit?

A. Yes.

Q. Can you turn to what has been pre-marked for identification purposes as Exhibit 2? Move for -- I'm sorry. Exhibit 2.

A. Yes.

Q. Do you recognize this document?

A. I do.

Q. Did you review this document during your engagement?

A. Yes.

Q. Can you tell the Court what Exhibit 2 is?

MS. GREENE: Objection. Foundation and hearsay.

He -- it's not addressed to him, and he's not a party to it. He's about to testify about it.

MS. BENES: So as an -- would you like me to respond, Your Honor?

THE COURT: Yes. Would you?

MS. BENES: Experts are allowed to rely on documents, including hearsay documents. He has already been qualified as an expert in this Court. I did ask him if he reviewed the letter during his engagement. And so I'd ask Your Honor to overrule the objection.

THE COURT: I think that's right. I will overrule the objection. You can answer.

A. Yes, I did review this over the course of the engagement. And this document is dealing with the request for --

MS. GREENE: Objection exceeds the scope of the question.

THE COURT: Overruled. You can continue, please.

A. This -- this document I reviewed for the purpose of identifying the fact that documents were being requested for the course of the litigation.

MS. BENES: Move for the admission of Exhibit 2.

THE COURT: Is there any objection?

MS. GREENE: Objection. Foundation.

THE COURT: Overruled. It will be admitted.

(Request for documents was hereby received into evidence as

Plaintiff's Exhibit 2, as of this date)
MS. BENES: Thank you, Your Honor.
Q. Mr. Racich, are you aware that Mr. Kamin eventually filed suit against Mr. Gunkova in March of 2021?
A. Yes.
Q. During your engagement, did you come to learn that there were various discovery issues that the Loudoun County Court had to rule upon?
A. Yes.
Q. I'm going to ask you to turn to Exhibit 3.
A. All right.
Q. Do you recognize Exhibit 3?
A. Yes.
Q. Did you review Exhibit 3 during the course of your engagement?
A. I did.
Q. And can you tell the Court what Exhibit 3 is?
A. This is one of the motion -- motion to compels that was filed with regard to gaining access to documents from Ms. Gunkova.
Q. Was this the order that was entered on June 7th, 2021?
A. Yes.
MS. GREENE: Objection. The document speaks for itself.
THE COURT: Overruled. You can continue please.

A. Yes.
Q. Turning to -- move for the admission of Exhibit 3.
THE COURT: Is there any objection?
MS. GREENE: No.
THE COURT: It will be admitted.
(Motion to compel was hereby received into evidence as Plaintiff's Exhibit 3, as of this date)
Q. You could, Mr. Racich, will you turn to Exhibit 4?
A. Yes.
Q. Do you recognize Exhibit 4?
A. Yes.
Q. Did you review Exhibit 4 during your engagement?
A. Yes, I did.
Q. And can you tell the Court what Exhibit 4 is?
A. Yes. This is an order with regards to the first motion to compel that was entered into the Loudoun County Court as far as what we were just discussing earlier.
Q. Is that entered on the 4th of August, 2021, page 4?
A. Yes.
Q. Move for the admission of Exhibit 4.
MS. GREENE: No objection.
THE COURT: Any objection?
MS. GREENE: No objection.
THE COURT: It will be admitted.
(Order regarding first motion to compel was hereby received

into evidence as Plaintiff's Exhibit 4, as of this date)
Q. Can you turn to Exhibit 5, Mr. Racich?
A. Yes.
Q. Do you recognize Exhibit 5?
A. Yes.
Q. And did you review Exhibit 5 during your engagement?
A. I did.
Q. Can you tell the Court what Exhibit 5 is?
A. This is again, another order with regard to, in this case, the third motion to compel for Ms. Gunkova to turn over documents that were lacking in production.
Q. Is that dated March 18th, 2022?
A. Yes.
Q. Move for the admission of Exhibit 5.
THE COURT: Any objection?
MS. GREENE: No, Your Honor.
THE COURT: It will be admitted.
(Order with regard to third motion to compel was hereby received into evidence as Plaintiff's Exhibit 5, as of this date)
Q. Mr. Racich, during your engagement, did you ever visit the office building owned by BNG Group, LLC?
A. Yes. I'm -- on one -- at one time.
Q. Can you tell the Court about the first time you visited the building?

A. It was in December of 2021. You, and I, and -- and Mr. Kamin went to a members meeting that was being held at the building there. And I was there with equipment and being prepared to make forensic images and extractions of data that existed on site, if possible.
Q. And was the request made to Ms. Gunkova to forensically image the computers on that day?
A. Yes.
Q. And was Ms. Gunkova present that day?
A. Yes.
Q. Did Ms. Gunkova permit you to forensically image the computers while you were there in December of 2021?
A. Well, through her counsel, Mr. McDannell, he did not allow us to -- to create forensic images at that time.
Q. Did you continue to assist Mr. Kamin in his efforts to get the BNG computers forensically analyzed?
A. Yes. That was the goal was to get the devices imaged extracted data that was relevant for the litigation.
Q. Can you tell the Court what additional efforts you were involved in?
A. Over the course of time, Vestigant attempted to -- assisted with the -- the process to try to get access to the -- the devices, including up into attending hearings and trying to get access to the -- to the devices. I'm not -- yeah.
Q. Did Ms. Gunkova ever voluntarily give up the devices before

a court order entered compelling her to do so?
A. Not that I'm aware of.
Q. Can you turn to Exhibit 6, please?
A. Yes.
Q. Do you recognize Exhibit 6?
A. Yes.
Q. Did you review Exhibit 6 during the course of your engagement?
A. Yes.
Q. Were you involved in the motion for sanctions and to compel inspection of electronic devices for forensic analysis?
A. Yes. This was the September motion. Yes.
Q. This was dated September 9th, 2022?
A. Yes, I believe that's correct.
MS. BENES: Move for the admission of Exhibit 6.
THE COURT: Any objection?
MS. GREENE: No, Your Honor.
THE COURT: It will be admitted.
(September 9th Motion was hereby received into evidence as Plaintiff's Exhibit 6, as of this date)
Q. Ultimately, are you aware of whether Ms. Gunkova filed an opposition to this motion?
A. I believe so.
Q. Did you attend the hearing that was scheduled regarding that matter?

A. Yes. There was a hearing on October 25th, I believe.
Q. October 25th, 2022?
A. Yes. I apologize. Yes.
Q. Did you attend that hearing?
A. Yes.
Q. Did the court grant Mr. Kamin's forensic motion, as we call it?
A. Yes.
Q. Can you turn to Exhibit 7, please?
A. Yes.
Q. Do you recognize Exhibit 7?
A. Yes.
Q. Can you tell the Court what Exhibit 7 is?
A. This is the order that we -- you and I and Mr. McDannell -- worked on after the hearing to -- with regard to gaining access to the devices for -- from Ms. Gunkova.
Q. Is this the order granting the forensic motion?
A. Yes.
Q. And you touched on it briefly. Can you explain to the Court how this was drafted, who was involved, where we were?
A. After -- after the -- the hearing, you and I and Mr. McDannell sat down and worked out the language as to -- and the timing to try to gain access to Ms. Gunkova's devices.
Q. This was a team effort as far as drafting this order? Mr. McDannell was involved, right?

A. Yes. Everybody -- yeah. The three of us were.

MS. BENES: Move for the admission of Exhibit 7.

THE COURT: Any objection?

MS. GREENE: No, Your Honor.

THE COURT: It will be admitted.

(Forensic order was hereby received into evidence as Plaintiff's Exhibit 7, as of this date)

Q. Looking at the order that compels Ms. Gunkova to turn over -- I'm under Subsection 2 of "it is hereby ordered" -- Ms. Gunkova to provide "all electronic devices and iCloud services containing and/or used to conduct business on behalf of BNG Group, LLC, including, but not limited to, the company devices referred to in the motion", and those are defined as devices. Do you see that?

A. Yes.

Q. Can you explain to the Court what an electronic device is?

A. From a computer forensic and an electronic discovery point of view, electronic devices are -- deal with data storage of information. So it will be computers, servers, network areas -- network-attached storage, USB storage devices, thumb drives, hard drives, cloud-based systems. All of those would be -- typically fall under electronic devices.

Q. You heard an opening statement. Ms. Gunkova's counsel indicated the thumb drives were not electronic devices; is that accurate?

A. Not in my experience.
Q. Can you explain to the Court what cloud services would include?
A. So cloud services are typically data storage locations where the user of that storage doesn't have direct control over the physical device that -- where the data is stored. Typically, it's going to be an online service such as Dropbox or Office 365, Google Drive. These are typically where one finds cloud-based systems. They can include file services where data itself, documents are held; data-based services, where databases are held within the cloud, like Salesforce or things like that; and email services. Gmail is a perfect example of a cloud-based email system.
Q. Turning to the actual process that's set forth in the order, did Vestigant participate in the forensic imaging process pursuant to the motion?
A. Yes.
Q. Did you prepare a report of Vestigant's findings in this case?
A. Yes.
Q. Can you turn to Exhibit 8? And I'm going to have you kind of tab Exhibit 7 because we're going to be referring to it quite often.
A. Okay.
Q. Do you recognize Exhibit 8?

A. I do.
Q. What is Exhibit 8?
A. This is the report that I -- I generated and signed on April 25th, 2024.
Q. Okay. And I --
A. In this case.
Q. -- know there's a lot of information in this case. So if you don't recall something, please, your report is there if you need it. Looking back at Exhibit 7, which is the forensic order, under "it is hereby ordered", subsection 2, did Ms. Gunkova provide the make, model, serial number, data size, and date of acquisition of all electronic devices and cloud services by November 1st, 2022, which was seven days of the order?
A. No.
MS. GREENE: Objection. Calls for a legal conclusion. That's what we're here to determine, among other things so.
THE COURT: Well, he can state his opinion as an expert, so the objection is overruled.
A. No.
Q. Did Ms. Gunkova identify any devices by November 1st, 2022?
A. I'd have to look at my report as far as the date when the first round of -- I think, not at that -- no, not at that point. No, it wasn't within seven days.
Q. Let's turn to Exhibit 9. Do you recognize Exhibit 9?

A. Yes.
Q. Can you tell the Court what Exhibit 9 is?
A. Yes. Okay. This is a letter to you from Mr. McDannell with regard to certain devices that were identified by Mr. McDannell --
Q. Did --
A. -- on November 1st, 2022.
Q. Did you also receive a copy of this letter from Mr. McDannell or myself?
A. Yes.
MS. BENES: Move for the admission of Exhibit 9.
MS. GREENE: No objection.
THE COURT: It will be admitted.
(November 1st letter was hereby received into evidence as Plaintiff's Exhibit 9, as of this date)
Q. In looking at Exhibit 9, Ms. Gunkova identified five devices: device 1, device 2, device 3, device 4, and device 5. Ultimately, how many devices did Vestigant identify that were responsive to the forensic order?
A. I think our final number was forty-five.
Q. Did Ms. Gunkova eventually produce all forty-five to Vestigant pursuant to the order?
A. No. We received, I believe, thirty-four devices.
Q. Did Ms. Gunkova identify any cloud storage accounts on November 1st?

A. Not on November 1st, no.
Q. Did you later learn that cloud storage accounts were responsive to the order?
A. Yes.
Q. Turn to Exhibit 10 and direct your attention to page 3. I'm sorry. Do you recognize Exhibit 10?
A. Yes.
Q. What is Exhibit 10?
A. In my copy, there's a -- a sticky note in the top end of it, so it looks a little different. But it looks like an email that was sent by Mr. McDannell with regard to devices that were identified by -- by him and Ms. Gunkova.
Q. I'm sorry, you said there's a sticky note on your copy?
A. Mine looks --
THE COURT: Yes, there's a sticky note on my copy, too. I'll show you.
THE WITNESS: Yeah.
THE COURT: Can you see that? It obscures the -- I think it obscures the date of the email and a little bit of the first paragraph.
MS. BENES: Oh, that's odd.
THE COURT: Do you see that?
MS. GREENE: It matches my --
MS. BENES: I have no sticky note. Do you have a sticky note?

MS. GREENE: No.
MS. BENES: I apologize, Your Honor.
THE COURT: It's realistic-looking. I was trying to pull the sticker off of there, but.
MS. BENES: It's a good copy job.
MS. GREENE: It's my Exhibit 10, as well.
MS. BENES: Okay. I'm happy to hand up --
MS. GREENE: It's my Exhibit 10.
MS. BENES: We don't need to go back and --
THE COURT: Oh, okay. You have the same exhibit?
MS. GREENE: I have the same exhibit as Exhibit 10.
THE COURT: All right. Why don't we go in the --
MS. GREENE: I have that.
THE COURT: -- other book, the bigger book, then, please? And let's go to Defendant's Exhibit -- it says Debtor's --
MS. BENES: Your --
THE COURT: -- Exhibit 10, please.
MS. BENES: Your Honor, I also have clean copies that can be replaced in those binders --
THE COURT: Okay, why don't you hand those up, please?
MS. BENES: -- without -- that way, Your Honor has it.
MS. GREENE: Do you have a clean copy for my book?
THE COURT: All right, thank you.
MS. BENES: No, you have it, Exhibit 10 of your book.

THE COURT: All right. Coincidentally, they're both Exhibit --

MS. GREENE: Yeah, go ahead and give him my book. He's going to need it eventually.

THE WITNESS: I -- I think I have -- I -- I have a copy of your book --

MS. GREENE: Yeah.

THE WITNESS: -- up here. Yes. Thank you.

MS. BENES: Go ahead and swap that out.

THE WITNESS: Sure.

MS. BENES: That way, that book is complete.

THE COURT: All right. So we're looking at --

MS. GREENE: Okay.

MS. BENES: Plaintiff's Exhibit --

THE COURT: Substituted Exhibit 10 --

MS. GREENE: Thank you.

MS. BENES: Correct. Thank you for bringing that to --

THE COURT: -- which is an email --

MS. BENES: -- my attention.

THE COURT: -- dated November 10 of 2022?

MS. BENES: Yes.

THE COURT: All right. You can --

BY MS. BENES:

Q. Do you recognize Exhibit 10?

A. Yes.
Q. Looking at page -- I'm sorry. Can you tell the Court what Exhibit 10 -- focusing on Mr. McDannell's email, can you tell the Court who Mr. McDannell is?
A. As I knew him, he was counsel for Ms. Gunkova.
Q. Mr. McDannell's email is on page 1. And looking at number 8 of Mr. McDannell's letter, it says, "As I understand it, the only cloud system utilized by BNG is Dropbox." Do you see that?
A. Yes.
Q. Prior to November 10th, had Ms. Gunkova identified any Dropbox cloud services pursuant to the order?
A. No, not that I'm aware of.
MS. BENES: Move for the admission of Exhibit 10.
THE COURT: Any objection?
MS. GREENE: Assuming the revised version doesn't have the redactions that the original version did. Because I didn't get to see what she handed up to you.
MS. BENES: You're more than welcome to look at --
MS. GREENE: I assume it's the complete email. Then I don't have a problem with it.
THE COURT: All right. It'll be admitted. Thank you.
(Mr. McDannell email was hereby received into evidence as Plaintiff's Exhibit 10, as of this date)
Q. Looking back at Exhibit 7, the order, number 3 required

within seven days of this order, which would be November 1st, "Plaintiff Harry D. Kamins shall propose search terms to be applied to the devices." Did Mr. Kamin provide search terms?
A. Yes.
Q. And did he provide those by November 1st, 2022?
A. I believe there was a letter dated November 1st that was sent out I -- I reviewed, yes.
Q. Can you turn to Exhibit 11?
A. Yes.
Q. Do you recognize this document?
A. Yes. This is the letter we were just discussing as -- that has the search terms that were going to be applied to Ms. Gunkova's devices when -- when they were imaged and extracted.
Q. Did you receive a copy of this letter, as well?
A. Yes.
MS. BENES: Move for the admission of Exhibit 11.
THE COURT: Any objection?
MS. GREENE: No objection.
THE COURT: It will be admitted.
(Letter with search terms was hereby received into evidence as Plaintiff's Exhibit 11, as of this date)
Q. Looking at the next item of the forensic order, number 4, "Within fourteen days of this order, Defendant Valeria Gunkova shall allow for the forensic imaging and/or copying and inspection of all devices." Did Ms. Gunkova allow for the

forensic imaging and inspection of all devices within fourteen days of the order?
A. No. The -- the initial imaging occurred after that.
Q. When, ultimately, did Ms. Gunkova allow for the devices to be imaged and inspected?
A. So the first round of devices were imaged -- I believe it was on November 22nd of 2022.
Q. Did Vestigant travel to -- tell the Court how Vestigant received the devices.
A. So two Vestigant employees went to the -- the building and were given access to the computers that existed there onsite.
Q. Can you tell the Court what, if anything, was turned over on November 22nd, which I call the first turnover date?
A. The first -- first day, there were four computers and two iPhones that were turned over during that time frame.
Q. Ms. Gunkova's counsel, as we saw in Exhibit 10, had previously indicated that BNG utilized Dropbox. Were the Dropbox credentials or access to the Dropbox turned over on November 22nd?
A. Not at that time.
Q. Did you perform a forensic analysis of the four Dell desktops that were turned over on November 22nd?
A. Yes. They were imaged, and the data was extracted and analyzed.
Q. What, if anything, did that analysis reveal?

A. There were -- the first thing that -- that came out of it was the fact that there were numerous USB devices that had been -- storage devices that had been attached to the various computers. And given that they had the ability, and in some cases, we were able to identify data that was stored on them, we requested those be turned over as well.
Q. When you say, "numerous", do you recall how many?
A. I believe we identified at least sixteen devices that -- that matched.
Q. And those devices were or were not identified by Ms. Gunkova pursuant to the order?
A. Not -- no, we -- we identified those through looking at the registry files and link files and jump lists to show that the devices had been attached to computers.
Q. What, if anything, did Vestigant do with this new information that you revealed?
A. I sent an email to Mr. McDannell and said that we identified these devices and -- and that we would like to image them.
Q. Turn to Exhibit 12, please. Do you recognize Exhibit 12?
A. Yes.
Q. Can you tell the Court what Exhibit 12 is?
A. This is an email chain where, on the first page, at least, there's a -- at the bottom, there's an email from me to Mr. McDannell identifying that we still needed to capture the

Dropbox data, as well as there were USB devices that had been attached to the computers we had imaged. And the follow-up email from Mr. McDannell on December 2nd said that -- to collect any of the USB devices and that we were going to be able to image them.

Q. Okay.

MS. BENES: Move for the admission of Exhibit 12.

MS. GREENE: No objection.

THE COURT: It will be admitted.

(Vestigant email chain was hereby received into evidence as Plaintiff's Exhibit 12, as of this date)

Q. Did Vestigant schedule a second turnover date to discover the newly discovered devices?

A. Yes.

Q. Do you recall what date that was scheduled for?

A. It was scheduled for, I believe, the 12th. I think on the 8th, we scheduled -- we -- we made the schedule.

Q. December 12th?

A. I believe that's when it was.

Q. Was that the date that it was originally scheduled for, and then it was rescheduled?

A. There was -- there was a rescheduling, but I think that was when the -- the final imaging actions did take place.

Q. Is there anything that would refresh your recollection as to that date?

A. Yeah, I can go back to my report. I have the information as far as the different times and -- dates and times when certain activity occurred.
Q. Let me ask you this. What, if anything, as turned over on the second turnover date?
A. There were USB devices that were -- thumb drives were turned over at that date. And I apologize. It was the 14th when they were turned over, not the 12th.
Q. December 14th --
A. Yes.
Q. -- was the second turnover date?
A. Yes.
Q. Okay. And I'm sorry, can you tell the Court what was turned over on the second turnover date?
A. USB thumb drives. I believe it was -- yes, it was USB thumb drives on the 14th.
THE COURT: How many?
THE WITNESS: I think it was sixteen. I'd have to go back and look specifically. There were -- there were a number of devices. Here we go.
Q. Paragraph 11 of your report on page 4, if you'd go ahead and review that.
A. Yes, nineteen. I apologize. Nineteen.
Q. And had those devices previously been identified by Ms. Gunkova pursuant to the forensic order?

A. No.
Q. Were any Dropbox credentials turned over on December 14th?
A. No. I don't believe so. Not at that time, no.
Q. Had Vestigant identified three external hard drives as part of the forensic imaging and process?
A. Yes. So the analysis of the computers showed that three hard drives had been attached to those computers over the course of the previous two years, and those were devices that we requested information about as well.
Q. Were the three hard drives turned over at the first turnover date?
A. No.
Q. Were the three external hard drives turned over on the second turnover date?
A. No.
Q. Have the three external hard drives ever been turned over?
A. Not the three hard drives that we identified having been attached to those computers, no.
Q. Did you review Ms. Gunkova's depositions in the Loudoun County case during your engagement?
A. Yes.
Q. Turn to Exhibit 13, please. The first few pages are standard beginning pages of a transcript. I would direct your attention to what's labeled at the top starting with 56. Can you tell the Court, did you review this testimony as part of

your engagement?
A. Yes.
Q. And can you tell the Court whose deposition this is?
A. This is Ms. Gunkova's deposition that was taken on May 9th, 2023.
Q. Okay. I see here on page 56, the top, Ms. Gunkova had indicated that there was an email, vgunkova@gmail.com (ph.) that she had given access to Jacob. Do you know who Jacob is?
A. My understanding is Jacob Bogatin, who's a -- has been part of this case.
Q. Okay. My question to you is, vgunkova@gmail.com, did Ms. Gunkova ever identify this email address or provide these credentials to Vestigant pursuant to the forensic order?
A. No.
Q. Further down, there's an email, valeria@ariamedispa.com (ph.). Did Ms. Gunkova provide those credentials to Vestigant pursuant to the order?
A. No.
Q. There is then an email address, bnggroup46@gmail.com (ph.). Did Ms. Gunkova provide the credentials for this account?
A. No.
Q. Turning to the next page at the very bottom, line 21, valeria@bnggroupllc.com (ph.), did Ms. Gunkova provide the credentials for that account?
A. No.

Q. Turning to the next page, line 2 says, "Do you see 'BNG Group' under 'business information' on the front?" Ms. Gunkova responded, "Yes, I do". 5, "Now, under the business contact information, it listed at ariaskincare@gmail.com (ph.)". Did Ms. Gunkova provide the credentials for that account?
A. No.
Q. Turning to the next page, beginning at line 6, discusses a document for Byline Bank, and at the very bottom, line 20, "Okay, Jacob sent this email, right? That's his email, gershj33@gmail.com (ph.)". Were the credentials for gershj33@gmail.com produced pursuant to the order?
A. No.
MS. BENES: Move for the admission of Exhibit 13.
THE COURT: Any objection?
MS. GREENE: No objection.
THE COURT: It will be admitted.
(Deposition of Ms. Gunkova was hereby received into evidence as Plaintiff's Exhibit 13, as of this date)
Q. Did you also review some of Ms. Gunkova's discovery responses during your engagement?
A. Yes.
Q. Turning to Exhibit 14, please, did you review the supplemental discovery responses?
A. Yes.
Q. And turn to page 2, interrogatory number 16, "Identify all

email addresses that were created and/or are used to conduct business of BNG from September 1st, 2019 to the present and the identity of the person who created such email addresses. Supplemental response: in addition to previous responses, harry@ariamedispa.com (ph.), created by Jacob Bogatin". Did Ms. Gunkova provide the credentials for harry@ariamedispa.com pursuant to the order?
A. No.
Q. The next one, grishakk301@gmail.com (ph.), created by Jacob Bogatin. Did Ms. Gunkova provide the credentials for this account?
A. No.
Q. Ultimately, how many devices were turned over by Ms. Gunkova that Vestigant was able to forensically image and analyze?
A. I believe the number was 34.
MS. BENES: Before I forget, Your Honor, move for the admission of Exhibit 14.
THE COURT: Any objection?
MS. GREENE: No objection.
THE COURT: It will be admitted.
(Supplemental discovery was hereby received into evidence as Plaintiff's Exhibit 14, as of this date)
Q. Did Vestigant conduct a forensic imaging of the devices turned over by Ms. Gunkova.

A. Yes. The ones that were made available, yes.
Q. Did you assist in creating a chart regarding certain devices?
A. With regard to this --
Q. The identity of the devices?
A. Yes.
MS. BENES: Your Honor, this is a demonstrative.
Counsel, a copy for you, as well. Thank you very much.
THE COURT: Thank you.
Q. Mr. Racich, do you have a --
THE COURT: Did you want the witness to have one of these?
MS. BENES: Yes, please, Your Honor. Thank you.
THE WITNESS: Thank you.
Q. Mr. Racich, is this a copy of the chart that you assisted in creating?
A. Yes.
Q. And can you explain it to the Court?
A. Yes. So when Vestigant --
THE COURT: Wait. Are we looking at Exhibit 15 now?
MS. BENES: We are looking at the demonstrative, identification.
THE COURT: Oh, we're looking at the identification of devices? Okay.

MS. BENES: Correct.
A. When Vestigant creates forensic images, we typically try to give our own internal numbering system so we can figure out where they are and where they came from. So the column on the far left-hand side has our item number. So you have IT001, 2, 3, 5, and 27. The Gunkova ID is a column that identifies where Mr. McDannell identified certain devices as being used by different persons and what their -- and then the third column is the serial number. And so we matched up the serial numbers to what Mr. McDannell identified as -- as his devices -- or Ms. Gunkova's devices and then identified it with regard to the Vestigant ID. And then the description that we have is the description that Mr. McDannell identified these computers as how they were used.
Q. Was this chart created using the information in Exhibits 9 and 10? Mr. --
A. Yes.
Q. -- McDannell's --
A. Yes.
Q. -- emails and letter?
A. Yes, that's correct.
Q. Okay. So this is our cheat sheet, as I call it. Can you explain IT001? It was not identified by Ms. Gunkova?
A. Not in any of the correspondence. But when my employees went onsite, it was a computer that was available, and so that

was identified and -- and imaged.
Q. IT002, whose computer was IT002?
A. Based on Mr. McDannell's representations in his letters, it -- that was a computer used by Ms. Gunkova.
Q. IT003, what device was that?
A. That was a computer used by Mr. Yun (ph.), who was an employee at BNG, I believe.
Q. Do you know where that computer was located?
A. It was in the BNG business office.
Q. Can you tell the Court, IT005, who that belonged to?
A. Based on what Mr. McDannell said, that -- that was a computer that was used by Mr. Bogatin.
Q. Did he also indicate it was the main computer used in BNG's day-to-day operations?
A. Yes, that was the -- the description that was had.
Q. And finally, IT027, that was a thumb drive?
A. That's correct, it was a thumb drive that was identified as -- as being used by Mr. Bogatin.
Q. Okay. Can you tell the Court what steps Vestigant took to image and inspect the devices that were turned over?
A. So onsite, the computers were forensically imaged using forensic software designed in a way to not write or alter any data to the computer, and a forensic -- static forensic image called a dead-box image of every single sector from the first sector, the last sector was created, and that was successful

for all the devices. The thumb drive was done at a later date. That was at the second time frame, but it was again done on site using forensic tools to make a full, sector-by-sector image of the device.
Q. Did you receive Ms. Gunkova's opposition filed in this court to this motion?
A. Yes.
Q. And did you review it?
A. Yes.
Q. Ms. Gunkova alleges in her opposition that the data that you captured was corrupted; is that accurate?
A. No. So during the forensic imaging process, the image, itself, is hashed against the device. So a hash value is an electronic fingerprint. If the hash value of the image matches the hash value of the original device, they are exact duplicates. They're -
THE COURT: Can you tell me what a hash value is?
THE WITNESS: Sure. It's a mathematical algorithm where -- so it's a formula that if you push the numbers of the data into it, it gets out a really big number, and this calculation is different for every single dataset that exists. So if you have a hard drive, which has billions of sectors, and one sector is different, then the hash value is going to be a different value. So essentially, what this does is this is a check where you throw all the data through the math, and the

math that comes out, if the numbers are the same, it's exactly -- it's an exact duplicate.

So we have the original hash values as it was being images, that's one of the processes that occurs. Match it, it then checks the image, itself. If those two numbers match up, they're exact duplicates.

THE COURT: Thank you.

Q. Did Vestigant use certain software to perform these imaging and analyses?

A. Yes. There's a number of forensic and eDiscovery to a certain extent tools that are utilized to perform this type of analysis.

Q. Can you tell the Court what software was used?

A. Different ones, but Axiom Forensics is a tool that was used, EnCase was used, Forensics Toolkit was used, Intella is another tool that was used. These are all different industry standard tools that are utilized with regard to forensic analysis and eDiscovery work.

Q. Did the forensic images of all of the devices that Vesigant was able to get his hands on complete successfully with all data captured?

A. Yes. There were no errors that were identified.

Q. What did Vestigant do next after successfully imaging the devices?

A. So the first thing that gets done is a working copy is

created. The original images are put aside into evidence, and all work is performed upon the working copies. So they're processed using the different tools. Different tools do different things, and we reviewed the results of that software analysis and identify what's going on.

Q. Did Vestigant apply the search terms that we had looked at in the November 1st letter to the working copies of the devices?

A. Yes.

Q. Did the search yield results?

A. Yes.

Q. Did Vestigant also conduct a forensic examination of the devices?

A. Yes.

Q. Can you explain to the Court the difference between a forensic imaging and a forensic examination?

A. So the imaging is the capture of the data. Then there's the searching, which can be part of forensics, but in general, it's using search terms to identify documents and artifacts that respond to -- that have positive results to those search terms. An investigation, forensic investigation is typically identifying through data and metadata an ability to create a time line of activity on a device. So it's what software is being run, what files are being touched, what activity you can say, and what is the data showing as far as a time line of

activity and attempt to link that activity to whether or not it was user-created activity or application activity or operating system activity and try to get an understanding of how devices are being used.
Q. Can you explain to the Court what a jump list is?
A. So in a Microsoft Windows environment, Microsoft Windows keeps track of the opening of documents, files, and different types of artifacts and keeps certain information about those files and artifacts that are being opened. Like, for example, it can identify the name of the file being opened, when it was being opened, what user was logged into when the file was opened, how bit the file was.

The metadata, which is data about data. It's not the content. It's really about the -- the again, what we're talking about the time line of what's going on, and it gives that information, and we can interpret that and figure out what's going on with particular objects.
Q. Did you review the jump list for the devices?
A. Yes.
Q. Can you explain to the Court what link files are?
A. Link files are similar. They're discrete files as opposed to -- the jump lists are -- it's actually a database. Link files are actually individual shortcuts. So when you open up a file, this shortcut is created, and it has certain information about the file that was opened as far as dates and times and

file size and where the file lives.
Q. Were the link files analyzed?
A. Yes.
Q. Can you explain to the Court what a pre-fetch artifact is?
A. So --
THE COURT: Could you say that again?
THE WITNESS: So --
MS. BENES: Pre-fetch?
THE COURT: F-E-T-C-H?
MS. BENES: F-E-T-C-H, yes.
THE COURT: Okay.
A. So a pre-fetch artifact is a Windows-based artifact where Windows keeps track of the applications that you run, and it's doing it for efficiency purposes. It identifies moments in time when applications are run.
Q. Okay. Did you review the pre-fetch artifacts for the devices?
A. Yes.
Q. Can you explain to the Court finally what user-assist artifacts are?
A. So user-assists artifacts are keys in a Microsoft Windows Office registry. So the registry keeps information about how the computer works, and one of the things it does is, again, this is used for Windows to keep track of applications that are run, and the user-assist keeps similar information to what the

pre-fetch does, but in some cases more, as far as the number of times an application is run, and it can actually get back us to certain specific moments in time when executables are run.
Q. Did you review the user-assist artifacts for the devices?
A. Yes.
Q. What, if anything, did Vestigant find after conducting the forensic imaging and examination of the devices?
A. So initially -- and we talked about this a little bit -- is that USB devices had been attached, specifically external hard drives had been attached to the various computers as well as there was evidence of CCleaner, which is a tool that can be used to destroy information had been run on the various computers.
Q. Let's first talk about the external hard drives. Did you examine a Dell desktop that you refer to as IT001?
A. Yes.
Q. What did you find regarding IT001?
A. A Western Digital hard drive had been attached to IT001, and I can refer back to my report to give you specific volumes, serial numbers, and specific moments in time, but the device had been attached to IT001.
Q. Okay. Had the device been attached to -- I'm sorry. We refer to this as the first hard drive?
A. Yes.
Q. Okay. Did you also examine a Dell desktop that you refer

to IT002?
A. Yes.
Q. And that's the Dell desktop as Ms. Gunkova's computer, right?
A. That's correct.
Q. What did you find regarding IT002 and the first hard drive, if anything?
A. So the first hard drive had been attached to both of those computers, IT001 and IT002, and this was determined by -- there are certain artifacts that keep track of the volume serial number of storage media that's attached to a computer, and in this case, the Western Digital hard drive with a particular volume serial number had been attached to both devices, both IT001 and IT002.
Q. Will you turn to Exhibit 15 in your binder? Exhibit 15 should be a bigger exhibit that you're going to need to fold out.
A. Yes.
Q. With hopefully no Post-its.
THE COURT: Now, just quickly, when you say a hard drive was attached, could that -- is a thumb drive a subset of a hard drive? Is that a kind of hard drive --
THE WITNESS: No --
THE COURT: -- or are you talk -- in other words, are you talking about a thumb drive there, or is that something

different?

THE WITNESS: They're a little different. So a thumb drive is typically the size of the thumb, but -- and have slightly -- although in today's world, it can be -- they can store a huge amount of data, but typically, they hold less data than a hard drive. The hard drives that we're talking about are the ones that are about the size of a playing car -- playing card deck with a wire, and those -- and that's what a hard drive is. With --

THE COURT: Okay. Thank you.

THE WITNESS: Yeah.

Q. Looking at Exhibit 15, Mr. Racich, do you recognize Exhibit 15?

A. I do.

Q. Can you tell the Court what Exhibit 15 is?

A. So this is a report that was generated specifically about -- from jump lists, the jump list database I was talking about before that existed on IT002, and specifically, with regard to information about files that had been opened from the external device with volume serial number 28CEE36F, which was a My Passport, a Western Digital My Passport device that had been attached to IT002.

Q. That's the first hard drive?

A. Yes.

Q. Okay. And why are the file names -- what do the file names

show us?
A. So the linked path, which gives us the file name and the location of where these files were when the user opened them so for this artifact to be created, a user needs to open up a file by double clicking on it or using Windows Explorer. There's different ways that that can be done. What we have here is that a file for the first half about the drive was provided with the drive letter E, and for the second half, the drive was provided with the drive letter F. Even though they have different drive letters, it's the same device because the volume serial numbers are exactly the same.
So these are particular files that had been opened by the user on IT001 at different points, and we can say what dates that occurred based upon the last access date, which is the sixth column over, and that's indicative of when the file was opened from the device.
Q. So for example, the third one down that appears to have a file name harrydkamin/drlicfront.jpg, I understand that's a picture?
A. Yes. So what you have here, the first part is the path so the physical location as to where the file lives. It was in a folder called -- on the E drive, which was the external hard drive, in a folder called scan, and a subfolder called underscore area and a subfolder of that underscore investors, subfolder of that, which is Harry D Kamin, and then the file,

itself was names drlicfront.kpeg, which is a picture file based on the name. Driver's license would be my guess.
Q. And it looks like it was last accessed using Ms. Gunkova's computer on September 22nd, 2021; is that correct?
A. Yes. That's correct.
Q. I understand from your prior testimony, Ms. Gunkova has never produced this hard drive, right?
A. We do not have -- we've never received the first hard drive, correct.
Q. What is the result of her failure to turn over the first hard drive?
A. We don't have --
MS. GREENE: Objection. Calls for speculation.
THE COURT: I sustain that objection. Could you receive the question, Ms. --
MS. BENES: Sure. Let me rephrase the question.
Q. As a result of her failure to turn over the device, were you able to ever analyze the data that was on that device?
MS. GREENE: Objection. And it assumes facts not in evidence that she failed to turn over, and it presumes that she had any control over this particular hard drive, which is also not in evidence.
THE COURT: All right. Well, I understand your position, but the question is as a result of not having the information --

MS. BENES: Right.

THE COURT: -- were you able to analyze it, I guess is the question. Why don't you restate the question --

MS. BENES: Sure.

THE COURT: -- in a more neutral way, please.

Q. Let me ask you this, was the first hard drive an electronic device pursuant to the order?

MS. GREENE: Objection again. Calls for a legal conclusion.

THE COURT: All right. Overrule that objection.

A. Yes. External hard drives and thumb drives are stored devices that --

Q. Was it ever produced to Vestigant?

A. No.

Q. Okay. Because it was never produced Vestigant, was Vestigant ever able to analyze that data?

A. No. So the data itself was unavailable, but we had some tangential information such as what we have here showing that there were files that existed on there, and where those files lived, but we weren't able to do any analysis or extract those actual files.

Q. Were you able to conclude whether there was other data on that device other than what we see here on Exhibit 15?

A. So Exhibit 15 goes a little farther with regard to the link files, but so there are certain information that we have about

files that exist there, but these only show -- these types of artifacts that we're looking at only show what files were opened. So if a user double-clicked on it, this type of artifact gets generated.

So if we have, you know, twenty of these files that we can show, twenty files were opened from this computer, but what we don't have is what else might exist on that device. So there could be just these twenty files, but there also could be thousands and thousands and thousands of other files, but without the device, itself, we can't do any analysis of that.

Q. Did you examine --

MS. GREENE: Your Honor, before she asks the next question, can we take a comfort break?

THE COURT: How much more -- the answer is going to be yes. How much more do you think you will have here, Ms. Benes? I'm not trying to rush you. I just want to get an idea, please?

MS. BENES: I hate to say this, but probably another hour, Your Honor.

THE COURT: Well, that's fine.

We'll take our lunch break now until 1:30, and we'll resume.

I will say that it's as though you're still on the witness stand here. Parties shouldn't be --

MS. BENES: Absolutely.

THE COURT: -- prejudiced on the one hand or benefitted by the happenstance that we all need to go eat lunch. So do not therefore -- do not discuss your testimony with anybody, including Ms. Benes and Ms. Ohm. All right. We'll resume at 1:30.

MS. BENES: Thank you, Your Honor.

MS. GREENE: Thank you, Your Honor.

THE CLERK: All rise. This Honorable Court is now in recess.

(Recess from 12:26 p.m. until 1:32 p.m.)

THE CLERK: Please be seated. This Honorable Court is back in session.

THE COURT: All right. Please be seated. We're back on the record, and Ms. Benes?

MS. BENES: Thank you, Your Honor.

RESUMED DIRECT EXAMINATION

BY MS. BENES:

Q. Mr. Racich, we left off talking about the external hard drives. Did you examine a Dell desktop that you refer to as IT003?

A. Yes.

Q. And this was the computer that was located in BNG's business office, right?

A. That's correct.

Q. What, if anything, did you find regarding IT003 relating to

an external hard drive?
A. There was an external hard drive that was attached, but based on the volume serial number, that was a different device than the one that was attached to IT001 and 002.
Q. So it was a different hard drive than the first hard drive?
A. Yes.
Q. Okay. And we refer to those as the second hard drive?
A. Yes.
Q. Can you turn to Exhibit 16, please?
MS. BENES: Your Honor, I'm not sure if I did this prior to the lunch break. I'd move for the admission of Exhibit 15.
THE COURT: All right. That's the chart. Is there any objection?
MS. GREENE: No, Your Honor.
THE COURT: It will be admitted.
(Chart was hereby received into evidence as Plaintiff's Exhibit 15, as of this date)
MS. BENES: Thank you, Your Honor.
Q. I'm sorry, Mr. Racich. Can you turn to Exhibit 16, please?
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. Can you explain to the Court what Exhibit 16 is?
A. The first page in Exhibit 16 is dealing with the link file

analysis that was performed on IT003, and you can see from the link path, the pathing and if a file, the name of the file that was opened from an external device. In this case it's another My Passport, a different Passport, though, with a volume serial number of 64D14DA0.
Q. I apologize for the very small font of this exhibit. Were you able to conclude when the second hard drive was attached to the BNG business office computer?
A. So there are certain dates that are indicative of that, and you can see them in various highlighted rows on the fourth column where the target file last access date was updated, and you see here that at least on November 10th, 2022, the hard drive, 2, was attached IT003.
Q. If I'm counting correctly, the second hard drive was attached to IT003 seven times on 11/10/2022; is that right?
A. Well, so it may have been time, and those accesses were updated during that time frame because they were all on the same date in relatively close proximity. It may have been one or two times, but you have seven artifacts being opened during that time frame.
Q. Okay. So I'm showing some around 3 p.m., 3:35 p.m., and then 7:03 p.m.?
A. Yes. That's correct.
Q. Has Ms. Gunkova ever produced the second hard drive for analysis?

MS. GREENE: Objection. Fact not in evidence that it's her hard drive, that she has it in her possession, custody, and control.

THE COURT: I'll overrule the objection. You can answer.

A. No. We never received a hard drive with this volume serial number.

Q. Were you able to conclude the contents of the second hard drive?

A. Within the limitations of what we see here, we do have some information about files that exist on there. However, this is, again, only files that were opened specifically from this computer. So whatever else is on there, we cannot see without gaining access to the device itself.

Q. Is that similar to the conclusion you had about the first hard drive where there may have been other documents on that hard drive, but if they were not opened, they would not appear on this chart?

A. That's correct.

Q. Did you find that a third hard drive was also attached to IT003?

A. Yes.

Q. And we refer to this as the third hard drive?

A. Yes.

Q. Has Ms. Gunkova ever produced the third hard drive for

analysis?
A. No.
Q. Were you able to conclude the contents of the third hard drive?
A. No. Again, we have limited information as to what data may be on a hard drive from looking at the computer, itself, the only way to actually determine that would be to look at the hard drive, itself.
Q. As a result of never receiving the third hard drive, were you ever able to analyze the data then?
A. No.
MS. BENES: Move for the admission of Exhibit 16.
THE COURT: Any objection?
MS. GREENE: No, Your Honor.
THE COURT: It will be admitted.
(Link file analysis was hereby received into evidence as Plaintiff's Exhibit 16, as of this date)
Q. Mr. Racich, could you please turn to Exhibit 17?
A. Yes.
Q. Did you review Ms. Gunkova's discovery responses in this case?
A. Yes.
Q. Is Exhibit 17 a copy of discovery responses of Ms. Gunkova that you reviewed during your analysis?
A. Yes.

Q. I direct your attention to the second page. This is an excerpt. Forty-five. It was a lengthy document. Number 81, says, "To permit for forensic inspection pursuant to the order entered on October 25th, 2022, in the Loudoun case, Western Digital USB hard drive, volume serial number 28CEE36F, including all ESI from September 1st, 2019, to the present." Was that the first hard drive?
A. I believe that's the volume serial number for that. We can check to be sure, but yes, I believe that's correct.
THE COURT: I'm sorry. Can you say that again, please?
THE WITNESS: Yes. I apologize. I believe that's correct, yes.
THE COURT: This is which hard drive now?
THE WITNESS: Hard drive 1.
THE COURT: Okay. Thank you.
Q. And Ms. Gunkova's response is, "After reasonable and diligence search, Ms. Gunkova is unable to locate any USB drive matching the description"; is that right?
A. That's correct.
Q. Number 82, can you tell the Court, number 82, what hard drive is referred to here?
A. That's the Western Digital hard drive with volume serial number 64D14DA0, and that was the device attached to IT003.
Q. Was that the second hard drive?

A. Yes.
Q. And what about 83? Can you tell the Court what device is described in 83?
A. That is a hard drive with a serial number of 301966403, and again, that was the third hard drive, which was attached to IT003.
MS. BENES: Move for the admission of Exhibit 17.
THE COURT: Is there any objection?
UNIDENTIFIED SPEAKER: No objection.
THE COURT: It will be admitted.
(Discovery responses was hereby received into evidence as Plaintiff's Exhibit 17, as of this date)
Q. Mr. Racich, turning to the second category of information that you had referred to earlier in your findings, are you familiar with the software or a data destruction software called CCleaner?
A. Yes. I am aware of that.
Q. Can you explain to the Court what CCleaner is?
A. So CCleaner is an application that can be installed on Windows environment -- there is a Macintosh version as well -- that allows for the removal of data for different purposes. Some claims to make the computers more efficient and some to permanently destroy so things cannot be recovered for privacy purposes.
Q. Does it delete files?

A. It can be set to that and does.
Q. Does it delete internet history?
A. Yes.
Q. Does it delete folders?
A. Yes.
Q. Does it delete metadata as to all the contents of the computer?
MS. GREENE: Leading.
THE COURT: Overruled.
A. Yes. It -- all the contents is very broad, but yes, it can -- it can destroy metadata such as file, path, Bate time stamps, file sizes. It can alter data so it becomes unrecoverable.
Q. Did you find any evidence of CCleaner being run on IT001?
A. Yes.
Q. Can you turn to Exhibit 18, please? Do you recognize Exhibit 18?
A. I do.
Q. Can you tell the Court what Exhibit 18 is?
A. So I briefly said before talking about different types of artifacts that you asked me, one of the being pre-fetch. The pre-fetch artifact is a Windows -- log isn't quite right. It's an artifact, but it keeps track of the number of times that certain -- that applications are run, and it keeps it in a small database. And what we have here is the pre-fetch

analysis for IT001 specifically for two different versions of CCleaner, one is the thirty-two-bit version, and one is the sixty-four-bit version. That's not terribly important, but what it does show is it shows certain instances when the CCleaner application was executed meaning run.

Q. Okay. When does it show the CCleaner was run on IT001?

A. So the sixty-four-bit version of CCleaner was run on two separate days, one on October 1st, 2022, and it was run three times, and one on October 10th of 2022.

Q. Was it run at the same time on both of these dates?

A. No.

Q. I see here on October 1st, it was run numerous times around 5:45, and then on October 10th, 11:48 p.m.; is that right?

A. That's correct.

Q. What is that indicative of?

A. So one of the things that can come up is you can set CCleaner up to run on a schedule. Typically, when it's run on a schedule, it's run at the exact same moment in time. So it will be Mondays at a particular moment in time or every weeknight at a particular moment in time. You can set it depending on the calendar. When you have instances like this where you have completely disparate times on different days, it's indicative that on at least one of those occasions, it was done manually.

MS. BENES: Move for the admission of Exhibit 18.

THE COURT: Any objection?

MS. GREENE: No, Your Honor.

THE COURT: It will be admitted.

(Pre-fetch analysis was hereby received into evidence as Plaintiff's Exhibit 18, as of this date)

Q. How did the running of CCleaner on IT001 impact the availability of the data on that device?

A. So the running of CCleaner and the deletion of files that CCleaner does will make that information, that data unavailable. So in my experience, running CCleaner in the manner of what we see means any of the data that was deleted on either November 10th or October 1st would have been rendered unavailable to someone trying to extract a data like us.

Q. When you say "unavailable", does that mean it's unrecoverable?

A. Yes. So it's possible there could be fragments left over in the manner in which it was run, but for all intents and purposes of creating -- of getting the files back and the metadata back, that data is gone.

Q. When you say "fragments", can -- were the fragments pieced together on a form, a document so that we can actually read it? Is it readable format?

A. Not typically, no.

Q. Did you find any evidence of CCleaner being run on Ms. Gunkova's computer, IT002?

A. Yes.

MS. GREENE: Objection as to characterization of Ms. Gunkova's computer.

THE COURT: Overruled.

A. Yes.

Q. Can you turn to Exhibit 19?

A. Yes.

Q. Do you recognize Exhibit 19?

A. Yes.

Q. Can you tell the Court what Exhibit 19 is?

A. So this is the same sort of information, but it's actually broken down into two lines essentially. So just to be clear, you have the top part, which is five lines, and then the bottom part, which are five lines. They really should be side by side, just extended out, but it's just easier to read --

Q. Too long.

A. Yeah. It gets very, very small. So what this shows is that different parts of the CCleaner application were run on IT002, and you can see that the first line of actual nonhighlighted line is a CCleaner bug report. So that is an application that's part of the -- that is part of the executable, which is a bug report. So if there's something that's going wrong or the application thinks something weird is going on, it runs a bug report, and it keeps track.

And you can see that that was run based on the application

run count, twelve times, and you can also see the dates and times when that occurred, which is similar to what we were talking about before, things being done on a consistent moment in time where the eighth last runtime was at 12:06:01 p.m. on 10/19. The seventh last run date and time was at 12:06:01 p.m. on 10/20. The sixth last run date and time was at 12:06:01 p.m. on --

Q. Sure.

A. -- 10/21. So the last run time is on 10/26 at 12:06:01.

Q. That's for the bug report?

A. That's the bug report.

Q. Okay.

A. But then the CCleaner application, itself, you have two parts, the sixty-four-bit version and the thirty-two-bit version. The sixty-four-bit version is the one we'll look at, which is the third line, CCleaner 64.exe. You can see that was run eighteen times from the first creation date, which was June 16th, 2022.

Q. Okay. So let me stop you there.

A. Sure.

Q. June 16th, 2022, is that when CCleaner 64 was installed on IT002?

A. We know it was installed. Whether or not it was in an installation or update, I can't be sure from this information, but there was an installation that occurred at that moment in

time.
Q. Okay. And let's talk about the runs. Here, we see eighth last run, but the application run count is eighteen. Why don't we see the ten other runs?
A. Because the pre-fetch database only keeps track of the last technically eight. So one -- so the last one through eight.
Q. Okay. Can you tell the Court when the last eight runs were made on IT002?
A. Yes. So you have one on September 4th, one on October 11 -- oh, 2022. September 4th, 2022, the second time was October 11, 2022. There's three instances all very close in time indicating that it was loaded in the memory three times on October 14th, 2022, and then you have two times on October -- I apologize, three times on October 26th, 2022, at 9:30 p.m.
Q. The various dates that CCleaner 64 was run on IT002, were those at the same time of day or different?
A. Different. So as -- it's different than what we're seeing from the bug report CCleaner executable where those were all run essentially at the exact same moment and time daily where we have things being done at different moments of time over the course of the --
Q. And what is the different moments in time indicative of?
A. That it was -- it was done manually and not done on the schedule.
Q. How did the running of CCleaner on Ms. Gunkova's computer,

IT002 impact the availability of the data on that device?

MS. GREENE: Objection. Characterization of Ms. Gunkova's computer.

THE COURT: Overruled.

A. So any of the data that was deleted with the CCleaner application would have been rendered unrecoverable for our purposes.

MS. BENES: Move for the admission of Exhibit 19, Your Honor.

THE COURT: Any objection?

MS. GREENE: No objection.

THE COURT: It will be admitted.

(CCleaner report was hereby received into evidence as Plaintiff's Exhibit 19, as of this date)

Q. Did you find any evidence of CCleaner being on IT005 --

A. Yes.

Q. -- which was described Mr. McDannell, Ms. Gunkova's counsel as the main computer in BNG's day-to-day operations and Mr. Bogatin's computer?

A. Yes.

Q. Can you turn to Exhibit 20, please?

A. Yes.

Q. Do you recognize Exhibit 20? And I again apologize for the very small font.

A. Yes. This is similar information from pre-fetch for IT005,

and we can see CCleaner, 64 executable being created on July 3rd of 2022, and we have it being run, the eighth last time on 7 -- July 3rd, 2022, seventh; August 9, 2022; sixth, the same moment in time. The fifth and fourth were on October 26th, 2022, and then the third, the second, and the last run date were on August 8th, 2022.

Q. Okay. Was the running of CCleaner on IT005 on November 8th, 2022, as shown here in Exhibit 20, different than the prior runs on IT001 and IT002?

A. Yes. So CCleaner has a couple different options. You can have it delete things where it removes the data and metadata. However, there is a possibility of recovering certain fragments of information as we discussed, but there is a function that you can enable called SecureClean part of CCleaner where you set it to not just delete the information, but permanently overwrite the information so it can never be recovered. It also removes the index information, which is things like the file path, the file name, the dates and time stamps of the files. The metadata itself, it specifically overwrites them in a very specific pattern that makes it impossible to ever recover that data, ever.

Q. Is the SecureDelete function or the SecureClean function, I think you called it, a manual feature that is selected, or is that part of the default features of the CCleaner?

A. It is not set by default. You have to turn it on,

typically because it takes more time.
Q. What impact does this have on the availability of the data when you run the SecureDelete feature?
A. So that data is unrecoverable as well, but unlike the fact that you might be able to recover fragments, there is no ability to recover any data that exists that was deleted in this manner.
Q. Are you able to tell from the pre-fetch report of IT005 how many files were deleted using this SecureDelete function on November 8th, 2022?
A. So not from the pre-fetch, itself. However, there is a specific pattern that CCleaner utilizes to destroy the index data. So what it does is it renames the file in a ZZZ pattern. So it essentially -- like, if you have something called report.doc, it will actually change the file name to ZZZZZZ, like lots and lots of Zs. And then it will do it in a manner that updates all the date and time stamps, and it will remove the pathing location for it. So what we have here is 120-odd thousand ZZZ files that were created, have updated dates and times on this August 8th -- sorry, November 8th time frame indicating that Cleaners was utilized to destroy at least 123,000, I think it was.
Q. 122,564?
A. That sounds about right. There is a specific number as far as the numbers of files and folders that were deleted using

this manner, and those are gone. There is no way to ever recover that information.
Q. Looking at Exhibit 20, I had mentioned the 122,564 files that were deleted using SecureDelete --
THE COURT: Where is that number coming from?
MS. BENES: We don't see -- and let me get there.
THE COURT: I mean, is it in Exhibit 19 or 20 --
MS. BENES: Well --
THE COURT: -- should I be looking at that?
MS. BENES: Exhibit 20, yes, please, is paginated at the bottom, and I see here 1 of 1,857 pages --
THE WITNESS: So that's actually Exhibit 21.
MS. GREENE: Where do you see -- you're at Exhibit 20.
THE WITNESS: That's Exhibit 21. It's Exhibit 21.
MS. GREENE: I have two pages for Exhibit 20.
MS. BENES: Hold on.
MS. GREENE: I have two pages for Exhibit 20.
MS. BENES: I'm sorry. That's --
MS. GREENE: Okay. So you want to go to Exhibit 21?
MS. BENES: No. We're going to do 20. This is wrong.
MS. GREENE: Okay. Fair enough.
MS. BENES: Okay. I can help.
MS. GREENE: Maybe the Court because he's got to (indiscernible), too.
THE WITNESS: Well, so I have --

THE COURT: Wait, wait, stop. Let's wait for a question, please.

THE WITNESS: Yeah.

MS. BENES: Your Honor, do you have -- what do you have on Exhibit 20? Do you have two pages, one of which is paginated 1 of 1,857?

THE COURT: No. For Exhibit 20, I have pre-fetch IT005 --

MS. BENES: Okay.

THE COURT: It's two pages. The second page says Google Search IT005 --

MS. BENES: I apologize --

THE COURT: -- 21, then I have in the lower, right-hand corner, 1 of 1,857.

MS. BENES: Okay. I apologize. 20 and 21 need to be switched --

THE COURT: Oh, I see.

MS. BENES: -- we are talking about --

THE COURT: Okay. All right. Go ahead.

MS. BENES: I apologize --

THE COURT: That's fine.

MS. BENES: -- for the inconvenience to everyone. Do you have --

MS. GREENE: Yep.

BY MS. BENES:

Q. Do you have the correct exhibit in front of you?
A. So the exhibit I have for 20, I have the pre-fetch information, which is what we identified as 20 before. And for 21, I have the ZZZ files.
Q. Okay. So maybe it's wrong in only in my book. We are looking at the ZZZ file exhibit, which I have identified as Exhibit 20.
THE COURT: Is 20 the one that says 1 of 1,857 in the lower, right-hand corner?
MS. BENES: Correct.
THE COURT: Okay.
MS. BENES: And Your Honor --
THE COURT: Oh, I see all those Zs.
MS. BENES: Right. And the second page is actually the last page of that spreadsheet, the 1,857 of 1,857.
THE WITNESS: That's correct. So I generated this full --
BY MS. BENES:
Q. Can you tell me why you generated it that way?
A. Yeah. So the -- there's a lot ZZZs. There's 120,000 of them. So because of how much it takes to print these, I identified the first page and the last page to give an indication as to what it looks like and the total number of pages that exist, but you can see the date and time stamps that were -- when they were initiated, and you have a 10:37 being

the last one -- or on the first page it's the latest one so at 10:37, and then you have on the last page, it's -- the earliest is 10:30. So that essentially, it's seven minutes of overwriting of data that existed.

Q. Do you have the entire spreadsheet, the 1,857 pages, containing all 122,564 deleted files if the Court would like to see all 1,857?

THE COURT: No, I don't, but --

MS. BENES: Okay.

THE COURT: -- what I want to know why you're using 122,000 and change, and the exhibit says 1,857.

MS. BENES: 1,857 is the pages.

THE COURT: Oh, they're page numbers.

MS. BENES: Um-hum. And so on each page, there are however many files that were deleted, and so you take the number of rows times 1,857, and so when you look at the native spreadsheet, which was produced --

THE COURT: Why don't we ask the witness that question --

MS. BENES: Right.

THE COURT: -- instead of having you testify about --

MS. BENES: Sure.

THE COURT: -- it, please? But thank you for --

MS. BENES: Sure.

THE COURT: -- bringing me up to speed on that.

Q. Can you --

THE COURT: Can you explain that to me?

THE WITNESS: Yes.

THE COURT: Do you see what I'm asking there?

THE WITNESS: Absolutely.

THE COURT: Okay.

THE WITNESS: So what I do have, though, is the exact number -- here we go. On paragraph 68 of my report, it identifies that there are 122,564 artifacts that have the ZZZ pattern. The attachment that -- which is Exhibit 16 of my report is an electronic Excel spreadsheet that has all of those artifacts within them, but because of how it takes to print, we only printed the first and the last one.

THE COURT: All right. That's fine. Thank you.

MS. BENES: Thank you. Move for the admission of Exhibit 20xxx --

THE COURT: Any objection?

MS. BENES: -- the ZZZ file.

MS. GREENE: I'm going to object that it's incomplete, and it's partial. It's not a demonstrative. It's not a summary. It is an uncomplete document purporting to be evidence of something that we don't have a way to verify, cross-examine on. It's not representative of -- 1,857 pages, we've got two of it.

MS. BENES: I'm happy to produce all 1,857, if the

Court would like them.

THE COURT: I'm going to overrule the objection because --

MS. GREENE: I understand.

THE COURT: -- I want to make it clear why I'm overruling the objection. Technically, that's not bad objection because it's a partial document, but I can tell you that looking at page 1 and page 1,857, that the pages in between won't tell me anything useful. I will not be able to discern anything useful, but if you want to -- you're entitled to cross-examine on the entire document, and if you want to, then I'll order that. So the objection is overruled, and number 20 is admitted.

(ZZZ file was hereby received into evidence as Plaintiff's Exhibit 20, as of this date)

MS. GREENE: Thank you, Your Honor.

BY MS. BENES:

Q. Moving to 21, which is the pre-fetch, which I believe, everybody except for me looked at as Exhibit 20, do you know -- do you recognize Exhibit 21?

A. Yes.

Q. And can you tell the Court what that is?

A. This is the CCleaner 64 pre-fetch for IT005.

Q. Okay. And can you tell when it was downloaded or installed on IT005, CCleaner 64?

A. Based upon the creation date, it has July 3rd, 2022, at 10:05 a.m. Again, it's hypothetically possible there was an update, but that was an install that occurred.
Q. Do you know whether it was redownloaded and reinstalled on IT005?
A. So there is indication of that if you go to the next page. There was extracted from the internet history of IT005 was a Google Search that was identified showing that the CCleaner was run on Google about fifteen minutes prior before -- prior to CCleaner being run on November 8th, 2022.
MS. BENES: Okay. I move for the admission of Exhibit 21.
MS. GREENE: No objection.
THE COURT: It will be admitted.
(Pre-fetch for IT005 was hereby received into evidence as Plaintiff's Exhibit 21, as of this date)
Q. Did you also analyze a device referred to as IT027, which was identified by Mr. McDannell as Mr. -- as the main -- I'm sorry, Mr. Bogatin's thumb drive?
A. Yes.
Q. And what, if any, evidence did you find of CCleaner being run on IT027?
A. So another function of CCleaner gives the user the ability to overwrite unallocated space. So when you delete a file, essentially what you're doing -- and this dates me a little

bit. It's similar to a card catalogs system where you have an index and you have the books. When you delete a file, essentially all you're doing is bending the card by default. So you still have metadata, you still have the information about the book, and you still have the data, which is the book on the shelf.

But as new data comes in, it knocks the books off the shelf. Basically that area gets to be -- that's now -- that's an area that's assigned to be used. It can be used, but it still contains data. So if you want to -- if you delete something, and you want to get rid of the data an effective way to do that is to have an application such as CCleaner knock all the books off the shelf. So essentially overwrite all the unallocated space, which makes it impossible for any deleted information to ever be recovered.

When CCleaner does it, it has a very specific pattern as to how it does it. It creates very, very, very big files with a very specific type name, and in doing so, it overwrites all the data that exists in unallocated space. So if you look at the first -- I think it's eight lines --

Q. I'm sorry. We have not gotten to Exhibit 22 yet.

A. Oh, I apologize.

Q. Can you turn to Exhibit 22?

A. I apologize.

Q. You're fine.

THE COURT: All right. We will, but remind me, if you would, please, what IT001 is in your understanding?

THE WITNESS: IT027?

THE COURT: No. IT001.

THE WITNESS: Oh, IT001 is one of the computers. That was the computer that was not identified specifically by Mr. McDannell.

THE COURT: Okay. Thank you.

Q. We're talking about IT027, right?

A. That's correct.

Q. Okay. Can you turn to Exhibit 22?

A. Yes.

Q. Do you recognize Exhibit 22?

A. Yes. This is a file listing of data that exists on IT027.

Q. Can you tell the Court what Exhibit 22 tells us about IT027?

A. So as I was saying, when CCleaner is used to overwrite unallocated space, making it impossible to recover files that had been deleted, not with CCleaner, just through any methodology, it creates a recognizable pattern of file. In this case, we have a file name. I'm not going to read the whole thing. It has a very specific beginning, and in this case, you can see that on December 14th, 2022, at around 9 a.m. -- so 8:50 to 9:02 a.m., seven-plus gigabytes of CCleaner data was written to the drive and then deleted, and what that

does is any -- any of the data that existed in that unallocated space prior to that moment in time gets knocked off the shelf and becomes unrecoverable.
Q. You said it began to run -- or this began to occur at 8:52 a.m. on December 14th, 2022?
A. That's correct.
Q. Wasn't December 14th, 2022, the second turnover date?
A. Yes. That's the day when Kevin Cantwell went to the building to collect thumb drives.
Q. Do you recall what time Vestigant was to appear at the building for the second turnover?
A. Around noon, I think. Maybe a little earlier.
Q. You mentioned that 7.4 gigabytes, I believe -- or seven gigabytes was overwritten?
A. That's correct.
Q. Can you tell the Court how much is seven gigabytes? What are we talking about here? What's the magnitude?
A. So in eDiscovery -- and again, we don't know what data was there. So in eDiscovery, there's a metric that they use. Every gigabyte is about 30,000 emails is a good met -- if this was up like -- hypothetically, if this was all emails and they're all text emails, it's about 30,000 of them. So again, it could be more, it could be less, but that's a decent metric as to what it could be.
Q. Okay. So 30,000 times 7 is 210,000 emails?

A. Hypothetically, yes.
Q. Okay. How did the running of CCleaner on IT027 using this unallocated space feature impact the availability of the data on that device?
A. If there was any deleted data that existed in there that was recoverable or even just not overwritten, we would have been able to access it, and we lost that ability.
Q. Did you also --
MS. BENES: Move for the admission of Exhibit 22.
THE COURT: Any objection?
MS. GREENE: No objection.
THE COURT: It will be admitted.
(List of file data was hereby received into evidence as Plaintiff's Exhibit 22, as of this date)
Q. Did you also find evidence of other data destruction efforts that were made on the devices, other than CCleaner?
A. Yes.
Q. Can you explain to the Court what you found?
A. So on one of the devices, a user profile was placed in the recycle bin on I believe it was October 26th, 2022, and the entirety of that user profile was placed in the recycle bin. I think it was about 80,000 files were included in that. And to be clear, that's documents and such, but it's also system and user information as well, but it was a large amount of data.
Q. Was that on IT002?

A. Yes. I apologize. It was IT002.
Q. And that is the computer that Mr. McDannell identified as Ms. Gunkova's computer?
A. Yes. Based on the letter he sent, yes.
Q. Were you able to determine what files were placed in the recycle bin on October 26th, 2022?
A. Yes. We were able to recover that data.
Q. Okay. What does placing those files in the recycle bin indicate to a forensic expert?
A. I --
MS. GREENE: Objection. Calls for speculation.
THE COURT: I sustain that objection.
Q. You indicated you were able to recover the files. Were the files altered in any way because of the placing in the recycle bin?
A. Yes. So there's certain metadata fields that get updated and changed. So for example, the last access date is an important one. That gets updated. The entry modified is another type of modification file that gets updated when a file gets placed in the recycle bin. And what can -- that can show us from a forensic point of view is because the information -- the computer only keeps track of the last time those files have that date updated, it overwrites the one before that. So if you -- if it's important to know that a file was interacted with in, like, a month earlier, we lose that ability to see

that.
Q. From looking at the files that were placed in the recycle bin, were those files or folder names -- were you able to determine whether they were responsive to the search terms under the order?
A. So at the very least, there were a number of files that had the search terms within their file names and in their content.
Q. I'd like to transition to discuss metadata issues, Mr. Racich. Do you know what a ransomware attack is?
A. Yes. So ransomware attacks are a viral type attack where a user typically executes an application, which in turn starts the encryption, the unwanted encryption of -- of data that exists on a computer. If the computer is not secured, executables can then transport themselves to other computers on the network. So it will definitely affect the one that you launch it. But depending on how securely you have your network set up, it can -- it can affect other computers within your network.
Q. Did you review Ms. Gunkova's prior testimony in the Loudoun case relating to an alleged ransomware attack?
A. I did.
Q. Can you turn to Exhibit 23, please? Do you recognize Exhibit 23?
A. Yes. It's an excerpt of the September 30th, 2021, deposition of Ms. Gunkova.

Q. Turning to the page marked 322, line 6, I asked Ms. Gunkova, okay, did your computer suffer a ransomware attack at some point? Ms. Gunkova answered, yes. It was your computer? Answer: All computers. Question: All computers where? Answer: In the spa. Question: In Aria Medispa? Answer: Yes. I then went on to ask her, and tell me about that ransomware attack; what happened? Her answer, we lost all database. Did you review Ms. Gunkova's testimony during your analysis?

A. I did.

Q. In performing your forensic examination, did you form an opinion as to whether Ms. Gunkova's contention that all data and all data base were lost was accurate?

A. It wasn't accurate based on the information that we had. There were certain files that -- that were produced in discovery that had creation dates earlier than November time frame that's referenced. Indicating that they existed on computers in -- in some way, shape or form at least since an earlier time frame, as well as one of the computers had an installation date earlier than the November 2020 time frame.

MS. BENES: Move for the admission of Exhibit 23?

THE COURT: Any objection?

MS. GREENE: I don't have an objection to it up to page 322. The page went from as to the balance of it, I do as they were not utilized or read into the record.

MS. BENES: Okay. Happy to make it part of the record by moving it in. They are the statements of Ms. Gunkova. So they are admissions by a party opponent.

THE COURT: I overrule the objection. It will be admitted.

(September 30, 2021 Excerpt of V. Gunkova Deposition was hereby received into evidence as Plaintiff's Exhibit 23, as of this date)

Q. Mr. Racich, were you asked to analyze certain native files that Ms. Gunkova had produced in August or September of 2021?

A. Yes.

Q. Okay. Did you understand that those native files related to Mr. Kamin's claims?

A. Yes.

Q. Did you --

THE COURT: Can you stop there and tell me what a native file is, please?

THE WITNESS: Sure. Yes. So there are a couple of different ways one can produce files in electronic discovery. The two main ones that you see are natively and in some sort of modified format with a load file. So native is -- like a Word doc is literally a Word doc. You just provide the Word doc, the PowerPoint. The value of that is you get the whole thing exactly as it is, more or less, and the content as a particular file, but you have to open it using Microsoft Word. You have

to -- there's certain things you have to do to make it work.

The other option is to put -- have it be in PDF or TIFF format with -- with the metadata attached. The use of that is you have one application that can read all of it. It's not always pretty. It doesn't always look exactly the way it would look like on the screen. And you -- when you're running searches, you have to look at the metadata separately, but those are the two main ways. So in this case these files were produced natively. If they're a PDF file, it was produced as a PDF file, not as a converted PDF file. Not from something else converted into PDF format.

THE COURT: Thank you.

Q. Do the native electronic files allow an expert or one who knows how to do it to analyze the metadata, the fingerprint of that document?

A. Yes, there's certain -- there's certain information that gets carried with the file even when produced in normal e-discovery process. And one of those things that you can do are date and time stamps, including things like creation dates and last modification dates.

Q. Did you analyze those files that were produced?

A. Yes.

Q. Can you turn to Exhibit 24? Do you recognize Exhibit 24?

A. I do.

Q. Can you tell the Court what Exhibit 24 is?

A. So this is a list of files that were produced as native files in discovery by Ms. Gunkova. And it includes the file name, as well as the internal creation date and the entry modified date, which is a date when the file was updated and saved.
Q. Can you tell the Court what did you determine about the files that are highlighted in yellow?
A. So those files all had creation dates that were earlier than the November 2020 time frame when the alleged ransomware attack took place.
Q. And what does that tell us about Ms. Gunkova's contention that a ransomware attack occurred and they lost all database?
A. So it means that these files, at least, were not affected by a ransomware attack. So we have at least five of these files in this list that existed during the ransomware attack but don't appear to have been affected by it.
Q. Can you tell the Court what you found as to all of the remaining documents?
A. So the creation date and the entry modified dates are all in 2021. Listed in those two -- those two fields indicating that they were created in that time frame and last saved in that time frame. So from a forensic point of view, that's the earliest information we have as to identifying when those files existed.
Q. Mr. Kamin filed his case in Loudoun County on March 8th,

2020. Does it show whether these documents were modified during litigation?
A. It shows that there was a -- there was modification in April, in May, and in August, depending on the files.
THE COURT: And let me stop you there as well. Understanding that all of my questions are demonstrating how little I know about computers. But if you just open, for example, a PDF document, look at it, don't change it, and close it, does that create -- would that be in the entry modified column?
THE WITNESS: No.
THE COURT: Okay.
THE WITNESS: So in order for that to change there are some sort of save has to occur. So what that saved is I can't tell you, but I can tell you that something was altered at that moment in time.
Q. But could it include an alteration of text?
A. Yes.
Q. Could it include an alteration of a signature?
A. Yes.
THE COURT: Okay. Thank you.
MS. BENES: Move for the admission of Exhibit 24?
THE COURT: Any objection?
MS. GREENE: No.
THE COURT: It will be admitted.

(List of Native Files was hereby received into evidence as Plaintiff's Exhibit 24, as of this date)

Q. Mr. Racich, did you assist in creating a timeline that laid out all of your findings with regards to the date of destruction that you discovered in this case?

A. Yes.

MS. BENES: Deputy, can I have your assistance, please? Thank you. One for the witness and one for the Judge, please. Thank you so much.

THE COURT: Thank you. Let's have one for the witness, please. Would you? Thank you. One for the witness, please.

THE WITNESS: Thank you.

Q. Mr. Racich, I have handed you what is pre-marked for identification purposes as Exhibit 25. Is this the chart that you assisted or the timeline that you assisted in providing?

A. Yes.

Q. And does this accurately depict your findings as to the date of destruction that you have testified to at the various times in this case?

A. Well, there's two parts to it. One is the attachment of different hard drives and the -- that were at various item numbers. That's mostly on the left -- on the left-hand side. And then we have on the right-hand side in red the different time frames when CCleaner was, was executed.

Q. Does this accurately depict your findings with regards to the various activities that took place in the data destruction in this case, with regards to the other dates that were pending at the time?
A. Yes.
MS. GREENE: Objection. Asked and answered.
THE COURT: Overruled.
A. Yes. So the top part shows different parts of the -- of the case and when these other actions in red were occurring.
Q. Thank you.
MS. BENES: Move for the admission of Exhibit 25?
THE COURT: And just a second, where it says CCleaner on the right, that's installation or use or both?
THE WITNESS: Use.
THE COURT: Use. Okay. Thank you.
Any objection to -- we're going to mark this as what, 25 you say?
MS. BENES: Yes, Your Honor.
THE COURT: All right. Any objection to Exhibit 25?
MS. GREENE: No, Your Honor.
THE COURT: It will be admitted.
(Timeline Chart was hereby received into evidence as Plaintiff's Exhibit 25, as of this date)
Q. And let me just clarify, just to make sure, Mr. Racich, looking at the first block of all these various hard drives,

what do those blocks show?
A. They show different attachments of different hard drives to the different item numbers. So for example, the first one on the left-hand side, which is April 10th, 2021, the first hard drive was attached to IT user 002. On April 27th, 2021, the first hard drive was attached to IT 002. And we have artifacts that support that throughout in -- within my report. So that's how one reads those blocks.
MS. BENES: Thank you, Your Honor.
I have no further questions for you, Mr. Racich, at this time. Thank you.
THE COURT: All right. Thank you.
Cross-examination?
MS. GREENE: Oh, yeah.
(Pause)
CROSS-EXAMINATION
BY MS. GREENE:
Q. Good afternoon, Mr. Racich. My name is Nancy Greene. I represent Ms. Gunkova in this case. You testified earlier about the attachment of various USB drives to the various computers, correct?
A. Yes.
Q. Nothing in your report identifies who attached those USB drives, correct?
A. That's correct.

Q. And nothing indicates who actually owned the USB drives?
A. That's correct.
Q. Okay. Other than IT 027, which we indicate was Mr. Bogatin's thumb drive?
A. Yes.
Q. Okay. I'll direct your attention to Exhibit 10 and your demonstrative, which was not marked, that was called identification of devices. So if you could take both of those out.
A. And this is Exhibit 10 of plaintiff's?
Q. Yeah.
A. Yes.
Q. We'll start with plaintiff's book for a second. Okay. You have indicating -- the Cova ID for IT 002, you label it as, quote, Ms. Gunkova's computer, right?
A. Yes.
Q. Okay. You say that as identified by the ID device three. But in fact, if you look at Mr. McDannell's email under Ms. Gunkova's computer, it says one is device 1 in our disclosure; that computer is the main computer used in BNG's daily operation. It is also used in Aria's day-to-day operation, correct?
A. Yes.
Q. Okay. So it was not, in fact, primarily Ms. Gunkova's, correct?

A. I -- I didn't say primarily. I just said that's the description provided by Gunkova.
Q. And you did nothing to determine who else had access to device number 1, correct?
A. And I apologize, you're talking about IT 002 device 1? I just want to make, like -- if we just to be consistent in whatever number so I don't get confused.
Q. Right. What you've identified in your identification of devices under Ms. Gunkova's computer device 3 and 6 that Mr. McDannell in Exhibit 10 refers to as device 1, which is different than how you've represented it. But you did nothing to identify who was using Mr. McDannell's device 1, which he states is used in BNG's and Aria's day-to-day operations?
A. Right. But there's also in Exhibit 9 where there's a -- there's a further description based upon serial number as to what the different devices are as well.
Q. It's not my question. You didn't do anything to determine who had access to that computer, did you?
A. I couldn't be able to tell as to who physically had access to that computer.
Q. Okay. And let me go further down in that paragraph. So three lines up from the bottom of that, quote, Ms. Gunkova does use this computer to access her BNG, comma, so I'm adding it as device 6, parentheses, below in this email, should you wish to image this computer as well. Device 6 is what we assume you

were referring to as, quote, Ms. Gunkova's computer, unquote. That was another area computer in its business office, right?
A. So that is a bit confusing as to what Mr. McDannell was just discussing at this point.
Q. Okay. Let me direct you to the very first line in that paragraph. Quote, there are two computers in the Aria business office, unquote. Right?
A. Yes.
Q. And he's identifying one as device 1 in his initial disclosure, and he's now saying there is a second one that he's calling device 6, correct?
A. Right. Yes.
Q. Okay. Did you do anything to determine who had access to device 6?
A. I have no ability to determine who is provided access to -- to device 6.
Q. And device 6 is referred to by Mr. McDannell in Exhibit 10, is part of IT 002 in your identification of devices, correct?
A. That's correct.
Q. Okay. So IT 002 is actually two computers in your identification of devices, correct?
A. So it's not two separate computers. There's one computer that has the serial number. I don't know what Mr. McDannell -- when Mr. McDannell identified the serial numbers, these are the serial numbers of the -- of the devices that we have that we

were provided access to.
Q. But didn't you -- you testified, in fact, that when you say Gunkova ID number, it was based on Mr. McDannell's identification of them based on his Exhibit 10, right?
A. And Exhibit 9, yes.
Q. Okay.
THE COURT: Let me stop you there for another question. In the Gunkova ID on the identification of devices, does that correspond to the November 1st, 2022, letter from Mr. McDannell where he says device 1, you're using device 1 as IT 005, et cetera?
THE WITNESS: So the device -- the -- the -- Ms. Gunkova's computer device 3 and 6 has a serial number that was not identified in the November 1st time frame. So that was a computer that was -- that had a different serial number or the serial number, if I recall, was actually incorrect. I think that was the Q -- that was technically supposed to be the QLF00572, which I think was just a mistake, I think. So there was a model number that had that information in there, and the actual serial number was the 6122CH2. I think that was a -- someone made a mistake when -- when they told Mr. McDannell that that was the serial number.
THE COURT: But the Gunkova IDs that you're using comes from Mr. McDannell's letter; is that right?
THE WITNESS: Yes.

THE COURT: Okay. Thank you.
You can proceed, please.
Q. Okay. I want to take you to the defendant's book and direct your attention to Exhibit 9. You've seen Exhibit 9 before today?
A. I do.
Q. Did you help Ms. Benes prepare Exhibit 9 in responding to Mr. McDannell's designation of devices?
A. I'm sure I looked at the information.
Q. Okay. And nowhere in Exhibit 9 did you reference USB devices, hard drives, or external cloud devices?
MS. BENES: Objection.
Q. Let me rephrase that, because it's not your letter, but nowhere in Exhibit 9 is there a reference to USB devices, cloud devices, or hard drives, is there?
A. Not specifically. Cellular devices -- oh, well, no, that's not true. Any cloud or backup storage. So that would include cloud based systems and backup, which is, to be frank, is USB devices are often used for that purpose.
Q. So no reference to USB devices, correct?
A. Not using those words, but backup storage is inclusive of that.
Q. Okay. And turning attention to again Exhibit 10 in either books but the plaintiff's book that you were just looking at. And when Mr. McDannell responded on November 10th, you were

copied on that email?
A. I believe that's correct, yes.
Q. And you did not respond to him saying there's no USB devices or other devices in your designation, correct?
A. No, not -- no, I didn't respond to this. No.
Q. And you didn't indicate, hey, we're also looking for cloud and email devices, did you?
A. No, not specifically. No.
Q. Okay.
MS. GREENE: Move for the admission of Defendant's Exhibit 9?
THE COURT: Any objection?
MS. BENES: No objection, Your Honor.
THE COURT: It will be admitted.
(Device Designations was hereby received into evidence as Defendant's Exhibit 9, as of this date)
Q. You testified earlier that you went to the BNG members meeting in approximately December 2021, with the intent to image the BNG computers, correct?
A. If possible, yes.
Q. Were you aware that Ms. Gunkova had made an offer to have joint imaging of the computers prior to that point?
A. I don't recall at this point, no.
Q. I'll direct your attention to defendant's book to Exhibit 6.

A. Okay.
Q. In the second paragraph, six lines from the bottom, starting at the end of that line. Mr. McDannell writes to Ms. Benes, quote, when I orally suggested we agree to a formal procedure to have professional collect those emails, paren, your clients and ours, end paren, and run agreed upon keywords against them as a ethod (ph.) -- and I presume that's a typo for method -- of resolving this issue, you rejected that. Do you see where I'm reading?
A. I do.
Q. Had you been made aware by Ms. Benes that there had been an offer to jointly collect the emails and electronic communications, a cost sharing offer made in November of 2021?
A. I don't recall when I saw this email. I believe I have seen it at some point. Although the December 7th me going there was more for a collection of the physical devices, not email.
MS. GREENE: Move for the admission of Defendant's Exhibit 6?
THE COURT: Any objection?
MS. BENES: Objection on the basis of hearsay.
THE COURT: Ms. Greene?
MS. GREENE: I can table it for now and bring it back in. It is part of the admissions as to those communications from Ms. Gunkova's counsel to Mr. Kamin's counsel. But I can

have Mr. McDannell come in and authenticate it in a little bit.

THE COURT: I mean, is he available this afternoon?

MS. GREENE: He's here.

THE COURT: Oh, he's here. Okay. Good. And you might be called to the stand to -- Ms. Benes, to determine if you received the email.

MS. BENES: Sure. Mr. McDannell testifying about this email doesn't change the fact that it's still hearsay. It's not a party opponent admission.

THE COURT: Well, I'll sustain the objection.

MS. BENES: It's still hearsay.

THE COURT: But I'm sustaining it really on the grounds of foundation, because he wasn't a recipient of the email, nor was he the sender.

MS. GREENE: Understood.

THE COURT: So somebody's got to identify it. I'll reserve judgment on the hearsay objection.

MS. BENES: Thank you, Your Honor.

Q. I would like to direct your attention to the defendant's book to Exhibit 11.

A. Yes.

Q. Can you identify Exhibit 11?

A. I apologize, it's very faint, so. But it looks like part of a message. It's not complete because it starts with the hyphen, hyphen, hyphen original message, which indicates that

this was a reply of some sort. But beneath that there is a reply from me to Mr. McDannell cc'ing Bethany Benes and the admin at Bethune Benes.
Q. Right. Was this regarding scheduling the original forensic imaging?
A. It -- it -- it appears to be, yes. I -- this -- this function again, it's -- it's not complete, but it says, Jay, we can make the 22nd work.
Q. Right. In fact, Ms. Gunkova had proposed a number of days for the imaging of the computers, and that Vestigant picked the date that was most convenient for it of the dates proposed by Ms. Gunkova, correct?
A. So sort of. I -- I -- I'm not sure about the categorization, but on November 10th I would -- I put in a request of how long I thought different device imaging would take. On the 14th, Mr. McDannell said that the next day was -- was possible or the day after that. And honestly, two days, if I recall, that wasn't enough time to -- to coordinate getting two people to the offices. So the 22nd was the earliest that we could do, given the time when Mr. McDannell responded.
MS. GREENE: I'd like to move to the admission of Exhibit 11?
THE COURT: Any objection?
MS. BENES: No objection.
THE COURT: It will be admitted.

(Email Scheduling Original Forensic Imaging was hereby received into evidence as Defendant's Exhibit 11, as of this date)

Q. In fact, there were discussions with Mr. McDannell about how the investigations, production or imaging was going to be produced to Ms. Gunkova for review, for privilege information, correct?

A. There were emails about -- about production, yes.

Q. I'll direct your attention to Exhibit 12. Identify Exhibit 12.

A. All right. It looks to be an email from Mr. McDannell to Ms. Benes, and I was cc'ed on that.

Q. Okay. Specifically, I want to direct you to the first bullet point. Isn't it true that Ms. Gunkova was proposing key terms that Ms. Benes had left out of her search that to be part of the data search?

A. There -- there's a -- the first bullet point says Mr. McDannell says, I think you're missing one important term, the(indiscernible)301@gmail.com. That's as a search term.

Q. And that if you turn on it, Mr. McDannell was also indicating that he was concerned about the format that the data would be returned over to him for review at this point, correct?

A. If you can point to it, I'm happy to look at it.

Q. The last bullet point.

MS. BENES: Sorry, Counsel. Can you direct me to where you are? The last bullet point.

MS. GREENE: On the bottom of the page. Well, the second bullet point, last bullet point.

MS. BENES: Second bullet point. Last bullet point.

A. So the last bullet starting with finally?

Q. Among others, yes.

A. I'm not sure where you're saying there's anything about production. And if you can point specifically to where it says stuff about production, I'm happy to look at it.

MS. GREENE: Move for the admission of Exhibit 12?

THE COURT: Any objection?

MS. BENES: Objection on the basis of hearsay. This is an email written by Ms. Gunkova's counsel. You can't submit your own statement, out of court statement for the truth of the matter asserted.

THE COURT: Well, what's the purpose of --

MS. BENES: She's not a party opponent.

THE COURT: Thank you. What's the purpose of introducing this email? Because I'm kind of missing the point here?

MS. GREENE: A couple of points, right. Among other things, they're trying to say that Ms. Gunkova was delaying, not participating in, obstructing, and here she is proposing search terms that are critical. One of the issues is this

ownership of this particular email account and the correspondence related to it. And here they are pointing out specifically that it was a search term that was missed out. That there was concern about the false -- the number of hits, that it was going to produce, a huge data set that was going to impact the review process, and that these are all being raised as part of the whole process, right.

One of the concerns in the motion is that it took so much time to review this data set and return it back. This all goes to that whole process that Mr. Racich was involved.

THE COURT: I've overruled the objection. It will be admitted.

(Email re Key Search Terms was hereby received into evidence as Defendant's Exhibit 12, as of this date)

Q. Mr. Racich, I direct your attention to Exhibit 13.
A. Okay.
Q. Again, starting as early as December 1st, 2022, wasn't it true that there were concerns about the format of the data set that you were going to turn over to Ms. Gunkova for review after the imaging of the computers?
A. I'm not sure about the concern. We produced data as either forensic artifact reports with regard to things like the jump files link -- link jump list, link files, those sorts of things, and then native files. We produced native data.
Q. Right. Wasn't there, in fact, request for you to

coordinate with Ms. Gunkova's ESI experts, so that it could facilitate the review and transfer of that documentation?
A. We transferred the native files to KLDiscovery. That was what we -- we provided.
Q. Directing your attention to Exhibit 13, third paragraph. In fact, there was a request for you to sort out formatting protocol issues for the search results deduping method of transfer between the two companies, correct?
A. Yes.
Q. And that was not done?
A. No, that's incorrect. I had a phone -- I had phone calls with Keith about that, and I told him we were providing data in native format.
Q. Right. And that included that it did not have any load or control file numbers on them?
A. We don't do that. We're -- we don't do -- we aren't providing the data from a load file format. We provided the native files, which is a typical and industry standard way to produce data in electronic discovery.
Q. So in fact, once Ms. Gunkova got the raw data from you, she would then have to hire someone to process the data further before it could be reviewed and reproduced back to Mr. Kamin, correct?
A. We provided the data and spreadsheets that gave the information about the data to KLDiscovery. What they did with

it, and how they were going to do their analysis on it, wasn't part of my understanding of what Vestigant was supposed to do. We were doing the forensic exam, identifying the data based upon search terms that -- that were responding to the search terms, and provide it to Ms. Gunkova's counsel and her eDiscovery vendor to do with it what they needed to do in order to have him review it.
Q. Right. But to review that data set, for example, privilege, because they would have had to then further manipulate that documents to extract out the attorney-client privilege information, correct?
A. Arguably, they could have reviewed all the native files. It's not the easiest way, but it could -- it could be done. So our job was not to do the processing of the data for Ms. Gunkova. We were -- we were hired and our job was to identify the data, search for it, identify the forensic timeline of information and provide that under the protocol. That's what we did.
Q. Okay. Let me direct your attention to Exhibit 15, Defendant's Exhibit 15. In fact, you first advise Ms. Gunkova that there was an issue regarding USB drives on December 1st, 2022, correct?
A. Yes. That we had started the analysis and we were able to identify USB devices being attached to various computers. And so we identified those for Mr. McDannell.

Q. And within a day, Ms. Gunkova advised you that they had located eighteen sticks in one external hard drive, correct?
A. Yes. Well, Mr. McDannell did, but yes.
Q. Fair enough.
MS. GREENE: I'd like to move --
Q. And that communication is Exhibit 15, correct?
A. Yes, this is -- yes -- yes.
Q. Okay.
MS. GREENE: Move for the admission of Exhibit 15.
THE COURT: Any objection?
MS. BENES: No objection. That's also Plaintiff's 12. So it's already in evidence.
THE COURT: All right. Thank you. It'll be admitted.
(Vestigant Email Chain was hereby received into evidence as Defendant's Exhibit 15, as of this date)
Q. If you look at Exhibit 15, you're talking about on the second line in your email, the bottom email, quote, we are attempting to reduce the amount of false hits as much as possible. That's what's referred to in the industry as the deduplication. Sorry, let me rephrase.
MS. GREENE: Strike that.
Q. In terms of false hits, what are you referring to?
A. So for example, if you have a word that shows up in a object that is a system object, we try to reduce those as best we can, either by using a missed -- so a national industry

standard, I can't remember what the T stands for, but basically based upon hash values, trying to reduce the amount of information that is known information or things that are -- are doing at least a -- a 30,000 foot overview to try to reduce the garbage files that -- that are not going to be relevant.

(Pause)

Q. There come a time when you were made aware that files that you provided to Ms. Gunkova for review and processing were corrupted?

A. Yes.

Q. And that was in March of 2023?

A. I'd have to go back and look at the email, but there was a time frame when there were four files. I think it was out of the ones that we -- the thousands and thousands that we pulled -- I think there were four that -- that KLDiscovery wasn't able to open. So we reproduced those.

Q. And the fact that Ms. Gunkova's team also -- Ms. Gunkova also raised issues with regards to the deduplication process that KL used? Not KL, sorry. Vestigant used?

A. We did do deduplication based upon individual custodian, but we didn't do a -- we didn't do deduplication across devices.

Q. Can you please explain to the Court what that means?

A. So you can deduplicate data within the same container.

THE COURT: Are you saying deduplicate?

THE WITNESS: So using that --

THE COURT: The opposite of duplicate?

THE WITNESS: Yes. So using that same math we were talking about before, every file has its own fingerprint. You can run particular files through that same mathematical algorithm. And if they have the same file, if -- if they have the same exact MD5 hash value, they're the same file. So you don't necessarily have to produce them. However, sometimes you still have to produce them based upon pathing. Like if you -- if they're -- if it's important, like say if you have a file in the recycle bin and another file not in the recycle bin. It may be important from a forensic point of view to understand that both -- while both files are exactly the same because they -- they live in different places. It might be important to the investigation.

Q. And you are also aware that Ms. Gunkova raised issues with the fact that the files that the .ost .dst files that you were producing that were -- did not include files that were still hosted on the computers and therefore were missing from your data set that you had provided to them?

A. I don't think that's accurate.

Q. Direct your attention to Exhibit 24 in the defendant's book. Did you receive exhibit -- you received Exhibit 24 on or about April 10th, 2023?

A. Yeah. I remember looking at this, and I don't think this

is accurate. So Mr. McDannell said that there were .ost and .pst files that did not return results. There were lots and lots of results that came from those files, but lots and lots were withheld for privilege or what Mr. McDannell was -- was withholding data from. So I don't think this is accurate where he says that things did not return -- they -- they were produced to KLDiscovery. What was then produced back, I don't know what to tell you.
Q. Ms. Gunkova continued to express concerns that the initial pull of data did not represent a -- was not a complete representation of the files that were on the devices into April of 2023, correct?
A. I can't tell you what Mr. -- Ms. Gunkova thought.
Q. Direct your attention to Exhibit 25.
A. Okay.
Q. Do you recall receiving Exhibit 25 on or about April 18th, 2023?
A. Yes.
Q. In fact, at the end of the review process, Ms. Gunkova through counsel turned over approximately 34,517 individual documents in native format?
A. Yes.
Q. Okay.
MS. GREENE: Move for the admission of Exhibit 25.
THE COURT: Any objection?

MS. BENES: Same objection, Your Honor. This is an email from Mr. McDannell. It's hearsay. And Mr. McDannell is also not an expert witness. So his opinions that are stated in this email are improper layperson opinion testimony.

THE COURT: I'll overrule the objection. It will be admitted.

(April 18, 2023 Email from Jay McDannell was hereby received into evidence as Defendant's Exhibit 25, as of this date)

Q. In reviewing IT 005, which you indicate is Mr. Bogatin's computer, you were in fact able to confirm that it had been upgraded after and replaced in service after November 2020, correct?

A. I believe the operating system was -- was installed after that -- that time.

Q. Okay. Did you in fact verify that the computer that Aria was using for videos was in fact also upgraded or reformatted and put in service after that November 2020 date as well?

A. I believe that was the one used by Mr. Yun. If you tell me which one that was, I can -- I can go back to my report to identify the information I have about that.

Q. Well, are you aware that there was a computer that Aria was using for video?

A. That was one of the designations that Mr. McDannell stated one of the computers had been used for.

Q. And it is accurate to say that -- isn't it accurate to say that if a software is updated from the web, that it would be -- show its origination date as the download date?
A. I don't understand the question.
Q. Sure. Let me try to rephrase that. That came out poorly. Isn't it accurate to say that if software is downloaded from the web and installed on the computer, the computer is going to show that as its creator origination date?
A. It depends.
Q. And in fact, isn't it true that the files and creation dates, if a file had been saved over from another source and uploaded onto the computer, it may also retain its original date in the metadata?
A. I'm not quite sure I understand that question.
Q. Sure. If I had a Word document that was originally created, and I downloaded it from the web to the computer, it might retain its original origination date from the web file?
A. So the creation date is going to be the date that it was created on the media. So if that's what you're talking -- I think that's what you're talking about. But the creation date of a -- of a -- the operating system creation date is the date and time that a file exists on a particular piece of media. Can be creation, but it also can be copied.
Q. And isn't it true that none of your forensic review is able to tell you the original subscription date from when CCleaner

was purchased for the computers it was installed on?
A. I'm not sure -- CCleaner can be used as a free tool and there can be a subscription purchase, but.
Q. Let me rephrase that then.
A. Yeah.
Q. Isn't it true that none of your forensic analysis was able to determine when it was first installed?
A. We did have information about what we had as first installation. The first time we were able to identify when it was used. There -- there was artifacts that showed that.
Q. But you testified, did you not, that you could not tell if that was an update versus a first installation?
A. In certain circumstances, yes.
Q. And again, you testified you took no steps to determine who had access to the various computers that you imaged?
A. I have no ability to determine who physically has access to the computers.
Q. When you are on site, you didn't ask?
A. I wasn't on site.
Q. Your team?
A. They had access to four computers. One was in the front desk. They had -- they took notes on where they were as far as physical offices. But I don't know what the policies are for Aria Medispa, for BNG as far as who's allowed to use. Do they share passwords? I don't have any of that information.

Q. Right. And let me go back to that real key point. These computers were being used for Aria Medispa, correct?
A. I don't know. They were being used for BNG. I -- I know based upon what Mr. McDannell provided to us.
Q. And the computers were located in the reception area. At least two of them were located in the reception area for Aria Medispa, correct?
A. There was one that was -- had a user or front desk that I believe was in -- in that area.
Q. Okay. And did you do anything -- and you being Vestigant -- to determine how many employees at Aria Medispa would have access to any of the computers used in Aria Medispa's business?
A. I have no way to determine that.
Q. Okay. In looking at IT 002, which is the computer that had the -- oh, I'm going to say this so wrong. I love this divich (ph.) user on it. Did you -- again, you being Vestigant -- do anything to determine who that user might have been?
A. No. These were provided by -- by Ms. Gunkova and Mr. McDannell as computers that were responsive to the order.
Q. Okay. Did you take any steps to determine who may have access to that user file?
A. No.
Q. Okay. Again, with regard to the USB drives that you've testified to, do you have any basis as part of your

investigation to determine whose USB drives they actually were?
A. Well, as far as who owned them, not really, but we could see with -- to a certain respect, that certain information was part of -- had file paths that had Mr. Kamin's name in it, had BNG in -- in the file path name. So at the very least, they were potentially responsive to the keywords, if not to just the general devices that were part of the order.
Q. Okay. And you indicated that IT 005 was Mr. Bogatin's computer, correct?
A. According to Mr. McDannell, yes.
Q. Okay. To the best of your knowledge, Mr. Bogatin was not subject to the production order entered by the Loudoun County Court, correct?
A. I don't know specifically, but again, this was a device that was identified and -- and produced under the order.
Q. Go back to the production order.
THE COURT: We were unable to hear that because a -- you're not in --
MS. GREENE: Pen in my mouth. Sorry. It doesn't help when I'm looking in my book for something not in it.
Q. Let's go back to plaintiff's book, Exhibit 7.
A. Okay.
Q. You testified you were familiar with the Loudoun County order compelling production, correct?
A. Yes.

Q. Okay. Exhibit 7 has nothing to do or reference to Mr. Bogatin at all, correct?

MS. BENES: Objection. Calls for a legal conclusion.

MS. GREENE: He testified as to his familiarity with this order. And when I objected to it as to calling for legal conclusions, he was allowed to testify as to the effect of this order and what it meant.

THE COURT: But doesn't it say all electronic devices used to conduct business on behalf of BNG Group?

MS. GREENE: But the question is what Ms. Gunkova had control over and what she has the duty to produce. And right, we're here to sanction her for her conduct. And the question is what is her conduct and what is and is not under her possession and control. Whether or not she voluntarily produced it, again, is going above and beyond the order which affects whether or not she should be sanctioned.

THE COURT: I'm going to sustain the objection because I think it's just argumentative. I mean, we can all read the order and understand what it means.

MS. GREENE: Okay.

Q. I'm going to direct your attention and plaintiff's book to Exhibit 15.

A. Okay. All right.

Q. Okay. Indicate there are a number of documents that -- you testified there were a number of documents that appeared to

have been accessed from one of the thumb drives. In fact, you did not search the data to see if any of those documents still existed on the computers, correct?
A. A couple of things. First, this wasn't a thumb drive. This was a hard drive.
Q. I apologize.
A. No, I just wanted to be clear -- clear on that. But what we do have here is we -- all we have here are file names and file paths. So with regard to determining whether or not these are the exact same files as something with the same file name, we have no way to determine that. Not to a degree of scientific certainty as to whether or not these files do exist anywhere, because we're literally just going based upon file name. If we had access to the device itself, we could do that type of analysis.
Q. Sir, with all respect, that wasn't my question. You didn't do a search to see if these file names existed on the computers, did you?
A. So if they, because of -- if you look at the -- the file pathing, if they existed in file paths that existed on the local computers, they would have come up in the search terms. However, but again, what we have here is a file path and name. We don't know and have no way to determine without access to the device itself, whether or not -- even if they look exactly the same, we don't know whether or not they're the same unless

we have access to the -- to the device.
Q. Did you do a search for the file name, driver's license JPEG?
A. Specifically, I don't recall.
Q. So you have no way of knowing if these documents still existed on the computers, correct?
MS. BENES: Objection, Your Honor. Please, there's no need to raise voices at a witness.
THE COURT: All right. With that understanding, you can answer.
A. Even if we had a file named drlicfront.jpeg, we would not know if it's the same file as what exists here.
Q. And you didn't search for it either, did you?
A. But without -- it doesn't -- from the point of view of without the device itself, these files -- the files with these file names, even if all of them existed with these file names, there's no way to determine if they're the same files. So it's sort of like saying, you know, you're -- you're -- I can't even come up with a decent metaphor.
THE COURT: I get it. You're talking about two guys named Bill, and is it the same guy?
THE WITNESS: Yeah.
A. We just -- we just don't know. So even if we had run that search and looked for these files, and I don't know that we didn't. I mean, we definitely ran a search for BNG. So it

would have -- if they had this pathing information, we would have. And Harry D. Kamin was another one. We would have -- that -- that was another search term. So it would have pulled those files. However, even then I would not be able to say that it's the same file without having access to the external device.

MS. GREENE: Move to strike as nonresponsive.

THE COURT: Overruled.

Q. Directing your attention to Exhibit 16, Plaintiff's Exhibit 16.

A. Yes.

Q. In looking at the pathing, about a third of the way down, it says, D: Blake Plaza, new documents, property management, Judicial Drive. You're aware that Judicial Drive was the prior owner of the property at issue?

A. No.

Q. Okay. And this Exhibit 16 is the docket. It comes from the computer that you identified as IT 003 Yong Hu's computer?

A. That's my understanding; it was Yong Hu's from -- based on Mr. McDannell.

Q. Okay. Directing your attention to about the bottom third at the pathing, it says D: Lake Plaza, new documents, property management, Lake Plaza. You're aware of any connection to Lake Plaza to this case?

A. I don't know one way or the other.

Q. Okay. Do you have any way of knowing whether or not this particular, I believe -- I apologize. I don't remember if this is a hard drive or a USB drive list, but if it was Mr. Yun's personal device?
A. I don't know. What I can -- what I can say is that there's a -- there was a hard drive attached to IT 003, and there were certain files that were accessed within the -- within the time frame.
Q. Given that it looks like that file was first, if you look at the very first line of it, of Exhibit 16. If I'm reading it right, the target file was created way back in 2011?
A. That's a folder. But yes, there was a folder that was created in 2011.
Q. And 2012 for my videos?
A. Yes. There was a folder that was created then, yes.
Q. Okay. But you have no idea if that was Mr. Yun's personal device that he attached to a computer that he was using?
A. I -- I don't know.
Q. Okay. Are you aware the Loudoun court denied a prior motion to compel access to a forensic examination of the computers prior to the September 2022 motion?
A. You have to show me the document. I'm happy to look at it.
Q. Are you aware or not?
A. Oh, off the top of my head, I don't -- I don't recall.
MS. BENES: Objection. Misstates facts not in

evidence.

THE COURT: He's already answered the question, so the objection is waived.

Q. You testified that CCleaner, one of its functions is to overwrite unused space. And it overwrites that unused space whether or not there's data in it or not, correct?

A. If it's unallocated space, it over it -- it's -- not necessarily zeroes out. It actually is random data that it puts inside, but it puts random data in all of unallocated space.

Q. Right. So whether or not there was data in it before?

A. Yes. And we have no way to determine whether or not there was data at any point in it before because of the actions of that software being run.

Q. Okay.

MS. GREENE: I have no further questions for this witness.

THE COURT: Okay. Thank you.

Any redirect?

MS. BENES: Brief clean up.

REDIRECT EXAMINATION

BY MS. BENES:

Q. Mr. Racich, I want to clarify where and how you created the devices identification chart.

A. All right.

Q. So if you could pull out your chart. And I'm going to direct your attention to Plaintiff's Exhibit 9.
A. Yes.
Q. Okay. Device Vestigant ID IT 001 did not appear on Mr. McDannell's identification of devices in Exhibit 9, did it?
A. That's correct.
Q. Okay. IT 002, that appeared as device three on Mr. McDannell's November 1st, 2022, identification of devices, is that correct?
A. Yes. So the serial number that Mr. McDannell put together, that QLF serial number, was incorrect. When the Vestigant staff was on site, they identified that that was the computer -- that device 3 was the computer that was supposed to be that. And that was -- but the serial number that that had was the 6122CH2 serial number.
Q. So device 3, where Mr. McDannell had identified a serial number of QLF00572, that was actually a model number, right?
A. Yes.
Q. Okay.
Q. Go to Exhibit 10.
THE COURT: So let's just stop there for a second, please. Why does the chart say device 3 and 6?
MS. BENES: I'm going to get there.
THE COURT: Well, let's just have him answer now. Okay.

THE WITNESS: So Mr. McDannell identified -- he -- I'm not sure exactly his reasoning behind it, but he identified a device 3 and device 6 as separate devices, but they were the same computer.
Q. Look at Exhibit 10.
A. Yes.
Q. Go to the second page of Exhibit 10. Mr. McDannell identified device 6, right?
A. Yes.
Q. And he identified the exact same device with serial number QLF00572?
A. Yes.
Q. That was previously identified as device 3?
A. Yes.
Q. And in Mr. McDannell's November 10th email at Exhibit 10, he says on the first page, device 6 is what you -- what we assume you are referring to as Mr. Gunkova's computer, right?
A. That's correct.
THE COURT: So 3 and 6 aren't two devices; they're just one thing referred to in two different ways?
THE WITNESS: Yes
MS. BENES: Correct. He identified it twice.
THE COURT: Thank you.
MS. BENES: He identified Ms. Gunkova's computer twice as device 3 and device 6.

THE COURT: Thank you.
MS. BENES: You're welcome.
Q. IT003, that was identified as device 2 on Mr. McDannell's November 1st identification; is that right?
A. That's correct.
Q. And Mr. McDannell, in his November 1st, 2022 letter, described that as BNG property manager Jung Yun's (ph.) computer, physically located in BMG's business office, right?
A. That's correct.
Q. And that is why you put that on your chart; is that correct?
A. That's correct.
Q. Let's go down to IT005. That was identified by Mr. McDannell as device 1 on his November 1st, 2022 identification; is that right?
A. That's correct.
Q. And there, Mr. McDannell identified it as the current BNG Aria main business computer; is that right?
A. That's correct.
Q. And in Exhibit 10, he further described that as Mr. Bogatin's computer; is that right?
A. That's correct.
Q. Okay. And IT027 was not identified by Ms. Gunkova in any of the communications; isn't that right?
A. Correct. That wasn't identified until we identified USB

devices being attached later on.
Q. Okay. Turn to Exhibit 23 -- Plaintiff's Exhibit 23.
A. All right.
Q. This was Ms. Gunkova's testimony. It's already admitted into evidence. Page 325, line 9.
A. Okay.
Q. I asked, do you use the same computer for Aria Medispa that you do for BNG? And Ms. Gunkova replied, yes.
MS. GREENE: Bethany, where are you?
MS. BENES: 325, line 9.
Q. Question. Okay. Do you use the same computer for Aria Medispa that you do for BNG? Answer, yes. Did you review that testimony during your analysis?
A. Yes.
Q. Based on that testimony, did you understand that the computers that were being turned over by Ms. Gunkova, whether physically located in Aria or not, were being produced pursuant to the forensic order?
A. Yes.
Q. Ms. Gunkova's counsel made -- took issue with the fact that you did not provide or tell -- or alleges you did not tell Ms. Gunkova or Mr. McDannell, her counsel, what was missing that had not been produced. Was it your understanding that you were required to do that under the order?
A. No. We were supposed to run searches, produce search

results, as well as forensic artifacts that we're able to establish timelines of -- of events on the computers.
Q. Did you do what you were required to do under the order?
A. Yes.
Q. You were asked about Defendant's Exhibit 12; specifically, an email address, grishack301@gmail.com. The email, the first bullet point said, I think you are missing one important item, grishack301@gmail.com. Do you see that?
A. Yes.
Q. I'd like you to turn to Plaintiff's Exhibit 11.
A. All right.
Q. Let me know when you're there.
A. I'm there.
Q. The sixth bullet point down, Grishack (ph.).
A. Yes.
Q. Was that a search term?
A. Yes.
Q. Was that search -- was that search term run?
A. Yes.
Q. If you run Grishack, would that have picked up grishack301@gmail.com?
A. Yes. It was inclusive.
Q. Ms. Gunkova apparently took issue that the files were not produced in load file format. Did you recall her asking you about that?

A. Yes.
Q. Was Vestigant required under the order to produce the documents and load file format?
A. No.
Q. And in fact, Mr. McDannell had helped draft that order and come up with a process, didn't he?
A. Yes. We sat in the courtroom and -- and you he and I went and made the order together.
THE COURT: Well, once again, what is load file format?
THE WITNESS: So -- so again, it's producing files in sort of the PDF or TIFF version with the metadata as a separate file. It's -- it makes it easier to load up and review. But it's the same data as natives. But we as forensics people don't typically produce stuff in that because the natives are more important. Like, you can get a lot more data from the natives. So when you're dealing with forensic work, even for production purposes, that's how you do it. And to be frank, most all e-discovery vendors can deal with native format. It's -- it's pretty standard.
THE COURT: Thank you.
Q. Ms. Gunkova also took issue with files that she called corrupted -- four corrupted files and KLDiscovery, bringing that to Vestigant's attention. Do you recall that?
A. Yes.

Q. The corrupted files -- and I'll put that in air quotes -- corrupted files, were those files corrupted during the imaging and analysis portion, the capture of the data, or was that corruption in the transfer of that data to KLDiscovery?
A. It appeared to be the transfer. This -- some of the transfer was done via device, and some of the transfer was done via online file share. And those files, there were four of the thousands of files that were produced that -- that had -- they had -- weren't -- were unable to read. And so they asked if we could reproduce them, and we did.
Q. And were there any issues with the exact same files that you reproduced to KLDiscovery?
A. I think there was one that was an empty file, but we produced them back again, and I don't believe there was any issue.
Q. There was an issue with or alleged issue with deduplication. Was deduplication required under the order?
A. No.
Q. Finally, Plaintiff's Exhibit 16. If I recall your testimony correctly, Exhibit 16 were the link files showing the hard drive -- the external hard drive that was attached to IT003, right?
A. That's correct.
Q. And we see here that there appeared to be files regarding Lake Plaza Financial's (ph.) videos. We don't know what else

was on that hard drive, though, do we?
A. That's correct. Again, this goes to the point that we can only see from linked files what files were opened, not necessarily what files existed. So we can say with certainty at particular moments in time files were opened, but that's not necessarily the entirety of all the data that exists on this -- on this hard drive.
Q. So is it fair to say that you don't know whether there were 20 files that have not been turned over or 200,000 files that haven't been turned over?
A. That's correct.
Q. Thank you. And does the same go for the documents that were deleted using CCleaner? Is it fair to say that you don't know whether it was 200 documents or 200,000 documents?
A. That's correct.
MS. BENES: Thank you. I have no further questions.
THE COURT: Okay. Thank you for your testimony today, sir.
THE WITNESS: Thank you.
THE COURT: You're free to go. All right. We'll take a ten-minute recess. We'll resume at 3:30. But before we do, Ms. Benes, how many more witnesses do you think you'll have today? Or I shouldn't say today. How many more witnesses will you have?
MS. BENES: We have no further witnesses for our case.

Mr. Racich, I believe, would be subject to recall in case there -- in case rebuttal is allowed. I do --

THE COURT: Well, it'll be allowed if it's within the rules. I mean --

MS. BENES: Sure.

THE COURT: -- I don't have a problem with that.

MS. BENES: Then Mr. Racich --

THE COURT: So when I say you're free to go, counsel may want you to stay.

MS. BENES: You are subject to recall. I would love for you to stay.

THE COURT: All right.

MS. BENES: But other than Mr. Racich, we are not calling any further -- any further witnesses, and plaintiff rests.

THE COURT: Okay. And how about you, Ms. Greene, just to get an estimate?

MS. GREENE: I have three.

THE COURT: Three witnesses. Okay. Well, we may not finish today, in which event we'll pick a date to finish the hearing. All right. We'll come back at 3:30 p.m. Thank you.

MS. GREENE: Thank you.

MS. BENES: Thank you.

THE CLERK: All rise. This Honorable Court is now in recess.

(Recess from 3:18 p.m. until 3:35 p.m.)

THE CLERK: You can remain seated. This Honorable Court is back in session.

THE COURT: All right.

Ms. Greene, your first witness, please.

MS. GREENE: Call Jacob Bogatin to the stand.

THE COURT: Mr. Bogatin, would you please come forward and raise your right hand?

(Witness sworn)

THE COURT: All right. Over to our witness stand on this side, please.

DIRECT EXAMINATION

BY MS. GREENE:

Q. Mr. Bogatin, can you state your name for the record?

A. (Indiscernible)What was that?.

Q. Okay. Mr. Bogatin, can you state your name for the record?

A. Can you do it again?

Q. Yeah. Mr. Bogatin, can you state your name for the record?

A. My name is Jacob Josh (ph.) Bogatin.

THE COURT: You need to speak into the microphone, sir.

THE WITNESS: I'm sorry.

THE COURT: Can you get closer to the microphone? Thank you.

THE WITNESS: My name is Jacob Josh Bogatin.

Q. What is your educational background?
MS. GREENE: Did the mic not work -- the assistive device not working so well?
THE WITNESS: (Indiscernible).
UNIDENTIFIED FEMALE SPEAKER: Don (ph.), can you check the volume for me, please?
Q. What is your educational background?
A. I have MBA from Saratov State University, PhD from Volgograd State University and Doctor of Science. And then I have finance from University of Pennsylvania.
Q. Okay. Could you try to remember to talk into the microphone and keep your voice up?
A. I'm sorry.
Q. Okay.
A. So I have MBA from Saratov State University, PhD from Volgograd State University, doctor of science and the finance from University of Pennsylvania.
Q. Was there a time that you were associated with a company called BNG Group?
A. Can you repeat again?
Q. Sure. Was there a time that you were working with a -- let me start with a company called Skin Logic LLC.
A. Yes. I started work with Skin Logic LLC from beginning 2013.
Q. Okay. And what was your role with Skin Logic? What did

you do with Skin Logic?
A. So in Skin Logic -- in Skin Logic, basically I do the marketing and bookkeeping.
Q. Okay. Did Skin Logic have anyone that was responsible for their IT or computers?
A. I'm sorry, sir. Okay. I'm okay.
THE COURT: We're going to take another five minutes and let's see if we can get that working to help you. We'll be back at a quarter to 4.
MS. GREENE: Thank you, Your Honor.
THE WITNESS: No, it's working now, sir.
MS. GREENE: Is it working now, Jacob?
THE COURT: It's working now?
THE WITNESS: Yes.
THE COURT: Okay.
MS. GREENE: Okay.
THE COURT: All right. So would you repeat the question for me then, please?
Q. Yep. Did Skin Logic, which is also called Aria, have anyone who was responsible for the IT or computer system?
A. Yes, we have IT person, Igor Liskevych (ph.), who is responsible for security and software.
Q. Okay. Did there come a time in 2019 where the Aria computers suffered a virus attack?
A. Actually in 2019, during migration from Invision to

(indiscernible) our server get software -- sorry, ransomware. It was late 2019.
Q. Okay. And what happened?
A. Well, all our database was destroyed, encrypted. And we tried to work with different companies to restore, but it's not happens.
Q. Okay. And what, if anything, did you do in response to that virus ransomware attack in 2019?
A. So what we've done basically, number one, we replace computer. Replace server, I'm sorry. Put a new server. And number two, we implement protocol to be sure in future is not going to repeat again because this server contain also database and public document. Database, we restore from cloud, public document from local computers.
Q. Okay. In the big book in front of you, I'm going to direct your attention to the document that is Exhibit 1, so behind the first tab.
A. Which one?
Q. The big book in front of you. Exhibit 1 or tab one?
A. Okay.
Q. Can you identify that document? What is it?
A. November 15th, 2019, email.
THE COURT: You need to speak into the microphone, sir, please.
A. November 15th, 2019, email from -- reply email Malware

Bytes come to Jacob (indiscernible) .com, reference 1084522220, your Malwarebytes premium order.
Q. Okay. Is this one of the software programs that Aria purchased at the time, November 2019, in response to that first ransomware attack?
A. Can repeat again?
Q. Sure. Is the Malware Bytes one of the software that Aria purchased in November of 2019 in response to that first ransomware attack?
A. Correct.
Q. Okay. Move for the admission of Exhibit 1.
THE COURT: Any objection?
MS. BENES: No objection, Your Honor.
THE COURT: It will be admitted.
(Malware Bytes email referencing premium order was hereby received into evidence as Defendant's Exhibit 1, as of this date)
Q. Okay. I direct your attention to Exhibit 2, it's in the second tab.
A. November 15th, 2019, email from noreplymailmalwarebytes.com to jacobgbogatin@gmail.com in reference of 20310828, your Malwarebytes premium order.
Q. Okay. Did Aria buy a second subscription for another computer as a result of the malware attack?
A. Correct. We purchased malware for every computer in

company after this.

MS. GREENE: I would move for the admission of Exhibit 2.

THE COURT: Any objection?

MS. BENES: No objection.

THE COURT: It will be admitted.

(Malware Bytes email re order was hereby received into evidence as Defendant's Exhibit 2, as of this date)

Q. Did you also buy additional software protection at the time in 2019?

A. Well, Exhibit 3, it is not software. I think it's document which we try to recover data from server. And we sent this information to this company.

Q. Okay. And is Fast Data Recovery the company that Aria tried to hire to recover your data?

A. It doesn't work. Okay. Go ahead.

Q. Is Fast Data Recovery the company Aria hired in 2019 to attempt to recover some of the data from the malware attack?

A. No, I can't listen like this. Okay. Try it again.

Q. Is Fast Data Recovery the company that Aria hired in 2019 to try to recover some of its data?

A. Correct.

MS. GREENE: Move for the admission of Exhibit 3.

THE COURT: Any objection?

MS. BENES: No objection.

THE COURT: It will be admitted.
(Fast Data Recovery document was hereby received into evidence as Defendant's Exhibit 3, as of this date)
Q. Did Aria in 2019 purchase any other software programs to attempt to protect its network?
A. Correct. We purchase basically two programs, malware and the virus protection program, two program on each computer. The document for it is email to ransom recovery. It's related to server recovery.
Q. The second program that you bought in 2019, was that CCleaner?
A. CCleaner. Yes. I think CCleaner was installed on server after this.
Q. Okay. And who was responsible for the implementation of CCleaner at Aria?
A. Our IT person.
Q. And that would be Mr. Liskevych?
A. Igor Liskevych. Yes.
Q. Okay. Did you have any part in creating the settings for CCleaner?
A. No.
Q. To the best of your knowledge, did Ms. Gunkova have any part in running CCleaner on the computers?
A. No. Ms. Gunkova does not have any IT education. She never done anything to computers.

Q. Did there come a time when the computer that you used in the business suffered a second ransomware attack?
A. So after 2019, like I said, we put quite a few implementations to be sure our data is secure. In 2020, when we was in Florida during a visit to Mr. Kamin, we done communication with Saint Petersburg, Russia. We have cryogenic machine and it was broken. So I called them and they sent me instruction. And along with the instruction, I think, came this file. When I opened, I received the message welcome -- I mean, congratulations, you have money. I mean, you have ransom.
Q. Okay. And approximately when was that in 2020?
A. I know it was late fall. November, probably, sometime like this.
Q. Okay. I'm going to direct your attention to Exhibit 4.
A. Yes.
Q. And is this the ransomware communication that you were just testifying about?
A. I know I communicate with people who send the ransom. I don't remember this email specifically. What this ransom recovery, it is the company who do recovery? This is what you're talking about? One second.
THE COURT: All right. You either remember it or you don't.
MS. GREENE: Yeah.

THE COURT: If you don't remember it, just say I don't remember.

THE WITNESS: I don't remember.

Q. Okay. I'll direct your attention to Exhibit 5.

A. Uh-huh.

Q. Can you identify Exhibit 5?

A. Oh, this is crazy communication between me and Russian guys who put ransom in my computer. It was like ten or fifteen different email where I tried to recover the files because it was many file. And they offer me to recover, but request about four or three Bitcoin, which approximately 100,000 dollars, so impossible.

Q. Okay. I'd move for the admission of Exhibit 5.

MS. BENES: Your Honor, I object to Exhibit 5. There's language that I don't even know what it says. It appears to be Russian.

THE COURT: Yes. Is there a translation here attached to it?

MS. GREENE: There is not.

THE COURT: All right. I sustain the objection.

Q. Okay. Ultimately, were you able to get the -- let me take that back a second. The ransomware attack in 2020, what computer or computers did it impact?

A. This was impact on my computer, which on my disc, which hold (indiscernible) and logic and my personal communication.

Q. Okay. Were you able to unencrypt the files on your personal -- on the computer that you used?
A. No.
Q. Okay. What ultimately did you do with that computer?
A. Is this what we done? We clear completely this computer, puts them in a video camera computer. And we purchased new computer installed in my disc.
Q. And were you able to recover any of the files that were on that computer before the ransomware attack?
A. I'm sorry?
Q. Were you able to recover any of the files that had been on that computer before the ransomware attack?
A. Yes. I recover a file from Google, which is an email. I recover email from my email. I recover the file which was holding cloud and in Dropbox. And I recover file which has -- during 2020 November, I went to Mr. Cunningham (ph.), pick up all original files signed by Mr. Carman (ph.) -- it was like one hundred different documents -- and I brought to I think it was Office Deport along with (indiscernible) scan everything, make hard copy and along with a closing document of purchasing BNG. And I return back original to Mr. Carman, but a hard copy I brought to Virginia and eventually download to computer. It's strictly BNG documents.
MS. GREENE: I have no further questions for Mr. Bogatin.

THE COURT: Okay. Thank you. Cross-examination?
MS. BENES: Yes. Thank you, Your Honor.
CROSS-EXAMINATION
BY MS. BENES:
Q. Good afternoon, Mr. Bogatin. Bethany Benes, we've met before.
A. Good afternoon.
Q. Good afternoon. Mr. Bogatin, Ms. Gunkova is your girlfriend, correct?
A. Ms. Gunkova is my best half.
Q. Is she your girlfriend?
A. She's my best half.
Q. Is she your girlfriend, Mr. Bogatin? Yes or no?
A. Well, you know, in Jewish tradition, we don't understand girlfriend. We have best half and we have nobody.
Q. Okay. She is your girlfriend, isn't she?
MS. GREENE: Asked and answered.
MS. BENES: He has not answered.
THE COURT: I'll sustain that. He's answered the question.
Q. And you assist Ms. Gunkova with various businesses that she owns; isn't that right?
A. Correct.
Q. One of them is Skin Logic LLC, right?
A. Yes.

Q. And one of them is BNG Group LLC, right?
A. Correct.
Q. You also helped her with VNJ Management LLC; is that right?
A. Correct.
Q. And Sterling Investment LLC?
MS. GREENE: Objection. Relevance.
THE COURT: Overruled. You can continue.
Q. Thank you. You also assisted her with Sterling Investment LLC; is that right?
A. Yes.
Q. And you perform lots of tasks to assist Ms. Gunkova, isn't that right?
A. Yes, that's correct.
Q. You have access to all of her email addresses; isn't that right?
A. I have -- I have access to her regular email, yes.
Q. I'm sorry, what did you say?
A. I don't know what email you're talking about.
Q. Do you have access to her valeria@ariamedispa.com account?
A. Yes. Correct.
Q. And you have access to her Gmail account too, right?
A. No.
Q. You do not have access to her Gmail account?
A. No. It's her personal email.
Q. And you have access to all of the BNG bank accounts, right?

A. I have access online download. Yes. Only download.
Q. One of your duties that you are assisting Ms. Gunkova with for BNG was that you were BNG's bookkeeper as well, right?
A. Correct.
MS. GREENE: Objection. Relevance.
THE COURT: Overruled.
Q. And you maintained BNG's books and records, right?
A. Some, yes.
Q. Okay. And that was performed in your duties to Ms. Gunkova in assisting her, right?
A. Correct.
Q. Okay. And you also made phone calls on her behalf, right?
A. No, I never have.
Q. You've never made a phone call for Ms. Gunkova?
A. Hold on. Hold on one second. I make phone call when Ms. Gunkova ask me to call, but I never call on her behalf.
Q. Sure. And Ms. Gunkova has asked you a number of times to make calls for her, right?
A. Correct.
Q. And to help her and all of her business ventures, right?
A. Some of them.
Q. Okay. And she has asked you, for example, when Mr. Kamin filed suit to hire an attorney for her, right?
A. No, it's not true.
Q. You didn't contact --

A. We went together and hire attorney together.
Q. Okay. So you assisted Ms. Gunkova with hiring her attorney, correct?
A. I don't understand questions.
Q. Did you assist Ms. Gunkova in hiring her attorney?
MS. GREENE: Objection. Relevance.
THE COURT: Overruled.
A. I assist Ms. Gunkova to find attorney, but we hired attorney separate. Ms. Gunkova hire attorney.
Q. You first assisted Ms. Gunkova in hiring Charles Curran (ph.); isn't that right?
A. No. It was assist to Jung Yun. He advised us to hire him. It was attorney for previous owner. And we hired him.
Q. And you assisted Ms. Gunkova in hiring him, right?
A. I assist Yung Yun, property manager, not Ms. Gunkova.
Q. Did you assist Ms. Gunkova in retaining Mr. Corran in February of 2021 when Mr. Kamin filed suit?
A. I don't know what you mean by assist. I do my due duty. If Ms. Gunkova asked me to do it, I done do this one.
Q. Okay.
A. But the charts was maintained by company BNG.
Q. And you assisted Ms. Gunkova with her communications with her former attorney, Jay McDannell; isn't that right?
MS. GREENE: Objection.
THE COURT: What's the objection?

MS. GREENE: Relevance and encroaching attorney-client privilege.
THE COURT: Overruled.
Q. You assisted in hiring Mr. McDannell for Ms. Gunkova; isn't that right?
A. No. The previous attorney advised us to hire -- he basically sent information to Ms. McDonald (ph.). And Ms. McDonald was agreed to be hired by Ms. Gunkova to represent her.
Q. And you assisted --
A. And Skin Logic.
Q. -- Ms. Gunkova in retaining Mr. McDannell, right?
MS. GREENE: Asked and answered.
THE COURT: I'll sustain that objection. You can move on, please.
Q. You assisted Ms. Gunkova in communicating with Mr. McDannell, didn't you?
A. Correct.
MS. GREENE: Objection, attorney-client.
THE COURT: I don't think it calls for attorney-client privilege because it doesn't call for the substance of the communication. So I overrule the objection.
Q. You assisted Ms. Gunkova in communicating with Mr. McDannell, didn't you?
A. Well, we communicate, true. Yeah, Ms. Gunkova communicated

and I communicate.
Q. Is it fair to say you and Ms. Gunkova do everything together with regards to these various business ventures?
A. I'm sorry. Can you repeat again?
Q. So is it fair to say that you and Ms. Gunkova do everything together with regards to the various business ventures?
A. Me and Ms. Gunkova ran operation to be sure what business sustain. We hire employee. We run good business. And right now, we're hiring to 32 employee in company.
Q. Okay.
A. So we've done everything possible to be sure business operate. It's correct.
Q. Look Defendant's Exhibit 2. It should be in the big binder in front of you.
A. Which one? This one? Left?
Q. Big binder in front of you that Ms. Gunkova's attorney had previously asked you about.
A. Which exhibit?
Q. I cannot see what you're looking at, sir.
THE COURT: Exhibit 2 in the big book.
THE WITNESS: I have two books. This one?
THE COURT: The bigger book. There are two books. One is bigger than the other.
Q. That appears to be the correct binder.
A. You're talking this one?

Q. No, sir. The bigger binder.
A. Okay.
Q. Exhibit 2.
A. Okay. Exhibit 2.
Q. Yep. Are you there?
A. Yeah.
Q. Can you tell me -- it appears to me that this email was sent to you jgbogatin@gmail.com., right?
A. Yes.
Q. That's your email address, right?
A. Well, my email jgbogatin isn't -- typo over here, but it's my email.
Q. I'm sorry. What did you say? Your email is what?
A. Jacob Gils Bogatin, jgbogatin.
Q. Okay. So is this your correct email address? Jgbogatin@gmail.com on Exhibit 2?
A. I have over here jbbogatin.
Q. My exhibit shows jg --
A. No, the exhibit shows --
Q. -- bogatin@gmail.com.
A. -- jb.
Q. I'm sorry, what did you say?
A. Exhibit show jbbogatin.
Q. Your exhibit shows jbbogatin?
A. Yes.

Q. And do you have an email address jbbogatin?
A. No.
MS. BENES: Then I'd move to strike Exhibit 2 based on his prior testimony.
THE COURT: No, but Exhibit 2, I have, Ms. Greene, it says jg, as in George, bogatin@gmail.com.
MS. GREENE: That's what I have.
MS. BENES: That's what I have as well.
THE COURT: All right. So I deny the motion to strike.
MS. BENES: Does he have a different -- does he have a different exhibit in front of him?
THE COURT: I don't think he has a different exhibit. I think he's just misreading it.
Q. Okay. So this email was received by you; is that right?
A. Correct.
Q. Can you tell the Court why if it was an email sent to you, it says, thank you for your order, Valeria Gunkova?
A. Because we sent the order. Valeria have authorized user on the account and we send request. We pay from Valeria Gunkova debit card.
Q. So you take actions on behalf of Ms. Gunkova often, don't you?
A. I take action when Valeria Gunkova ask me to take.
THE COURT: Let me ask you this. Whose credit card

was used for this purchase?
THE WITNESS: Valeria Gunkova.
Q. Thank you. Do you have access to all of Ms. Gunkova's credit cards?
A. I have -- I can see online only.
Q. There are various computers that are in Aria Medi Spa; is that right?
A. About one, yes.
Q. You and Ms. Gunkova have an office together in Aria Medi Spa; isn't that right?
A. Correct.
Q. And the office has two computers in it; isn't that right?
A. Yes.
Q. One is Ms. Gunkova's computer, correct?
A. Yes.
Q. And one is your computer, correct?
A. Correct.
Q. And both computers are used to conduct business of Aria, right?
A. Depends on what you mean by business. Ms. Gunkova used computers strictly for ordering skincare product, to maintain training, to order some supply. My computer contained QuickBooks and marketing stuff.
Q. And you also, on those two computers, conduct business of BNG, right?

A. Well, primarily my computer used to conduct business, probably about 10%.
Q. And Ms. Gunkova uses her computer to access her email. Isn't that right?
A. Valeria using her computer, probably about 2% to access email from BNG, correct.
Q. BNG doesn't have separate computers for you and Ms. Gunkova to use for BNG business only; isn't that right?
A. No, it's not right. BNG have computer is installed in second floor on Yung Yun office which you specifically to business BNG.
Q. Okay. I'm sorry, Mr. Yun is BNG's property manager, right?
A. Correct.
Q. And he uses a separate computer to conduct business of BNG, right?
A. That's what I said.
Q. Okay. And that is not located in the Aria Medi Spa, right?
A. No.
Q. Okay. The computers you use to conduct BNG business is the same computer that's in the Aria Spa office that you share with Ms. Gunkova, right?
A. Hold on one second. I have my computer, which I use for Skin Logic, BNG, and personal use.
Q. Yes.
A. BNG, probably about 10 to 12%.

Q. Okay. So there's a -- Mr. Yun has his computer that he uses for BNG business, and that's in the BNG office, right?
A. Yes. That's what I said.
Q. Then you have your computer that is located in the Aria Spa that you use for Aria and BNG business, right?
A. Primarily for Aria, yes. A little bit for BNG.
Q. Okay. BNG's books and records are kept on that computer; isn't that right?
A. Correct.
Q. Including its QuickBook records?
A. Yes.
Q. Okay. And then Ms. Gunkova has her separate computer that's also located in the Aria Spa, right?
A. Yes.
Q. And she uses that also to conduct business of BNG?
A. She uses to only send and receive email of BNG.
Q. Okay. You testified that the ransomware attacked your computer; is that right?
A. No. I testify in 2019 ransomware attack (indiscernible) which have public file attached to every computer.
Q. Okay. When you say every computer, what computers were attached?
A. 20 computer.
Q. 20 computers are attached to that network?
A. To server, yes.

Q. And were all of those devices turned over to Vestigant?
A. Oh, it was a server. Server attack was happens 2019.
Q. Okay. My question to you was you have just testified that there were 20 computers attached to a network that were also attached to your computer --
A. No, no.
Q. -- affected by a ransomware attack.
A. Hold on one second. I don't testify this. What I said server was attacked by ransom. And server, we have public file, Skin Logic public file, which all computer attached to. Not BNG, Skin Logic public file.
Q. And you said there were 20 computers.
A. Correct. We have -- each treatment room has computer, front desk has computer, in other front desk, yoga studio, everyone has computer.
Q. And about how many of those computers were also used to conduct BNG business?
A. Zero.
Q. Zero?
A. Only my area in the Yung Yun.
Q. Okay. So that's not zero, that's three, right?
A. Okay. 20 computer. When I talking about this computer, it is not including Valerie Gunkova, me, or Yung Yun.
Q. Okay. After the ransomware attack occurred or the alleged ransomware attack occurred, you said that Ms. Gunkova didn't do

anything with regards to computers. She doesn't have that expertise, right?
A. Ms. Gunkova do it only business strictly related to skincare.
Q. Okay. Ms. Gunkova didn't tell you to preserve data --
A. No.
Q. -- after February of 2021, did she?
A. Ms. Gunkova told me and as well as lawyer to preserve data. Yes.
Q. Okay. What did she tell you to do?
A. What we done basically, the following. We install the external disk, number one, we install the Dropbox, and we copy all information to Dropbox and internal disk. And we send Dropbox information every month to your client, Mr. Curran, along with monthly report, which contained about, I will say, 200 megabyte memory, including QuickBook, all document, all business activity for this specific month. And we started this from '21 to March 2023.
Q. My question was a little different. My question was, did Ms. Gunkova tell you to preserve data on your computer after February of 2021?
A. Yes, I told you. She told us to present it -- preserve it and we prevent data from continue the stuff.
Q. Did she tell you to disable CCleaner on your computer?
A. Disable? She don't know about CCleaner at all.

Q. She doesn't know about CCleaner?
A. No, she don't know.
Q. So she didn't tell you to disable it, did she?
MS. GREENE: Asked and answered.
THE COURT: Overruled.
A. Well, Ms. Gunkova don't have no idea about CCleaner.
Q. But you knew that there was CCleaner on the computer, right?
A. Correct.
Q. And you didn't disable it, did you?
A. What do you mean by disable?
Q. You didn't remove it from the computer, right?
A. Okay. Hold on. Hold on one second. Can I just a little bit explain. CCleaner was installed to be sure we can delete all malware, all viruses, files which is attacked by this one. So CCleaner was installed and monthly removes this information from computer to be sure the virus is not going to spread around.
Q. How many computers did you know CCleaner was installed on?
A. It was installed in my computer and server.
Q. Your computer and the server?
A. Correct.
Q. Okay. And you did not disable the CCleaner that was installed on your computer --
A. If I disable --

Q. -- after February of 2021, did you?
A. If I disable CCleaner, we get that again virus or malware.
Q. Okay. So the answer is no, you did not disable it, did you?
A. What are you -- nobody told me to disable, number one. Number 2, we cannot disable because it's protection.
Q. Okay. Thank you. No further questions.
THE COURT: Okay. Thank you. Ms. Greene, any redirect?
MS. GREENE: Just real brief.

REDIRECT EXAMINATION

BY MS. GREENE:

Q. Mr. Bogatin, you testified that you were providing monthly reports to Mr. Kamin. Can I direct your attention to Exhibit 26 in the book in front of you?
A. 26, yes. Monthly report email.
Q. Can you identify Exhibit 26 when you get there?
A. Sorry. Let me get over there. Okay. I'm here.
Q. Okay. Can you tell me what Exhibit 26 is?
A. Exhibit 26, December 21 information monthly report, which included the financial statement per law, balance sheet, TD Bank and Atlantic Union bank statement, which included the QuickBooks premium edition 22 backup file with username, legal, password to be sure it can be open, communication email between tenants the Sterling Dentistry, new channel Sterling Dentistry,

because we done -- we start to do the build up this for the tenants. It was dental company which included about 6,000 square feet which we built completely from scratch, including the -- including as well the financial statement communication between me and Valerian, and of course, Yung Yun.
Q. Okay. And then if I direct you to the third page of Exhibit 26, can you explain what that is?
A. Source page. It is a June 8th, 2022, monthly report. So we said Countryside Counseling extending the lease for another five years. Sterling Dentistry moved to June 23 -- June 13, '22, and paid the first month's rent. Elevators still have problem with operation. Please submit your K-1 and PFC -- it is personal financial statement -- to Atlantic Union Bank as soon as possible. Attachment to Dropbox, which contain all information. QuickBook files, banking account statement, document concerning the construction on site 370 for Sterling Dentistry. Monthly expense document. Information collections, photos, email. Let me know if you have any difficulty viewing this document.
Q. Okay. In looking at the emails that this was being sent to, one of the emails is grishak46@at&t.net. Was that Mr. Kaimen's email?
A. Yes, it's his email.
Q. Okay.
A. It was sent --

THE COURT: And whose email address is bngl7847?

THE WITNESS: It was a BNG email address to property manager.

Q. That would be Mr. Yung Yun?

A. Yung Yun, yes.

Q. Okay. And during what time period was Ms. Gunkova and you sending these monthly reports to Mr. Kamin?

A. From 21 to 20 -- March 23 every month.

Q. Okay. And that included, if you look at page 3, the emails without the email correspondence related to BNG's business for the month?

A. Correct. Every month we send information, full business activity to be sure Mr. Kamin know about what done in this company.

MS. GREENE: Move for the admission of Exhibit 26.

THE COURT: Any objection?

MS. BENES: Well, yes, Your Honor. He just testified that bngl7847 was Yung Yun's email, but the email shows it was sent by Ms. Gunkova. And it doesn't appear that it's complete either.

THE COURT: In what way is it incomplete? And when you say it looks like it was sent by Ms. Gunkova, you're talking about what I'll call the signature block --

MS. BENES: Correct.

THE COURT: -- Valerie Gunkova, president, et cetera,

at the bottom?

MS. BENES: Correct.

THE COURT: Right. But in what way is it incomplete?

MS. BENES: Well, it's incomplete because the documents that were available allegedly by Dropbox, which I can also get into, were not attached. And so this is showing that -- or this is alleging that documents or certain information was sent, but we don't have whether it was actually sent or not.

THE COURT: I'll overrule the objection. It'll be admitted.

(June 8th, 2022 monthly report was hereby received into evidence as Defendant's Exhibit 26, as of this date)

MS. GREENE: Thank you, Your Honor. I have no further questions for this witness.

THE COURT: Okay. Thank you. Thank you, sir, for your testimony. You can step down.

THE WITNESS: Thank you, Your Honor. And I'm sorry (indiscernible).

THE COURT: No, I understand. And thank you for your testimony.

MS. GREENE: We call Mr. McDannell, who's in the witness room.

THE COURT: Would you call Mr. McDannell, please? And it's Mr. McDannell and who else, Ms. Gunkova?

MS. GREENE: Yes.

THE COURT: All right. We're almost certainly not going to get done today. So we'll pick another date at the conclusion of today's hearing.

(Pause)

THE COURT: Mr. McDannell, would you come up to the podium, please, and raise your right hand?

(Witness sworn)

THE COURT: All right. Would you go to our witness stand, please?

MS. GREENE: Your Honor, Mr. Bogatin is still in the courtroom. He might be subject to recall by us. So we would ask that he be removed from the courtroom.

THE COURT: Mr. Bogatin, you'll have to go back to the witness room, please. Thank you, sir. Ms. Greene?

MS. GREENE: Okay.

DIRECT EXAMINATION

BY MS. GREENE:

Q. All right. Mr. McDannell, can you please state your name for the record?

A. Jay Martin McDannell.

Q. And can you please state your profession?

A. I'm an attorney.

Q. And in what bars are you admitted?

A. Virginia and D.C.

Q. And did you represent Ms. Gunkova in the Loudoun County case wherein Mr. Kamin had sued her related to BNG?
A. Yeah.
Q. Okay.
A. For a portion of the time, yes.
Q. And were you the first attorney that represented her in that case?
A. No, I was not.
Q. Okay. Did you discuss discovery issues with Ms. Benes in that case?
A. Yes, I did.
Q. Okay. Did there come a time in that case where there was a hearing regarding to a preliminary injunction?
A. Yes.
Q. And after that hearing with preliminary injunction, did you discuss with Ms. Benes doing a joint, essentially, production of the emails between the parties related to BNG?
A. Yeah. So during the hearing, as part of our discussions to potentially resolve it and/or just about the discovery going forward, we had -- I had raised the possibility of essentially a joint database or a joint effort to collect emails from both sides that were BNG emails because both Mr. Kamin and Ms. Gunkova were equal partners in BNG and presumably had BNG's information in their possession.
Q. And what was Ms. Benes' response to that?

A. Every effort I made to attempt to do anything jointly with Ms. Benes was rebuffed.
Q. I would direct your attention to the document in the big book marked as Exhibit 6.
A. Yes.
Q. Can you identify that document?
A. This is an email that I wrote to Ms. Benes dated November 18th, 2021.
Q. Directing your attention to the second paragraph about two thirds of the way down, six lines up from the bottom towards the end of that sentence, starting with, "I orally suggested we agree to a formal procedure to have professionals collect those emails." Is that referencing the discussion that you just testified about the joint database?
A. Correct. It was obvious to me that there were -- that the email productions to date when I came into the case had not been professionally done by outside vendors. And I thought we should correct that problem and hire an outside vendor. And that's what I was trying to encourage us to agree on -- agree to.
Q. And were you able in November of 2021 to agree to having an outside vendor do essentially a joint data production from BNG?
A. No, no, I was never able to agree -- was never able to get Ms. Benes to agree to have anything jointly done agreeably with BNG.

MS. GREENE: We move for the admission of Exhibit 6.

THE COURT: Any objection?

MS. BENES: Your Honor, I still maintain that this is hearsay.

THE COURT: I'll overrule the objection. It will be admitted.

(Email to Ms. Benes on November 18th, 2021 was hereby received into evidence as Defendant's Exhibit 6, as of this date)

Q. Did there come a time in the litigation that Ms. Gunkova was providing Mr. Kamin with monthly updates with regard to the status of BNG and its communications?

A. Yes. Shortly after we prevailed in the preliminary injunction hearing, we set up unilaterally a process by which BNG would provide -- I'm sorry, Ms. Gunkova would provide BNG's monthly documents, essentially, to Mr. Kamin in a sort of a Dropbox link on a monthly basis. And that process continued starting, I believe, in late '21 and then continued all throughout 2022 and into 2023, I believe.

Q. Okay. Did there come a time -- and I'm going to direct you to this smaller book for a moment that the Louden Court entered an order allowing -- well, I mean, did there come a time early in 2021 that Mr. Kamin moved to try to compel a forensic examination of the BNG computers?

A. So I believe -- you said early '21. I believe in early '22

or in late '21 there was a motion to compel that sought as part of its relief an effort to -- for a -- for a forensic examination of the computers under the -- under the auspices that they were books and records of the company, and there was access to it. That was denied by the judge in the spring of '21. And then later in '21, there was a -- there was a more formal, focused motion where Mr. Kamin again asked for that same relief.

Q. Okay. Directing your attention to the small book to Exhibit 7. This is Plaintiff's Exhibit 7.

A. Okay.

Q. Is that the order the Louden Court ultimately entered with regard to the forensic examination of the BNG computers?

A. Correct. That was -- yes, that was the one that was entered at the end -- sort of in October of 2022, I guess it was.

Q. Okay. Directing your attention to the little II, second paragraph where it reads, "All electronic devices and cloud services". Was there any discussion at that time about the production of USB thumb drives or hard drives?

A. Okay. So you were referring me to on page one, item two; is that correct? Okay. I just want to make sure I read what you wanted me to read. There was never a discussion prior to the initial inspection by any party in the court or outside of the court in preparation for that inspection about thumb drives

and external devices. We had a --

MS. BENES: Objection, Your Honor.

A. -- number of communications back and forth.

THE COURT: What's the objection?

MS. BENES: Well, he's testifying about -- what the question is calling for is an expert opinion as to what an electronic device is and whether that incorporates thumb drives and external drives. Mr. McDannell is not an expert in computer forensics, or computers, or e-discovery. And so the question is calling for an expert opinion that falls outside his testimony and his scope as a witness.

THE COURT: Well, I don't view it as expert testimony because he hasn't been qualified as an expert in computer forensics. But let's ask the question in a different way. Did you understand when the order said all electronic devices that that included external hard drives and thumb drives?

THE WITNESS: I certainly did not. And nothing that I got from the other side indicated to me they thought it meant that either.

THE COURT: Thank you.

Q. All right. I'm going to direct your attention to Defendant's Exhibit 8 in the big book.

A. Okay.

Q. Can you identify Exhibit 8?

A. Yes. As part of, I believe, that order that we were just

looking at, I was required to, within seven days of that order, identify the devices that had been used for BNG. And this letter was to formally do that to Ms. Benes. It was dated November 1st, 2022.

MS. GREENE: I will note -- I will note this is also Plaintiff's Exhibit 9.

THE COURT: Thank you.

Q. Okay. Did you receive any response from Ms. Benes with regard to Defendant's Exhibit 8?

A. I did. I received a response -- I don't know whether it was by letter or by email -- but a few days later asking for some clarification about the devices.

Q. I'm going to direct your attention to Defendant's Exhibit 9.

A. Yes. This is the -- this is the response that I got, I believe.

Q. At any time on or about November 9th, 2022, did you get any communication from Ms. Benes or her forensic examiner requesting information about USB drives or hard drives?

A. No. This email asked for information about devices as I understood them. And I -- and I believe I answered this request. But there was -- again, there was no discussion whatsoever about thumb drives or externals or anything like that that came up during that period in November before we did the inspection.

Q. Okay. And direct your attention to Defendant's Exhibit 10.
A. Okay.
Q. Can you identify Defendant's Exhibit 10?
A. So Defendant's Exhibit 10 was my response to Exhibit 9. I went item by item through Ms. Benes' letter to make sure that we clarified any confusion that existed as to what devices existed and which devices didn't exist. And so I tried to address each one of them. And that's what this this email was.
Q. I'm going to direct you to the third page of Exhibit 10.
A. Okay.
Q. Specifically the email from you starting November 8th, 2022, the second paragraph starting in the third line about halfway through, "I need to understand whether Vestigant intends to make positive hits available on a web based portal, produce everything to us in some sort of industry standard format," open paren, "and specifically what formatting parameters might be," close paren, "and let us deal with it, or some combination of the two." Did you receive a response to that inquiry as to what data you would be receiving back from Vestigant, from the forensic examination?
A. There was an ongoing discussion, but the answer is no. I never -- I never did understand until we got it. And actually, for quite some time after we got it, exactly what they were doing and what the parameters were, we had to reverse engineer all that basically.

Q. Turning to the second to last -- four lines up, you say, "I can anticipate that screening these documents will be a time-consuming process." Why were you concerned about this being a time-consuming process?

A. Well, for a variety of reasons. Client cost was one of them. But I also wanted to set expectations. We were reviewing the -- there was some sort of forensic examination over multiple computers that had many, many gigabytes of data on them. And the just sheer logistics of both the substantive review and the attorney privilege review that would need to be conducted on those two things -- on whatever the results will be, I was concerned would take us a while just realistically. And so I -- you know, obviously we could do certain things to speed that up if we needed to. But I wanted to set some expectations so that we were all on the same page, and nobody was being surprised that it took a little while once we once we got the data.

THE COURT: Let me just back up a second in terms of the timing here. If you look at -- your email is dated November 8th, right?

THE WITNESS: So you're talking about the one on page 3 of Exhibit 10?

THE COURT: Yes.

THE WITNESS: Uh-huh.

THE COURT: So that preceded Ms. Benes' letter of

November 9th.

THE WITNESS: Correct. Correct. I was worried on the day that we had the hearing, Your Honor, on October 25th, Ms. Benes had Mr. Racich there. I sat with Ms. Benes and Mr. Racich at the time. I apologize if I'm mispronouncing his name. At the time and said essentially something to the effect of, you know, it's the company's information. We're going to -- we're not going to fight this, but there's a giant attorney-client privilege problem on this computer because we were sharing a Dropbox file. They would -- they would provide to me documents through Dropbox that would be mirrored. So they would copy the document into a place that basically said to Jay, you know, our attorney, things we want to ask Mr. Kamin about or whatever, you know, a variety of categories. And so they would just copy it there. And that was kind of like them sending me, you know, FedEx in the olden days.

And so we were doing it that way. So when they examined the computer, I was quite concerned that there was a giant attorney-client privilege problem with the results that would come. And so I was -- I was concerned about the method of production and everything else from the minute the order was entered. I actually didn't think that there was much of a chance October 25th or whatever it was, that they were going to get that production. And we were fine that they got it, but the logistics of it had not been thought through, in my

opinion. And so that's why I was kind of jumping the gun on trying to raise those issues before even I had heard from Ms. Benes.

THE COURT: All right. Thank you. Ms. Greene?

MS. GREENE: I'd move for the admission of Exhibit 10.

THE COURT: Is there any objection?

MS. BENES: I think it's already admitted, Your Honor.

THE COURT: All right.

MS. BENES: So no objection.

THE COURT: To the extent it hasn't been admitted, it will be admitted.

MS. BENES: It was Plaintiff's Exhibit 10 --

THE COURT: Is it in your book?

MS. BENES: It was Plaintiff's 10, and it's Defense 10. So yes.

THE COURT: All right. It's admitted.

(Response to Ms. Benes' letter was hereby received into evidence as Defendant's Exhibit 10, as of this date)

Q. Fair enough. Okay. After the initial production of computers and imaging, did you continue to request that Vestigant work out some sort of protocol for delivering these documents for your review for the attorney-client privilege?

A. Yeah, we did that in a couple of different ways. I had obviously asked Ms. Benes some questions. But I also -- we went ahead and hired a e-discovery vendor, KL Discovery,

probably shortly after this order was entered. I don't remember the timing of that exactly. And well, I think we may have had them on staff even before this. But one way or the other, I tasked them to directly interface with Mr. Racich. And so we had had a couple of calls, I believe in the time even before the first inspection, trying to understand essentially what was going to happen and how it was going to happen.

And there was never much in the way of actual understanding, because the two experts seemed to be talking to some degree past each other. Mr. Racich was more of a forensic expert, as I understood it. And our e-discovery people were more e-discovery people who were used to producing documents with control numbers and things like that, that we do in litigation. I assumed that the results of the forensic inspection would need to get into some sort of e-discovery format because they would be produced and used in the court and all that kind of good stuff. And it was clear that -- it became clear to me in the -- in that time period that Mr. Racich was not tasked with doing that. And we were -- we were trying to solve that problem, and we were just never able to.

Q. In terms of what you had to do to review the documents for privilege, what sort of -- what did you have to do to the data set before you were able to do that?

A. So the data set that we got, as I understand it -- and I'm not an expert; we hired experts to do it -- but it was

essentially -- it kind of just looked like the contents of a hard drive essentially. You know, because it was it was the native files in the native structure or with markings of the native structure. They hadn't been processed. They hadn't been turned into PDFs or PIFs in the way that you would normally do with e-discovery. They were just --

MS. BENES: Objection, Your Honor. He's testifying as an expert as to what is normally done in e-discovery. He's not a e-discovery expert.

THE COURT: That's all right. I understand his testimony to be what he understands happens in discovery. And so you can proceed.

A. Yes. Thank you, Your Honor. And so we got these native documents back, and we then, when we realized that that's what we got back and we didn't get control numbers and we didn't have them in some sort of searchable format, or anything like that, we inquired again, I believe it was in January. Right after I got the results, I inquired again with Ms. Benes as to whether she would be willing to have a shared BNG resource that basically took all this BNG data and converted it into a searchable database that we both could use then to access and mark and tag these documents as necessary. That's kind of the next step that occurred, I believe in January of '23.

Q. I'm going to direct your attention to Exhibit 18. Can you identify Exhibit 18 when you get there?

A. Yes.

Q. Defendant's Exhibit 18, to be clear for the record.

A. Yes. Defendant's Exhibit 18 is an email from me to Ms. Benes dated January 12th, 2023, primarily about the e-discovery issues that I was just talking about. Okay.

Q. And in terms of the proposal that you were referring to make a shared BNG database that both sides could use for the litigation, did you receive a response to that?

A. I received no response at all to this email for about a month. And once I did, it was -- this proposal was rejected.

MS. GREENE: I'd move for the admission of Exhibit 18.

MS. BENES: Your Honor, I have the same concerns about Exhibit 18. First of all, hearsay, also containing information that is expert testimony that was apparently received from Pale discovery. Pale discovery is not here, so it's hearsay. He has no personal knowledge and is not an expert in e-discovery. Under the --

THE COURT: But isn't the point of the email that -- and I'm not blaming anybody here. I'm not suggesting that either of you was wrong to take the action that you took, but that there was a disagreement and you weren't able to come to an agreement. Isn't that the point of it?

MS. BENES: I think that's what they're trying to say, that they disagreed with how the results were being produced. But the order had already been entered. And so Mr. McDannell's

issues were subsequent to what the Court had ordered Ms. Gunkova to do. Quite frankly, his issues and what he found with the production or the format of the production and it not being the way he pleased is irrelevant.

THE COURT: All right. I'll overrule the objection, and it will be admitted.

(Email to Ms. Benes about e-discovery issues was hereby received into evidence as Defendant's Exhibit 18, as of this date)

Q. Thank you, Your Honor. You stated that you didn't receive a response for approximately a month from Ms. Benes and that she did not agree to a shared database, correct?

A. That is correct.

Q. Okay. Can I direct your attention to Exhibit 19?

A. Yes.

Q. Can you identify Exhibit 19?

A. Yes.

Q. Exhibit 19 is an email from Ms. Benes to me in direct response to that January 12th email. It's dated February 6th, where she indicates that she had been in trial and just was getting back to me now, but that she did not intend to share any expenses or have BNG pay -- or agree to have BNG pay for BNG's data to be processed.

MS. GREENE: Okay. Move for the admission of Exhibit 19.

MS. BENES: No objection.

THE COURT: It will be admitted.

(Email from Ms. Benes was hereby received into evidence as Defendant's Exhibit 19, as of this date)

Q. Did you continue to have discussions with Ms. Benes regarding the production and ability to provide the privilege log based on the information you've been provided by Vestigant into March of 2023?

A. We continued to have discussions on a couple of different fronts associated with what I saw as problems with their search, that is as far as I could observe it. And you know, I've done numerous e-discovery cases and so I'm very familiar with the results and how -- and how you manage large sets of data like this. And as an example, I had to produce a privilege log. And without control numbers just as a base level thing, we couldn't identify these documents in any rational way that would say, I'm holding this document back, but giving you this other document. And so there were things like that, the searchability. There were also some things about deduplication that I thought were extremely problematic with their search methodology. And frankly, I didn't want to do the same work twice. I didn't want to review a partially complete version of their pull if there had been some mistake in it. So I was trying to get to the bottom of whether they had made some inadvertent error associated with the way they

had done it that led to some weird results I was seeing.

MS. BENES: Your Honor, I hate to continue to objecting. I would just --

THE COURT: You're entitled. I'm not offended by it.

MS. BENES: Thank you. Again, objection, calls for expert testimony. This is a lay witness who has not been qualified as an expert.

THE COURT: All right. I'm going to overrule the objection because I do not view it as expert testimony. Rather, it's his understanding of how to approach the problem, if you will. But let me ask you this. Because now I'm a little confused. We're talking about BNG's servers, right?

THE WITNESS: We were talking about all of this BNG data. Some of it was located on their computers. Some of it was located on personal devices.

THE COURT: So the nature of the attorney-client privilege was that Ms. Gunkova and you had personal attorney-client privilege material on BNG's servers?

THE WITNESS: Correct. Because it was a -- it was a computer used for multiple purposes, Your Honor.

THE COURT: So what was your proposal to deal with that? How were you going to solve that problem?

THE WITNESS: Well, the goal from the beginning had been to do a privileged review of the results that came back. Their initial pull was a keyword based pull from all these

devices. And then we basically got physical locations and, of course, document names and the -- and the documents themselves. And so I would then do a review of that doing both free word searching for, you know, common markers like my name. Luckily, I have a unique name that I'm easy to -- it's easy to find. And then also, as I was mentioning before with the Dropbox issue, there were physical locations on the hard drive that I knew were the shared, essentially the shared file between me and my client.

So I did it on both fronts. I looked for specific documents that may be wherever in their email, for example, or you know, had been copied onto their hard drive, and I looked for the physical locations where it was essentially a file folder full of documents that were, you know, shared with the -- shared with my attorney, you know, that kind of a thing. So that's what I was looking for and that's how we generated, eventually, the privileged log in March and April, as we were -- as we decided that we had to go it alone and just process the data ourselves without cooperation from the other owner of BNG.

THE COURT: Thank you. Ms. Green.

BY MS. GREENE:

Q. Okay. Did there come a time when that review became impeded by files that had been -- that you received from Vestigant that were corrupted?

A. Yes. So when we first got the document -- the data from them in January, I believe -- I'm working from memory -- but I believe it was a partial production, I think because of the USB thing. It was -- some of the things where they gave us and some of them they were still processing. We looked at what we could look at there and saw the data formatting, and we raised those issues, but we didn't process it at that time because we were trying to solve with them the processing. When we -- by the time we had figured out they were not going to cooperate, we'd given it the time we could give it before we had to move forward.

We had some additional data from them. And some of that additional data was corrupted. So when they went to go -- when our vendor went to go process everything, they simply were not able to open certain files that for whatever reason in transmission became had become corrupted. We raised that to their attention, I believe it was in early March when the -- when our vendor started to do that work. And we resolved it relatively quickly within the next week or week or two. I think it took longer than I thought it should take, but it got resolved.

Q. Okay. Did you run into issues with the OST and PST files that were produced by Vestigant?

MS. BENES: Objection. Same objection, Your Honor. Calls for expert testimony.

MS. GREENE: It's his experience with the files.

MS. BENES: The question was, did you run into issues with the OST and PST files? My objection this calls for expert testimony.

THE COURT: All right. I'll overrule the objection. But perhaps you can explain to me, Ms. Green. The files originally came from BNG and went to Vestigant, right?

MS. GREENE: Right.

THE COURT: So why isn't he looking at BNG files as opposed to Vestigant files? I mean, it seems like your client sends them out and then they come back and there's a problem with them because they're corrupted in some way. Why aren't they looking at the original files?

MS. GREENE: Well, the reason they're not looking at the original files is because they're doing the review on the narrower search on the keyword search that they have to produce back and release from the forensic imaging. Because it's not the whatever amount of data on the forensic imaging that they're releasing; it's the keyword search. So there's the huge data set of everything on all the computers and all the sticks, right? And then there was a keyword search, which is a subset of data that we're actually talking about. And then there's a subset, which is that data after the privileged materials have been removed. So for part of this discussion, in terms of the spoliation, right, everything we produced in

discovery, it's what came off these computers in the forensic search. So if there was a problem -- and one of the things, I can't say that without pre-advising the witness.

THE COURT: Well, okay, I understand your point. Did you experience a problem in what was produced?

THE WITNESS: Yeah. So what I noticed very quickly -- and to answer your question, Your Honor, I was doing both. I was looking at the results from Vestigant, and I was comparing them to the results that -- we had the computer still, we had the PSTs. So I was -- I think one day I just happened to, in response to some requests I needed to update for Ms. Benes, I looked for somebody's name. I believe it was an accountant or something like that, that I knew there should be some emails from. And I found emails that were in my client's PSTs, but were not in the Vestigant PSTs that I thought should have been hit by the Vestigant searches.

And frankly, Your Honor, this is all -- I was not -- I shared some of this information with Ms. Benes, but I was more -- at the time I was more going to use it to cross-examine Mr. Racich about his methodology and the completeness thereof. Because it was obvious to me that it was some sort of problem. And I was raising it with them because I didn't want everyone's time wasted. But it was obvious to me that there was something associated with the deduplication or some other processing mechanism that ended up with things not being where they should

have been.

And I'll give you -- I can give you an example of that that doesn't really relate to a PST, but if, for example, I had -- we had shared, you know, whatever, an invoice from BNG, and that invoice would come in on BNG servers and it was in an email and was in a folder called invoices and was in -- and it was something they needed to send to me too. And they sent it to me in a -- in a -- in a folder called things I want to ask Mr. Kamin about. So it's clearly privileged in that folder. If the -- if they ran some sort of deduplication on it, that the only place it exists is in the -- in what they gave us back was in the folder called things I want you to ask Mr. Kamin about, then the other two places that it should exist, and we're not trying to hold that back, that it doesn't exist anymore because of the way they ran the deduplication.

So I was noticing that -- I think that was the problem. I don't really know. I never got to the bottom of it because our experts couldn't work together. And basically, Ms. Benes' response was, the order's the order, produce what you have to produce. And there was just no -- there was no desire to collaboratively try to solve these kind of problems. But I noticed a very specific problem that I thought would at least be fertile grounds for me to understand -- to question Mr. Racich about eventually down the road, about his methodology and the completeness of his results. But I just -- we just

never got that far.

THE COURT: Ms. Greene?

MS. GREENE: I have no further questions for this -- well, let me take that back. We will go one more place. I have no further questions for this witness at this time.

THE COURT: Okay. Thank you. Cross-examination?

MS. BENES: Yes. Court's indulgence.

CROSS-EXAMINATION

BY MS. BENES:

Q. Good afternoon, Mr. McDannell.

A. Good afternoon.

Q. Good to see you again. Mr. McDannell, you testified that you had proposed a professional to come in and image or collect all of the relevant emails, right?

A. Yes.

Q. And you testified that you could never get me to agree -- I wouldn't agree on anything, right?

A. Any shared expenses. That's correct.

Q. Right. Didn't I, in fact, write you a letter on November 18th, 2021, and state to you, "Your email incorrectly states that I rejected your proposal to implement a formal procedure to have professionals collect our client's respective emails. Let me clarify my position so that there is no question. As I stated to you in your office on the date of Mr. Kamin's deposition, I am not opposed to having a procedure implemented

to search our client's respective emails using keywords. However, I cannot agree that a professional needs to be hired to do this for my client, as such an agreement would unnecessarily incur fees for Mr. Kamin to hire such a professional when I can run the search myself if Mr. Kamin provides me his credentials. As to your clients, I have no objection if they want to hire a professional to run the procedure on their emails." Didn't I send that to you on November 18th, 2021?
A. I have no idea. I trust that you wouldn't make that up in front of the Court, but I don't -- I have no idea. Okay?
Q. And in fact, your clients didn't hire a professional to run the procedure on their emails, did they?
A. No. The proposal was to have BNG do it jointly because these were BNG documents that you wanted.
Q. Sure. And my question was, your client did not hire a professional to engage the activities that you wanted to have done, correct?
A. My client did not -- my client, Ms. Gunkova, did not hire a professional to collect BNG's documents until after there was a -- there was a forensic examination order to do that.
Q. Correct. You also testified that Ms. Gunkova -- And let me make clear, you also represented Mr. Bogatin, right?
A. For a portion of my -- of the time. I'd have to look back to see exactly when that was.

Q. You testified also that Ms. Gunkova provided monthly reports to Mr. Kamin, right?
A. Yes.
Q. Isn't it a fact, though, that after nearly every monthly report I wrote you a letter, lengthy letters every month detailing the deficiencies and remaining questions with the reports? Isn't that right?
A. It is not. There were a number of discovery dispute letters that you wrote me, but I do not believe it was -- they were at all triggered by the monthly reports. There were times where you had questions about them. And if they were questions that Ms. Gunkova was able to answer, she did.
Q. (Indiscernible).
A. And I will say that, Ms. Benes, I don't -- there's a -- there's a difference between what we produced in discovery and the monthly reports we did.
Q. Right. We're talking about --
A. We were obligated to supplement our discovery responses, and we did when we needed to. And I think most of the things that you wrote directed to me was for that purpose.
Q. Your testimony was about the monthly reports that were produced, right?
A. Correct.
Q. And I sent a number of letters. For example, on May 17th, 2022, I sent you a letter that started, "This letter

supplements my no less than seven prior attempts, for which Mr. Kamin has not received a response from Ms. Gunkova, or a response from counsel relating to Mr. Kamin's request for information as a member of BNG pursuant to Virginia Code Section 13.1-1028. In addition, this is a response to Ms. Gunkova's emails sent on May 11th, 2022, and May 13th, '22, together the May reports. I sent you those sorts of letters, didn't I?
A. Yeah, I'm sure that you did on occasion. I didn't suggest otherwise.
Q. And there were no responses to those letters?
A. That is absolutely not true. We had active back and forth about discovery issues. And sometimes -- I mean, part of the issue was Ms. Gunkova and Mr. Kamin were active partners in a -- in a business. They were 50-50 partners. And so outside of the scope of litigation, frankly, and to save costs, we provided monthly reports that eventually we ended up Bates stamping and giving to you as additional documents. But we were providing them contemporaneously in the operation of the business so that Mr. Kamin could be informed.
Q. You testified about corrupted files. Do you recall that?
A. Yes.
Q. The corrupted files were four files; is that right?
A. I don't know how many.
Q. And those files, you don't contend those were corrupted

during the imaging process, do you?
A. I have no idea where they -- where they were corrupted.
Q. Those were simply corrupted in the transfer from Vestigant to KL Discovery, right?
A. No, I don't -- I wouldn't say that. I do not know.
Q. Okay. The alleged corrupted files issue was resolved though, wasn't it?
A. Absolutely.
Q. And KL Discovery received all results, none of which were corrupted, right?
A. They received all results of Vestigant's work.
Q. Yes.
A. That's -- that is true.
Q. Okay.
A. At least as far as I know. I wouldn't have a way to independently verify that. But I trust that they provided what they were supposed to provide.
Q. And you testified at great length of your efforts to make our team aware of your concerns, right?
A. Yes.
Q. And isn't it true that on a number of occasions I asked you to provide a list of the files that you believed were not captured?
A. You did.
Q. And in fact, you responded, "It takes a special kind of

nerve." This is a quote. "It takes a special kind of nerve to demand that I prove my concern for you. I have explained my concerns and provided plenty of information that would allow for QC on your end. I was under no obligation to even share the concern. I'm not going to do your homework for you." That's what you told us, isn't it?
A. That sounds exactly like what I would have said.
Q. And in fact, it didn't end up producing any of the results, even the unprivileged results, for quite some time, right?
A. I believe that it took us about six weeks to process -- to give you the first results out of Vestigant data once we had the --
Q. The first --
A. -- once we had them up and running.
Q. Vestigant provided to you the first results from their search in December of 2022; isn't that right?
A. Over the Christmas holiday, yes.
Q. Correct. And you didn't produce any results for months, right?
A. Because I was waiting for a response from you --
Q. The answer to that is you did not produce any results for months, right?
A. The context matters, Counsel. But yes, that is the correct answer.
Q. And in fact, Mr. Kamin had to file a motion to compel

production of forensic results on or about April 7th, 2023, because the results still hadn't been produced to him; isn't that right?
A. At that point in time, I believe we had had the database up and running for about three or four weeks. So he did not have it. You did not have to file anything, but you did file something.
Q. I'm going to mark this as Exhibit, I believe we left off at 26.
THE COURT: All right. This will be marked as Plaintiff's 26.
(Order by Loudoun County Court was hereby marked for identification as Plaintiff's Exhibit 26, as of this date)
THE COURT: Let's hand one to the witness if you would, please. Would you take one to the witness, please? Thank you.
THE WITNESS: Thank you.
Q. Do you recognize this order, Mr. McDannell?
A. Not on sight. No.
Q. This is the order that was entered by the Loudoun County Court on May 2nd, 2023, by Judge Fisher after a hearing on the motion to compel and for sanctions that was filed by Mr. Kamin on March 31st, as well as the motion to compel production of forensic results that was filed on April 7th, 2023. Do you see that?

A. Do I see what?
Q. Do you see that this is the order that was entered by the Court on May 2nd, 2023?
A. Yes, I see that.
Q. Okay. And it said -- the order states, "It further appearing to the Court that the defendant, Valeria Gunkova, has failed to produce a privilege log and all unprivileged documents data as required by the Court's October 25th, 2022, order." Do you see that?
A. Yes.
Q. And in fact, it went on and it granted the motion, right?
A. Yes.
Q. And then it compelled Ms. Gunkova to produce a full and complete privilege log by May 15th, and that she should identify and produce all remaining unprivileged documents by May 15th, 2023; isn't that right?
A. Yes.
Q. So for nearly six months, no results were provided to Mr. Kamin, and it took a court order to compel those results to be turned over; isn't that right?
A. No, not really. Not put that way.
MS. BENES: Move for the admission --
A. Six months was the time between the order to do the forensic examination and this order. That's correct.
Q. Six months from the turnover of the results to KL Discovery

in December of 2022. You said over the Christmas holiday to May 2nd, 2023,
A. Some of the results, I said, by the way. Some of the results, not all of them.
Q. And as of May 2nd, 2023, none had been turned over.
A. Well, that's not six months. That's barely four months is what that is.
Q. Okay.
A. And a month of which I was waiting for a response from you, Counsel.
MS. BENES: Move for the admission of Exhibit 26, please.
THE COURT: Is there any objection?
MS. GREENE: No objection.
THE COURT: It will be admitted.
(Order by Loudoun County Court was hereby received into evidence as Plaintiff's Exhibit 26, as of this date)
Q. Mr. McDannell, you were ultimately disqualified by the Loudoun County Court, weren't you?
MS. GREENE: Objection. Relevance.
THE COURT: Overruled.
A. Yes.
Q. Exhibit 27. Mr. McDannell, Exhibit 27 is the order of disqualification entered by the Loudoun County Court. Do you recognize this document?

A. I do.
Q. And the Court's order on page 2 disqualified you as of June 2nd, 2023, right?
A. Yes.
Q. And in fact, the Court found a number of things, but including that Ms. Gunkova is using fraudulent funds to pay for a variety of things, right?
MS. GREENE: Objection. Document speaks for itself. And there was no finding that Ms. Gunkova had engaged in fraud at this point.
A. Certainly isn't the basis --
THE COURT: Well, wait, wait, there's an objection. And you're a lawyer, and you understand --
THE WITNESS: Sorry. I apologize, Your Honor.
THE COURT: -- the Court will rule on the objection.
THE WITNESS: I apologize, Your Honor.
THE COURT: I'll overrule the objection. You can answer.
A. I'm sorry. Yeah, I don't believe that your representation of what the order says is accurate.
Q. Okay. Looking at the order, Mr. McDannell, you would agree that the order on page 1, subsection 1, says the alleged fraud in the case appears to be ongoing. It is sustained, and it is over a period of time. You agree it says that, right?
A. Yes, that's what it says.

Q. You agree in subsection 2, it says the alleged fraud is pervasive. It prevents an alter ego framework where it appears that Ms. Gunkova is using fraudulent funds to pay for a variety of things. You see that?
A. Yes.
Q. 3 goes on to state the evidence in question is not de minimis. It is substantial at nearly half a million in fees paid by Ms. Gunkova to counsel and constitutes a significant portion of the plaintiff's case. You see that?
A. I do.
Q. The counsel referred to here is you, right?
A. It would not -- that would not be an accurate description of me. It would -- I would assume that description in 3, and if that's what you're asking about --
Q. It includes you.
A. It includes me. Yes.
Q. Correct.
A. That's correct.
Q. It includes you.
A. Yes.
Q. Ms. Gunkova, the Court then found that the Court should resist any enabling whatsoever of any fraudulent practices. And an order of disqualification accomplishes that enabling? Isn't that right?
A. That's what it says. Yes.

Q. And it disqualified you as of June 2nd, 2023.
A. I've already answered that. But yes.
Q. And yet you continued to represent Ms. Gunkova, didn't you?
A. I did not end the representation agreement for a couple of -- couple of weeks after that, I believe. But we wrapped it up and handed it off to another attorney.

MS. BENES: Move for the admission of Exhibit 27.

MS. GREENE: No objection.

THE COURT: All right. This will be marked as 27. Without objection, it will be admitted.

(Order of disqualification was hereby received into evidence as Plaintiff's Exhibit 27, as of this date)

Q. And the new Exhibit --

THE COURT: Excuse me, 28.

Q. You've been handed what has been marked for identification purposes as Exhibit 28. This is your invoice for Ms. Gunkova, isn't it?
A. Yes.
Q. In fact, this is the invoice for June 29th, isn't it?
A. Correct.
Q. Notwithstanding that you were disqualified by the Loudoun County Circuit Court on June 2nd, 2023, you continued to represent Ms. Gunkova until June 29th, 2023, at the earliest.
A. I didn't appear in court for her during that time.
Q. You continued to represent Ms. Gunkova even though you had

been disqualified by the Loudoun County Court, hadn't you?
A. Yes. To transfer over to new counsel.
Q. You are not an expert in e-discovery, are you?
A. I have had substantial e-discovery experience.
Q. You are not an expert.
A. Ma'am, can I answer the question?
THE COURT: Just let him answer the question, please.
A. I've had substantial e-discovery experience over 20 years. I have managed large e-discovery projects. I have personally handled the review of over a million documents through various different portal mechanisms in an individual case. And so I actually consider myself to be an e-discovery expert. I don't know that I would be qualified by this Court if they were asking me to do that, but I consider myself as a lawyer to be very knowledgeable about e-discovery. Yes.
Q. You've never qualified as an expert in e-discovery?
A. I would -- I've never had the need to do so.
MS. BENES: Thank you, Your Honor. No questions.
THE COURT: Any further questions?
MS. GREENE: No, he is free to go.
THE COURT: All right. Thank you for your testimony. You're free to go.
THE WITNESS: Thank you, Your Honor.
THE COURT: All right. Well, it is 5 o'clock now. It seems to me to be a good time to take a break for the day, Ms.

Benes.

MS. BENES: If I did not already do so, move for the admission of Exhibit 28, which is the --

THE COURT: Any objection?

MS. GREENE: Just as to relevance.

THE COURT: Overruled. It will be admitted.

(Invoice for Ms. Gunkova was hereby received into evidence as Plaintiff's Exhibit 28, as of this date)

THE COURT: What about 27? I don't think I have that either.

MS. BENES: Move for the admission of Exhibit 27, which is the order of disqualification. I think she said --

THE COURT: Any objection?

MS. GREENE: I didn't object to 27.

THE COURT: It will be admitted. Thank you. All right. You're free to go. Thank you, sir.

MS. GREENE: Thank you, Jay.

THE COURT: All right. We have a holiday tomorrow. I have Chapter 13 on Thursday, and we have a full day trial on Friday. So Monday the 24th at 9:30 a.m.

MS. GREENE: I'm open.

MS. BENES: Give me one second while my computer is loading up, Your Honor, please. Mr. Racich does not have his phone.

THE COURT: This is shocking to me that the one person

in the Court who knows the most about computers.

MS. BENES: Oh, he's been dying all day.

MS. GREENE: I'm sure.

THE COURT: Well, is he going to be needed as a rebuttal witness?

MS. BENES: He might be. But the 24th is available, and Mr. Racich will do his best.

THE COURT: All right. Then we'll set it for Monday at 9:30, Monday the 24th at 9:30 a.m. Hopefully it'll be a half day hearing, but I understand that these things often run longer than intended. And I thank the parties for their cooperation. And we'll stand adjourned. And everybody have a nice holiday tomorrow.

(Whereupon these proceedings were concluded at 5:04 PM)

# I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| FOR THE PLAINTIFF: | | | | | |
| John Christopher Racich | 19 | 100 | 129 | | |
| FOR THE DEFENDANT: | | | | | |
| Jacob Bogatin | 139 | 149 | 163 | | |
| Jay McDannell | 167 | 189 | | | |

| EXHIBITS: | DESCRIPTION | MARK | ADMIT |
|---|---|---|---|
| FOR THE PLAINTIFF: | | | |
| 1 | Mr. Racich's CV | | 24 |
| 2 | Request for documents | | 26 |
| 3 | Motion to compel | | 27 |
| 4 | Order regarding first motion to compel | | 28 |
| 5 | Order with regard to third motion to compel | | 28 |
| 6 | September 9th motion | | 30 |
| 7 | Forensic order | | 32 |
| 9 | November 1st letter | | 35 |
| 10 | Mr. McDannell email | | 39 |
| 11 | Letter with search terms | | 40 |
| 12 | Vestigant email chain | | 43 |
| 13 | Deposition of Ms. Gunkova | | 47 |

| EXHIBITS CONT'D: | DESCRIPTION | MARK | ADMIT |
|---|---|---|---|
| FOR THE PLAINTIFF: | | | |
| 14 | Supplemental discovery | | 48 |
| 15 | Chart | | 65 |
| 16 | Link file analysis | | 68 |
| 17 | Discovery responses | | 70 |
| 18 | Pre-fetch analysis | | 73 |
| 19 | CCleaner report | | 77 |
| 20 | ZZZ file | | 85 |
| 21 | Pre-fetch for IT005 | | 86 |
| 22 | List of file data | | 90 |
| 23 | September 30, 2021, excerpt of V. Gunkova Deposition | | 94 |
| 24 | Native files list | | 98 |
| 25 | Timeline chart | | 99 |
| 26 | Order by Loudoun County Court | 195 | 197 |
| 27 | Order of disqualification | | 200 |
| 28 | Invoice for Ms. Gunkova | | 202 |
| FOR THE DEFENDANT: | | | |
| 1 | Email reply in reference to Malware Bytes order | | 143 |
| 2 | Email in reference of Malware Bytes order | | 144 |
| 3 | Fast Data Recovery document | | 145 |
| 6 | Email to Ms. Benes on November 18th, 2021 | | 170 |

| EXHIBITS CONT'D: DESCRIPTION | | MARK | ADMIT |
|---|---|---|---|
| FOR THE DEFENDANT: | | | |
| 9 | Device designations | | 106 |
| 10 | Response to Ms. Benes' letter | | 177 |
| 11 | Email scheduling original forensic imaging | | 110 |
| 12 | Email re key search terms | | 112 |
| 15 | Vestigant email chain | | 115 |
| 18 | Email to Ms. Benes about e-discovery issues | | 181 |
| 19 | Email from Ms. Benes | | 182 |
| 25 | April 18, 2023, email from Jay McDannell | | 119 |
| 26 | June 8th, 2022, monthly report | | 166 |

# C E R T I F I C A T I O N

I, Bridget Hearne, the court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Bridget Hearne July 5, 2024

______________________________ ____________________

BRIDGET HEARNE DATE

## A

**ability (10)** 5:22;42:4;54:22;79:6;86:23;90:7;91:25;103:15;121:16;182:6
**able (49)** 7:23;8:14;13:11,22;14:7;15:10,12;42:5;43:5;48:14;53:20;61:18;62:2,16,20,22;66:7;67:8;68:3,10;79:5,8;85:9;90:7;91:5,7,13;92:3;102:19;114:23;116:16;119:11;120:24;121:6,9;127:4;134:1;147:21;148:1,8,11;169:21,23,23;178:20,23;180:21;185:15;191:12
**above (1)** 124:15
**Absolutely (5)** 19:4;63:25;84:5;192:12;193:8
**accepted (1)** 22:21
**access (42)** 26:19;29:22,24;31:15,23;41:11,18;46:8;60:14;66:11;67:14;90:7;91:17;102:3,18,19,23;103:13,15;104:1;121:15,16,21;122:12,22;125:14,23;126:1;127:5;128:20;150:14,16,19,21,23,25;151:1;157:3;158:3,5;171:5;179:21
**accessed (3)** 61:3;125:1;128:7
**accesses (1)** 66:16
**accessible (1)** 17:16
**accommodate (2)** 5:15,25
**accomplishes (1)** 199:23
**According (1)** 123:10
**account (10)** 46:20,24;47:5;48:11;112:1;150:19,21,23;156:20;164:15
**accountant (1)** 187:12
**accounts (3)** 35:24;36:2;150:25
**accurate (12)** 32:25;52:11;93:13,14;117:21;118:1,5;120:1,1,6;198:20;199:12
**accurately (2)** 98:18;99:1
**acquisition (1)** 34:12
**across (1)** 116:21
**action (2)** 156:24;180:20
**actions (4)** 43:23;99:9;129:13;156:22
**active (2)** 192:12,14
**activities (2)** 99:2;190:17
**activity (10)** 44:3;54:23,24;55:1,1,2,2,3;161:17;165:13
**actual (5)** 33:14;62:21;74:19;104:20;178:8
**actually (23)** 18:4;22:19;55:22,23;57:2;68:7;73:21;74:11;79:15;80:12;82:14;101:1;103:20;104:16;123:1;129:8;130:17;141:25;166:8;174:22;176:22;186:22;201:12
**adding (1)** 102:23
**addition (2)** 48:4;192:5
**additional (5)** 29:19;144:9;185:12,13;192:18
**address (9)** 46:12,19;134:6;155:10,15;156:1;165:1,2;174:8
**addressed (1)** 25:1
**addresses (4)** 13:16;48:1,3;150:14
**adjourned (1)** 203:12
**admin (1)** 109:3
**admission (46)** 18:23;23:24;25:21;27:2,20;28:14;30:15;32:2;35:11;39:14;40:16;43:7;47:13;48:18;65:11;68:12;70:7;72:25;77:8;84:15;86:11;90:9;93:21;97:22;99:11;106:10;107:18;108:9;109:21;111:11;115:9;118:24;143:11;144:2,23;147:13;165:15;170:1;177:5;180:11;181:24;196:22;197:11;200:7;202:3,11
**admissions (2)** 94:3;107:24
**admit (1)** 7:3
**admits (5)** 12:5,5,6,12,13
**admitted (48)** 7:3;18:21;24:2;25:24;27:5,24;28:17;30:18;32:5;35:13;39:22;40:19;43:9;47:16;48:21;65:16;68:15;70:10;73:3;77:12;85:13;86:14;90:12;94:5;97:25;99:21;106:14;109:25;112:12;115:13;119:6;133:4;143:14;144:6;145:1;166:11;167:24;170:6;177:7,10,11,16;181:6;182:2;197:15;200:10;202:6,15
**Advantage (2)** 21:3,5
**adversary (2)** 3:4,18
**advise (1)** 114:20
**advised (3)** 115:1;152:12;153:6
**affect (2)** 92:15,17
**affected (4)** 7:7;96:13,16;160:7
**affects (1)** 124:16
**afternoon (8)** 4:24;100:18;108:2;149:5,7,8;189:10,11
**again (44)** 7:7,11;17:2,9;28:9;52:2;55:14;56:6,23;62:8;67:12;68:5;69:10;70:5;77:23;86:2;89:18,22;105:23;109:7;112:17;121:14;122:17,24;123:14;124:15;125:22;135:9,11;136:14;137:2;139:17;140:20;142:12;143:6;144:19;154:4;163:2;171:7;173:22;179:17,18;183:5;189:12
**against (4)** 24:7;26:4;52:13;107:7
**agree (17)** 7:22;8:17;107:4;169:12,19,19,21,23,24;181:12,22;189:16,17;190:2;198:21,24;199:1
**agreeably (1)** 169:24
**Agreed (3)** 4:12;107:6;153:8
**agreeing (1)** 7:21
**agreement (4)** 8:13;180:22;190:3;200:4
**ahead (9)** 9:4,7;10:8;38:3,9;44:21;81:19;144:16;177:25
**air (1)** 136:1
**algorithm (2)** 52:18;117:6
**alleged (9)** 3:19;14:9;92:20;96:9;136:16;160:24;193:6;198:22;199:1
**allegedly (1)** 166:5
**alleges (3)** 12:16;52:10;133:21
**alleging (1)** 166:7
**allow (7)** 10:5;29:13;40:24,25;41:4;95:13;194:3
**allowed (5)** 25:6;121:24;124:6;138:2,3
**allowing (1)** 170:22
**allows (1)** 70:21
**almost (2)** 17:24;167:2
**alone (1)** 184:18
**along (5)** 13:7;146:8;148:19,20;161:15
**alter (3)** 51:22;71:12;199:2
**alteration (2)** 97:17,19
**altered (2)** 91:14;97:15
**Alternatively (1)** 9:12
**although (3)** 21:2;59:4;107:15
**always (2)** 95:5,5
**among (3)** 34:17;111:7,22
**amount (5)** 59:5;90:24;115:18;116:2;186:18
**analyses (1)** 53:9
**analysis (25)** 13:19;24:6;30:11;41:21,25;45:6;53:12,18;54:5;62:20;63:10;66:1,25;68:1,16,24;72:1;73:4;93:9;114:1,23;121:6;125:15;133:13;136:3
**analyze (9)** 48:15;61:18;62:2,16;68:10;86:17;94:9;95:14,21
**analyzed (3)** 29:16;41:24;56:2
**and/or (4)** 32:11;40:24;48:1;168:19
**answered (10)** 93:3;99:6;129:2;149:17,18,19;153:13;162:4;173:21;200:2
**anticipate (1)** 175:2
**anymore (1)** 188:15
**apologize (21)** 31:3;37:2;44:7,23;66:6;69:12;76:14;77:23;81:12,15,20;87:22,24;91:1;102:5;108:23;125:6;128:2;176:5;198:14,16
**apparently (2)** 134:23;180:14
**appear (8)** 9:2,21;67:17;89:10;96:16;130:4;165:19;200:24
**appearance (1)** 10:5
**appeared (4)** 124:25;130:7;136:5,24
**appearing (1)** 196:6
**appears (7)** 60:17;109:6;147:16;154:24;155:7;198:23;199:2
**application (15)** 9:2;55:2;57:2;70:19;72:5;74:18,21,23,25;75:13;76:3;77:6;87:12;92:11;

95:4
**applications (5)** 21:15;56:13,15,24;71:24
**applied (2)** 40:3,12
**apply (1)** 54:6
**approach (1)** 183:10
**appropriate (3)** 9:21;15:23;16:2
**approximately (6)** 16:20;106:18;118:20;146:12;147:11;181:11
**April (11)** 34:4;97:4;100:4,5;117:24;118:11,16;119:7;184:17;195:1,24
**arbitration (2)** 22:9,10
**area (8)** 60:24;87:8,9;103:2;122:5,6,9;160:20
**areas (1)** 32:20
**Arguably (1)** 114:12
**argued (1)** 4:5
**arguing (2)** 18:14,20
**argumentative (1)** 124:18
**Aria (33)** 16:8;93:5;103:6;119:16,22;121:24;122:2,6,11,12;132:18;133:7,11,17;141:19,23;143:3,7,23;144:14,17,20;145:4,15;157:6,9,18;158:17,20;159:4,5,6,13
**Aria's (3)** 16:8;101:21;102:13
**ariaskincare@gmailcom (1)** 47:4
**around (5)** 66:21;72:12;88:23;89:12;162:18
**artifact (8)** 56:4,12,12;60:4;63:4;71:22,23;112:22
**artifacts (16)** 54:19;55:8,9;56:16,20,21;57:4;58:10;63:2;66:19;71:21;84:9,12;100:6;121:10;134:1
**aside (1)** 54:1
**asserted (1)** 111:16
**asserts (1)** 12:9
**assigned (1)** 87:9
**assist (11)** 29:15;49:2;98:3;149:21;150:11;152:5,8,12,15,16,18
**assistance (1)** 98:7
**assisted (13)** 29:21;49:16;98:16,16;150:8;152:2,10,14,22;153:4,10,16,23
**assisting (2)** 151:2,10
**assistive (1)** 140:2
**assists (1)** 20:6
**associated (4)** 140:18;182:10,25;187:24
**Associates (1)** 20:25
**Association (1)** 21:18
**assume (4)** 39:20;102:25;131:17;199:13
**assumed (1)** 178:14
**assumes (1)** 61:19
**Assuming (1)** 39:16
**Atlantic (2)** 163:22;164:13
**attached (42)** 13:23;16:15;42:3,14;43:2;45:7,18;57:9,10,18,21,22;58:8,11,13,21;59:22;65:2,4;66:7,13,15;67:20;69:24;70:5;95:3;100:5,6,23;114:24;128:6,17;133:1;136:21;147:17;159:20,22,24;160:4,5,10;166:6
**attachment (4)** 84:10;98:21;100:20;164:14
**attachments (1)** 100:2
**attack (24)** 92:9,10,20;93:2,7;96:10,12,14,15;141:24;142:8;143:5,9,24;144:18;146:2;147:22;148:9,12;159:19;160:2,7,24,25
**attacked (3)** 159:17;160:9;162:15
**attacks (1)** 92:10
**attempt (4)** 55:1;144:18;145:5;169:1
**attempted (3)** 15:16,16;29:21
**attempting (1)** 115:18
**attempts (1)** 192:1
**attend (2)** 30:24;31:4
**attending (1)** 29:23
**attention (35)** 36:5;38:20;45:24;69:1;101:6;105:4,23;106:24;108:19;110:9;112:15;113:5;114:19;117:22;118:14;124:21;127:9,21;130:2;135:24;142:16;143:18;146:15;147:4;163:14;169:3,9;171:9,17;172:21;173:13;174:1;179:24;181:14;185:17
**attorney (20)** 21:20,22,25;151:23;152:1,3,5,8,9,9,13,23;153:6;154:16;167:23;168:6;175:10;176:13;184:15;200:6
**attorney- (1)** 183:17
**attorney-client (8)** 114:10;153:1,19,20;176:9,19;177:22;183:16
**attorneys (2)** 9:13,21
**August (8)** 5:23;7:10;27:18;78:3,6;79:20;94:10;97:4
**auspices (1)** 171:3
**authenticate (1)** 108:1
**authorized (1)** 156:19
**availability (5)** 5:19;73:7;77:1;79:2;90:3
**available (16)** 7:25,25;8:3,7,12;9:14,20;16:18;17:21,23;49:1;50:25;108:2;166:5;174:14;203:6
**avoid (1)** 8:16
**aware (15)** 26:3;30:2,21;39:13;70:17;106:21;107:11;116:7;117:16;119:22;127:14,23;128:19,23;193:19
**away (1)** 19:6
**Axiom (1)** 53:14

## B

**back (46)** 19:1;20:24;21:10;34:9;37:9;39:25;44:1,19;57:2,19;64:12,13;73:18,19;107:23;112:9;113:22;116:12;118:7;119:20;122:1;123:16,21;128:11;136:14;138:21;139:3;141:9;147:22;148:21;167:14;172:3;174:19;175:18;179:14,15;181:21;182:17;183:24;186:11,17;188:11,14;189:4;190:24;192:12
**background (3)** 13:3;140:1,7
**backup (4)** 105:17,18,21;163:23
**bad (1)** 85:6
**balance (2)** 93:24;163:21
**Bank (5)** 47:8;150:25;163:22,22;164:13
**banking (1)** 164:15
**bankruptcy (4)** 8:21;12:25;23:11,15
**bar (2)** 21:23,24
**barely (1)** 197:6
**barred (2)** 21:13,20
**bars (1)** 167:24
**base (2)** 93:13;182:15
**Based (25)** 51:3,11;60:14;61:1;65:3;74:25;86:1;91:4;93:14;102:15;104:3,4;105:18;114:3;116:2,20;117:9;122:4;125:13;127:19;133:15;156:3;174:14;182:7;183:25
**Basically (12)** 87:8;116:1;141:2;142:9;145:6;153:7;161:11;174:25;176:12;179:20;184:1;188:18
**basis (6)** 21:25;107:21;111:13;122:25;170:17;198:11
**Bate (1)** 71:11
**Bates (2)** 18:13;192:17
**became (3)** 178:18;184:23;185:16
**become (1)** 185:16
**becomes (2)** 71:12;89:3
**began (3)** 21:1;89:4,4
**beginning (6)** 21:10;45:23;47:7;88:22;140:23;183:23
**behalf (9)** 3:7,9,10,13;32:11;124:9;151:12,16;156:22
**behind (2)** 131:2;142:16
**belonged (1)** 51:10
**below (1)** 102:24
**bending (1)** 87:3
**beneath (1)** 109:1
**benefitted (1)** 64:2
**Benes (240)** 3:8,8,15;4:1,3,8,12,25;5:1,2,6,11,18;6:9,17;7:12,14,22;8:11,23;9:12,16,19;10:1,3,14,16,17;12:1,2,20,22;15:3,5,9;17:19,21,24;19:9,11,18,21,24;23:16,24;25:3,6,21;26:2;30:15;32:2;35:11;36:21,24;37:2,5,7,9,17,19,22,25;38:9,11,14,17,20,22,24;39:14,19;40:16;43:7;47:13;48:17;

49:7,14,22;50:1;56:8,10;61:16;62:1,4;63:15,18,25;64:4,6,14,15,17;65:10,19;68:12;70:7;72:25;77:8;80:6,8,10,16,18,20,22;81:4,9,12,15,18,20,22,25;82:10,12,14,18;83:9,12,14,20,22,24;84:15,18,25;85:17;86:11;90:9;93:21;94:1;97:22;98:7;99:11,18;100:9;105:7,12;106:13;107:4,11,21;108:5,7,11,18;109:2,3,24;110:12,15;111:1,5,13,18;115:11;119:1;124:3;126:7;128:25;129:20,22;130:23;131:22,24;132:2;133:10;137:16,22,25;138:5,7,10,13,23;143:13;144:5,25;147:14;149:2,4,5,18;156:3,8,11;165:17,24;166:2,4;168:9,16;169:2,7,24;170:3,7;172:2,5;173:3,8,18;176:4,4;177:3,7,9,12,14,24;179:7,18;180:4,12,23;181:7,11,18;182:1,3,5;183:2,5;185:24;186:2;187:11,18;189:7,9;191:14;196:22;197:11;200:7;201:18;202:1,2,11,22;203:2,6
**Benes' (5)**
168:25;174:5;175:25;177:17;188:19
**best (7)**
115:24;123:11;145:22;149:10,12,15;203:7
**Bethany (4)**
3:8;109:2;133:9;149:5
**Bethune (1)**
109:3
**beyond (1)**
124:15
**big (10)**
8:18;52:20;87:17;142:15,19;154:13,16,20;169:3;172:22
**bigger (5)**
37:14;58:16;154:22,23;155:1
**Bill (1)**
126:21
**billions (1)**
52:22
**bin (13)**
14:23;15:11,12;17:20;90:20,21;91:6,8,15,20;92:3;117:11,11
**binder (7)**
19:18;20:10;58:15;154:13,16,24;155:1
**binders (1)**
37:20
**bit (9)**
5:22;36:19;55:12;57:8;87:1;103:3;108:1;159:6;162:14
**Bitcoin (1)**
147:11
**Blake (1)**
127:13
**blaming (1)**
180:19
**block (2)**
99:25;165:23
**blocks (2)**
100:1,8
**BMG's (1)**
132:8
**BNG (79)**
3:10,13;13:18;16:11,22;18:11;28:22;29:16;32:11;39:8;41:17;47:1;48:2;51:7,9;66:8;102:23;106:17,19;121:24;122:3;123:5;124:9;126:25;132:7,17;133:8,12;140:19;148:21,23;150:1,25;151:3;152:21;157:25;158:6,7,8,9,11,14,19,23,25;159:2,2,5,6,15,16;160:11,17;165:2;168:2,17,22,23;169:22,25;170:12,15,24;171:13;173:2;179:19,20;180:7;181:22,22;183:13;184:20;186:7,9;188:4,5;190:14,15;192:4
**bnggroup46@gmailcom (1)**
46:19
**bngl7847 (2)**
165:1,18
**BNG's (18)**
16:7,24;51:13;64:22;77:18;101:20;102:13;151:3,7;158:12;159:7;165:10;168:23;170:15;181:23;183:12,18;190:20
**bodies (2)**
22:9,10
**body (1)**
22:21
**Bogatin (29)**
11:3,7,11,12,16,23;46:9;48:5,10;51:12,18;123:11;124:2;139:6,7,14,16,18,19,25;148:25;149:5,8,13;155:14;163:13;167:11,14;190:23
**bogatin@gmailcom (2)**
155:20;156:6
**Bogatin's (6)**
77:19;86:19;101:4;119:10;123:8;132:21
**book (30)**
8:2;37:14,14,23,25;38:3,6,11;82:5;87:5,5;101:13;105:3,24;106:24;108:20;117:23;123:20,21;124:21;142:15,19;154:20,22;163:15;169:4;170:21;171:9;172:22;177:13
**bookkeeper (1)**
151:3
**bookkeeping (1)**
141:3
**books (9)**
87:2,7,13;105:24;151:7;154:21,22;159:7;171:4
**both (21)**
4:17;8:12;16:1;38:1;58:8,13,13;72:10;99:13;101:8;117:13,13;157:18;168:21,22;175:9;179:21;180:7;184:3,10;187:7
**bottom (14)**
42:24;46:22;47:8;74:13;80:11;102:22;107:2;111:3;115:17;127:21;166:1;169:10;182:24;188:17
**bought (1)**
145:10
**break (5)**
11:6;63:13,21;65:11;201:25
**breaks (1)**
11:6
**Brief (2)**
129:20;163:10
**briefly (2)**
31:19;71:20
**bring (1)**
107:23
**bringing (3)**
38:17;83:25;135:23
**broad (1)**
71:10
**broken (2)**
74:12;146:7
**brought (2)**
148:18,22
**bug (6)**
74:20,22,24;75:10,11;76:18
**build (1)**
164:1
**building (6)**
28:22,25;29:3;41:10;89:9,11
**built (1)**
164:3
**bullet (11)**
110:14,17,25;111:2,4,4,5,5,6;134:7,14
**business (40)**
13:18;16:11;32:11;47:2,3;48:2;51:9;64:23;66:8;103:2,6;122:13;124:9;132:8,18;146:2;151:20;154:3,6,7,8,11;157:18,20,24;158:1,8,11,14,19;159:2,5,15;160:17;161:3,17;165:10,12;192:15,20
**businesses (1)**
149:21
**buy (2)**
143:23;144:9
**Byline (1)**
47:8
**Bytes (4)**
143:1,7,15;144:7

**C**

**calculation (1)**
52:21
**calendar (4)**
4:11;6:1;8:17;72:21
**calendars (1)**
9:23
**call (15)**
3:1;11:5;19:11;31:6;41:13;50:22;139:6;151:14,15,16,16;153:21;165:23;166:22,24
**called (20)**
11:19;22:19;51:24;60:22,23,23;70:16;78:14,23;79:14;101:7;108:5;135:22;140:19,22;141:19;146:7;188:6,8,12
**calling (6)**
10:9;103:11;124:5;138:14;172:6,10
**Calls (13)**
34:16;61:13;62:8;91:11;113:11;124:3;151:12,18;153:20;178:5;183:5;185:25;186:3
**came (11)**
16:14;42:1;50:4;118:3;120:5;146:8;169:16;173:24;183:24;186:7;187:1
**camera (1)**
148:6
**can (209)**
4:10,13,15;5:15;6:11;7:4,11,15;9:8;11:14,14;15:1;19:25;20:4,18,21;24:17,24;25:12,17;26:17,25;27:14;28:2,8,24;29:19;30:3;31:9,13,19;32:16;33:2,9,21;34:18;35:2;36:18;37:20;38:23;39:2,3;40:8;41:12;42:22;44:1,13;45:24;46:3;49:19;50:3,22;51:10,19;52:17;53:13;54:15,18,24;55:5,10,16,20;56:4,19;57:2,11,19;59:4,4,15;60:6,13;63:5,13;65:9,20,24;66:1,10;67:4;69:8,10,21;70:2,18,19;71:1,11,11,12,16,19;72:16,16,20;73:20,21;74:6,10,19,25;75:1,16;76:7;77:21;78:1,10,14,16;80:22;82:19,24;84:1,2;85:7,22,24;87:9,23;88:11,15,23;89:16;90:18;91:20,20;92:14,17,17,22;94:16,19;95:4,18,23,25;96:6,17;97:15;98:7;105:2;107:23,25;108:22;109:8;110:24;111:1,9;115:25;116:23,24;117:5;119:20,20;120:23,23;121:2,3;124:18;126:10;128:5,5;135:16,19;137:2,4;139:2,14,16,17,18,23;140:5,20;141:8;142:21;143:6;147:6;150:7;153:14;154:4;155:7;156:17;157:5;162:13,14;163:14,17,19,24;164:7;166:5,17;167:19,22;169:6;

172:24;174:3;175:2;179:12,24;181:14,16;186:6;188:2;190:5;198:17;201:6
**Cantwell (1)** 89:8
**capture (3)** 42:25;54:17;136:3
**captured (3)** 52:11;53:21;193:23
**car (1)** 59:7
**card (5)** 59:8;87:1,3;156:21,25
**cards (1)** 157:4
**career (2)** 21:9,19
**Carman (2)** 148:17,21
**carried (1)** 95:17
**case (58)** 3:4,22;4:5,6;5:7;9:13;11:7,9,20;12:14,25;13:1,2,3;14:3;15:20,23;16:6;17:4,25;18:5,20;19:5;22:13;23:15;24:6;28:9;33:19;34:6,7;45:20;46:10;58:12;66:3;68:21;69:4;88:21,23;92:20;95:8;96:25;98:5,20;99:3,9;100:19;127:24;137:25;138:1,2;168:2,7,10,12;169:16;198:23;199:9;201:11
**cases (8)** 12:18,24,24;18:2;21:8;42:5;57:1;182:12
**catalogs (1)** 87:1
**categories (1)** 176:14
**categorization (1)** 109:14
**category (1)** 70:13
**cc'ed (1)** 110:12
**cc'ing (1)** 109:2
**CCleaner (76)** 12:6,13;14:4,5,17,18;15:16;18:14,15;57:11;70:16,18,19;71:14;72:2,5,6,7,17;73:6,8,9,10,24;74:18,20;75:13,16,21;76:15,18,25;77:5,13,15;78:1,7,10,14,24;79:12;85:23,25;86:8,10,21,23;87:12,16;88:17,19,24;90:2,16;98:25;99:12;120:25;121:2;129:4;137:13;145:11,12,12,15,20,23;161:24,25;162:1,6,7,14,16,19,23;163:2
**Cellular (1)** 105:16
**CEO (1)** 20:3
**certain (29)** 24:6;35:4;44:3;49:2;50:7;53:8,11;55:8,24;57:3;58:10;62:25;66:9;71:24;72:4;78:12;91:16;93:15;94:9;95:1,16,16;121:13;123:3,3;128:7;166:7;175:13;185:15
**certainly (3)** 167:2;172:17;198:11
**certainty (2)** 125:12;137:4
**certifications (3)** 21:12,14,16
**Certified (1)** 21:16
**cetera (2)** 104:11;165:25
**chain (3)** 42:23;43:10;115:14
**chance (1)** 176:23
**change (5)** 79:15;83:11;97:8,13;108:8
**changed (1)** 91:17
**channel (1)** 163:25
**Chapter (1)** 202:19
**characterization (2)** 74:2;77:2
**Charles (1)** 152:10
**chart (12)** 49:2,16;50:15;65:13,17;67:18;98:15;99:22;129:24;130:1,22;132:10
**charts (1)** 152:21
**cheat (1)** 50:22
**check (3)** 52:25;69:9;140:5
**checking (1)** 6:4
**checks (1)** 53:5
**Christmas (2)** 194:17;197:1
**Christopher (3)** 12:16;19:12;20:2
**Circuit (3)** 14:14;24:8;200:22
**circumstances (1)** 121:13
**claims (2)** 70:22;94:13
**clarification (1)** 173:12
**clarified (1)** 174:6
**clarify (3)** 99:24;129:23;189:23
**clean (3)** 37:19,23;129:20
**Cleaners (1)** 79:21
**clear (10)** 74:12;85:5;90:23;125:7,7;148:5;178:17,18;180:2;190:23
**clearly (1)** 188:9
**CLERK (5)** 3:3;64:8,11;138:24;139:2
**clicking (1)** 60:5
**client (10)** 24:6;161:14;175:5;183:18;184:9;186:10;190:3,16,19,19
**clients (3)** 107:6;190:6,12
**client's (3)** 187:14;189:22;190:1
**close (4)** 66:18;76:11;97:8;174:17
**closer (1)** 139:23
**closing (2)** 16:2;148:20
**cloud (18)** 13:15;16:10;33:2,4,11;34:12;35:24;36:2;39:8,12;105:11,14,17,18;106:6;142:13;148:15;171:18
**cloud-based (3)** 32:21;33:9,13
**Code (1)** 192:4
**Coincidentally (1)** 38:1
**collaboratively (1)** 188:21
**collect (9)** 43:4;89:9;107:5,12;168:21;169:12;189:13,22;190:20
**collection (1)** 107:16
**collections (1)** 164:17
**Columbia (1)** 21:14
**column (6)** 50:4,6,8;60:15;66:11;97:10
**com (1)** 143:1
**combination (1)** 174:18
**comfort (1)** 63:13
**coming (1)** 80:5
**comma (1)** 102:23
**common (1)** 184:4
**commonly (1)** 16:8
**communicate (3)** 146:19;153:25;154:1
**communicated (1)** 153:25
**communicating (2)** 153:16,23
**communication (9)** 115:6;146:6,17;147:7,25;153:22;163:24;164:4;173:18
**communications (9)** 16:24,25;17:14;107:13,24;132:24;152:22;170:12;172:3
**companies (2)** 113:8;142:5
**company (15)** 20:6;32:12;140:18,22;144:1,13,14,17,20;146:21;152:21;154:9;164:2;165:14;171:4
**company's (1)** 176:7
**comparing (1)** 187:8
**compel (14)** 13:4;27:6,16,25;28:10,18;30:10;128:20;170:23;171:1;194:25;195:22,23;196:19
**compelled (1)** 196:13
**compelling (3)** 14:14;30:1;123:24
**compels (2)** 26:18;32:8
**complete (9)** 38:11;39:20;53:20;108:24;109:7;118:10;165:19;182:23;196:14
**completely (3)** 72:22;148:5;164:3
**completeness (2)** 187:20;188:25
**comply (3)** 13:8,9,9
**Compound (1)** 22:23
**computer (140)** 12:17;14:24;20:5,6,9,23,24;21:4,7,17,17;22:1,5;23:17;32:17;50:25;51:2,4,6,8,12,13,23;56:23;58:3,11;61:4;63:6;64:22;66:8;67:13;68:6;71:7;73:25;74:3;76:25;77:3,18,19;88:6;91:2,3,22;92:13,13;93:2,3;101:15,19,20,20;102:9,18,20,23,25;103:1,2,22;104:13,15;119:11,16,22;120:7,7,12,16;122:15;123:9;127:18,18;128:17;130:13,13;131:4,17,24;132:8,18,21;133:7,11;141:20;142:10;143:24,25;145:7;146:1;147:8,23,24;148:2,4,5,6,7,9,12,22;157:14,16,22;158:1,3,5,9,14,20,22;159:1,4,7,12,18,20,21,23;160:5,10,13,14,15,22,22;161:20,24;162:7,12,17,20,21,24;172:9,13;176:9,18;183:20;187:9;202:22
**computers (87)** 13:14;16:6,7,15;18:15;29:7,12,16;32:19;41:11,14;42:4,14;43:2;45:6,7,18;50:13;51:21;57:10,13;58:9;70:22;88:5;92:14,17;93:4,4,18,19;97:7;100:21;103:6,20,22;106:19,22;109:10;112:20;114:24;117:19;119:25;121:1,15,17,21;122:2,5,12,20;

125:3,18,21;126:6;128:21;133:16;134:2;141:5,24;142:14;145:23,25;147:23;157:6,12,18,21,24;158:7,19;159:21,24;160:4,12,16;161:1;162:19;170:24;171:3,13;172:9;175:8;177:20;183:14;186:20;187:1;203:1
**concern (5)** 7:24;112:4,21;194:2,5
**concerned (5)** 110:21;175:3,12;176:18,20
**concerning (1)** 164:16
**concerns (6)** 112:8,18;118:9;180:12;193:19;194:3
**conclude (4)** 62:22;66:7;67:8;68:3
**concluded (1)** 203:14
**conclusion (5)** 34:16;62:9;67:15;124:3;167:4
**conclusions (1)** 124:6
**conduct (20)** 13:18;15:24;16:11;17:2;18:4;19:5;32:11;48:1,24;54:12;124:9,12,13;157:18,24;158:1,14,19;159:15;160:17
**conducted (1)** 175:11
**conducting (1)** 57:6
**confident (1)** 16:1
**confirm (1)** 119:11
**confused (2)** 102:7;183:12
**confusing (1)** 103:3
**confusion (1)** 174:6
**congratulations (1)** 146:10
**conjunctive (1)** 18:4
**connection (1)** 127:23
**consider (2)** 201:12,14
**consistent (2)** 75:3;102:6
**constitutes (1)** 199:8
**construction (1)** 164:16
**consulting (1)** 20:6
**consuming (1)** 175:3
**contact (2)** 47:3;151:25
**contain (2)** 142:12;164:14
**contained (2)** 157:22;161:15
**container (1)** 116:24
**containing (4)** 16:10;32:11;83:6;180:13
**contains (1)** 87:10
**contemporaneously (1)** 192:19
**contend (1)** 192:25
**content (3)** 55:14;92:7;94:24
**contention (2)** 93:12;96:11
**contents (5)** 67:8;68:3;71:6,10;179:1
**context (2)** 19:6;194:23
**continue (10)** 8:8;9:24;25:17;26:25;29:15;150:7;161:23;177:20;182:5;183:2
**continued (7)** 118:9;170:17,18;182:9;200:3,22,25
**control (9)** 33:5;61:21;67:3;113:15;124:11,14;178:13;179:15;182:15
**convenient (1)** 109:11
**conveniently (1)** 14:11
**converted (3)** 95:10,11;179:20
**cooperate (1)** 185:9
**cooperation (2)** 184:19;203:12
**coordinate (2)** 109:18;113:1
**copied (3)** 106:1;120:23;184:12
**copies (3)** 37:19;54:2,7
**copy (18)** 16:22;35:8;36:9,13,15;37:5,23;38:6;40:14;49:8,16;53:25;68:23;148:20,21;161:12;176:12,15
**copying (1)** 40:24
**Corefax (2)** 21:1,2
**corner (2)** 81:14;82:9
**Corran (1)** 152:16
**correctly (2)** 66:14;136:20
**correspond (1)** 104:9
**correspondence (3)** 50:24;112:2;165:10
**corrupted (18)** 52:11;116:9;135:23,23;136:1,2,2;184:25;185:13,16;186:12;192:21,23,25;193:2,3,6,10
**corruption (1)** 136:4
**cost (3)** 17:1;107:13;175:5
**costs (1)** 192:16
**counsel (23)** 7:15;17:14;29:13;32:23;39:5;41:16;49:8;77:17;107:25,25;111:1,14;114:5;118:20;133:20,22;138:8;192:3;194:23;197:10;199:8,11;201:2
**Counseling (1)** 164:9
**count (4)** 15:21;22:8;75:1;76:3
**counting (1)** 66:14
**Countryside (1)** 164:9
**County (21)** 4:4;5:7;13:3,6;14:13;16:9;24:8;26:7;27:16;45:20;96:25;123:12,23;168:1;195:12,20;197:16,19,24;200:22;201:1
**couple (9)** 78:10;94:18;111:22;125:4;177:23;178:5;182:9;200:4,5
**course (11)** 21:9,19;25:13,20;26:14;29:21;30:7;45:8;76:21;164:5;184:2
**COURT (458)** 3:1,5,11,14,16,22;4:1,4,7,9,13;5:4,9,15,24;6:2,5,12,15,19,21,23;7:1,11,18,20;8:5,5,6,10,14,17,21,25;9:1,4,7,10,14,16,17,22,24;10:2,4,8,11,12,15,20,22;11:1,1,9,13,18,24;12:1,4,15,19,21,25;13:1,6;14:14;15:1,4,8,24;16:3,4,21;17:9;19:7,9,13,16,20;20:1,4,18,21;21:24;22:21,24;23:11,20,23,25;24:2,8,24;25:5,8,11,17,22,24;26:7,17,25;27:3,5,14,16,22,24;28:8,15,17,24;29:19;30:1,16,18;31:6,13,20;32:3,5,16;33:2;34:18;35:2,13;36:15,18,22;37:3,10,12,14,18,21,24;38:1,12,15,19,21,23;39:2,4,15,22;40:17,19;41:8,12;42:22;43:9;44:13,17;45:25;46:3;47:14,16;48:19,21;49:10,12,19,21,24;51:10,19;52:6,17;53:7,13;54:15;55:5,20;56:4,6,9,11,19;58:20,24;59:10,15;61:14,23;62:2,5,10;63:14,20;64:1,8,11,13;65:13,16,24;67:4;68:13,15;69:10,14,16,21;70:2,8,10,18;71:9,19;73:1,3;74:4,10;76:7;77:4,10,12;80:5,7,9,23;81:1,7,10,13,17,19,21;82:8,11,13;83:6,8,10,13,18,21,23,25;84:2,4,6,14,17;85:1,2,5,22;86:14;88:1,4,8,15;89:16;90:10,12,18;91:12;93:22;94:4,16;95:12,25;96:6,17;97:5,12,21,23,25;98:10;99:7,12,15,19,21;100:12;104:7,23;105:1;106:12,14;107:20,22;108:2,4,10,12,16;109:23,25;111:12,15,17,19;112:11;115:10,13;116:23,25;117:2;118:25;119:5;123:13,17;124:8,17;126:9,20;127:8;128:19;129:2,18;130:21,24;131:19,23;132:1;135:9,21;137:17,20;138:3,6,8,12,16,19,24;139:3,4,7,10,20,23;141:7,13,15,17;142:23;143:12,14;144:4,6,24;145:1;146:23;147:1,17,20;149:1,19;150:7;151:6;152:7,25;153:3,14,20;154:20,22;156:5,9,13,17,25;162:5;163:8;165:1,16,21,25;166:3,10,16,20,24;167:2,6,9,14;170:2,5,21;171:12,24,25;172:4,12,20;173:7;175:18,23,25;177:4,6,8,10,13,16;178:16;179:10;180:18;181:1,5;182:2;183:4,8,16,21;184:21;186:5,9;187:4;189:2,6;190:11;195:10,12,14,21;196:3,6,19;197:13,15,16,19,21,24;198:5,12,15,15,17;199:21,21;200:9,14,22,24;201:1,7,13,19,21,24;202:4,6,9,13,15,18,25;203:1,4,8
**courtroom (9)** 10:23,25;11:2,11,21;12:22;135:7;167:12,13
**courts (2)** 19:5;22:9
**Court's (4)** 13:8;189:7;196:8;198:2
**Cova (1)** 101:14
**cover (2)** 7:5,13
**crazy (1)** 147:7
**create (3)** 29:14;54:22;97:9
**created (18)** 48:1,3,5,9;50:15;51:25;54:1;55:24;60:4;78:1;79:19;96:21;120:16,19;128:11,13,15;129:23
**creates (3)** 50:2;87:17;88:20
**creating (5)** 49:2,17;73:18;98:3;145:19

**creation (12)**
75:17;86:1;93:16;95:19;96:3,8,19;120:10,18,20,21,23
**creator (1)**
120:8
**credentials (11)**
41:18;45:2;46:13,16,20,24;47:5,10;48:6,10;190:6
**credit (2)**
156:25;157:4
**Crime (1)**
21:18
**critical (2)**
16:5;111:25
**Cross-examination (6)**
100:13,16;149:1,3;189:6,8
**cross-examine (3)**
84:23;85:11;187:19
**cryogenic (1)**
146:6
**Cunningham (1)**
148:16
**Curran (2)**
152:10;161:14
**current (2)**
20:20;132:17
**currently (1)**
21:13
**curriculum (1)**
20:19
**custodian (1)**
116:20
**custody (1)**
67:3
**CV (2)**
20:19;24:3

## D

**daily (2)**
76:19;101:20
**data (137)**
13:11;14:5;15:10,19;20:8;23:2;29:4,18;32:18;33:4,6,10;34:11;41:23;42:5;43:1;51:23;52:10,20,25;53:21;54:17,22,25;55:13,13;59:5,5;61:18;62:16,17,22;68:5,10;70:15,21;71:12;73:7,9,11,13,19;77:1,5;78:11,21;79:2,4,6,13;83:4;87:5,7,10,11,19;88:14,25;89:1,18;90:3,5,13,15,24;91:7;92:12;93:12,13;99:2;110:16,21;112:5,9,18,21,24;113:12,17,19,20,21,24,25;114:3,8,14,16;116:24;117:20;118:5,10;125:2;129:6,8,9,11,13;135:14,16;136:3,4;137:6;144:12,14,15,17,18,20,21;145:2;146:4;161:5,8,20,23;169:22;174:19;175:8,17;178:22,24;179:20;181:23;182:14;183:14;184:19;185:1,6,12,13;186:18,20,22,23;194:11;196:8
**database (16)**
17:16;55:22;59:17;71:25;76:5;93:8;96:12;142:4,12,13;168:21;169:14;179:21;180:7;181:12;195:4
**data-based (1)**
33:10
**databases (1)**
33:11
**dataset (1)**
52:21
**date (106)**
5:20;7:7,9,21,24;8:2,4,12,13;9:14;14:1;15:1;24:4;26:1;27:7;28:1,20;30:20;32:7;34:12,22;35:15;36:19;39:24;40:21;41:13;43:11,12,15,20,25;44:5,7,11,14;45:11,14;47:18;48:23;52:1;60:14;65:18;66:11,18;68:17;70:12;73:5;75:5,6,17;77:14;78:5;79:17;82:24;85:15;86:1,16;89:7;90:14;91:17,23;93:20;94:8;95:19;96:3,4,4,19;98:2,4,19;99:23;106:16;109:11;110:3;112:14;115:15;119:9,18;120:3,3,8,13,17,18,18,20,21,21,25;138:20;143:17;144:8;145:3;166:13;167:3;169:16;170:9;177:18;181:9;182:4;189:24;195:13;197:17;200:12;202:8
**dated (9)**
28:12;30:13;38:21;40:6;169:7;173:3;175:19;180:4;181:19
**dates (27)**
4:17,23;5:18,23;7:15,24;8:16,17;10:12;44:2;55:25;60:13;66:9;72:10;75:1;76:15;78:18;79:19;86:25;93:16;95:19,20;96:8,19;99:3;109:11;120:11
**day (21)**
4:15;8:4;9:18,20;14:24;15:15;16:17;29:7,9;41:14;76:16;89:8;109:16,17;115:1;176:3;187:10;201:25;202:19;203:2,10
**day- (1)**
21:24
**days (18)**
4:5,6,11,13;5:11;6:7;34:13,24;40:1,23;41:2;72:8,22;109:9,17;173:1,11;176:16
**day-to-day (5)**
4:16;51:14;77:18;101:21;102:13
**DC (1)**
167:25
**de (1)**
199:6
**dead-box (1)**
51:24
**deal (5)**
7:11;32:18;135:19;174:17;183:21
**dealing (7)**
20:8;21:9,17;23:13;25:14;65:25;135:17
**dealt (1)**
23:6
**debit (1)**
156:21
**debtor (2)**
3:7;4:5
**Debtor's (1)**
37:16
**December (18)**
16:16,17;29:1,12;43:3,18;44:9;45:2;88:23;89:5,7;106:18;107:15;112:17;114:21;163:20;194:16;197:1
**decent (2)**
89:23;126:19
**decided (1)**
184:18
**deck (1)**
59:8
**deduping (1)**
113:7
**deduplicate (2)**
116:24,25
**deduplication (10)**
115:20;116:18,20,21;136:17,17;182:20;187:24;188:10,15
**default (6)**
15:22;16:2;18:3;78:24,25;87:3
**Defendant (9)**
12:3;16:19;17:2;18:8,9,24;24:7;40:23;196:6
**Defendant's (31)**
37:15;105:3;106:10,16,24;107:18;108:19;110:2;112:14;114:20;115:15;117:22;119:8;134:5;143:16;144:8;145:3;154:13;166:13;170:8;172:22;173:9,13;174:1,3,4;177:18;180:2,3;181:8;182:4
**Defense (1)**
177:14
**defer (1)**
3:24
**deficiencies (1)**
191:6
**defined (1)**
32:13
**definitely (2)**
92:15;126:25
**degree (2)**
125:11;178:10
**delaying (1)**
111:23
**delete (12)**
14:19;15:17;70:25;71:2,4,6;78:11,15;86:24;87:2,10;162:14
**deleted (14)**
14:23;73:11;77:5;79:6,9,25;80:4;83:6,15;87:14;88:19,25;90:5;137:13
**deletion (2)**
14:20;73:8
**delivering (1)**
177:21
**Dell (5)**
41:21;57:15,25;58:3;64:19
**demand (1)**
194:2
**demonstrating (1)**
97:6
**demonstrative (5)**
15:5;49:7,22;84:20;101:7
**denied (2)**
128:19;171:5
**dental (1)**
164:2
**Dentistry (4)**
163:25,25;164:10,17
**deny (2)**
19:7;156:9
**depending (3)**
72:21;92:16;97:4
**depends (2)**
120:9;157:20
**depict (2)**
98:18;99:1
**Deport (1)**
148:19
**deposed (3)**
22:12,14,14
**deposition (9)**
7:14,21;8:2;46:3,4;47:17;92:25;94:6;189:25
**depositions (2)**
13:17;45:19
**Deputy (1)**
98:7
**derivatively (1)**
3:9
**described (4)**
70:3;77:17;132:7,20
**description (8)**
50:12,13;51:15;69:19;102:2,15;199:12,13
**designated (2)**
22:12;23:17
**designation (2)**
105:8;106:4
**Designations (2)**
106:15;119:24
**designed (1)**
51:22
**desire (1)**
188:20
**desk (4)**
121:22;122:8;160:14,14
**desktop (5)**
13:14;57:15,25;58:3;64:19
**desktops (1)**
41:22
**destroy (7)**
14:6;18:17;57:12;70:23;71:11;79:12,21
**destroyed (2)**
14:17;142:4
**destruction (8)**
13:12;14:5;23:2;70:15;90:15;98:5,19;99:2
**detailing (1)**
191:6
**determine (23)**
13:11;34:17;68:7;91:5;92:4;96:6;102:3,17;103:13,15;108:5;

121:7,14,16;122:11, 14,18,21;123:1; 125:11,23;126:17; 129:12
**determined (1)**
58:9
**determining (1)**
125:9
**device (79)**
32:16;33:6;35:17, 17,17,17,17;51:5; 52:4,13,15;54:23; 57:20,22;59:20,21; 60:10,16;61:17,18; 62:7,23;63:7,10;65:3; 66:3;67:14;69:24; 70:2;73:7;77:1;86:17; 90:4;101:17,19; 102:4,5,9,10,12,24, 25;103:9,11,14,16,17; 104:10,10,12,13; 106:15;109:15; 123:14;125:14,24; 126:1,15;127:6; 128:4,17;130:4,7,13, 16,22;131:3,3,8,10, 13,16,25,25;132:3,14; 136:6;140:3;172:7
**devices (114)**
13:13,24;14:10,15, 16;16:10,13;20:9; 29:17,23,24,25;30:11; 31:16,23;32:10,12,13, 18,20,22,24;34:12,21; 35:4,17,18,23;36:11; 40:3,13,25;41:1,4,6,9; 42:2,3,8,10,14,18; 43:1,4,13;44:6,20,24; 45:8;48:13,24;49:3,5, 25;50:7,10,11;51:20; 52:1;53:19,24;54:8, 13;55:3,18;56:17; 57:4,7,9;58:13;62:12; 90:16,19;101:8; 102:9,16;103:18,21, 25;104:8;105:8,11,11, 14,15,16,19,20;106:4, 4,7;107:16;114:24; 116:22;118:11;123:7; 124:8;129:24;130:5, 8;131:3,19;133:1; 160:1;171:18;172:1, 15;173:2,12,20;174:6, 7;183:15;184:1
**difference (2)**
54:15;191:15
**different (60)**
21:14,14;22:9; 23:13;36:10;44:2; 50:8;52:21,23,24; 53:14,16;54:3,3,4; 55:7;59:1,2;60:6,10, 13;65:3,5;66:4;70:21; 71:20;72:1,22;74:18; 76:16,17,17,20,22; 78:8,10;94:19;98:22, 24;99:8;100:2,2,3; 102:11,16;104:15; 109:15;117:14; 131:20;142:5;147:9; 148:18;156:11,12,13; 161:19;172:14; 177:23;182:9;201:11
**difficulty (1)**
164:18
**Digital (5)**
57:18;58:12;59:21; 69:5,23
**diligence (1)**
69:18
**dire (1)**
23:21
**DIRECT (37)**
19:23;33:5;36:5; 45:23;64:16;69:1; 101:6;103:5;105:4; 106:24;108:19;110:9, 13;111:1;112:15; 114:19;117:22; 118:14;124:21;130:2; 139:12;142:15; 143:18;146:15;147:4; 163:14;164:6;167:17; 169:3;170:20;172:21; 173:13;174:1,9; 179:24;181:14,18
**directed (1)**
191:20
**Directing (6)**
113:5;127:9,21; 169:9;171:9,17
**directly (2)**
13:2;178:4
**disable (11)**
161:24,25;162:3, 10,11,23,25;163:2,3, 5,6
**disagree (1)**
5:7
**disagreed (1)**
180:24
**disagreement (1)**
180:21
**disc (2)**
147:24;148:7
**discern (1)**
85:10
**discharge (1)**
5:13
**disclosure (6)**
8:1,3,8;9:25; 101:19;103:10
**discover (1)**
43:12
**discovered (2)**
43:13;98:5
**discovery (32)**
14:3;18:24;19:3; 20:5,7;26:7;32:17; 47:19,23;48:22; 68:20,23;70:11; 93:16;94:19;95:18; 96:2;113:19;168:9, 19;177:25;179:11; 180:15,15;187:1; 191:8,15,18;192:13; 193:4,9;196:25
**discrete (1)**
55:21
**discuss (7)**
11:7,9,20;64:3; 92:8;168:9,16
**discussed (1)**
78:13
**discusses (1)**
47:7
**discussing (3)**
27:17;40:11;103:4
**discussion (6)**
169:13;171:19,23; 173:22;174:21; 186:24
**discussions (4)**
110:4;168:18; 182:5,9
**disjunctive (1)**
18:1
**disk (2)**
161:12,13
**disparate (1)**
72:22
**dispute (1)**
191:8
**disqualification (4)**
197:24;199:23; 200:11;202:12
**disqualified (6)**
22:20;197:18; 198:2;200:1,21;201:1
**District (4)**
12:24;21:13;23:9, 14
**divich (1)**
122:16
**doc (4)**
17:11;94:22,22,22
**docket (2)**
3:17;127:17
**Doctor (2)**
140:9,16
**document (38)**
24:20,22;25:14,18; 26:23;40:10;47:8; 65:22;69:2;73:21; 84:21;85:7,11;95:15; 97:8;120:15;128:22; 142:13,14,16,21; 144:11;145:2,8; 148:20;161:16; 164:16,17,19;169:3,6; 176:12;182:17,18; 184:2;185:1;197:25; 198:8
**documentation (1)**
113:2
**documents (57)**
15:19,20;17:4,4,18, 21,21,22,23;18:21; 25:6,7,19,25;26:19; 28:11;33:10;54:19; 55:7;67:16;90:23; 96:18;97:1;114:10; 118:21;124:24,25; 125:2;126:5;127:13, 22;135:3;137:12,14, 14;148:18,23;166:5, 7;170:16;175:2; 176:11;177:22; 178:12,21;179:14,22; 182:16;184:2,11,14; 190:15,20;192:18; 196:8,15;201:10
**dollars (1)**
147:11
**Don (1)**
140:5
**done (32)**
17:13;21:8,8;52:1, 2;53:25;60:6;72:24; 75:3;76:20,23,23; 113:10;114:13;136:6, 6;142:9;145:25; 146:5;148:5;152:19; 154:11;161:11;164:1; 165:13;167:3;169:17, 24;179:8;182:12; 183:1;190:18
**double (2)**
6:3;60:5
**double-clicked (1)**
63:3
**down (12)**
6:16;31:22;46:15; 60:17;74:12;102:21; 127:12;132:13; 134:14;166:17; 169:10;188:24
**download (4)**
120:3;148:22; 151:1,1
**downloaded (3)**
85:24;120:6,16
**draconian (1)**
18:3
**draft (1)**
135:5
**drafted (1)**
31:20
**drafting (1)**
31:24
**drive (84)**
13:15;16:17;33:8; 51:16,17;52:1,22; 57:18,23;58:6,8,12, 21,21,22,22,25;59:3, 6,9,23;60:7,8,8,9,10, 22,23;61:7,9,11,21; 62:6;65:1,2,5,5,7; 66:7,13,14,24;67:2,6, 9,16,17,20,23,25; 68:4,6,8,9;69:5,7,14, 15,18,22,23,25;70:4, 5;86:19;88:25;100:5, 6;101:4;115:2;125:4, 5;127:14,14;128:3,3, 6;136:21,21;137:1,7; 179:2;184:7,12
**Driver's (2)**
61:2;126:2
**drives (49)**
13:15,20;14:1; 16:12,13,15,16;17:12; 32:21,21,24;44:6,15, 16;45:4,7,10,13,16, 17;57:10,14;59:6; 62:11,11;64:19;89:9; 98:22;99:25;100:2, 20,24;101:1;105:11, 15;114:21;122:24; 123:1;125:1;171:20, 20,25;172:7,8,16,16; 173:19,19,23
**drlicfrontjpeg (1)**
126:11
**drlicfrontkpeg (1)**
61:1
**Dropbox (18)**
33:7;39:8,12;41:17, 18,18;43:1;45:2; 148:15;161:12,13,14; 164:14;166:5;170:17; 176:10,11;184:6
**dst (1)**
117:17
**due (6)**
3:19;7:1;12:3,10, 15;152:18
**duplicate (2)**
53:2;117:2
**duplicates (2)**
52:16;53:6
**During (29)**
24:13,22;25:9;26:6, 14;27:12;28:6,21; 30:7;41:15;45:20; 47:20;52:12;66:17, 19;68:24;93:8;96:15; 97:2;133:13;136:2; 141:25;146:5;148:16; 165:6;168:18;173:24; 193:1;200:24
**duties (3)**
21:6;151:2,9
**duty (5)**
12:12;13:4,6;

124:11;152:18
**dying (1)**
203:2

## E

**e- (1)**
95:17
**earlier (10)**
27:17;70:14;89:12;91:25;93:16,19,20;96:8;100:19;106:17
**earliest (4)**
83:2;96:23;109:19;200:23
**early (6)**
13:7;112:17;170:22,25,25;185:17
**easier (2)**
74:15;135:13
**easiest (1)**
114:13
**Eastern (2)**
12:24;23:8
**easy (2)**
184:5,5
**eat (1)**
64:2
**eDiscovery (7)**
22:5;23:18;53:10,18;89:18,19;114:6
**e-discovery (20)**
135:19;172:9;177:25;178:11,12,15;179:6,8,9;180:4,16;181:7;182:12;201:3,4,8,9,12,15,16
**edition (1)**
163:23
**education (1)**
145:24
**educational (2)**
140:1,7
**effect (4)**
15:25;18:7;124:6;176:6
**effective (1)**
87:11
**efficiency (1)**
56:14
**efficient (1)**
70:22
**effort (4)**
31:24;168:21;169:1;171:2
**efforts (5)**
18:10;29:15,19;90:16;193:18
**ego (1)**
199:2
**egregious (3)**
13:11;15:24;18:4
**eight (6)**
13:13;21:2;76:6,6,7;87:20
**eighteen (4)**
16:16;75:17;76:3;115:2
**eighth (3)**
75:4;76:2;78:2
**either (13)**
4:13;5:2;15:24;73:12;105:23;112:21;115:25;126:13;146:23;165:20;172:19;180:20;202:10
**Electronic (23)**
16:10,13;20:5,7;30:11;32:10,16,17,18,22,24;34:12;52:14;62:6;84:11;94:19;95:13;107:12;113:19;124:8;171:18;172:7,15
**Elevators (1)**
164:11
**eleven (2)**
13:24,25
**else (9)**
7:4,12;63:7;67:13;95:10;102:3;136:25;166:25;176:21
**email (104)**
13:16;33:12,13;36:10,19;38:19;39:3,6,20,23;42:17,23,24;43:3,10;46:7,12,15,19;47:9,9;48:1,3;101:18;102:24;106:1,7;107:14,17;108:6,8,14;110:1,11;111:14,20;112:1,13;115:14,17,17;116:12;119:2,4,7;131:15;134:6,6;142:22,25,25;143:15,20;144:7;145:8;146:20;147:9;148:13,14,14;150:14,16,18,24;155:7,10,11,12,13,15;156:1,15,17;158:3,6;159:16;163:16,24;164:18,22,23;165:1,2,10,18,18;169:7,16;170:7;173:11,20;174:8,11;175:19;180:3,9,18;181:7,18,19;182:3;184:11;188:6;189:20
**emails (25)**
16:22;18:12;50:20;89:20,21,22,25;107:5,12;110:8;164:20,21;165:9;168:17,21,22;169:13;187:13,14;189:14,22;190:1,8,13;192:6
**employee (3)**
51:7;154:8,9
**employees (3)**
41:10;50:24;122:11
**employment (2)**
20:22;22:1
**empty (1)**
136:13
**enable (1)**
78:14
**enabling (2)**
199:22,23
**encase (2)**
21:16;53:15
**encourage (1)**
169:19
**encroaching (1)**
153:1
**encrypted (1)**
142:4
**encryption (2)**
92:12,12
**end (9)**
36:9;107:3,6;118:19;169:11;171:15;194:4,8;200:4
**ended (2)**
187:25;192:17
**engage (2)**
21:6;190:17
**engaged (3)**
24:5,11;198:9
**engagement (13)**
24:13,22;25:9,13;26:6,15;27:12;28:6,21;30:8;45:20;46:1;47:20
**engineer (1)**
174:24
**enough (8)**
5:24;7:9;8:24;19:1;80:21;109:18;115:4;177:19
**entered (19)**
13:5,5;14:14,25;26:21;27:16,18;30:1;69:4;123:12;170:21;171:12,15;176:22;178:1;180:25;195:20;196:2;197:24
**entertain (3)**
9:2,4;10:4
**entire (4)**
14:22;21:9;83:5;85:11
**entirety (2)**
90:21;137:6
**entitled (6)**
10:24,24;11:2;20:11;85:10;183:4
**entry (4)**
91:18;96:3,19;97:9
**environment (2)**
55:6;70:20
**equal (1)**
168:23
**equipment (1)**
29:3
**error (1)**
182:25
**errors (1)**
53:22
**ESI (5)**
17:8,11,15;69:6;113:1
**especially (1)**
19:6
**essentially (19)**
21:4;52:24;74:12;76:19;79:14;83:3;86:25;87:3,13;168:16,20;169:22;170:16;176:6;178:6;179:1,2;184:8,13
**establish (1)**
134:2
**estimate (3)**
3:24;5:10;138:17
**et (2)**
104:11;165:25
**ethod (1)**
107:7
**even (19)**
7:9;18:20;60:9;90:6;95:17;125:24;126:11,16,18,23;127:4;135:17;147:15;177:2;178:3,5;194:4,9;200:25
**event (1)**
138:20
**events (1)**
134:2
**Eventually (8)**
21:3;26:3;35:21;38:4;148:22;184:17;188:24;192:17
**everybody (5)**
3:14;9:20;32:1;85:19;203:12
**everyone (3)**
7:25;81:22;160:15
**everyone's (2)**
8:3;187:22
**evidence (66)**
3:19;7:3,4;10:18;12:4,5;14:6,18;16:1;18:17;23:2;24:3;25:25;27:6;28:1,19;30:19;32:6;35:14;39:23;40:20;43:10;47:18;48:22;54:1;57:11;61:20,22;65:17;67:1;68:16;70:11;71:14;73:4,24;77:13,15;84:22;85:14;86:15,21;90:13,15;94:7;98:1;99:22;106:15;110:2;112:14;115:12,14;119:8;129:1;133:5;143:16;144:8;145:3;166:13;170:8;177:18;181:8;182:3;197:17;199:6;200:12;202:7
**exact (10)**
52:15;53:2,6;72:18;76:19;84:7;117:7;125:10;131:10;136:11
**exactly (11)**
53:2;60:11;94:24;95:5;117:13;125:24;131:2;174:23;178:2;190:25;194:7
**exam (1)**
114:3
**examination (20)**
17:8,11;19:23;54:12,16;57:7;64:16;93:11;128:20;129:21;139:12;163:11;167:17;170:24;171:3,13;174:20;175:7;190:21;196:24
**examine (4)**
57:15,25;63:11;64:19
**examined (1)**
176:18
**Examiner (2)**
21:17;173:18
**example (15)**
22:12;33:13;55:9;60:17;91:17;97:8;100:3;114:8;115:23;151:22;182:14;184:11;188:2,3;191:24
**exceed (1)**
22:11
**exceeds (1)**
25:15
**Excel (1)**
84:11
**except (1)**
85:19
**excerpt (3)**
69:2;92:24;94:6
**exchanged (1)**
6:24
**Excuse (1)**
200:14
**executable (3)**
74:22;76:18;78:1
**executables (2)**
57:3;92:14
**executed (2)**

72:5;98:25
**executes (1)**
92:11
**exhibit (305)**
6:23;7:2,2;20:15,16,18;23:24;24:4,18,18,24;25:21;26:1,10,12,14,17;27:2,7,8,10,12,14,20;28:1,2,4,6,8,14,19;30:3,5,7,15,20;31:9,11,13;32:2,7;33:21,22,25;34:2,9,25,25;35:2,11,15,16;36:5,6,8;37:6,8,10,11,11,15,18,25;38:2,14,15,25;39:3,14,24,25;40:8,16,21;41:16;42:20,20,22;43:7,11;45:22;47:13,18,22;48:18,23;49:21;58:15,15,16;59:12,13,15;62:23,24;65:9,12,18,20,24,25;66:6;68:12,17,18,23;70:7,12;71:16,17,19;72:25;73:5;74:6,8,10;77:8,14,21,23;78:8;80:3,7,10,12,13,14,14,15,17,19;81:5,7;82:1,2,6,7;83:11;84:10,16;85:15,19,20;86:11,16;87:21,23;88:11,13,15;90:9,14;92:22,23;93:21;94:7;95:23,23,25;97:22;98:2,15;99:11,19,23;101:6,10;102:10,14;103:17;104:4,5;105:4,4,7,10,14,23;106:11,16,24;107:19;108:20,22;109:22;110:2,9,9;111:11;112:14,15;113:5;114:19,20;115:6,9,15,16;117:22,23,23;118:14,16,24;119:8;123:21;124:1,22;127:9,9,17;128:10;130:2,5,20;131:5,7,15;132:20;133:2,2;134:5,10;136:19,20;142:16,19;143:11,16,18;144:2,8,11,23;145:3;146:15;147:4,6,13,14;154:13,18,20;155:3,4,16,18,19,23,24;156:3,5,12,13;163:14,17,19,20;164:7;165:15;166:13;169:4;170:1,8;171:10,10;172:22,24;173:6,9,13;174:1,3,4,4,9;175:22;177:5,12,18;179:24,25;180:2,3,11,13;181:8,14,16,18,24;182:4;195:8,13;197:11,17,23,23;200:7,12,13,16;202:3,8,11
**exhibits (4)**
6:24;19:19;20:11;50:15
**exist (8)**
63:1,7;67:11;82:24;125:12;174:7;188:13,14
**existed (19)**
29:5;41:11;59:18;62:19;83:4;89:1;90:5;93:17;96:15,24;125:3,17,20,20;126:6,16;137:4;174:6,7
**exists (9)**
52:21;79:6;87:19;88:14;92:13;120:22;126:12;137:6;188:11
**expect (1)**
3:22
**expectation (1)**
4:14
**expectations (2)**
175:6,15
**expense (1)**
164:17
**expenses (2)**
181:22;189:18
**experience (8)**
12:18,23;33:1;73:10;186:1;187:5;201:4,8
**expert (33)**
12:16,17;22:4,11,17;23:1,8,17;25:8;34:19;91:9;95:13;119:3;172:6,8,10,12,13;178:11,25;179:8,9;180:14,16;183:6,7,9;185:25;186:3;201:3,5,12,16
**expertise (1)**
161:2
**Experts (8)**
10:25,25;11:1;25:6;113:1;178:9,25;188:18
**explain (20)**
14:21;20:4;31:19;32:16;33:2;49:19;50:23;54:15;55:5,20;56:4,19;65:24;70:18;84:2;90:18;116:23;162:14;164:7;186:6
**explained (1)**
194:2
**Explorer (1)**
60:5
**express (1)**
118:9
**extended (1)**
74:15
**extending (1)**
164:9
**extensive (2)**
12:18,23
**extensively (1)**
19:22
**extent (2)**
53:11;177:10
**external (23)**
13:15,20;16:13;45:4,13,16;57:9,14;59:20;60:22;62:11;64:18;65:1,2;66:3;105:11;115:2;127:5;136:21;161:12;172:1,8,16
**externals (1)**
173:23
**extract (3)**
62:20;73:13;114:10
**extracted (4)**
29:18;40:13;41:23;86:7
**extractions (1)**
29:4
**extremely (1)**
182:20

## F

**facilitate (1)**
113:2
**fact (36)**
17:3,23;18:2;25:19;42:2;67:1;79:4;101:18,24;104:2;108:8;109:9;110:4;112:25;113:6,20;114:20;116:17;117:17;118:19;119:11,16,17;120:10;125:1;133:20;135:5;189:19;190:12;191:4;193:25;194:8,25;196:11;198:5;200:19
**facts (2)**
61:19;128:25
**failed (5)**
13:8,8,9;61:20;196:7
**failure (2)**
61:10,17
**faint (1)**
108:23
**Fair (8)**
8:24;80:21;115:4;137:8,13;154:2,5;177:19
**fall (2)**
32:22;146:13
**falls (1)**
172:10
**false (3)**
112:4;115:18,22
**familiar (3)**
70:15;123:23;182:12
**familiarity (1)**
124:4
**far (18)**
5:24;7:8;22:16;27:16;31:24;34:22;44:2;50:5;54:25;55:25;57:1;79:24;121:22,24;123:2;182:11;189:1;193:15
**farther (1)**
62:24
**Fast (4)**
144:14,17,20;145:2
**favorite (1)**
8:23
**feature (4)**
14:24;78:23;79:3;90:3
**features (3)**
14:18,19;78:24
**February (8)**
12:8;13:7;24:14;152:17;161:7,21;163:1;181:19
**Federal (2)**
10:18;11:1
**FedEx (1)**
176:16
**fees (2)**
190:4;199:7
**feet (1)**
164:3
**FEMALE (1)**
140:5
**fertile (1)**
188:23
**F-E-T-C-H (2)**
56:9,10
**few (3)**
45:22;146:3;173:11
**field (3)**
20:24;22:4;23:17
**fields (2)**
91:16;96:20
**fifteen (2)**
86:9;147:8
**fifth (1)**
78:4
**fifty (2)**
22:8;23:5
**fifty-nine (2)**
15:21;17:22
**fight (1)**
176:8
**figure (2)**
50:3;55:16
**figured (1)**
185:9
**file (105)**
15:13,14;17:19;33:9;55:10,11,12,24,25;56:1,1;59:25,25;60:2,4,7,15,18,21,25;61:1;65:25;66:2,2,11;68:16;71:11,12;78:18,18;79:13,15;82:6;84:18;85:14;86:24;87:2;88:14,20,21;90:13;91:19,19,24;92:7;94:17,21,25;95:9,10,10,17;96:2,4;113:15,17;117:4,6,7,10,11;120:11,17,22;122:22;123:4,5;125:8,9,10,13,17,19,20,22;126:2,11,12,16,16;127:5;128:9,11;134:24;135:3,9,13;136:7,13;146:9;147:10;148:13,14,15;159:20;160:10,10,11;163:23;176:10;184:8,13;194:25;195:6,6
**filed (15)**
12:4;13:25;14:11,13;17:23;24:7;26:3,19;30:21;52:5;96:25;151:23;152:17;195:22,24
**files (134)**
14:23;15:12,13;42:13,13;54:24;55:7,9,20,21,21,23;56:2;59:19;60:3,12;62:19,19,21,25;63:1,2,5,6,8,9;67:11,12;70:25;73:8,18;78:19;79:9,19,25;80:3;82:4;83:6,15;87:17;88:18;90:22;91:5,8,13,14,22;92:2,3,6;93:15;94:9,12,19;95:8,13,21;96:1,2,7,8,13,15,23;97:4;98:1;112:23,23,24;113:3,18;114:12;116:5,7,13;117:5,13,17,17,18;118:2,3,11;120:10;125:10,12;126:15,15,17,24;127:4;128:7;134:23;135:11,22,23;136:1,2,2,7,8,11,20,24;137:3,3,4,5,9,9;147:9;148:1,8,11,17;162:15;164:15;179:3;184:24;185:15,22;186:1,3,6,9,10,13,15;192:21,23,23,25;193:6,22

**filing (1)**
24:15
**final (4)**
3:17;7:5;35:20;43:23
**finally (4)**
51:16;56:19;111:6;136:19
**finance (2)**
140:10,16
**financial (3)**
163:21;164:4,13
**Financial's (1)**
136:25
**find (15)**
14:7;16:20;17:6;57:6,17;58:6;64:25;67:20;71:14;73:24;77:15;86:21;90:15;152:8;184:5
**finding (1)**
198:9
**findings (5)**
33:18;70:14;98:4,18;99:1
**finds (1)**
33:9
**fine (8)**
5:2;7:10;9:10;63:20;81:21;84:14;87:25;176:24
**fingerprint (3)**
52:14;95:14;117:4
**finish (2)**
138:20,20
**finished (1)**
4:16
**firm (3)**
8:18,22;21:1
**first (72)**
3:17;4:15;10:17;12:22;19:9;21:3,4;27:15,25;28:24;34:23;36:20;41:6,13,14,14;42:1,23;45:10,22;51:24;53:25;57:14,23;58:6,8;59:23;60:7,20;61:8,10;62:6;65:5,25;67:15;69:7;74:19;75:17;82:22;83:1;84:13;87:20;99:25;100:3,4,6;103:5;110:13,17;114:20;121:7,8,9,12;125:4;128:9,10;131:16;134:6;139:5;142:17;143:4,8;152:10;164:11;168:6;178:6;180:13;185:1;194:11,13,15
**Fisher (1)**
195:21
**five (7)**
23:6;35:16;74:13,14;96:14;141:7;164:10
**floor (1)**
158:10
**Florida (1)**
146:5
**focused (1)**
171:7
**focusing (1)**
39:3
**fold (1)**
58:16
**folder (12)**
17:19;60:22,23;92:3;128:12,12,15;184:14;188:6,8,9,12
**folders (2)**
71:4;79:25
**following (1)**
161:11
**follow-up (1)**
43:2
**font (2)**
66:6;77:24
**foot (1)**
116:4
**forensic (83)**
13:5,9,10,22;14:7,11,12,14,16,24;15:1,15;17:5,8,10;20:5,6,24;21:15;29:4,14;30:11;31:6,17;32:6,17;33:15;34:9;35:19;40:22,24;41:1,21;44:25;45:5;46:13;48:24;50:2;51:22,23,23;52:3,12;53:10,17,19;54:12,16,16,21;57:7;69:3;91:9,21;93:11;96:22;109:4;110:1;112:22;114:3,16;117:12;120:24;121:6;128:20;133:18;134:1;135:17;170:23;171:2,13;173:18;174:20;175:7;178:10,14;186:17,18;187:1;190:21;195:1,24;196:24
**forensically (5)**
29:6,11,16;48:14;51:21
**forensics (14)**
12:17;20:23;21:4,7,17;22:2,5;23:17;53:14,15;54:18;135:14;172:9,14
**forged (2)**
15:20;17:22
**forget (1)**
48:17
**form (7)**
9:5;10:8;22:16;23:7;73:21;93:11,18
**formal (4)**
107:4;169:12;171:7;189:21
**formally (1)**
173:3
**format (17)**
73:22;94:21;95:3,11;110:21;112:18;113:13,17;118:21;134:24;135:3,10,19;174:16;178:16;179:16;181:3
**formatting (3)**
113:6;174:16;185:6
**former (1)**
152:23
**formula (1)**
52:19
**forth (3)**
33:14;172:3;192:12
**forty (3)**
17:24,24;22:14
**forty-five (3)**
35:20,21;69:2
**forward (5)**
11:13;19:13;139:7;168:20;185:11
**found (10)**
14:22;17:20,22;19:5;90:18;96:17;181:2;187:14;198:5;199:21
**Foundation (3)**
24:25;25:23;108:13
**four (15)**
5:11,13;13:14;41:14,21;116:13,15;121:21;135:23;136:7;147:11;175:1;192:23;195:5;197:6
**fourteen (5)**
4:6,10,11;40:23;41:1
**fourteen-day (1)**
5:4
**fourth (4)**
6:7,7;66:10;78:4
**fragments (5)**
73:16,20,20;78:12;79:5
**frame (14)**
41:15;52:2;66:17,20;79:20;93:17,19,20;96:9,21,22;104:14;116:13;128:8
**frames (1)**
98:25
**framework (1)**
199:2
**frank (2)**
105:18;135:18
**frankly (4)**
181:2;182:21;187:17;192:16
**fraud (3)**
198:9,22;199:1
**fraudulent (3)**
198:6;199:3,22
**free (7)**
121:2;137:20;138:8;184:3;201:20,22;202:16
**Friday (1)**
202:20
**front (16)**
18:22,23;20:10;47:2;82:1;121:21;122:8;142:15,19;154:14,16;156:12;160:14,14;163:15;190:11
**fronts (2)**
182:10;184:10
**full (6)**
52:3;82:17;165:12;184:14;196:13;202:19
**function (7)**
14:19;78:13,22,22;79:9;86:23;109:7
**functions (1)**
129:4
**funds (2)**
198:6;199:3
**further (20)**
7:3;46:15;100:10;102:15,21;113:21;114:9;129:16;132:20;137:16,25;138:14,14;148:24;163:7;166:14;189:3,5;196:5;201:19
**future (1)**
142:11

**G**

**gain (1)**
31:23
**gaining (3)**
26:19;31:15;67:14
**garbage (1)**
116:5
**gave (3)**
113:24;185:4;188:11
**general (2)**
54:18;123:7
**generated (6)**
34:3;59:16;63:4;82:16,19;184:16
**George (1)**
156:6
**gershj33@gmailcom (2)**
47:10,11
**gets (11)**
18:25;52:20;53:25;63:4;74:17;87:8;89:2;91:18,19,20;95:17
**giant (2)**
176:8,19
**gigabyte (1)**
89:20
**gigabytes (5)**
88:24;89:13,14,16;175:8
**Gils (1)**
155:14
**girlfriend (5)**
149:9,11,13,15,16
**given (6)**
41:11;42:4;46:8;109:20;128:9;185:10
**gives (4)**
18:25;55:15;60:2;86:23
**giving (2)**
182:18;192:18
**Gmail (3)**
33:12;150:21,23
**goal (2)**
29:17;183:23
**goes (4)**
62:24;112:10;137:2;199:6
**Good (23)**
3:1,5,6,8,11,12,14,15;8:25;19:25;37:5;89:20;100:18;108:4;149:5,7,8;154:8;178:17;189:10,11,12;201:25
**Google (5)**
33:8;81:11;86:8,9;148:13
**grant (2)**
16:3;31:6
**granted (2)**
10:22;196:11
**granting (1)**
31:17
**granular (1)**
18:13
**great (1)**
193:18
**Green (2)**
184:21;186:6
**Greene (185)**
3:5,6,6,21,23,24;5:12,16;6:1,3,10,13,18,20,22,25;7:5,6,19,23;8:9,11,16,24;9:11,13,15,23;10:7,13,20,21;11:8,15,17,25;16:4,5;17:10;22:23;23:19,22;24:1,25;25:15,23;26:23;27:4,

21,23;28:16;30:17;32:4;34:16;35:12;36:23;37:1,6,8,11,13,23;38:3,7,13,16;39:16,20;40:18;43:8;47:15;48:20;61:13,19;62:8;63:12;64:7;65:15;67:1;68:14;71:8;73:2;74:2;77:2,11;80:13,15,17,19,21,23;81:24;84:19;85:4,16;86:13;90:11;91:11;93:23;97:24;99:6,20;100:14,17,18;106:10;107:18,22,23;108:3,15;109:21;111:3,11,22;115:5,9,21;118:24;123:19;124:4,10,20;127:7;129:16;133:9;138:16,18,22;139:5,6,13;140:2;141:10,12,16;144:2,23;146:25;147:19;148:24;149:17;150:6;151:5;152:6,24;153:1,13,19;156:5,7;162:4;163:8,10,12;165:15;166:14,22;167:1,11,15,16,18;170:1;173:5;177:4,5;180:11;181:24;184:22;186:1,8,14;189:2,3;197:14,20;198:8;200:8;201:20;202:5,14,17,21;203:3

**Grishack (2)**
134:14,20

**grishack301@gmailcom (3)**
134:6,8,21

**grishak46@at&tnet (1)**
164:21

**grishakk301@gmailcom (1)**
48:9

**grounds (2)**
108:13;188:23

**Group (8)**
3:10;16:11;21:18;28:22;32:12;124:9;140:19;150:1

**Group' (1)**
47:2

**guess (3)**
61:2;62:2;171:15

**gun (1)**
177:1

**Gunkova (179)**
3:3,7;5:7;6:13;7:15;10:24;13:12,16,17,20;14:14,17;16:9,21;17:16;18:16,18;24:7,14;26:4,20;28:10;29:6,9,11,25;30:21;31:16;32:8,10;34:11,21;35:16,21,24;36:12;39:5,11;40:23,25;41:4;42:11;44:25;46:6,12,16,20,23;47:2,5,17;48:6,10,14,25;50:6,23;51:4;52:10;61:6;66:24;67:25;68:23;69:18;92:25;93:2,3;94:2,6,10;96:2;100:19;102:2,22;104:3,8,23;106:21;109:9,12;110:6,14;111:23;112:19;113:20;114:15,20;115:1;116:8,17;117:16;118:9,13,19;122:19;124:10;132:23;133:8,16,22;134:23;135:22;145:22,24;149:8,10,21;150:11;151:2,9,14,16,17;152:2,5,8,9,10,14,15,16,19,22;153:4,8,12,16,23,25;154:2,5,7;156:18,20,22,24;157:2,9,20;158:3,7,21;159:12;160:23,25;161:3,5,8,20;162:6;165:6,19,22,25;166:25;168:1,23;170:10,15;181:2;183:17;190:19,22;191:1,12;192:2,14;196:6,13;198:6,9;199:3,8,21;200:3,16,23,25;202:7

**Gunkova's (49)**
12:3,4;13:4,23;14:24;16:7,24;31:23;32:23;40:13;41:16;45:19;46:4;47:19;50:11;52:5;58:3;61:3;68:20;69:17;73:25;74:3;76:25;77:3,17;91:3;92:19;93:8,12;96:11;101:15,19,24;102:9;103:1;104:13;107:25;111:14;113:1;114:5;116:17;131:17,24;133:4,20;154:16;157:3,14;192:6

**guy (1)**
126:21

**guys (2)**
126:20;147:7

## H

**half (7)**
60:7,8;149:10,12,15;199:7;203:10

**halfway (1)**
174:13

**hallway (1)**
11:5

**hand (9)**
15:6;19:14;37:7,21;64:1;81:14;139:8;167:7;195:14

**handed (4)**
39:18;98:14;200:6,15

**handled (1)**
201:10

**hands (2)**
13:12;53:20

**happen (2)**
178:7,7

**happened (4)**
18:3;93:7;142:3;187:10

**happens (3)**
142:6;160:2;179:11

**happenstance (1)**
64:2

**happy (7)**
6:2;37:7;84:25;94:1;110:24;111:10;128:22

**hard (88)**
13:15,20;14:1;16:13,17;32:21;45:4,7,10,13,16,17;52:22;57:9,14,18,23;58:6,8,12,20,22,22;59:6,6,9,23;60:22;61:7,8,11,21;62:6,11;64:18;65:1,2,5,5,7;66:7,12,14,24;67:2,6,8,16,17,20,23,25;68:3,6,8,9;69:5,7,14,15,21,23,25;70:4,5;98:22;99:25;100:2,4,6;105:11,15;115:2;125:5;128:3,6;136:21,21;137:1,7;148:20,21;171:20;172:16;173:19;179:2;184:7,12

**Harry (6)**
3:9,13;24:5;40:2;60:25;127:2

**harry@ariamedispacom (2)**
48:5,6

**harrydkamin/drlicfrontjpg (1)**
60:18

**harsh (1)**
15:22

**hash (8)**
52:13,14,15,17,23;53:3;116:2;117:7

**hashed (1)**
52:13

**hate (2)**
63:18;183:2

**head (1)**
128:24

**hear (6)**
6:2;11:14,14;12:16;17:6;123:17

**heard (4)**
5:19;7:17;32:23;177:2

**hearing (17)**
8:1,10;9:25;30:24;31:1,4,15,21;138:21;167:4;168:13,15,18;170:14;176:3;195:21;203:10

**hearings (1)**
29:23

**hearsay (11)**
24:25;25:7;107:21;108:8,11,17;111:13;119:2;170:4;180:13,15

**held (3)**
29:2;33:10,11

**help (6)**
15:6;80:22;105:7;123:19;141:8;151:20

**helped (2)**
135:5;150:3

**hereby (43)**
24:3;25:25;27:6,25;28:18;30:19;32:6,9;34:10;35:14;39:23;40:20;43:10;47:17;48:22;65:17;68:16;70:11;73:4;77:13;85:14;86:15;90:13;94:7;98:1;99:22;106:15;110:1;112:13;115:14;119:7;143:15;144:7;145:2;166:12;170:7;177:17;181:7;182:3;195:12;197:16;200:11;202:7

**here's (1)**
4:9

**hey (1)**
106:6

**hide (1)**
17:3

**hiding (1)**
16:19

**High (1)**
21:18

**highlighted (2)**
66:10;96:7

**hire (15)**
17:16;113:21;144:15;151:23;152:1,9,12;153:6;154:8;169:18;190:4,7,12,16,19

**hired (11)**
17:7,10;114:15;144:17,20;152:8,13;153:8;177:25;178:25;190:2

**hiring (6)**
152:2,5,10,14;153:4;154:9

**history (4)**
12:25;20:22;71:2;86:7

**hit (2)**
4:23;187:16

**hits (4)**
112:4;115:18,22;174:14

**Hold (15)**
11:8;12:8;21:11,23,23;59:5;80:16;147:25;151:15,15;158:22;160:8;162:13,13;188:14

**holding (2)**
148:15;182:17

**holiday (4)**
194:17;197:1;202:18;203:13

**homework (1)**
194:5

**honest (1)**
5:3

**honestly (1)**
109:17

**Honor (84)**
3:6,8,12,21;4:3;5:2;6:17,18;8:20;9:1,9,12;10:13,14,17;11:25;12:2,11;15:6,14,22;16:3;19:11,18;23:16;25:4,9;26:2;28:16;30:17;32:4;37:2,19,22;48:17;49:7,14;63:12,19;64:6,7,15;65:10,15,19;68:14;73:2;77:9;81:4;82:12;85:16;99:18,20;100:9;106:13;108:18;119:1;126:7;141:10;143:13;147:14;149:2;165:17;166:14,18;167:11;170:3;172:2;176:3;177:7;179:7,13;180:12;181:10;183:2,20;185:24;187:7,17;198:14,16;201:18,23;202:23

**Honorable (4)**
64:8,11;138:24;139:2

**hopefully (4)**
7:18,19;58:19;203:9

**hosted (1)**
117:19

**hour (1)**

63:19
**house (1)**
18:19
**huge (3)**
59:5;112:5;186:20
**hundred (2)**
22:15;148:18
**Hu's (2)**
127:18,19
**hyphen (3)**
108:25,25,25
**hypothetically (3)**
86:2;89:21;90:1

**I**

**iCloud (1)**
32:10
**ID (7)**
50:6,12;101:14,17;104:3,8;130:4
**idea (6)**
63:16;128:16;162:6;190:10,11;193:2
**identification (18)**
20:16;24:17;49:23,24;98:15;101:8;102:8;103:18,21;104:4,8;129:24;130:5,8;132:4,14;195:13;200:15
**identified (50)**
13:16;16:17;35:4,16;36:12;39:11;42:8,10,12,18;44:24;45:4,17;50:7,10,11,13,23;51:1,17;53:22;82:3,6,22;86:8,18;88:6;91:2;101:17;102:8;103:24;104:14;114:25;123:15;127:18;130:12,16;131:1,2,8,10,13,22,24;132:3,13,17,23,25,25
**identifies (4)**
50:6;56:14;84:9;100:23
**identify (30)**
13:20;34:21;35:18,24;42:5;46:12;47:25;54:5,19;55:10;102:12;108:16,22;110:9;114:15,16,24;119:21;121:9;142:21;147:6;163:17;169:6;172:24;173:2;174:3;179:25;181:16;182:16;196:15
**identifying (6)**
25:19;42:25;54:22;96:23;103:9;114:3
**identity (2)**
48:3;49:5
**IDs (1)**
104:23
**Igor (2)**
141:21;145:18
**II (1)**
171:17
**image (15)**
29:7,11;42:18;43:5;48:14;51:20,23,24;52:4,12,14;53:5;102:25;106:19;189:13
**imaged (10)**
17:12;29:17;40:13;41:5,6,23;43:2;51:1,21;121:15
**images (6)**
29:4,14;50:2;53:4,19;54:1
**imaging (27)**
17:5,10;33:15;40:24;41:1,3;43:23;45:5;48:24;52:12;53:8,23;54:16,17;57:7;106:22;109:5,10,15;110:1,5;112:20;136:2;177:20;186:17,18;193:1
**impact (9)**
5:19,21;73:6;77:1;79:2;90:3;112:6;147:23,24
**impeded (1)**
184:24
**implement (2)**
142:11;189:21
**implementation (1)**
145:14
**implementations (1)**
146:4
**implemented (1)**
189:25
**importance (1)**
14:21
**important (9)**
72:3;91:18,24;110:18;117:10,12,14;134:7;135:16
**impossible (4)**
78:20;87:14;88:18;147:12
**improper (1)**
119:4
**inactive (1)**
14:10
**inadvertence (2)**
12:10,15
**inadvertent (1)**
182:25
**include (6)**
33:3,9;97:17,19;105:17;117:18
**included (7)**
90:22;113:14;163:21,22;164:2;165:9;172:16
**includes (4)**
96:2;199:15,16,19
**including (19)**
12:24;13:1,4,16;14:18;15:19;18:10;25:7;29:23;32:12;64:4;69:6;95:19;159:10;160:23;161:16;164:3,4;198:6
**inclusive (2)**
105:21;134:22
**incomplete (4)**
84:19;165:21;166:3,4
**inconvenience (1)**
81:22
**incorporates (1)**
172:7
**incorrect (3)**
104:16;113:11;130:11
**incorrectly (1)**
189:20
**incur (1)**
190:4
**independently (1)**
193:16
**index (3)**
78:17;79:12;87:2
**India (1)**
6:10
**indicate (6)**
51:13;91:9;101:3;106:6;119:10;124:24
**indicated (7)**
13:17;32:24;41:17;46:7;91:13;123:8;172:18
**indicates (3)**
101:1;108:25;181:20
**indicating (6)**
76:12;79:21;93:17;96:20;101:14;110:21
**indication (2)**
82:23;86:6
**indicative (5)**
60:15;66:9;72:15,23;76:22
**Indiscernible (10)**
11:12;80:24;140:4;142:1;143:1;147:25;148:19;159:19;166:19;191:13
**IndiscernibleWhat (1)**
139:15
**individual (4)**
55:23;116:20;118:20;201:11
**individually (1)**
3:9
**indulgence (1)**
189:7
**industry (5)**
53:16;113:18;115:19,25;174:15
**information (72)**
16:19;17:3,13;32:19;34:7;42:16;44:1;45:9;47:4;50:15;55:8,16,24;56:22,25;57:12;59:19;61:25;62:18,25;67:11;68:5;70:13;73:9;74:11;75:24;77:25;78:13,15,16,17;80:2;82:3;87:4,15;90:24;91:21;93:14;95:16;96:23;104:19;105:9;110:6;113:25;114:11,17;116:3,3;119:21;121:8,25;123:3;127:1;144:13;153:7;161:13,14;162:16;163:20;164:15,17;165:12;166:8;168:24;173:19,20;176:7;180:13;182:7;187:18;192:4;194:3
**information' (1)**
47:2
**informed (1)**
192:20
**initial (7)**
3:24;41:3;103:9;118:9;171:24;177:19;183:25
**initially (1)**
57:8
**initiated (1)**
82:25
**injunction (3)**
168:13,15;170:14
**injury (1)**
18:6
**inquired (2)**
179:17,18
**inquiry (1)**
174:19
**inside (1)**
129:9
**inspect (1)**
51:20
**inspected (1)**
41:5
**inspection (9)**
30:11;40:25;41:1;69:3;171:24,25;173:25;178:6,15
**install (3)**
86:3;161:11,12
**installation (7)**
14:5;75:24,25;93:20;99:13;121:9,12
**installed (21)**
12:6,13;14:9,10,12;70:19;75:21,23;85:24;119:14;120:7;121:1,7;145:12;148:7;158:9;162:14,16,19,20,24
**instances (3)**
72:4,21;76:11
**Instead (2)**
14:9;83:21
**instruction (2)**
146:8,8
**Intella (1)**
53:15
**intend (1)**
181:21
**intended (2)**
18:16;203:11
**intends (1)**
174:14
**intent (1)**
106:18
**intentionally (1)**
14:17
**intents (1)**
73:17
**interacted (1)**
91:24
**interface (1)**
178:4
**internal (3)**
50:3;96:3;161:13
**international (1)**
22:9
**internet (2)**
71:2;86:7
**interpret (1)**
55:16
**interrogatory (1)**
47:25
**into (67)**
6:6;7:3,4;18:7;24:3;25:25;27:6,16;28:1,19;29:23;30:19;32:6;35:14;39:23;40:20;43:10;47:17;48:22;52:20;54:1;55:11;65:17;68:16;70:11;73:4;74:12;77:13;85:14;86:15;90:13;93:25;94:7;95:11;98:1;99:22;106:15;110:2;112:13;115:14;118:11;119:8;133:5;139:20;140:11;142:23;143:16;144:7;145:2;166:6,12;169:16;170:8,19;176:12;177:17;178:15;179:5,20;

181:8;182:3,8;185:22;186:2;197:16;200:11;202:7
**introduce (1)** 19:25
**introducing (1)** 111:20
**investigant (1)** 22:2
**investigation (7)** 16:21;21:1,18;54:21,21;117:15;123:1
**investigations (2)** 20:7;110:5
**Investment (2)** 150:5,8
**investors (1)** 60:24
**Invision (1)** 141:25
**invoice (5)** 188:4,5;200:16,19;202:7
**invoices (1)** 188:6
**involved (5)** 29:20;30:10;31:20,25;112:10
**involving (2)** 23:2,11
**iPhones (1)** 41:15
**irrelevant (1)** 181:4
**issue (16)** 10:12;12:11,12;16:14;107:8;114:21;127:15;133:20;134:23;135:22;136:15,16,16;184:7;192:14;193:6
**issues (23)** 20:7;21:7,9;23:9,12,13;26:7;92:8;111:25;113:7;116:18;117:16;136:11;168:9;177:2;180:5;181:1,2,7;185:7,22;186:2;192:13
**IT001 (18)** 50:5,23;57:15,17,18,21;58:9,14;60:13;65:4;71:14;72:1,6;73:6;78:9;88:2,4,5
**IT002 (17)** 51:2,2;58:1,6,9,14;59:18,22;73:25;74:19;75:22;76:8,15;77:1;78:9;90:25;91:1
**IT003 (11)** 51:5;64:20,25;66:1,13,15;67:21;69:24;70:6;132:3;136:22
**IT005 (13)** 51:10;77:15,25;78:7;79:8;81:8,11;85:23,25;86:5,7,15;132:13
**IT027 (9)** 51:16;86:17,22;88:3,9,14,16;90:2;132:23
**Item (9)** 3:3;40:22;50:5;98:22;100:3;134:7;171:21;174:5,5
**items (1)** 15:11

## J

**Jacob (13)** 11:8;46:8,8,9;47:9;48:5,9;139:6,19,25;141:12;143:1;155:14
**jacobgbogatin@gmailcom (1)** 143:21
**January (5)** 179:17,23;180:4;181:19;185:2
**Jay (6)** 109:7;119:7;152:23;167:21;176:13;202:17
**jb (1)** 155:21
**jbbogatin (4)** 155:17,23,24;156:1
**Jewish (1)** 149:14
**jg (2)** 155:18;156:6
**jgbogatin (2)** 155:11,14
**jgbogatin@gmailcom (2)** 155:8,16
**job (4)** 17:12;37:5;114:14,15
**John (1)** 20:2
**joint (6)** 106:22;168:16,21,21;169:14,22
**jointly (4)** 107:12;169:1,24;190:14
**Josh (2)** 139:19,25
**JPEG (1)** 126:3
**Judge (3)** 98:8;171:5;195:21
**judgment (3)** 15:22;16:2;108:17
**judicial (4)** 18:6;22:21;127:14,14
**July (6)** 5:23;8:4;9:13;78:1,3;86:1
**jump (8)** 42:13;55:5,18,22;59:17,17;112:22,23
**jumping (1)** 177:1
**June (14)** 9:21;24:11;26:21;75:17,21;164:8,10,10;166:12;198:2;200:1,19,22,23
**Jung (2)** 132:7;152:12
**jurisdictions (1)** 21:23

## K

**K-1 (1)** 164:12
**Kaimen's (1)** 164:22
**Kamin (41)** 3:3,9,13;6:9;18:11,21;24:5,7,14;26:3;29:2,15;40:3;60:25;96:25;113:22;127:2;146:5;151:22;152:17;163:14;165:7,13;168:2,22;170:11,16,23;171:7;176:13;188:9,12;190:4,5;191:2;192:2,14,20;194:25;195:22;196:19
**Kamins (1)** 40:2
**Kamin's (7)** 16:24;31:6;94:13;107:25;123:4;189:24;192:3
**keep (4)** 4:16;56:24;58:10;140:12
**keeps (10)** 55:7,8;56:13,22,25;71:23,24;74:24;76:5;91:22
**Keith (1)** 113:12
**kept (1)** 159:7
**Kevin (1)** 89:8
**key (4)** 15:19;110:14;112:13;122:1
**keys (1)** 56:21
**keyword (4)** 183:25;186:16,19,21
**keywords (3)** 107:6;123:6;190:1
**kind (13)** 19:4;33:21;58:22;111:20;176:15;177:1;178:17;179:1,22;184:15;188:21;193:25;194:1
**KL (6)** 116:19,19;177:25;193:4,9;196:25
**KLDiscovery (7)** 113:3,25;116:15;118:7;135:23;136:4,12
**knew (4)** 39:5;162:7;184:8;187:13
**knock (1)** 87:12
**knocked (1)** 89:2
**knocks (1)** 87:7
**knowing (3)** 5:14;126:5;128:1
**knowledge (3)** 123:11;145:22;180:16
**knowledgeable (1)** 201:15
**known (2)** 16:8;116:3
**knows (2)** 95:14;203:1
**Kroll (2)** 20:25;21:6

## L

**label (1)** 101:14
**labeled (1)** 45:24
**lacking (1)** 28:11
**laid (1)** 98:3
**Lake (4)** 127:22,23,23;136:25
**language (2)** 31:22;147:15
**large (3)** 90:24;182:13;201:9
**last (32)** 12:19;15:21;22:8;51:25;60:14;61:3;66:11;75:4,5,6,9;76:3,5,6,7;78:2,5;82:15,22;83:1,2;84:13;91:17,22;95:20;96:21;110:25;111:2,4,5,6;175:1
**late (4)** 142:2;146:13;170:18;171:1
**later (6)** 7:9;36:2;52:1;133:1;171:6;173:11
**latest (1)** 83:1
**launch (1)** 92:16
**law (3)** 8:18,22;163:21
**lawyer (4)** 8:21;161:8;198:13;201:14
**lawyers (3)** 11:7,10,20
**lay (1)** 183:6
**layperson (1)** 119:4
**Leading (1)** 71:8
**learn (3)** 24:13;26:6;36:2
**lease (1)** 164:9
**least (16)** 13:24;23:5;42:8,23;66:12;72:23;79:21;92:6;93:18;96:13,14;116:4;122:6;123:5;188:22;193:15
**leave (2)** 10:2,11
**led (1)** 183:1
**left (7)** 20:25;64:18;73:16;98:23;110:15;154:15;195:8
**left-hand (3)** 50:5;98:23;100:4
**legal (5)** 34:16;62:8;124:3,5;163:23
**lender (1)** 18:13
**length (1)** 193:18
**lengthy (2)** 69:2;191:5
**less (4)** 59:5;89:23;94:24;192:1
**letter (29)** 12:8;24:14;25:9;35:3,8,14;39:7;40:6,

11,14,20;50:20;54:7;60:8,9;91:4;104:9,24;105:13;132:6;173:3,11;174:5;175:25;177:17;189:19;191:5,25,25
**letters (7)** 51:3;60:10;191:5,9,24;192:7,11
**level (1)** 182:16
**license (2)** 61:2;126:2
**licenses (1)** 21:11
**limitations (1)** 67:10
**limited (2)** 32:12;68:5
**line (18)** 46:22;47:1,7,8;54:23,25;55:15;74:19,20;75:16;93:1;103:5;107:3;115:17;128:10;133:5,10;174:12
**lines (8)** 74:12,13,14;87:20;102:22;107:2;169:10;175:1
**link (15)** 42:13;55:1,20,21,22;56:2;62:24;65:25;66:2;68:16;112:23,23,23;136:20;170:17
**linked (2)** 60:2;137:3
**Liskevych (3)** 141:21;145:17,18
**list (10)** 55:5,18;59:17;90:13;96:1,15;98:1;112:23;128:3;193:22
**listed (2)** 47:4;96:20
**listen (1)** 144:19
**listing (1)** 88:14
**lists (5)** 6:23,24;42:13;55:22;59:17
**literally (2)** 94:22;125:13
**litigation (11)** 12:8;13:2,25;20:9;25:20;29:18;97:2;170:10;178:14;180:8;192:16
**little (17)** 5:22;6:4;36:10,19;57:8;59:2;62:24;86:25;89:12;97:7;108:1;159:6;161:19;162:13;171:17;175:16;183:12
**live (1)** 117:14
**lived (1)** 62:20
**lives (2)** 56:1;60:21
**LLC (14)** 3:10;12:17;16:11;20:3,4;28:22;32:12;140:22,23;149:24;150:1,3,5,9
**LLC's (1)** 16:8
**load (7)** 94:21;113:14,17;134:24;135:3,9,13
**loaded (1)** 76:12
**loading (1)** 202:23
**local (2)** 125:21;142:14
**locate (1)** 69:18
**located (12)** 51:8;64:22;115:2;122:5,6;132:8;133:17;158:17;159:4,13;183:14,15
**location (3)** 60:3,21;79:18
**locations (4)** 33:4;184:1,7,13
**log (6)** 71:22;182:7,15;184:17;196:7,14
**logged (1)** 55:11
**Logic (15)** 16:8;140:22,23,25;141:1,2,2,4,19;147:25;149:24;153:11;158:23;160:10,11
**logistics (2)** 175:9;176:25
**long (4)** 3:22;4:1;74:16;109:15
**longer (2)** 185:20;203:11
**look (28)** 8:12;18:2;34:22;39:19;44:19;68:7;75:15;83:16;87:19;95:5,6,7;97:8;101:18;110:24;111:10;115:16;116:12;125:19,24;128:9,22;131:5;154:13;165:9;175:19;185:6;190:24
**looked (9)** 54:6;85:19;105:9;126:24;179:1;184:10,12;185:5;187:12
**Looking (36)** 32:8;34:9;35:16;38:12;39:2,6,25;40:22;42:12;49:21,22,24;59:12;63:2;68:6;80:3,9;82:6;85:8;92:2;99:25;105:24;106:6;117:25;122:15;123:20;127:12;154:19;164:20;173:1;184:16;186:9,13,14;187:8;198:21
**looks (10)** 20:19;36:10,10,14;61:3;82:23;108:23;110:11;128:9;165:22
**lose (1)** 91:25
**lost (6)** 15:10;17:20;90:7;93:7,13;96:12
**lot (7)** 22:17,17,18;23:13;34:7;82:20;135:16
**lots (7)** 79:16,16;118:2,3,3,3;150:11
**Louden (2)** 170:21;171:12
**Loudoun (26)** 4:4;5:7,14;13:3,6;14:13;16:9;18:20;24:8;26:7;27:16;45:19;69:4;92:19;96:25;123:12,23;128:19;168:1;195:12,20;197:16,19,24;200:21;201:1
**love (2)** 122:16;138:10
**lower (2)** 81:13;82:9
**Luckily (1)** 184:4
**lunch (4)** 11:6;63:21;64:3;65:11

## M

**Ma'am (1)** 201:6
**machine (1)** 146:7
**Macintosh (1)** 70:20
**magnitude (1)** 89:17
**main (8)** 22:1;51:13;77:18;86:18;94:20;95:8;101:20;132:18
**maintain (2)** 157:21;170:3
**maintained (2)** 151:7;152:21
**maintenance (1)** 14:8
**makes (3)** 78:20;87:14;135:13
**making (1)** 88:18
**Malware (10)** 142:25;143:7,15,24,25;144:7,18;145:6;162:15;163:2
**Malwarebytes (2)** 143:2,22
**manage (1)** 182:13
**managed (1)** 201:9
**management (3)** 127:13,23;150:3
**manager (4)** 132:7;152:15;158:12;165:3
**manipulate (1)** 114:10
**manner (5)** 73:11,17;79:7,16;80:1
**manual (1)** 78:23
**manually (3)** 14:9;72:24;76:23
**manually- (1)** 14:18
**many (19)** 21:8,8;22:7;23:4;35:18;42:7;44:17;48:13;79:9;83:15;122:11;137:22,23;147:10;160:16;162:19;175:8,8;192:24
**March (10)** 26:4;28:12;96:25;116:11;161:18;165:8;182:8;184:17;185:17;195:23
**mark (3)** 99:16;179:22;195:8
**marked (7)** 93:1;101:7;169:4;195:10,12;200:9,15
**markers (1)** 184:4
**marketing (2)** 141:3;157:23
**markings (1)** 179:3
**Martin (1)** 167:21
**Match (2)** 53:4,5
**matched (3)** 15:14;42:9;50:9
**matches (2)** 36:23;52:14
**matching (1)** 69:19
**material (2)** 15:17;183:18
**materials (1)** 186:24
**math (3)** 52:25;53:1;117:3
**mathematical (2)** 52:18;117:5
**matter (4)** 3:16;23:2;30:25;111:16
**matters (2)** 3:2;194:23
**May (23)** 46:4;66:16,18;67:16;68:5;97:4;117:12;120:12;122:21;138:9,19;178:2;184:11;191:24;192:6,6,7;195:21;196:3,14,16;197:2,5
**Maybe (3)** 80:23;82:5;89:12
**MBA (2)** 140:8,15
**McDannell (78)** 29:13;31:14,22,25;35:3,5,9;36:11;39:4,23;42:17,25;43:3;50:7,10,13;51:11;77:17;86:18;88:7;91:2;102:10;103:3,17,23,24;104:10,21;105:25;107:3;108:1,7;109:2,16,20;110:4,11,18,20;114:25;115:3;118:1,4;119:2,2,7,24;122:4,20;123:10;127:20;130:10,16;131:1,7;132:6,14,17;133:22;135:5;152:23;153:4,12,17,24;166:22,24,25;167:6,19,21;172:8;189:10,12;195:18;197:18,23;198:21
**McDannell's (15)** 39:3,6,7;50:18;51:3;101:18;102:12;104:3,24;105:8;

130:5,8;131:15;
132:3;180:25
**McDonald (2)**
153:7,8
**MD5 (1)**
117:7
**mean (17)**
18:14,19;21:20;
73:14;80:7;108:2;
124:18;126:25;138:4;
146:10,10;152:18;
157:20;162:11;
170:22;186:10;
192:13
**meaning (1)**
72:5
**means (4)**
73:11;96:13;
116:23;124:19
**meant (2)**
124:7;172:18
**meantime (4)**
11:5,9,20;21:3
**mechanism (1)**
187:25
**mechanisms (1)**
201:11
**Medi (3)**
157:6,9;158:17
**media (3)**
58:11;120:19,22
**Medispa (7)**
93:5;121:24;122:2,
7,11;133:7,12
**Medispa's (1)**
122:13
**meeting (2)**
29:2;106:18
**megabyte (1)**
161:16
**member (1)**
192:4
**members (2)**
29:2;106:17
**memory (3)**
76:12;161:16;185:2
**mentioned (2)**
80:3;89:13
**mentioning (1)**
184:6
**message (3)**
108:24,25;146:9
**met (2)**
89:20;149:5
**metadata (15)**
54:22;55:13;71:6,
11;73:19;78:11,19;
87:4;91:16;92:8;95:3,
7,14;120:13;135:12
**metaphor (1)**
126:19
**method (4)**
16:23;107:8;113:7;
176:20
**methodology (4)**
88:20;182:21;
187:20;188:24
**metric (2)**
89:19,23
**mic (1)**
140:2
**microphone (4)**
139:20,23;140:12;
142:23
**Microsoft (4)**
55:6,6;56:21;94:25
**middle (1)**
4:22
**might (14)**
4:18,19;8:6;9:2;
11:6;63:7;79:5;108:5;
117:14;120:17;
122:18;167:12;
174:17;203:6
**migration (1)**
141:25
**million (2)**
199:7;201:10
**Mine (1)**
36:14
**minimis (1)**
199:7
**minute (1)**
176:21
**minutes (3)**
83:3;86:9;141:7
**mirrored (1)**
176:11
**mispronouncing (1)**
176:5
**misreading (1)**
156:14
**missed (2)**
112:3;115:25
**missing (6)**
15:19;110:18;
111:20;117:19;
133:22;134:7
**Misstates (1)**
128:25
**mistake (4)**
19:3;104:18,21;
182:23
**model (3)**
34:11;104:19;
130:17
**modification (3)**
91:19;95:20;97:3
**modified (6)**
91:18;94:21;96:4,
19;97:1,9
**moment (10)**
72:18,19,20;75:3,
25;76:19;78:4;89:2;
97:16;170:21
**moments (6)**
56:14;57:3,20;
76:20,22;137:5
**Monday (4)**
4:20;202:20;203:8,
9
**Mondays (1)**
72:19
**money (1)**
146:10
**month (10)**
91:25;161:14,17;
165:8,11,12;180:10;
181:11;191:5;197:9
**monthly (19)**
18:10;161:15;
162:16;163:13,16,20;
164:8,17;165:7;
166:12;170:11,16,17;
191:1,4,10,16,21;
192:17
**months (8)**
14:10;194:18,22;
196:18,23,25;197:6,6
**month's (1)**
164:11
**more (25)**
15:23;17:12;19:1,2;
22:17;39:19;57:1;
62:5;63:14,15;70:22;
79:1;89:23;94:24;
107:16;135:16,16;
137:22,23;171:6;
178:10,12;187:19,19;
189:4
**morning (12)**
3:1,5,6,8,11,12,14,
15,17;4:19;12:23;
19:25
**most (5)**
20:20;109:11;
135:19;191:19;203:1
**mostly (1)**
98:23
**motion (36)**
3:18;5:17;7:8;8:7;
9:24;10:16;12:2;
14:11,12;16:3;26:18,
18;27:6,15,25;28:10,
18;30:10,12,19,22;
31:6,17;32:13;33:16;
52:6;112:8;128:20,
21;156:9;171:1,7;
194:25;195:22,23;
196:11
**motions (4)**
7:9,17,20;9:18
**mouth (1)**
123:19
**move (52)**
8:4;23:16,24;24:18;
25:21;27:2,20;28:14;
30:15;32:2;35:11;
39:14;40:16;43:7;
47:13;48:17;65:11;
68:12;70:7;72:25;
77:8;84:15;86:11;
90:9;93:21;97:22;
99:11;106:10;107:18;
109:21;111:11;115:5,
9;118:24;127:7;
143:11;144:2,23;
147:13;153:14;156:3;
165:15;170:1;177:5;
180:11;181:24;
185:10;196:22;
197:11;200:7;202:2,
11
**moved (2)**
164:10;170:23
**Moving (2)**
85:18;94:2
**much (11)**
4:4;49:9;63:14,15;
82:21;89:16;98:9;
112:9;115:18;176:22;
178:8
**multiple (2)**
175:8;183:20
**myself (4)**
35:9;190:5;201:12,
14

## N

**name (29)**
12:19;20:2;55:10;
60:2,18;61:2;66:2;
78:18;79:15;87:18;
88:21;96:3;100:18;
123:4,5;125:10,14,22;
126:2;139:14,16,18,
19,25;167:19;176:6;
184:4,5;187:12
**named (3)**
21:1;126:11,21
**names (12)**
15:13,14;59:25,25;
61:1;92:3,7;125:8,17;
126:16,16;184:2
**Nancy (2)**
3:6;100:18
**narrower (1)**
186:16
**national (1)**
115:25
**native (20)**
83:16;94:9,12,17,
21;95:13;96:1;98:1;
112:24,24;113:3,13,
18;114:12;118:21;
135:19;179:3,3,4,13
**natively (2)**
94:20;95:9
**natives (3)**
135:14,15,17
**nature (1)**
183:16
**nearly (3)**
191:4;196:18;199:7
**necessarily (5)**
22:13;117:8;129:8;
137:4,6
**necessary (2)**
7:16;179:22
**need (14)**
6:7;34:9;37:9;38:4;
58:16;64:2;81:15;
126:8;139:20;142:23;
174:13;175:10;
178:15;201:17
**needed (9)**
4:6;11:5;42:25;
114:6;175:14;187:11;
188:7;191:19;203:4
**needs (2)**
60:4;190:2
**negligence (1)**
19:4
**negotiating (2)**
4:17,23
**nerve (2)**
194:1,1
**network (7)**
32:19;92:15,16,18;
145:5;159:24;160:4
**network-attached (1)**
32:20
**neutral (1)**
62:5
**New (11)**
21:13;23:14;42:15;
87:7;127:13,22;
142:10;148:6;163:25;
200:13;201:2
**newly (1)**
43:13
**next (13)**
4:19;16:17;40:22;
46:22;47:1,7;48:9;
53:23;63:12;86:6;
109:16;179:23;
185:19
**nice (1)**
203:13
**Nineteen (2)**
44:23,23
**nobody (3)**
149:15;163:5;
175:15
**none (4)**
120:24;121:6;
193:9;197:5
**nonhighlighted (1)**
74:20
**nonresponsive (1)**
127:7
**noon (1)**
89:12
**nor (1)**

108:14
noreplymailmalwarebytescom (1)
143:20
**normal (1)**
95:17
**normally (2)**
179:6,8
**nose (1)**
18:8
**note (8)**
16:5;36:9,13,15,24,25;173:5,5
**notes (1)**
121:22
**noticed (3)**
16:14;187:6;188:22
**noticing (1)**
188:16
**notwithstanding (2)**
14:2;200:21
**November (55)**
34:13,21;35:7,14,25;36:1;38:21;39:11;40:1,5,6;41:7,13,19,22;54:7;66:12;73:12;78:7;79:10,20;86:10;93:16,20;96:9;104:9,14;105:25;107:13;109:14;119:12,18;130:8;131:15;132:4,6,14;142:22,25;143:4,8,20;146:13;148:16;169:7,21;170:7;173:4,17,24;174:11;175:20;176:1;189:19;190:9
**nowhere (2)**
105:10,14
**Number (72)**
3:3,4;6:3;18:13;21:8;34:11;35:20;39:6,25;40:22;44:19;47:25;48:16;50:5,9;52:20;53:10;57:1;58:11,13;59:20;65:3;66:5;67:7;69:2,5,8,21,21,24;70:4;71:23;79:24;80:5;82:23;83:16;84:8;85:13;92:6;102:4,7,15;103:23;104:3,13,15,16,19,20,22;109:9;112:4;124:24,25;130:10,11,14,15,17,17;131:10;142:9,11;151:17;161:12;163:5,6;172:3;191:8,24;193:21;198:5
**numbering (1)**
50:3
**numbers (16)**
50:9;52:19;53:1,5;57:20;60:11;79:25;83:13;98:23;100:3;103:24,25;113:15;178:13;179:15;182:15
**numerous (6)**
13:4,15;42:2,7;72:12;182:12

**O**

**oath (1)**
13:16
**object (6)**
23:19;84:19;115:24,24;147:14;202:14
**objected (1)**
124:5
**objecting (1)**
183:3
**objection (129)**
5:13;22:23;23:20,22,25;24:25;25:10,12,15,22,23;26:23;27:3,21,22,23;28:15;30:16;32:3;34:16,19;35:12;39:15;40:17,18;43:8;47:14,15;48:19,20;61:13,14,19;62:8,10;65:14;67:1,4;68:13;70:8,9;73:1;74:2;77:2,10,11;84:17;85:2,6,7,12;86:13;90:10,11;91:11,12;93:22,23;94:4;97:23;99:6,16,19;105:12;106:12,13;107:20,21;108:10,17;109:23,24;111:12,13;112:11;115:10,11;118:25;119:1,5;124:3,17;126:7;128:25;129:3;143:12,13;144:4,5,24,25;147:20;150:6;151:5;152:6,24,25;153:14,19,22;165:16;166:10;170:2,5;172:2,4;177:6,9;179:7;181:5;182:1;183:5,9;185:24,24;186:3,5;190:7;197:13,14,20;198:8,12,15,17;200:8,10;202:4,13
**objections (2)**
7:1,2
**objects (1)**
55:17
**obligated (1)**
191:18
**obligation (1)**
194:4
**obscene (1)**
6:4
**obscures (2)**
36:18,19
**observe (1)**
182:11
**obstructing (1)**
111:24
**obvious (3)**
169:15;187:21,23
**obviously (3)**
5:19;175:13;177:24
**occasion (1)**
192:9
**occasions (2)**
72:23;193:21
**occur (2)**
89:4;97:14
**occurred (10)**
41:3;44:3;60:14;75:2,25;86:3;96:12;160:24,25;179:23
**occurring (1)**
99:9
**occurs (1)**
53:4
**o'clock (1)**
201:24
**October (27)**
6:6,7,16,24;7:1;15:3,15;31:1,2;69:4;72:8,9,12,13;73:12;76:9,11,13,13,14;78:4;90:20;91:6;171:15;176:3,23;196:8
**odd (2)**
22:14;36:21
**off (11)**
12:7;18:15;37:4;64:18;87:7,13;89:2;128:24;187:1;195:8;200:6
**offended (1)**
183:4
**offer (4)**
106:21;107:12,13;147:10
**offered (1)**
16:21
**office (16)**
28:22;33:8;51:9;56:22;64:23;66:8;103:2,7;132:8;148:19;157:9,12;158:10,20;159:2;189:24
**offices (2)**
109:19;121:23
**often (4)**
33:23;105:19;156:22;203:10
**OHM (10)**
3:12,12;8:11,18,20;9:1,6,9;10:10;64:4
**olden (1)**
176:16
**omissions (1)**
18:20
**once (10)**
4:18;17:11,11;113:20;135:9;175:16,16;180:10;194:11,14
**one (116)**
5:16;7:24;13:14;16:5,17;20:18,20;22:15;26:18;28:23,23;33:8;48:9;49:12;52:23;53:4;56:23;60:17;64:1;65:4;66:18;71:21;72:2,2,8,9,16,23;75:15;76:6,6,9,9;81:5;82:8;83:1,1;84:13;88:5;90:19;91:18,23;92:15;93:19;94:19;95:4,13,18;98:8,8,10,11,21;100:3,8;101:19;103:9,10,22;110:18;111:25;112:8;115:2;119:19,20,24,25;121:21;122:8;125:1;127:2,25;129:4;131:20;134:7;136:13;142:9,18,19;143:3,7;146:22;148:18;149:24;150:1;151:2,15;152:19;154:15,15,21,23,25;157:8,14,16;158:22;160:8;161:12;162:13,15;163:5;164:21;171:14,21;174:8;175:5,21;178:3;187:2,10;189:4;195:14,15;202:22,25
**ones (5)**
49:1;53:14;59:7;94:20;116:14
**ongoing (2)**
174:21;198:23
**online (4)**
33:7;136:7;151:1;157:5
**only (23)**
7:6,24;8:2,21;14:12;18:2;39:8;63:1,2;67:12;68:7;76:5;82:5;84:13;91:22;137:3;151:1;157:5;158:8;159:16;160:20;161:3;188:11
**onsite (3)**
41:11;50:25;51:21
**onto (2)**
120:12;184:12
**open (9)**
55:23;60:4;94:25;97:7;116:16;163:24;174:16;185:15;202:21
**opened (18)**
55:9,10,11,12,25;59:19;60:3,12,16;63:3,6;66:3,19;67:12,17;137:3,5;146:9
**opening (3)**
20:21;32:23;55:7
**operate (1)**
154:12
**operating (3)**
55:2;119:14;120:21
**operation (5)**
101:21,21;154:7;164:12;192:19
**operations (3)**
51:14;77:18;102:13
**opinion (7)**
22:20;34:18;93:12;119:4;172:6,10;177:1
**opinions (1)**
119:3
**opponent (3)**
94:3;108:9;111:18
**opposed (3)**
55:21;186:10;189:25
**opposite (1)**
117:2
**opposition (6)**
10:20;12:4,9;30:22;52:5,10
**option (1)**
95:2
**options (1)**
78:10
**orally (2)**
107:4;169:11
**order (101)**
5:17;7:5;10:12;13:5,9,21,24;14:14,16,25;15:2,15,16;16:9;26:21;27:15,25;28:9,18;30:1;31:14,17,24;32:6,8;33:15;34:10,14;35:19,22;36:3;39:12,25;40:1,22,23;41:2;42:11;44:25;46:13,17;47:11;48:7;62:7;69:3;85:12;92:5;97:13;114:6;122:20;123:7,12,15,16,24;124:5,7,15,19;133:18,24;134:3;135:2,5,8;136:17;143:2,15,22;144:7;156:18,19;157:22;170:22;171:12;172:15,25;173:1;176:21;178:1;

180:25;188:19;190:21;195:12,18,20;196:2,5,9,19,23,24;197:16,23;198:2,20,21,22;199:23;200:11;202:12
**ordered (4)**
16:21;32:9;34:10;181:1
**ordering (1)**
157:21
**orders (2)**
13:5,8
**order's (1)**
188:19
**original (14)**
39:17;52:15;53:3;54:1;108:25;109:4;110:1;120:12,17,25;148:17,21;186:13,15
**originally (3)**
43:20;120:15;186:7
**originals (1)**
15:20
**origination (3)**
120:3,8,17
**ost (4)**
117:17;118:1;185:22;186:3
**others (1)**
111:7
**otherwise (1)**
192:10
**ours (1)**
107:6
**ourselves (1)**
184:19
**out (33)**
5:24;7:9,16;9:3;11:4,18;15:6;31:22;38:9;40:7;42:1;50:3;52:20;53:1;55:16;58:17;74:15;98:4;101:9;110:15;111:15;112:2,3;113:6;114:10;116:13;120:5;129:8;130:1;177:21;185:9;186:11;194:11
**outside (6)**
169:17,18,22;171:24;172:10;192:15
**outstanding (3)**
5:18;7:7,8
**over (64)**
7:20;13:18;14:1,2,15;16:10,12,13;17:3;19:16;21:9,18;25:13;28:10;29:21;32:9;33:5;41:12,15,18,22;42:6;44:4,7,8,14;45:2,7,10,13,16;48:13,25;51:20;60:15;61:10,17,20,21;73:16;76:20;110:22;112:19;118:20;120:11;124:11;129:7;133:16;137:9,10;139:10;155:11,17;160:1;163:18;175:8;194:17;196:20;197:1,5;198:24;201:2,8,10
**overlap (1)**
4:4
**overrule (14)**
25:10,11;62:10;67:4;85:2;94:4;119:5;153:22;166:10;170:5;181:5;183:8;186:5;198:17
**Overruled (19)**
22:24;25:17,24;26:25;34:19;71:9;74:4;77:4;85:12;99:7;112:11;127:8;150:7;151:6;152:7;153:3;162:5;197:21;202:6
**overruling (1)**
85:6
**overview (1)**
116:4
**overwrite (5)**
78:16;86:24;87:13;88:17;129:5
**overwrites (4)**
78:19;87:18;91:23;129:5
**overwriting (1)**
83:4
**overwritten (2)**
89:14;90:6
**owe (1)**
5:20
**own (3)**
50:3;111:15;117:4
**owned (3)**
28:22;101:1;123:2
**owner (3)**
127:15;152:13;184:20
**ownership (1)**
112:1
**owns (1)**
149:22

## P

**page (42)**
12:9;27:18;36:5;39:2,6;42:23;44:21;46:6,22;47:1,7,25;65:25;69:1;81:10;82:14,15,22,22;83:1,2,13,14;85:8,8;86:6;93:1,24,24;111:3;131:7,16;133:5;164:6,8;165:9;171:21;174:9;175:15,21;198:2,22
**pages (13)**
17:4;45:22,23;80:11,15,17;81:5,10;82:24;83:5,12;84:23;85:8
**paginated (2)**
80:10;81:6
**paid (2)**
164:11;199:8
**Pale (2)**
180:14,15
**paragraph (10)**
36:20;44:21;84:8;102:21;103:6;107:2;113:5;169:9;171:18;174:12
**parameters (2)**
174:17,24
**paren (4)**
107:5,6;174:16,17
**parentheses (1)**
102:24
**part (31)**
13:22;18:23;45:4,25;46:9;54:18;60:20;74:13,14,21,21;78:14,24;94:1;99:8;103:18;107:24;108:23;110:15;112:7;114:2;122:25;123:4,7;145:19,23;168:18;171:1;172:25;186:24;192:13
**partial (3)**
84:20;85:7;185:3
**partially (1)**
182:22
**participate (1)**
33:15
**participated (1)**
18:24
**participating (1)**
111:24
**particular (13)**
7:2;55:17;58:12;60:12;61:21;72:19,20;94:24;112:1;117:5;120:22;128:2;137:5
**parties (5)**
10:23;17:14;63:24;168:17;203:11
**partners (3)**
168:23;192:14,15
**parts (4)**
74:18;75:14;98:21;99:8
**party (10)**
10:23;16:22;17:25;18:5,6;25:1;94:3;108:9;111:18;171:24
**Passport (4)**
59:21,21;66:4,4
**password (1)**
163:24
**passwords (1)**
121:25
**past (1)**
178:10
**path (7)**
60:2,20;66:2;71:11;78:18;123:5;125:22
**pathing (7)**
66:2;79:18;117:9;125:20;127:1,12,22
**paths (3)**
123:4;125:9,20
**pattern (6)**
78:20;79:12,13;84:10;87:16;88:20
**Pause (3)**
100:15;116:6;167:5
**pay (5)**
156:20;181:22,22;198:6;199:3
**PDF (7)**
95:2,9,10,10,11;97:8;135:12
**PDFs (1)**
179:5
**Pen (1)**
123:19
**pending (3)**
8:7;14:13;99:3
**Pennsylvania (2)**
140:10,17
**people (7)**
11:10,21;109:19;135:14;146:19;178:11,12
**per (2)**
18:13;163:21
**perfect (1)**
33:12
**perform (5)**
24:6;41:21;53:8,11;150:11
**performed (3)**
54:2;66:1;151:9
**performing (1)**
93:11
**perhaps (1)**
186:6
**period (5)**
4:14;165:6;173:24;178:18;198:24
**permanently (2)**
70:23;78:15
**permit (2)**
29:11;69:3
**person (6)**
18:18,19;48:3;141:21;145:16;202:25
**personal (11)**
16:7;128:4,16;147:25;148:2;150:24;158:23;164:13;180:16;183:15,17
**personally (2)**
18:22;201:9
**persons (1)**
50:8
**pervasive (1)**
199:2
**Petersburg (1)**
146:6
**PFC (1)**
164:12
**ph (22)**
21:1;46:7,16,19,23;47:4,10;48:5,9;51:6;107:7;122:17;132:7;134:14;136:25;139:19;140:5;141:21;148:16,17;152:11;153:7
**PhD (2)**
140:8,15
**phone (6)**
113:11,11;151:12,14,15;202:24
**photos (1)**
164:18
**physical (8)**
13:13;33:6;60:21;107:16;121:23;184:1,7,13
**physically (4)**
102:19;121:16;132:8;133:17
**pick (3)**
138:20;148:16;167:3
**picked (2)**
109:10;134:20
**picture (2)**
60:19;61:1
**piece (2)**
15:6;120:22
**pieced (1)**
73:20
**pieces (1)**
15:7
**PIFs (1)**
179:5
**place (7)**
13:12;43:23;96:10;99:2;176:12;188:11;189:4
**placed (7)**
15:11,12;90:19,21;91:5,20;92:2
**places (2)**
117:14;188:13
**placing (2)**

91:8,14
**plaintiff (4)**
5:9;17:1;40:2;138:14
**Plaintiffs (2)**
3:25;19:1
**Plaintiff's (48)**
19:19;20:11;24:4;26:1;27:7;28:1,19;30:20;32:7;35:15;38:14;39:24;40:21;43:11;47:18;48:23;65:17;68:17;70:12;73:5;77:14;85:14;86:16;90:14;94:7;98:2;99:23;101:10,13;105:24;115:11;123:21;124:21;127:9;130:2;133:2;134:10;136:19;171:10;173:6;177:12,14;195:11,13;197:17;199:9;200:12;202:8
**playing (2)**
59:7,8
**Plaza (5)**
127:13,22,23,24;136:25
**please (61)**
3:2;11:13;15:2;19:14,17,25;25:17;26:25;30:3;31:9;34:8;37:15,18,21;42:20;45:22;47:22;49:14;62:5;63:17;64:11,13;65:9,20;68:18;69:11;71:16;77:21;80:10;81:2;83:23;88:2;92:22;94:17;98:8,9,11,12;105:2;116:23;126:7;130:22;139:5,7,11;140:6;141:18;142:24;153:15;164:12;166:24;167:7,10,15,19,22;195:15,15;197:12;201:7;202:23
**pleased (1)**
181:4
**plenty (2)**
7:16;194:3
**pm (14)**
64:10,10;66:21,21,22;72:13;75:4,5,7;76:14;138:21;139:1,1;203:14
**podium (2)**
11:14;167:7
**point (34)**
8:25;32:17;34:24;91:21;93:3;96:22;103:4;106:22,23;107:15;110:14,17,22,24,25;111:2,4,4,5,5,9,20;117:12;122:1;126:14;129:13;134:7,14;137:2;180:18,22;187:4;195:4;198:10
**pointing (1)**
112:2
**points (2)**
60:13;111:22
**policies (1)**
121:23
**poll (2)**
17:8,11
**poorly (1)**
120:5
**portal (2)**
174:14;201:11
**portion (4)**
136:3;168:5;190:24;199:9
**position (3)**
5:6;61:24;189:23
**positive (2)**
54:20;174:14
**possession (3)**
67:2;124:14;168:24
**possibility (2)**
78:12;168:20
**possible (8)**
29:5;73:16;86:2;106:20;109:17;115:19;154:11;164:14
**Post-its (1)**
58:19
**potentially (3)**
7:25;123:6;168:19
**PowerPoint (1)**
94:23
**practice (3)**
7:17,20;21:24
**practices (1)**
199:22
**practicing (1)**
21:22
**pre-advising (1)**
187:3
**preceded (1)**
175:25
**prefer (1)**
4:25
**preference (1)**
5:3
**pre-fetch (18)**
56:4,8,12,16;57:1;71:21,22,25;73:4;76:5;77:25;79:8,11;81:7;82:2;85:18,23;86:15
**prejudiced (1)**
64:1
**prejudicial (1)**
15:25
**preliminary (3)**
168:13,15;170:13
**pre-marked (3)**
20:15;24:17;98:14
**premium (4)**
143:2,15,22;163:23
**preparation (1)**
171:25
**prepare (2)**
33:18;105:7
**prepared (1)**
29:4
**present (4)**
29:9;48:2;69:6;161:22
**preserve (7)**
12:12;13:4,7;161:5,8,20,22
**president (3)**
20:2;21:4;165:25
**presumably (1)**
168:23
**presume (1)**
107:7
**presumes (1)**
61:20
**pre-trial (3)**
3:17,20;7:5
**pretty (3)**
8:18;95:5;135:20
**prevailed (1)**
170:13
**prevent (1)**
161:23
**prevents (1)**
199:2
**previous (4)**
45:8;48:4;152:13;153:6
**previously (4)**
41:17;44:24;131:13;154:17
**primarily (5)**
101:24;102:1;158:1;159:6;180:4
**print (2)**
82:21;84:12
**printed (1)**
84:13
**prior (19)**
13:1,17;20:21;24:14;39:11;61:6;65:11;78:9;86:9,9;89:2;92:19;106:22;127:14;128:19,21;156:4;171:23;192:1
**privacy (1)**
70:23
**privilege (18)**
17:17;110:6;114:9,11;118:4;153:2,21;175:10;176:9,19;177:22;178:22;182:6,15;183:17,18;196:7,14
**privileged (4)**
183:24;184:17;186:23;188:9
**probably (8)**
11:6;23:6;63:18;146:13;158:2,5,25;178:1
**problem (16)**
10:5;39:21;138:6;164:12;169:18;176:9,19;178:20;183:10,22;186:11;187:2,5,21;188:17,22
**problematic (1)**
182:20
**problems (3)**
17:6;182:10;188:21
**procedure (6)**
107:5;169:12;189:21,25;190:8,13
**proceed (2)**
105:2;179:12
**proceeding (1)**
3:18
**proceedings (1)**
203:14
**process (26)**
13:10,22;14:7;19:3;29:22;33:14,16;45:5;52:12;95:18;112:6,7,10;113:21;116:18;118:19;135:6;170:14,17;175:3,4;184:19;185:7,14;193:1;194:10
**processed (3)**
54:3;179:4;181:23
**processes (1)**
53:4
**processing (5)**
114:14;116:8;185:5,8;187:24
**produce (21)**
35:21;84:25;94:19;112:5;113:19;117:8,9;124:11;133:25;135:2,15;174:15;182:14;186:16;188:19,20;194:18,21;196:7,13,15
**produced (35)**
17:3;47:11;61:7;62:13,15;66:24;67:25;83:17;93:15;94:10;95:9,9,17,21;96:1;110:6;112:21,24;118:7,7;123:15;124:15;133:17,23;134:24;136:8,14;178:16;180:24;185:23;186:25;187:5;191:15,22;195:2
**producing (4)**
117:18;135:11;178:12;194:8
**product (1)**
157:21
**production (23)**
17:5,7;28:11;110:5,8;111:9,10;123:12,16,24;135:18;168:16;169:22;171:20;176:21,24;177:19;181:3,3;182:6;185:3;195:1,23
**productions (1)**
169:16
**profession (1)**
167:22
**professional (8)**
107:5;189:13;190:2,5,7,12,17,20
**professionally (1)**
169:17
**professionals (2)**
169:12;189:22
**proffered (1)**
22:17
**profile (3)**
14:23;90:19,21
**program (3)**
145:7,7,10
**programs (3)**
143:3;145:4,6
**projects (1)**
201:9
**property (7)**
127:13,15,22;132:7;152:15;158:12;165:2
**proposal (6)**
16:25;180:6,10;183:21;189:21;190:14
**propose (1)**
40:2
**proposed (5)**
8:4;16:23;109:9,11;189:13
**proposing (2)**
110:14;111:24
**protect (1)**
145:5
**protection (3)**
144:9;145:7;163:6
**protective (1)**
5:17
**protocol (4)**
113:7;114:17;142:11;177:21
**prove (3)**
17:25;18:5;194:2
**provide (21)**
32:10;34:11;40:3,5;

46:12,16,20,23;47:5;48:6,10;94:22;114:5,17;133:21;170:15,15;176:10;182:6;193:17,22
**provided (21)** 7:24;9:13;60:7,9;102:2;103:15;104:1;113:4,17,24;116:8;117:20;122:4,19;182:7;191:1;192:17;193:16;194:3,15;196:18
**provider (1)** 17:15
**provides (1)** 190:6
**providing (8)** 18:12,14;98:16;113:12,17;163:13;170:11;192:19
**proximity (1)** 66:18
**pst (4)** 118:2;185:22;186:3;188:3
**PSTs (3)** 187:10,14,15
**public (6)** 142:13,13;159:20;160:9,10,11
**pull (6)** 37:4;118:10;130:1;182:23;183:25,25
**pulled (2)** 116:15;127:3
**purchase (4)** 121:3;145:4,6;157:1
**purchased (6)** 21:3;121:1;143:4,8,25;148:6
**purchasing (1)** 148:20
**purporting (1)** 84:21
**purpose (6)** 14:6;25:18;105:19;111:17,19;191:20
**purposes (11)** 20:16;24:18;56:14;70:21,24;73:18;77:7;98:15;135:18;183:20;200:16
**pursuant (15)** 10:18;13:20;33:16;35:22;39:12;42:11;44:25;46:13,17;47:11;48:7;62:7;69:3;133:17;192:4
**push (2)** 7:9;52:19
**put (11)** 54:1;95:2;109:14;119:18;130:10;132:10;136:1;142:10;146:3;147:8;196:21
**puts (3)** 129:9,9;148:6

**Q**

**QC (1)** 194:4
**QLF (1)** 130:11
**QLF00572 (3)** 104:18;130:17;131:11
**qualified (10)** 22:4,8,12;23:5,23;25:7;172:13;183:7;201:13,16
**quarter (1)** 141:9
**quash (2)** 5:17;7:8
**QuickBook (3)** 159:10;161:16;164:15
**QuickBooks (2)** 157:23;163:23
**quickly (3)** 58:20;185:19;187:6
**quite (8)** 33:23;71:22;120:14;146:3;174:23;176:18;181:2;194:9
**quote (7)** 101:15;102:22;103:1,6;107:4;115:17;194:1
**quotes (1)** 136:1

**R**

**Racich (51)** 12:16,17,20;13:10,14,18,19;14:4,20;15:9,12;19:12,13,25;20:2,10;23:16;24:5;26:3;27:8;28:2,21;49:11,16;59:12;64:18;65:20;68:18;70:13;92:9;94:9;98:3,14;99:24;100:10,18;112:10,15;129:23;138:1,7,13;176:4,5;178:4,10,19;187:20;188:24;202:23;203:7
**R-A-C-I-C-H (1)** 12:20
**Racich's (1)** 24:3
**raise (5)** 19:14;126:8;139:8;167:7;177:2
**raised (6)** 112:6;116:18;117:16;168:20;185:6,16
**raising (1)** 187:22
**ran (5)** 15:16;126:25;154:7;188:10,15
**random (2)** 129:8,9
**ransom (6)** 145:8;146:11,19,20;147:8;160:9
**ransomware (23)** 92:9,10,20;93:2,7;96:9,12,14,15;142:1,8;143:5,9;146:2,17;147:22;148:9,12;159:17,19;160:7,24,25
**Rather (1)** 183:10
**rational (1)** 182:17
**raw (1)** 113:20
**re (2)** 112:13;144:7
**read (9)** 73:21;74:15;88:21;93:25;95:4;124:18;136:9;171:22,23
**readable (1)** 73:22
**reading (2)** 107:9;128:10
**reads (2)** 100:8;171:18
**real (3)** 18:13;122:1;163:10
**realistically (1)** 175:12
**realistic-looking (1)** 37:3
**realized (1)** 179:14
**really (8)** 52:20;55:14;74:14;108:12;123:2;188:3,17;196:21
**reason (3)** 18:5;185:15;186:14
**reasonable (1)** 69:17
**reasoning (1)** 131:2
**reasons (1)** 175:5
**rebuffed (1)** 169:2
**rebuttal (2)** 138:2;203:5
**recall (19)** 24:10;34:8;42:7;43:15;89:10;104:16;106:23;107:14;109:18;118:16;126:4;128:24;134:24;135:24;136:19;138:1,10;167:12;192:21
**receipt (1)** 12:7
**receive (10)** 35:8;40:14;52:5;61:15;117:23;159:16;173:8;174:18;180:8;181:10
**received (55)** 24:3;25:25;27:6,25;28:19;30:19;32:6;35:14,23;39:23;40:20;41:9;43:10;47:17;48:22;61:8;65:17;67:6;68:16;70:11;73:4;77:13;85:14;86:15;90:13;94:7;98:1;99:22;106:15;108:6;110:2;112:13;115:14;117:23;119:8;143:16;144:7;145:2;146:9;156:15;166:12;170:8;173:10;177:17;180:9,14;181:8;182:3;184:24;192:2;193:9,11;197:16;200:11;202:7
**receiving (3)** 68:9;118:16;174:19
**reception (2)** 122:5,6
**recess (5)** 64:9,10;137:21;138:25;139:1
**recipient (1)** 108:13
**recognizable (1)** 88:20
**recognize (23)** 24:20;26:12;27:10;28:4;30:5;31:11;33:25;34:25;36:6;38:25;40:10;42:20;59:12;65:22;71:16;74:8;77:23;85:20;88:13;92:22;95:23;195:18;197:25
**recollection (1)** 43:24
**record (8)** 64:14;93:25;94:1;139:14,16,18;167:20;180:2
**records (4)** 151:7;159:7,10;171:4
**recover (19)** 78:21;79:5,6;80:2;88:18;91:7,13;144:12,15,18,21;147:9,10;148:8,11,13,14,14,15
**recoverable (1)** 90:6
**recovered (3)** 70:23;78:16;87:15
**recovering (1)** 78:12
**Recovery (8)** 144:14,17,20;145:2,8,9;146:21,21
**recycle (13)** 14:23;15:11,12;17:20;90:20,21;91:6,8,14,20;92:2;117:11,11
**red (2)** 98:24;99:9
**redactions (1)** 39:17
**redirect (4)** 129:19,21;163:9,11
**redownloaded (1)** 86:4
**reduce (4)** 115:18,24;116:2,4
**refer (7)** 57:15,19,23,25;64:19;65:7;67:23
**reference (6)** 105:10,14,20;124:1;143:1,21
**referenced (2)** 17:19;93:17
**referencing (2)** 143:15;169:13
**referred (8)** 32:13;69:22;70:14;86:17;103:17;115:19;131:20;199:11
**referring (7)** 19:21;33:22;103:1;115:22;131:17;171:21;180:6
**refers (1)** 102:10
**reformatted (1)** 119:17
**refresh (1)** 43:24
**regard (18)** 20:9;26:19;28:9,18;31:15;35:4;36:11;49:4;50:11;53:17;59:19;62:24;112:22;122:24;125:9;170:11;

171:13;173:9
**regarding (12)**
23:9;27:25;30:24;49:2;57:17;58:6;64:25;109:4;114:21;136:24;168:13;182:6
**regards (9)**
24:6;27:15;98:4;99:1,3;116:18;154:3,6;161:1
**regional (1)**
21:17
**registry (3)**
42:13;56:22,22
**regular (2)**
14:8;150:16
**reinstalled (1)**
86:4
**rejected (4)**
16:25;107:8;180:10;189:21
**relate (1)**
188:3
**related (8)**
16:22;94:12;112:2;145:8;161:3;165:10;168:2,17
**relating (3)**
64:25;92:20;192:3
**relatively (2)**
66:18;185:19
**release (2)**
17:17;186:17
**releasing (1)**
186:19
**relevance (8)**
14:21;20:22;150:6;151:5;152:6;153:1;197:20;202:5
**relevant (6)**
13:3,13;15:10;29:18;116:5;189:14
**relief (2)**
171:2,8
**rely (1)**
25:6
**remain (1)**
139:2
**remaining (3)**
96:18;191:6;196:15
**remember (10)**
116:1;117:25;128:2;140:11;146:20,23;147:1,2,3;178:2
**remind (1)**
88:1
**remote (1)**
10:5
**remotely (1)**
9:2
**removal (1)**
70:21
**remove (2)**
79:17;162:12
**removed (2)**
167:13;186:24
**removes (3)**
78:11,17;162:16
**renames (1)**
79:13
**rendered (2)**
73:12;77:6
**rent (1)**
164:11
**repeat (5)**
140:20;141:17;142:12;143:6;154:4
**rephrase (5)**
61:16;105:13;115:20;120:5;121:4
**replace (2)**
142:9,10
**replaced (2)**
37:20;119:12
**replied (1)**
133:8
**reply (3)**
109:1,2;142:25
**report (27)**
33:18;34:3,8,22;44:1,21;57:19;59:16;74:20,22,24;75:10,11;76:18;77:13;79:8;84:8,11;100:7,23;119:20;161:15;163:16,20;164:8;166:12;191:5
**reportdoc (1)**
79:15
**reports (10)**
112:22;163:14;165:7;191:2,7,10,16,21;192:7,17
**represent (7)**
100:19;118:10;153:8;168:1;200:3,23,25
**representation (3)**
118:11;198:19;200:4
**representations (1)**
51:3
**representative (1)**
84:23
**represented (3)**
102:11;168:6;190:23
**reproduce (1)**
136:10
**reproduced (3)**
113:22;116:16;136:12
**request (11)**
25:14,25;29:6;109:15;112:25;113:6;147:10;156:20;173:22;177:20;192:3
**requested (5)**
14:3;19:8;25:19;42:6;45:9
**requesting (1)**
173:19
**requests (1)**
187:11
**require (3)**
6:23;16:12,12
**required (9)**
13:21;16:9;39:25;133:24;134:3;135:2;136:17;173:1;196:8
**rescheduled (1)**
43:21
**rescheduling (1)**
43:22
**reserve (1)**
108:17
**resist (1)**
199:22
**resolve (1)**
168:19
**resolved (3)**
185:18,21;193:6
**resolving (1)**
107:8
**resource (1)**
179:19
**respect (2)**
123:3;125:16
**respective (2)**
189:22;190:1
**respond (4)**
25:3;54:20;106:3,5
**responded (4)**
47:3;105:25;109:20;193:25
**responding (2)**
105:7;114:4
**response (25)**
18:25,25;48:4;69:17;142:7;143:4,8;168:25;173:8,10,15;174:4,18;177:17;180:8,9;181:11,19;187:11;188:19;192:2,3,5;194:20;197:9
**responses (9)**
5:21;47:20,23;48:4;68:20,23;70:11;191:18;192:11
**responsible (4)**
141:4,20,22;145:14
**responsive (6)**
15:17;35:19;36:3;92:4;122:20;123:6
**restate (1)**
62:3
**restore (2)**
142:5,13
**rests (1)**
138:15
**result (5)**
61:10,17,24;68:9;143:24
**results (34)**
54:4,10,20;113:7;118:2,3;134:1;175:11;176:19;178:14;179:18;180:24;182:13;183:1,24;187:8,9;188:25;193:9,11;194:8,9,11,15,18,21;195:1,2,24;196:18,19,25;197:3,4
**resume (3)**
63:22;64:5;137:21
**RESUMED (1)**
64:16
**retain (2)**
120:12,17
**retaining (2)**
152:16;153:12
**retrieve (1)**
15:13
**return (4)**
112:9;118:2,6;148:21
**returned (1)**
110:22
**returning (1)**
6:10
**reveal (1)**
41:25
**revealed (1)**
42:16
**reverse (1)**
174:24
**review (42)**
17:17;24:22;25:13;26:14;27:12;28:6;30:7;44:22;45:19,25;47:19,22;52:8;55:18;56:16;57:4;68:20;92:19;93:8;110:6,22;112:6,9,19;113:2;114:7,8;116:8;118:19;120:24;133:12;135:13;175:10,10;177:22;178:21;182:22;183:24;184:3,23;186:15;201:10
**reviewed (7)**
25:8,18;40:7;54:4;68:24;113:22;114:12
**reviewing (2)**
119:10;175:7
**revised (1)**
39:16
**rid (1)**
87:11
**right (200)**
3:5,14;5:15;6:5,12,15;7:4;8:7,9;9:22;10:7,15,22;11:14,18;12:1;18:4,7,16,19;19:14,16;23:23;25:11;26:11;31:25;37:12,24;38:1,12,23;39:22;47:9;58:4;61:7,23;62:1,10;64:4,13,23;65:13;66:15;69:19;71:22;72:13;79:24;81:19;82:14;83:20;84:14;88:1,9;99:13,19;100:12;101:15;102:8,14;103:2,7,12;104:4,24;109:4,9;110:11;111:22;112:7,25;113:14;114:8;115:13;122:1;124:11,23;126:9;128:11;129:11,25;130:17;131:8,17;132:4,8,15,18,21,24;133:3;134:11;136:22;137:20;138:12,21;139:4,8,10;141:17;146:23;147:20;149:22,24;150:1,3,9,12,15,21,25;151:3,7,10,12,18,20,23;152:11,14,23;153:5,12;154:8;155:8,10;156:9,15;157:7,10,12,19,25;158:4,8,9,12,15,17,21;159:2,5,8,13,18;160:21;161:2;162:8,12;166:3;167:2,7,9,19;172:21;175:20;177:4,8,16;179:10,17;181:5;183:8,12;186:5,7,8,21,25;189:14,17,19;190:23;191:2,7,17,22;192:23;193:4,10,19;194:9,16,19,22;195:3,10;196:11,16,20;198:3,7,24;199:11,24;200:9;201:21,24;202:16,18;203:8
**right- (1)**
81:13
**right-hand (2)**
82:9;98:24
**rise (2)**
64:8;138:24
**road (1)**
188:24
**role (1)**
140:25
**room (5)**
11:4,19;160:13;166:23;167:15
**round (2)**
34:23;41:6

**row (2)** 4:11;12:22
**rows (2)** 66:10;83:16
**Rule (4)** 10:18,18;26:8; 198:15
**rules (1)** 138:4
**run (57)** 12:6,13;14:8,9,12; 54:24;56:13,15,25; 57:2,3,12;71:14,24; 72:5,6,7,8,10,12,17, 17,18;73:17,24;74:18, 25;75:1,5,6,9,17;76:3, 3,15,19;78:2,5;79:3; 86:9,10,22;89:4; 107:6;117:5;126:23; 129:14;133:25; 134:18,20;154:8; 185:22;186:2;190:5, 7,12;203:10
**running (11)** 14:5;73:6,8,10; 76:25;78:7;90:2;95:6; 145:23;194:14;195:5
**runs (5)** 74:24;76:2,4,7;78:9
**runtime (1)** 75:4
**rush (1)** 63:16
**Russia (1)** 146:6
**Russian (2)** 147:7,16

## S

**Saint (1)** 146:6
**Salesforce (1)** 33:11
**same (41)** 37:10,11;53:1; 60:10,11;66:18; 72:10,18;74:11; 76:16,19;78:3; 116:24;117:3,5,6,7,7, 13;119:1;125:10,10, 25,25;126:12,17,21; 127:5;131:4,10; 133:7,11;135:14; 136:11;137:12; 158:20;171:8;175:15; 180:12;182:22; 185:24
**sanction (3)** 15:22;18:3;124:12
**sanctioned (1)** 124:16
**sanctions (5)** 3:19;12:3;19:7; 30:10;195:22
**Saratov (2)** 140:8,15
**sat (3)** 31:22;135:7;176:4
**save (2)** 97:14;192:16
**saved (4)** 96:5,21;97:14; 120:11
**saw (4)** 41:16;107:14; 182:10;185:6
**saying (6)** 88:17;103:10; 106:3;111:8;116:25; 126:18
**scan (2)** 60:23;148:19
**schedule (6)** 14:8;43:12,17; 72:17,18;76:24
**scheduled (5)** 30:24;43:15,16,17, 20
**schedules (1)** 5:23
**scheduling (2)** 109:4;110:1
**Science (2)** 140:9,16
**scientific (1)** 125:12
**scope (3)** 25:15;172:11; 192:16
**scratch (1)** 164:3
**screen (1)** 95:6
**screening (1)** 175:2
**search (47)** 15:14,17;40:2,3,12, 20;54:6,10,19,20; 69:18;81:11;86:8; 92:4,7;110:15,16,19; 111:25;112:3,13; 113:7;114:4,4,16; 125:2,17,21;126:2,13, 24,25;127:3;133:25; 134:16,18,18;182:11, 21;186:16,16,19,21; 187:2;190:1,5;194:16
**searchability (1)** 182:19
**searchable (2)** 179:16,21
**searches (3)** 95:7;133:25;187:16
**searching (2)** 54:18;184:4
**seated (3)** 64:11,13;139:2
**second (47)** 43:12;44:5,11,14; 45:14;52:2;60:8;65:7; 66:7,14,24;67:8;69:1, 25;70:13;76:10;78:5; 81:10;82:14;89:7,11; 99:12;101:13;103:10; 107:2;111:4,5; 115:17;130:21;131:7; 143:19,23;145:10; 146:2,22;147:22; 151:15;158:10,22; 160:8;162:13;169:9; 171:17;174:12;175:1, 18;202:22
**Section (1)** 192:5
**sector (4)** 51:24,25,25;52:23
**sector-by-sector (1)** 52:3
**sectors (1)** 52:22
**secure (2)** 14:19;146:4
**SecureClean (2)** 78:14,22
**secured (1)** 92:13
**SecureDelete (4)** 78:22;79:3,9;80:4
**securely (1)** 92:16
**security (1)** 141:22
**seeing (2)** 76:17;183:1
**seeking (1)** 7:3
**seemed (1)** 178:9
**seems (2)** 186:10;201:25
**selected (2)** 14:19;78:23
**send (7)** 146:19;156:20; 159:16;161:13; 165:12;188:7;190:8
**sender (1)** 108:14
**sending (2)** 165:7;176:16
**sends (1)** 186:11
**sent (23)** 24:14;36:11;40:7; 42:17;47:9;91:4; 144:12;146:7;153:7; 155:8;156:17,19; 164:20,25;165:19,22; 166:8,9;188:7; 191:24,25;192:6,7
**sentence (1)** 169:11
**separate (8)** 72:8;103:22;131:3; 135:12;152:9;158:7, 14;159:12
**separately (1)** 95:7
**September (13)** 14:11;30:12,13,19; 48:2;61:4;69:6;76:9, 10;92:24;94:6,10; 128:21
**serial (30)** 34:11;50:9,9;57:20; 58:10,13;59:20; 60:11;65:3;66:4;67:6; 69:5,8,23;70:4; 102:15;103:23,24,25; 104:13,15,16,20,22; 130:10,11,14,15,16; 131:10
**server (14)** 142:1,10,10,12; 144:12;145:9,12; 159:25;160:2,2,9,9; 162:20,21
**servers (4)** 32:19;183:12,18; 188:5
**service (3)** 33:7;119:12,18
**services (11)** 13:15;16:10;32:10; 33:2,4,9,10,12;34:13; 39:12;171:19
**session (2)** 64:12;139:3
**set (30)** 4:3,5,13,15;5:20, 24;6:6;8:10;9:20,24, 25;33:14;71:1;72:16, 20;78:15,25;92:17; 112:5,9,18;114:8; 117:20;170:14;175:6, 14;178:23,24;186:20; 203:8
**sets (1)** 182:13
**setting (1)** 5:16
**settings (1)** 145:19
**seven (10)** 34:13,24;40:1; 66:15,19;83:3;89:13, 16;173:1;192:1
**seven-plus (1)** 88:24
**seventh (2)** 75:5;78:3
**shall (2)** 40:2,24
**shape (3)** 22:16;23:7;93:18
**share (6)** 17:1;121:25;136:7; 158:20;181:21;194:4
**shared (10)** 179:19;180:7; 181:12;184:8,8,14,15; 187:18;188:4;189:18
**sharing (2)** 107:13;176:10
**sheer (1)** 175:9
**sheet (2)** 50:22;163:21
**shelf (4)** 87:6,8,13;89:2
**shocking (1)** 202:25
**shortcut (1)** 55:24
**shortcuts (1)** 55:23
**Shortly (2)** 170:13;178:1
**show (17)** 16:1;36:16;42:13; 60:1;63:1,2,6;72:4,6; 91:20;97:1;100:1,2; 120:3,8;128:22; 155:23
**showed (2)** 45:6;121:10
**showing (6)** 54:25;62:18;66:21; 86:8;136:20;166:6
**shown (1)** 78:8
**shows (9)** 72:4;74:17;97:3; 99:8;115:23;155:18, 19,24;165:18
**SI (1)** 17:5
**sic (3)** 12:16;16:8;22:2
**side (9)** 19:17;50:5;74:14, 15;98:23,24;100:4; 139:11;172:18
**sides (3)** 4:17;168:22;180:7
**sight (1)** 195:19
**sign (1)** 18:22
**signature (2)** 97:19;165:23
**signed (2)** 34:3;148:17
**significant (2)**

17:14;199:8
**Silvestri (1)**
18:1
**similar (6)**
55:21;56:25;67:15;75:2;77:25;87:1
**simple (1)**
19:4
**simply (3)**
12:9;185:14;193:3
**single (2)**
51:24;52:21
**site (6)**
29:5;52:3;121:18,19;130:12;164:16
**six (7)**
107:2;169:10;194:10;196:18,23,25;197:6
**sixteen (2)**
42:8;44:18
**sixth (4)**
60:15;75:6;78:3;134:14
**sixty-four-bit (4)**
72:3,7;75:14,15
**size (4)**
34:11;56:1;59:3,7
**sizes (1)**
71:12
**Skin (14)**
16:8;140:22,23,25;141:1,2,2,4,19;149:24;153:11;158:23;160:10,11
**skincare (2)**
157:21;161:4
**slightly (1)**
59:4
**small (5)**
66:6;71:25;74:17;77:24;171:9
**smaller (1)**
170:21
**software (20)**
14:6,8;21:15;51:22;53:8,13;54:4,23;70:15,15;120:2,6;129:14;141:22;142:1;143:3,7;144:9,11;145:4
**sole (1)**
14:6
**solve (4)**
178:20;183:22;185:8;188:21
**somebody's (2)**
108:16;187:12
**someone (3)**
73:13;104:21;113:21
**sometime (1)**
146:13
**sometimes (2)**
117:8;192:13
**soon (2)**
9:7;164:14
**sorry (34)**
12:19;17:5;24:18;36:6,13;39:2;44:13;57:22;65:20;69:10;79:20;80:18;86:19;87:21;111:1;115:20;116:19;123:19;139:22;140:13;141:6;142:1,10;148:10;150:17;154:4;155:13,22;158:12;163:18;166:18;170:15;198:14,19
**sort (18)**
74:11;94:20;97:14;109:1,13;113:6;126:18;135:12;170:16;171:15;174:15;175:7;177:21;178:15,22;179:16;187:21;188:10
**sorts (2)**
112:23;192:7
**sought (1)**
171:1
**sounds (2)**
79:24;194:7
**source (3)**
16:18;120:11;164:8
**Southern (1)**
23:14
**spa (7)**
93:5;157:6,10;158:17,20;159:4,13
**space (11)**
14:20;86:24;87:14,19;88:18;89:2;90:3;129:5,5,7,10
**speak (2)**
139:20;142:23
**SPEAKER (2)**
70:9;140:5
**speaks (2)**
26:23;198:8
**special (2)**
193:25;194:1
**specially (1)**
9:20
**specific (13)**
21:15;57:3,19,20;78:20;79:12,24;87:16,18;88:22;161:17;184:10;188:22
**Specifically (23)**
10:19;15:17;16:9;44:19;57:9;59:16,18;67:12;72:1;78:19;88:6;105:16;106:8;110:13;111:9;112:3;123:14;126:4;134:5;146:20;158:10;174:11,16
**speculation (2)**
61:13;91:11
**speed (2)**
83:25;175:14
**spoilation (1)**
18:3
**spoiled (1)**
17:20
**spoliation (16)**
3:19;10:16;12:3,5,14,18,23;15:25;20:8,22;21:7;23:2,6,9,12;186:25
**spread (1)**
162:17
**spreadsheet (4)**
82:15;83:5,17;84:11
**spreadsheets (1)**
113:24
**spring (1)**
171:5
**square (1)**
164:3
**staff (2)**
130:12;178:3
**stamping (1)**
192:18
**stamps (5)**
71:12;78:18;79:17;82:24;95:19
**stand (7)**
19:16;63:24;108:5;139:6,10;167:10;203:12
**standard (7)**
15:23;45:23;53:17;113:18;116:1;135:20;174:15
**standing (1)**
14:1
**stands (1)**
116:1
**start (7)**
3:20;4:18;6:20,21;101:13;140:22;164:1
**started (7)**
20:24;21:5;114:23;140:23;161:17;185:18;191:25
**starting (9)**
6:5;45:24;107:3;111:6;112:17;169:11;170:18;174:11,12
**starts (2)**
92:11;108:24
**state (14)**
11:1;13:1;34:18;139:14,16,18;140:8,9,15,16;167:19,22;189:20;199:6
**stated (4)**
119:3,24;181:10;189:24
**statement (12)**
8:1,3,8;9:25;32:23;111:15,15;163:21,22;164:4,13,15
**statements (2)**
18:11;94:2
**states (3)**
102:13;189:20;196:5
**static (1)**
51:23
**status (1)**
170:12
**stay (5)**
10:24,25;11:2;138:9,11
**step (2)**
166:17;179:23
**steps (3)**
51:19;121:14;122:21
**Sterling (6)**
150:5,8;163:25,25;164:10,16
**sticker (1)**
37:4
**sticks (2)**
115:2;186:21
**sticky (5)**
36:9,13,15,24,25
**still (21)**
7:14;11:21;15:19;42:25;63:23;87:4,4,5,10;108:8,11;117:9,18;125:2;126:5;164:11;167:11;170:3;185:5;187:9;195:2
**stone (1)**
6:16
**stop (6)**
75:19;81:1;94:16;97:5;104:7;130:21
**storage (11)**
32:18,20,20;33:4,5;35:24;36:2;42:3;58:11;105:17,21
**store (1)**
59:5
**stored (3)**
33:6;42:5;62:11
**strictly (3)**
148:23;157:21;161:3
**Strike (4)**
115:21;127:7;156:3,10
**structure (2)**
179:3,4
**studio (1)**
160:14
**stuff (5)**
111:10;135:15;157:23;161:23;178:17
**subfolder (3)**
60:23,24,25
**subject (7)**
13:24;14:16;15:14;123:12;138:1,10;167:12
**submit (4)**
9:7;10:8;111:14;164:12
**subpoenas (4)**
5:17,21;7:8;17:24
**subscription (3)**
120:25;121:3;143:23
**Subsection (4)**
32:9;34:10;198:22;199:1
**subsequent (1)**
181:1
**subset (3)**
58:21;186:22,23
**substance (1)**
153:21
**substantial (3)**
199:7;201:4,8
**substantive (1)**
175:9
**Substituted (1)**
38:15
**successful (1)**
51:25
**successfully (2)**
53:20,23
**sued (1)**
168:2
**suffer (1)**
93:2
**suffered (2)**
141:24;146:2
**suggest (1)**
192:9
**suggested (3)**
8:6;107:4;169:11
**suggesting (1)**
180:19
**suit (4)**
24:15;26:4;151:23;152:17
**summary (1)**
84:21
**supplement (1)**
191:18
**supplemental (3)**
47:23;48:4,22
**supplementations (1)**
18:12
**supplements (1)**

192:1
**supply (1)**
157:22
**support (1)**
100:7
**supposed (5)**
104:17;114:2;
130:13;133:25;
193:17
**Supreme (1)**
21:24
**Sure (40)**
38:10;52:18;61:16;
62:4;65:10;69:9;75:8,
20,24;83:22,24;
94:18;99:24;105:9;
108:7;109:13;111:8;
112:21;120:5,14,15;
121:2;131:2;138:5;
140:21;142:11;143:7;
146:4;151:17;154:7,
11;162:14,17;163:24;
165:13;171:22;174:5;
190:16;192:9;203:3
**surprised (1)**
175:16
**suspended (1)**
12:7
**sustain (8)**
61:14;91:12;
108:10;124:17;
147:20;149:19;
153:14;154:8
**sustained (1)**
198:23
**sustaining (1)**
108:12
**swap (1)**
38:9
**switched (1)**
81:16
**sworn (3)**
19:15;139:9;167:8
**system (12)**
18:6,9;33:13;39:8;
50:3;55:3;87:1;90:23;
115:24;119:14;
120:21;141:20
**systems (3)**
32:21;33:9;105:18

**T**

**tab (5)**
20:13;33:22;
142:17,19;143:19
**table (2)**
10:24;107:23
**tag (1)**
179:22
**talk (4)**
57:14;58:24;76:2;
140:11
**talked (1)**
57:8
**talking (29)**
16:6;55:15;58:25;
59:6,17;64:18;71:20;
75:3;81:18;88:9;
89:17;102:5;115:16;
117:4;120:19,20;
126:20;146:22;
150:18;154:25;
160:22;165:23;
175:21;178:9;180:5;
183:12,13;186:22;
191:17
**talks (1)**
17:21
**tangential (1)**
62:18
**target (2)**
66:11;128:11
**tasked (2)**
178:4,19
**tasks (1)**
150:11
**TD (1)**
163:21
**team (4)**
31:24;116:17;
121:20;193:19
**Tech (1)**
21:18
**technically (3)**
76:6;85:6;104:17
**telling (1)**
5:4
**tells (2)**
12:14;88:15
**ten (3)**
4:5;76:4;147:8
**tenants (2)**
163:25;164:2
**ten-minute (1)**
137:21
**term (6)**
110:18,19;112:3;
127:3;134:16,18
**terms (22)**
15:14,18;40:2,3,12,
20;54:6,19,21;92:4,7;
110:15;111:25;
112:13;114:4,5;
115:22;125:21;
175:18;178:21;180:6;
186:25
**terribly (1)**
72:3
**testified (26)**
22:16;23:1,8,11;
98:19;100:19;104:2;
106:17;121:11,14;
122:25;123:23;124:4,
25;129:4;159:17;
160:3;163:13;165:17;
169:14;189:12,16;
190:22;191:1;192:21;
193:18
**testify (6)**
23:14;25:2;83:21;
124:6;159:19;160:8
**testifying (4)**
108:7;146:18;
172:5;179:7
**testimony (26)**
17:6;22:13;45:25;
61:6;64:3;92:19;93:8;
119:4;133:4,13,15;
136:20;137:17;156:4;
166:17,21;172:11,12;
179:11;180:14;183:6,
9;185:25;186:4;
191:21;201:21
**That'll (1)**
10:22
**theindiscernible301@gmailcom (1)**
110:19
**therefore (2)**
64:3;117:19
**thereof (1)**
187:20
**third (19)**
16:22;28:10,18;
50:8;60:17;67:20,23,
25;68:3,9;70:5;75:16;
78:5;113:5;127:12,
21;164:6;174:9,12
**third-party (1)**
17:15
**thirds (1)**
169:10
**thirty-four (1)**
35:23
**thirty-two-bit (2)**
72:2;75:14
**though (10)**
8:23;10:8;60:9;
63:23;66:4;84:7;
137:1;191:4;193:7;
200:25
**thought (9)**
109:15;118:13;
169:17;172:18;
176:25;182:20;
185:20;187:15;
188:22
**thousand (1)**
79:19
**thousands (6)**
63:9,9,9;116:14,14;
136:8
**three (23)**
4:13;6:6;13:15,19;
32:1;45:4,6,10,13,16,
17;72:8;76:11,12,14;
101:17;102:22;130:7;
138:18,19;147:11;
160:21;195:5
**three-day (1)**
5:13
**throughout (2)**
100:7;170:19
**throw (1)**
52:25
**thumb (24)**
13:14;32:20,24;
44:6,15,16;51:16,17;
52:1;58:21,25;59:2,3;
62:11;86:19;89:9;
101:4;125:1,4;
171:20,25;172:7,16;
173:23
**thumbed (1)**
18:8
**Thursday (1)**
202:19
**tied (1)**
13:2
**TIFF (2)**
95:3;135:12
**time- (1)**
175:2
**time-consuming (1)**
175:4
**timeline (5)**
15:6;98:3,16;99:22;
114:16
**timelines (1)**
134:2
**times (32)**
13:24,25;22:7,8,11,
15,15,18;23:4,5;44:2,
2;55:25;57:2;66:15,
19;71:23;72:9,12,22;
75:1,2,17;76:12,13,
14;79:20;83:16;
89:25;98:20;151:17;
191:10
**timing (4)**
12:14;31:23;
175:19;178:2
**tirelessly (1)**
18:9
**today (7)**
14:2;105:5;137:17,
23,23;138:20;167:3
**to-day (1)**
21:25
**today's (2)**
59:4;167:4
**together (11)**
15:7;73:21;130:10;
135:8;152:1,1;154:3,
6;157:9;188:18;192:7
**told (7)**
104:21;113:12;
161:8,22,22;163:5;
194:6
**tomorrow (2)**
202:18;203:13
**took (16)**
13:12;51:19;96:10;
99:2;112:8;121:14,
22;133:20;134:23;
135:22;175:16;
179:20;180:20;
185:20;194:10;
196:19
**tool (4)**
53:14,16;57:11;
121:2
**Toolkit (1)**
53:15
**tools (5)**
52:3;53:11,17;54:3,
3
**top (6)**
36:9;45:24;46:6;
74:13;99:8;128:24
**tops (1)**
5:14
**total (1)**
82:23
**touched (2)**
31:19;54:24
**towards (1)**
169:10
**track (8)**
55:7;56:13,24;
58:10;71:23;74:24;
76:5;91:22
**Tracy (1)**
3:12
**tradition (1)**
149:14
**training (1)**
157:22
**transcript (1)**
45:23
**transfer (9)**
20:8;113:2,8;136:4,
5,6,6;193:3;201:2
**transferred (1)**
113:3
**transition (1)**
92:8
**translation (1)**
147:17
**transmission (1)**
185:16
**transport (1)**
92:14
**travel (2)**
5:23;41:8
**treatment (1)**
160:13
**trial (12)**
3:23;4:18,22,23;
5:5,10,13,20;10:12;
22:18;181:20;202:19
**tried (5)**
4:14;142:5;144:15;
147:9;174:7
**triggered (1)**

191:10
**trouble (1)**
5:22
**true (12)**
11:1;105:17;110:14;112:18;120:10,24;121:6;151:24;153:25;192:12;193:13,21
**trust (2)**
190:10;193:16
**truth (1)**
111:15
**try (13)**
29:22;31:23;50:2;55:3;115:24;116:4;120:5;140:11;144:12,19,21;170:23;188:21
**trying (16)**
8:12;17:3;29:23;37:3;63:16;73:13;111:23;116:2;169:19;177:2;178:6,20;180:23;182:24;185:8;188:14
**Tuesday (2)**
4:20;9:1
**turn (44)**
10:16;14:15;16:10,12,12;17:17;20:13,15,25;24:17;26:10;27:8;28:2,10;30:3;31:9;32:8;33:21;34:25;36:5;40:8;42:20;45:22;47:25;58:15;61:10,17,20;65:9,20;68:18;71:16;74:6;77:21;78:25;87:23;88:11;92:11,22;95:23;110:20;112:19;133:2;134:10
**turned (29)**
12:7;13:18;14:1,2;18:15;41:12,15,18,22;42:6;44:4,7,8,14;45:2,10,13,16;48:13,25;51:20;118:20;133:16;137:9,10;160:1;179:5;196:20;197:5
**Turning (10)**
27:2;33:14;46:22;47:1,7,22;70:13;93:1;105:23;175:1
**turnover (10)**
41:13;43:12;44:5,11,14;45:11,14;89:7,11;196:25
**twelve (1)**
75:1
**twenty (3)**
63:5,6,8
**twenty- (1)**
23:5
**twice (3)**
131:22,24;182:22
**two (48)**
3:16;4:13;5:17;21:23;41:10,14;45:8;53:5;66:19;72:1,7;74:12;75:13;76:13;80:15,17;81:5,10;84:24;94:20;95:8;96:20,20;98:21;103:6,20,22;109:17,19;113:8;122:6;126:20;131:19,20;142:11;145:6,7;154:21,22;157:12,24;169:9;171:21;174:18;175:11;178:9;185:19;188:13
**type (7)**
19:7;53:11;63:3;87:18;91:19;92:10;125:15
**types (4)**
21:15;55:8;63:1;71:20
**typical (1)**
113:18
**typically (13)**
32:22;33:4,7,8;50:2;54:21;59:3,5;72:17;73:23;79:1;92:11;135:15
**typo (2)**
107:7;155:11

**U**

**ultimately (10)**
13:11;19:7;30:21;35:18;41:4;48:13;147:21;148:4;171:12;197:18
**Um-hum (1)**
83:14
**unable (3)**
69:18;123:17;136:9
**unallocated (9)**
14:20;86:24;87:14,19;88:18;89:1;90:3;129:7,9
**unavailable (4)**
62:17;73:10,13,14
**uncomplete (1)**
84:21
**uncover (1)**
13:22
**under (21)**
13:6,16;32:9,22;34:10;47:2,3;92:5;101:18;102:9;114:17;123:15;124:13;133:24;134:3;135:2;136:17;171:3,3;180:17;194:4
**underlying (1)**
17:4
**underscore (2)**
60:24,24
**understands (1)**
179:11
**Understood (3)**
108:15;173:21;178:11
**unencrypt (1)**
148:1
**UNIDENTIFIED (2)**
70:9;140:5
**unilaterally (1)**
170:14
**Union (2)**
163:22;164:13
**unique (1)**
184:5
**University (6)**
140:8,9,10,15,16,17
**unless (1)**
125:25
**unlike (1)**
79:4
**unnecessarily (1)**
190:4
**unprivileged (3)**
194:9;196:7,15
**unquote (2)**
103:1,7
**unrecoverable (5)**
71:13;73:15;77:6;79:4;89:3
**unused (2)**
129:5,5
**unwanted (1)**
92:12
**up (46)**
10:5;11:8;16:14;20:7;29:23,25;37:7,21;38:8;39:18;50:9;53:5;55:23;60:4;72:16,17;83:25;89:21;92:17;93:23;102:22;115:23;125:21;126:19;129:20;134:20;135:6,13;140:12;148:16;164:1;167:6;169:10;170:14;173:24;175:1,14,18;187:25;190:10;192:17;194:8,14;195:4;200:6;202:23
**update (4)**
75:24;86:3;121:12;187:11
**updated (9)**
66:11,17;79:19;91:16,18,19,23;96:4;120:2
**updates (2)**
79:17;170:11
**upgraded (2)**
119:12,17
**uploaded (1)**
120:12
**upon (13)**
12:7;26:8;54:2;60:14;86:1;102:15;107:6;114:4;116:2,20;117:9;122:4;125:13
**usable (1)**
17:13
**USB (30)**
16:12,15,16;32:20;42:2;43:1,4;44:6,15,15;57:9;69:5,18;100:20,23;101:1;105:10,14,18,20;106:3;114:21,24;122:24;123:1;128:3;132:25;171:20;173:19;185:3
**use (21)**
12:7;14:17;20:8;53:8;89:19;95:3;99:13,14,15;102:23;121:24;133:7,11;158:8,19,22,23;159:5;179:21;180:7;187:19
**used (47)**
13:17;16:11;32:11;48:1;50:7,14;51:4,6,12,13,18;53:13,15,15,15,16;55:4;56:24;57:12;87:9,9;88:17;101:20,21;102:13;105:19;116:19,19;119:19,25;121:2,10;122:2,3,12;124:9;146:1;148:2;157:1,18,20;158:1;160:16;173:2;178:12,16;183:20
**useful (2)**
85:9,10
**user (18)**
14:22;33:5;55:11;60:3,4,13;63:3;86:23;90:19,21,24;92:11;100:5;122:8,17,18,22;156:19
**user-assist (3)**
56:19,25;57:4
**user-assists (1)**
56:21
**user-created (1)**
55:2
**username (1)**
163:23
**uses (5)**
158:3,14;159:2,15,16
**using (28)**
50:15;51:21;52:3;54:3,19;60:5;61:3;79:9,25;80:4;83:10;90:2;94:25;102:12;104:10,23;105:21;115:25;117:1,3;119:17,23;128:17;137:13;158:5;190:1;198:6;199:3
**utilized (6)**
39:8;41:17;53:11,17;79:21;93:25
**utilizes (1)**
79:12

**V**

**vacation (1)**
9:3
**Valeria (9)**
3:7;40:23;156:18,19,20,24;157:2;158:5;196:6
**valeria@ariamedispacom (2)**
46:15;150:19
**valeria@bnggroupllccom (1)**
46:23
**Valerian (1)**
164:5
**Valerie (2)**
160:23;165:25
**value (8)**
52:13,14,15,17,23,24;94:23;117:7
**values (2)**
53:3;116:2
**variety (4)**
175:5;176:14;198:7;199:3
**various (19)**
26:7;42:3;57:10,12;66:10;76:15;98:19,22;99:2,25;100:20,20;114:24;121:15;149:21;154:3,6;157:6;201:10
**vendor (6)**
114:6;169:18,22;177:25;185:14,18
**vendors (2)**
135:19;169:17
**ventures (3)**
151:20;154:3,6
**verify (3)**
84:22;119:16;193:16
**version (11)**
39:16,17;70:20;72:2,3,7;75:14,15,15;135:12;182:23
**versions (1)**
72:1

**versus (1)** 121:12
**Vesigant (1)** 53:19
**Vestigant (64)** 12:17;13:21;16:14, 18;17:7,12,15;20:3,4, 5,21;21:5;29:21; 33:15;35:18,22;41:8, 8,10;42:15;43:10,12; 45:4;46:13,16;48:14, 24;49:20;50:2,12; 51:19;53:8,23;54:6, 12;57:6;62:13,15,16; 89:10;109:10;114:2; 115:14;116:19; 122:11,17;130:4,11; 135:2;160:1;174:13, 20;177:21;182:7; 184:25;185:23;186:7, 10;187:8,15,16; 193:3;194:11,15
**Vestigant's (3)** 33:18;135:24; 193:11
**vgunkova@gmailcom (2)** 46:7,11
**via (2)** 136:6,7
**vice (1)** 21:4
**video (2)** 119:23;148:6
**videos (3)** 119:17;128:14; 136:25
**view (7)** 32:18;91:21;96:22; 117:12;126:14; 172:12;183:9
**viewing (1)** 164:18
**viral (1)** 92:10
**Virginia (5)** 12:24;23:9;148:22; 167:25;192:4
**virus (5)** 141:24;142:8; 145:7;162:17;163:2
**viruses (1)** 162:15
**visit (2)** 28:21;146:5
**visited (1)** 28:24
**vitae (1)** 20:19
**VNJ (1)** 150:3
**voice (1)** 140:12
**voices (1)** 126:8
**voir (1)** 23:21
**Volgograd (2)** 140:9,16
**volume (12)** 12:14;58:10,13; 59:20;60:11;65:3; 66:4;67:6;69:5,8,23; 140:6
**volumes (1)** 57:19
**voluntarily (3)** 18:12;29:25;124:14
**voluntary (1)** 18:10
**vs (1)** 3:3

## W

**wait (8)** 11:4,19;49:21;81:1, 1,1;198:12,12
**waiting (3)** 7:14;194:20;197:9
**waived (1)** 129:3
**warn (1)** 4:17
**wasted (1)** 187:23
**way (47)** 4:7,7;5:2;13:7; 21:10;22:16;23:6; 37:22;38:11;51:22; 62:5;68:7;80:1;82:19; 84:22;87:11;91:14; 93:18;95:5;113:18; 114:13;122:14; 125:11,23;126:5,17; 127:12,25;128:1,11; 129:12;165:21;166:3; 169:10;172:14; 176:17;178:3,8; 179:5;181:4;182:17, 25;186:12;188:15; 193:15;196:21;197:3
**ways (5)** 60:6;94:19;95:8; 131:20;177:23
**web (5)** 120:2,7,16,17; 174:14
**Wednesday (2)** 4:20;9:17
**week (2)** 185:19,19
**weeknight (1)** 72:20
**weeks (3)** 194:10;195:5;200:5
**weigh (1)** 18:7
**weird (2)** 74:23;183:1
**welcome (3)** 39:19;132:2;146:9
**weren't (4)** 62:20;136:9; 180:21;197:19
**Western (5)** 57:18;58:12;59:21; 69:4,23
**What's (13)** 5:9;12:19;18:11; 45:24;54:5;55:15,17; 89:17;111:17,19; 115:19;152:25;172:4
**whatsoever (2)** 173:23;199:22
**wherein (1)** 168:2
**Whereupon (1)** 203:14
**wherever (1)** 184:11
**whole (4)** 88:22;94:23;112:7, 10
**who's (6)** 10:23;18:6,24;46:9; 121:24;166:22
**whose (5)** 46:3;51:2;123:1; 156:25;165:1
**willing (1)** 179:19
**Windows (8)** 55:6,6;56:13,21,24; 60:5;70:20;71:22
**Windows-based (1)** 56:12
**wire (1)** 59:8
**wish (1)** 102:24
**withheld (1)** 118:4
**withholding (1)** 118:5
**within (18)** 4:14;33:11;34:24; 40:1,23;41:1;67:10; 84:12;92:7,17;100:7; 115:1;116:24;128:7, 7;138:3;173:1;185:19
**without (13)** 7:3;37:22;63:10; 67:13;125:23;126:14, 15;127:5;165:10; 182:15;184:19;187:3; 200:10
**witness (91)** 6:24;11:3,4,19; 19:10,15,16;23:21; 36:17;38:5,8,10; 44:18;49:12,15; 52:18;56:7;58:23; 59:2,11;63:24;69:12, 15;80:12,14,25;81:3; 82:16;83:18;84:3,5,7; 88:3,5;94:18;97:11, 13;98:8,11,11,13; 99:14;104:12,25; 117:1,3;119:3;126:8, 22;129:17;131:1,21; 135:11;137:19;139:5, 9,10,22,25;140:4; 141:11,14;147:3; 154:21;157:2;165:2; 166:15,18,23;167:8,9, 15;172:11,17;175:21, 24;176:2;183:6,13,19, 23;187:3,6;189:5; 195:14,15,17;198:14, 16;201:23;203:5
**witnesses (6)** 10:18;137:22,23, 25;138:14,19
**Word (7)** 94:21,22,22,25; 115:23;120:15;184:3
**words (3)** 4:18;58:24;105:21
**work (19)** 6:11,13;7:15;21:25; 22:11;53:18;54:2; 95:1;109:8;135:17; 140:2,23;142:5; 144:16;177:21; 182:22;185:18; 188:18;193:11
**worked (6)** 9:14,16;18:9;21:2; 31:15,22
**working (12)** 20:24;21:1;53:25; 54:2,7;140:3,21; 141:8,11,12,13;185:2
**works (2)** 6:9;56:23
**world (1)** 59:4
**worried (1)** 176:2
**worthy (1)** 19:5
**wrapped (1)** 200:5
**write (2)** 51:22;189:19
**writes (1)** 107:3
**written (4)** 6:15;18:1;88:25; 111:14
**wrong (5)** 74:23;80:20;82:5; 122:16;180:20
**wrote (4)** 169:7;191:5,9,20

## X

**X-Ways (1)** 21:15

## Y

**year (1)** 16:20
**years (4)** 21:2;45:8;164:10; 201:8
**yellow (1)** 96:7
**Yep (3)** 81:24;141:19;155:5
**yield (1)** 54:10
**yoga (1)** 160:14
**Yong (2)** 127:18,19
**York (2)** 21:13;23:14
**Yun (12)** 51:6;119:19; 152:12,15;158:10,12; 159:1;160:20,23; 164:5;165:4,5
**Yung (8)** 152:15;158:10; 160:20,23;164:5; 165:4,5,18
**Yun's (4)** 128:3,16;132:7; 165:18

## Z

**Zero (3)** 160:18,19,21
**zeroes (1)** 129:8
**Zs (2)** 79:16;82:13
**ZZZ (7)** 79:13,19;82:4,6; 84:9,18;85:14
**ZZZs (1)** 82:20
**ZZZZZZ (1)** 79:15

## 0

**001 (1)** 130:4
**002 (9)** 65:4;100:5,6;

101:14;102:5;103:18,20;122:15;130:7
**003 (2)**
127:18;128:6
**005 (3)**
104:11;119:10;123:8
**027 (1)**
101:3

## 1

**1 (27)**
20:13,16;23:24;24:4;35:17;39:6;69:15;80:11;81:6,14;82:8;85:8;101:19;102:4,5,10,12;103:9;104:10,10;132:14;142:16,19;143:11,16;198:22,22
**1,857 (14)**
80:11;81:6,14;82:8,15,15;83:5,7,11,12,16;84:23,25;85:8
**1:30 (2)**
63:21;64:5
**1:32 (1)**
64:10
**10 (38)**
36:5,6,8;37:6,8,11,18,25;38:15,21,25;39:3,14,24;41:16;50:16;101:6,10;102:10;103:17;104:4;105:23;130:20;131:5,7,15;132:20;158:25;174:1,3,4,9;175:22;177:5,12,14,15,18
**10% (1)**
158:2
**10/19 (1)**
75:5
**10/20 (1)**
75:6
**10/21 (1)**
75:9
**10/26 (1)**
75:9
**10:05 (1)**
86:2
**10:30 (1)**
83:3
**10:37 (2)**
82:25;83:2
**100,000 (1)**
147:11
**1084522220 (1)**
143:1
**10th (10)**
39:11;66:12;72:9,13;73:12;100:4;105:25;109:14;117:24;131:15
**11 (11)**
40:8,16,21;44:21;76:10,11;108:20,22;109:22;110:2;134:10
**11/10/2022 (1)**
66:15
**11:00 (1)**
3:1
**11:48 (1)**
72:13
**11th (2)**
6:24;192:6
**12 (11)**
42:20,20,22;43:7,11;110:9,10;111:11;112:14;115:11;134:5
**12% (1)**
158:25
**12:06:01 (4)**
75:4,5,6,9
**12:26 (1)**
64:10
**120,000 (1)**
82:20
**120-odd (1)**
79:18
**122,000 (1)**
83:11
**122,564 (4)**
79:23;80:3;83:6;84:9
**123,000 (1)**
79:22
**12th (5)**
43:16,18;44:8;180:4;181:19
**13 (7)**
45:22;47:13,18;112:15;113:5;164:10;202:19
**13.1-1028 (1)**
192:5
**13th (1)**
192:6
**14 (3)**
47:22;48:18,23
**14th (10)**
6:11;44:7,9,16;45:2;76:13;88:23;89:5,7;109:16
**15 (17)**
49:21;58:15,15;59:12,13,15;62:23,24;65:12,18;114:19,20;115:6,9,15,16;124:22
**15th (6)**
7:2;142:22,25;143:20;196:14,16
**16 (14)**
47:25;65:9,20,24,25;68:12,17;84:10;127:9,10,17;128:10;136:19,20
**16th (2)**
75:18,21
**17 (8)**
6:6,8,11,16;68:18,23;70:7,12
**17th (1)**
191:24
**18 (17)**
6:6,8,11,16;71:16,17,19;72:25;73:5;119:7;179:24,25;180:2,3,11,13;181:8
**18th (6)**
28:12;118:16;169:8;170:7;189:20;190:9
**19 (12)**
3:3;74:6,8,10;77:8,14;80:7;181:14,16,18,25;182:4
**1997 (1)**
20:25
**1st (25)**
16:16;34:13,21;35:7,14,25;36:1;40:1,5,6;48:2;54:7;69:6;72:8,12;73:12;104:9,14;112:17;114:21;130:8;132:4,6,14;173:4

## 2

**2 (27)**
12:9;24:18,18,24;25:21;26:1;32:9;34:10;35:17;47:1,25;50:5;66:13;132:3;143:18;144:3,8;154:13,20;155:3,4,16;156:3,5;163:6;198:2;199:1
**2% (1)**
158:5
**20 (30)**
3:3;47:8;77:21,23;78:8;80:3,7,10,13,15,17,20;81:5,7,15;82:2,3,7,8;85:13,15,19;137:9;159:23,24;160:4,12,22;165:8;201:8
**200 (2)**
137:14;161:16
**200,000 (2)**
137:9,14
**2001 (1)**
20:25
**2009 (2)**
20:21;21:5
**2011 (2)**
128:11,13
**2012 (1)**
128:14
**2013 (1)**
140:24
**2019 (19)**
48:2;69:6;141:23,25;142:2,8,22,25;143:4,8,20;144:10,17,20;145:4,10;146:3;159:19;160:2
**2020 (9)**
93:20;96:9;97:1;119:12,18;146:4,12;147:22;148:16
**2021 (28)**
12:8;13:7;24:12,14;26:4,21;27:18;29:1,12;61:4;92:24;94:6,10;96:20;100:4,5;106:18;107:13;152:17;161:7,21;163:1;169:8,21;170:7,23;189:20;190:9
**2022 (57)**
14:12;15:3,15;16:16;28:12;30:13;31:2;34:13,21;35:7;38:21;40:5;41:7;66:12;69:4;72:8,9;75:18,21;76:10,10,11,13,14;78:2,3,3,5,6,8;79:10;86:1,10;88:23;89:5,7;90:20;91:6;104:9;112:17;114:22;128:21;130:8;132:6,14;164:8;166:12;170:19;171:15;173:4,17;174:12;191:25;192:6;194:16;196:8;197:1
**2023 (21)**
46:5;116:11;117:24;118:12,17;119:7;161:18;170:19;180:4;182:8;195:1,21,24;196:3,16;197:2,5;198:3;200:1,22,23
**2024 (1)**
34:4
**20310828 (1)**
143:21
**20xxx (1)**
84:16
**21 (23)**
6:8,11,16;46:22;80:12,14,14,19;81:13,15;82:4;85:18,20;86:12,16;161:18;163:20;165:8;170:18,25;171:1,6,6
**210,000 (1)**
89:25
**22 (11)**
87:21,23;88:11,13,15;90:9,14;163:23;164:11;170:25;192:6
**22nd (7)**
41:7,13,19,22;61:4;109:8,19
**23 (9)**
92:22,23;93:21;94:7;133:2,2;164:10;165:8;179:23
**23-1062 (1)**
3:4
**24 (7)**
95:23,23,25;97:22;98:2;117:22,23
**24th (6)**
9:13,17,19;202:20;203:6,9
**25 (9)**
98:15;99:11,17,19,23;118:14,16,24;119:8
**25th (12)**
8:11;9:21,25;15:3,15;31:1,2;34:4;69:4;176:3,23;196:8
**26 (13)**
163:15,16,17,19,20;164:7;165:15;166:13;195:9,11,13;197:11,17
**26th (4)**
76:14;78:4;90:20;91:6
**27 (9)**
50:6;197:23,23;200:7,9,12;202:9,11,14
**27th (1)**
100:5
**28 (4)**
200:14,16;202:3,8
**28CEE36F (2)**
59:20;69:5
**29th (2)**
200:19,23
**2nd (9)**
16:18;43:3;195:21;196:3;197:2,5;198:3;200:1,22

## 3

**3 (27)**
26:10,12,14,17;27:2,7;35:17;36:5;39:25;50:6;66:21;102:9;104:13;130:13,16,22;131:3,13,19,25;144:11,23;145:3;165:9;175:22;199:6,13

**3:18 (1)**
139:1
**3:30 (2)**
137:21;138:21
**3:35 (2)**
66:21;139:1
**30 (1)**
94:6
**30,000 (4)**
89:20,22,25;116:4
**301966403 (1)**
70:4
**30th (2)**
8:4;92:24
**31st (1)**
195:23
**32 (1)**
154:9
**322 (2)**
93:1,24
**325 (2)**
133:5,10
**34 (1)**
48:16
**34,517 (1)**
118:20
**35,000 (2)**
17:4,18
**365 (1)**
33:8
**370 (1)**
164:16
**3rd (3)**
78:2,3;86:1

**4**

**4 (12)**
27:8,10,12,14,18,20;28:1;35:17;40:22;44:21;141:9;146:15
**4th (3)**
27:18;76:9,10

**5**

**5 (14)**
28:2,4,6,8,14,19;35:17;47:3;50:6;147:4,6,13,14;201:24
**5:00 (1)**
4:23
**5:04 (1)**
203:14
**5:45 (1)**
72:13
**50-50 (1)**
192:15
**56 (2)**
45:24;46:6

**6**

**6 (26)**
30:3,5,7,15,20;47:7;93:1;102:9,24,25;103:11,14,16,17;104:13;106:25;107:19;130:22;131:3,8,16,19,25;169:4;170:1,8
**6,000 (1)**
164:2
**6122CH2 (2)**
104:20;130:15
**615 (1)**
10:18
**64 (5)**
75:21;76:15;78:1;85:23,25
**64D14DA0 (2)**
66:5;69:24
**64exe (1)**
75:16
**66,000 (1)**
17:3
**68 (1)**
84:8
**6th (1)**
181:19

**7**

**7 (14)**
31:9,11,13;32:2,7;33:22;34:9;39:25;78:3;89:25;123:21;124:1;171:10,10
**7.4 (1)**
89:13
**7:03 (1)**
66:22
**7th (4)**
26:21;107:15;195:1,24

**8**

**8 (7)**
33:21,25;34:2;39:7;172:22,24;173:9
**8:50 (1)**
88:24
**8:52 (1)**
89:4
**80,000 (1)**
90:22
**81 (1)**
69:2
**82 (2)**
69:21,21
**83 (2)**
70:2,3
**85,000 (2)**
14:23;15:11
**8th (12)**
43:17;78:6,8;79:10,20,20;86:10;96:25;164:8;166:12;174:11;175:20

**9**

**9 (25)**
34:25,25;35:2,11,15,16;50:15;78:3;88:23;102:14;104:5;105:4,4,7,10,14;106:11,16;130:2,5;133:5,10;173:6,14;174:4
**9:02 (1)**
88:24
**9:30 (7)**
4:19,20;6:21;76:14;202:20;203:9,9
**9th (5)**
30:13,19;46:4;173:17;176:1