IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)

| | |
|---|---|
| In re | ) Case No. 23-01062-BFK |
| | ) Alexandria, Virginia |
| VALERIA V. GUNKOVA, | ) |
| | ) |
| Debtor. | ) June 24, 2024 |
| | ) 9:09 a.m. |
| -------------------------------- | ) |
| HARRY KAMIN, | ) Adv. Proc. 23-01062-BFK |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| VALERIA V. GUNKOVA, | ) |
| | ) |
| Defendant. | ) |
| -------------------------------- | ) |

TRANSCRIPT OF HEARING ON
#53 PLAINTIFF'S MOTION FOR SANCTIONS DUE TO DEFENDANT'S SPOLIATION OF EVIDENCE
BEFORE THE HONORABLE BRIAN F. KENNEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: NANCY GREENE, ESQ.
N D GREENE PC
3977 Chain Bridge Road
Suite 1
Fairfax, VA 22030

For the Plaintiff: BETHANY R. BENES, ESQ.
TRACEY M. OHM, ESQ.
BETHUNE BENES, PLLC
3975 Fair Ridge Drive
South Building 246
Fairfax, VA 22033

Transcription Services: eScribers, LLC
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

THE CLERK: Item one on today's docket is Kamin v. Gunkova, Adversary 23-01062.

THE COURT: All right. Good morning, everybody.

Ms. Greene, are you prepared to present your next witness?

MS. GREENE: Yes, we are, Your Honor.

THE COURT: All right. And who's that?

MS. GREENE: Valeria Gunkova for --

THE COURT: Ms. Gunkova, would you please step forward and raise your right hand?

(Witness sworn)

THE WITNESS: Yes, I do.

THE COURT: All right. That's fine. Would you come to our witness stand, please?

DIRECT EXAMINATION

BY MS. GREENE:

Q. Ms. Gunkova, can you please state your name for the record?

A. Valeria Gunkova.

Q. What is your educational background?

A. Business administrator for a Finnish university in Russia, and master institution in America.

Q. Okay. And how are you employed?

A. How I employed?

Q. What's your job?

A. Oh, I'm president of companies Skin Logic, LLC, and BNG.

Q. Okay. And what are your job duties at Skin Logic, LLC, which is also called Aria?
A. Okay. I do everything -- is belongs to management department. I work with employee. I work with the -- this inventory process, with equipment, with the staff, most likely.
Q. Okay. Are you aware of a case that was filed against you in Loudoun County, Virginia, by Mr. Harry Kamin?
A. Nancy, could you please repeat one more time?
Q. Absolutely.
A. Or rephrase.
Q. Were you sued in Loudoun County, Virginia, by Harry Kamin?
A. Yes.
Q. Okay. And in that case, did Mr. Kamin request that you provide certain documents through the discovery process?
A. Yes. Of course.
Q. And did you provide responses and updates to those requests?
A. Yes.
Q. Okay. If you look at plaintiff's exhibit binder, that's the bigger of the two books in front of you --
A. Okay.
Q. -- at tab -- sorry. Tab -- yeah. Tab -- sorry. The smaller of the binders, at tab 26.
A. Okay.
MS. BENES: Are you referring to plaintiff's?

MS. GREENE: Yes, plaintiff's.
Q. You'll see a May 2nd, 2023, order. And it might --
A. And I see you mean this one?
Q. Yes.
A. Okay. Okay.
Q. I take that back. Exhibit 26 may be one of the loose documents.
A. Exhibit 26. Yeah, I have one at 24. The last one.
Q. Okay. There should be some loose documents in front of you. One should be marked No. 26.
A. Loose. Okay. I don't see it. I'm not sure on this, yet. Let me see.
Q. It won't be in one of the binders. It was one of the ones added after. It should be a loose document.
MS. GREENE: Can I approach, Your Honor?
THE COURT: Yes. Would you please?
THE WITNESS: I'm sure it's -- I'm sorry. Oh.
MS. GREENE: Oh, it's because there's another (indiscernible).
THE COURT: Okay. Thank you, Ms. Greene. But try to keep your voice up and speak into the microphone, please.
MS. GREENE: Yes.
THE COURT: Okay? Thank you.
MS. GREENE: Yes.
A. Yes.

Q. Okay. If you look at Plaintiff's Exhibit 26, which is a May 2nd, 2023, order from the Loudoun Court requiring you to supplement your discovery responses in that case. Did you supplement your discovery responses after entry of that order?
A. Okay. Am I seeing you now? Or rephrase me again, please.
Q. Okay. After the Loudon court in May --
A. Uh-huh.
Q. -- of 2023 --
A. Yes.
Q. -- said that you had to supplement or add more to your document response --
A. Yes.
Q. -- do you recall doing so?
A. Yes.
Q. Okay. And now in the big book, if I could direct you to Defendant's Exhibit 28.
A. Yes, I'm here.
Q. Okay.
A. Yes.
Q. Okay. And was that your supplementation of discovery in the Loudan County case pursuant to the May 2nd, 2023, order?
A. Yes. Yes.
Q. Okay. And in the Loudan case, did you admit that certain documents bearing Mr. Kamin's signature had not personally been signed by him?

A. One more time, please?
Q. Sure. In that case did you admit that certain documents bearing Mr. Kamin's signature had not personally been signed by him?
A. I'm not sure what you're asking.
Q. Let me direct your attention to Defendant's Exhibit 29.
A. 29, okay.
Q. And that would be the next tab.
A. Yes.
Q. Okay. Can you identify what is the document, number 29?
A. Okay. Yes. It's document S. Came from my attorney, which means it's my document.
Q. Okay. Is it your response to Mr. Kamin's first request for admissions in the Loudan County case?
A. Yes, if it's my attorney, yes.
Q. Okay. And looking at that did you admit that certain documents attached to the complaint were not personally signed by Mr. Kamin?
A. I'm not sure. I'm sorry, Nancy, I'm not sure what you're asking.
Q. Okay. Let me direct your attention in Exhibit 29 to -- under -- first page under where it says response for request for admissions.
A. So you said 29?
Q. Yes.

A. Yes. What's your question?
Q. Okay. If you read that first question and response, does that refresh your recollection as to whether or not you admitted that certain documents attached to the amended complaint were not personally signed by Mr. Kamin?
A. Uh-huh. Yes, I see it.
Q. Okay. And did you admit that certain documents attached to the amended complaint were not personally signed by Mr. Kamin?
A. Yes.
MS. GREENE: I move for the admission of Exhibits 28 and 29.
MS. BENES: No objection, Your Honor.
THE COURT: They'll be admitted.
(Plaintiff's supplementation to discovery was hereby received into evidence as Defendant's Exhibit 28, and Plaintiff's response to admissions was hereby received into evidence as Defendant's Exhibit 29, as of this date)
MS. GREENE: Okay.
THE WITNESS: 28, 29. Okay. 28.
MS. GREENE: Don't worry about it. It was administrative for the Court. It wasn't a question, Ms. Gunkova.
Q. Okay. You mentioned earlier that you do some management at Aria. Does any of your management of Aria include management of its computer systems?

A. Yes. Yes.
Q. What management of the computer system do you do at Aria?
A. Management computer system, I'm not really understand about any computer system. All responsibility about the computer stuff Jacob does.
Q. And --
A. And my IT person.
Q. When you say Jacob, who is Jacob?
A. Jacob my business partner. I can tell like that.
Q. Is --
A. And -- uh-huh?
Q. Is that Mr. Jacob Bogatin?
A. Yes.
Q. Okay. And when you say your IT person, what is his name?
A. Igor (ph.).
Q. And do you -- what is his last name?
A. Oussenko (ph.).
Q. Oussenko. And were Mr. Bogatin and Mr. Oussenko responsible for the management of Aria's computer system in 2020?
A. Yes.
Q. And did that change at any time?
A. I don't know.
Q. Does Mr. Oussenko still work for Aria?
A. Not right now, no.

Q. When did he stop working for Aria?
A. Approximately one year ago. I don't know what happened to him. He disappear. We call him multiple times. I don't know what's going on.
Q. Were you personally responsible for buying any of the programs used on the computers for Aria or BNG?
A. No.
Q. Before the sanctions motion was filed in the Loudan County case, did you know that a program called CCleaner had been installed on certain computers used for Aria or BNG's business?
A. I have no idea.
Q. After the dispute arose with Mr. Kamin regarding BNG's operation, what, if anything, did you tell the people in your business about keeping documents or information related to BNG?
A. Can you please rephrase one more time shorter?
Q. Sure.
A. Uh-huh.
Q. Once it was apparent that you -- that Mr. Kamin had a disagreement about BNG --
A. Uh-huh.
Q. -- did you -- what did you tell people in relation to BNG about keeping documents or information?
A. I didn't tell anything. What people are you talking about?
Q. Anyone related to BNG's operations.
A. No idea as to what you can -- I work in most -- most time

is Jacob. I don't really share any information with my staff.
Q. Did you tell Mr. Bogatin to keep information related to BNG?
A. I personally did not.
Q. Did you personally ever run CCleaner on any of the computers used in BNG's business?
A. No.
Q. Would you even know how to run CCleaner on any of those computers?
A. Huh-uh. No.
Q. Okay. After getting notice that Mr. Kamin had an issue related to the operations of BNG, did you ever intentionally delete information from the computers?
A. No.
Q. Did you ever instruct anyone to delete information from the computers being used to run BNG business?
A. No.

MS. GREENE: I have no further questions.

THE COURT: Okay. Thank you.

Ms. Benes?

MS. BENES: Yes, sir. Court's indulgence.

THE COURT: You see you don't have Ms. Ome (ph.) to keep track of that for you.

MS. BENES: See, I told you that she was my favorite, and now she's not here and I'm struggling without her. I'm

glad the Court recognizes that.

THE COURT: Take your time.

MS. BENES: I will let Ms. Ome know as well.

CROSS-EXAMINATION

BY MS. BENES:

Q. Good morning, Ms. Gunkova.

A. Good morning, Ms. Benes.

Q. Bethany Benes, we've met before. Ms. Gunkova, you testified that you do everything for Aria Management; is that right?

A. That's correct.

Q. Okay. And Mr. Bogatin helps you with that; isn't that right?

A. Absolutely.

Q. In fact, you work with Mr. Bogatin on all of your business ventures; isn't that right?

A. Yes. Can you please repeat one more time?

Q. You work with Mr. Bogatin on all of your business ventures, right?

A. That's -- that's correct. Yes.

Q. You defer --

A. I do.

Q. -- a lot of stuff to Mr. Bogatin; don't you?

A. I do a lot of stuff for Mr. Bogatin?

Q. You defer, you have him do a lot things for you and your

businesses; is that right?
A. I'm not sure about a lot, but what he does he works as in the financial area and marketing.
Q. Well, let's talk about that.
A. Of course.
Q. He helped you form various companies, right?
A. What did you say? I'm sorry, I didn't hear you.
Q. Jacob Bogatin helped you form various companies?
A. Yes --
Q. Isn't that right?
A. -- he does. He has a huge experience in the business industry. He is a very good businessman at -- and he helps me a lot. And me teach me a lot as well.
Q. He helped you form Sterling Investment, LLC?
A. Sterling Investment, yes.
Q. He helped you form VNJ Management, LLC?
A. VNJ --
MS. GREENE: Objection, relevance.
THE COURT: Overruled.
You can answer.
A. Answer this -- he informed me -- what's your question, I'm sorry?
Q. He helped you form VNJ Management, LLC?
A. Yeah. Yeah, we worked together. Yeah.
Q. He helped you form Skin Logic, LLC, right?

A. Yes.
Q. He helped --
A. Of course.
Q. -- you form BNG Group, LLC, right?
A. Yes. Yes, of course.
Q. And you authorized Mr. Bogatin to conduct certain activities on behalf of your various companies; isn't that right?
A. Correct.
Q. You have him speak with attorneys for you?
A. Yes.
Q. You have him speak with banks?
A. Yes, of course.
Q. You have him speak with real estate brokers; isn't that right?
A. Yes. Yes, it is.
Q. You have him speak with tenants; isn't that right?
A. Yes. Yes. We work together. Yes.
Q. Is it fair to say he's your right-hand man?
A. Absolutely.
Q. In fact, you gave Mr. Bogatin access to all of our email accounts; didn't you?
A. What you say to me? I mean --
Q. You gave Mr. Bogatin access to all of your email accounts; didn't you?

A. Not all. My personal business account -- business email -- or I'm sorry. My personal email he doesn't have access. But if I ask him send letter from my personal email, and I give it to him access, use my email.
Q. Okay. Do you recall being deposed in my office on May 9th, 2023?
A. Did I recall my -- I'm sorry?
Q. Do you recall your deposition --
A. Uh-huh.
Q. -- last May?
A. Uh-huh.
Q. May 9th, 2023?
A. Uh-huh.
Q. Okay.
A. Yes.
Q. Do you recall that your attorney was there with you?
A. Yes. Yes.
Q. And there was a court reporter there?
A. Who was here?
Q. There was a court reporter?
A. I don't --
Q. Taking down everything you said and everything I said?
A. I don't understand.
Q. Do you recall that you swore to tell the truth that day under penalty of perjury?

A. I -- in a deposition --
Q. Yes.
A. -- I try to say truth all the time. I say can't understand you. The problem was sometimes you screaming on me and I was a little bit under threats, and maybe I made a wrong answer.
Q. And my question to you was, Question: "Does Jacob have access to each and every one of those accounts?" Answer: "Yes." Do you recall telling me that Jacob had access to all of your email accounts?
A. What did you -- can you please read one more time?
Q. Sure. Question: "Does Jacob have access to each and every one of those accounts?"
A. Uh-huh.
Q. Answer: "Yes."
A. Yes.
Q. And then I asked, "When did Jacob begin having access to those accounts? Let's start with vgenkova@gmail.com."
A. Okay.
Q. Your answer, "As soon as I opened Skin Logic, LLC."
A. Uh-huh.
Q. Question: "When was that?" Answer: "Ten years ago."
A. Okay.
Q. So Mr. --
A. What's your question?
Q. Do you recall that testimony that differs from your

testimony now today?
A. Every -- everything what you said, yes. Uh-huh. Definitely, it's true.
Q. You gave access to financial accounts to Mr. Bogatin; didn't you?
A. You mean bank accounts?
Q. Yes.
A. Online, yes.
Q. In fact, Mr. --
A. He had access online.
Q. Okay. In fact, Mr. Bogatin has signature authority on a number of the accounts; isn't that right?
MS. GREENE: Objection --
A. No.
MS. GREENE: -- relevance.
A. I don't know. You are --
THE COURT: Wait, wait, there's an objection.
Overruled.
You can answer.
THE WITNESS: I can answer? Okay.
A. No, he doesn't.
Q. It's your testimony that Jacob does not have signature authority on bank accounts for you?
A. Right now what I'm thinking about -- I don't know which account you're talking about.

Q. Let me clarify.
A. Of course.
Q. Jacob Bogatin has had signature authority on the Skin Logic, LLC bank accounts; isn't that right?
A. Skin Logic, LLC, no, I don't think so.
Q. And it's your --
A. No.
Q. It's your testimony here under penalty of perjury that Jacob Bogatin has never access -- or never had signature authority to the Skin Logic bank accounts?
A. Ms. Benes, I told you already. Mr. -- Jacob Bogatin --
Q. Uh-huh.
A. -- he has access online. I have a provision to sign my checks -- business accounts, Skin Logic, LLC. Mr. Bogatin has no relation to any business checks.
Q. Have you ever authorized Mr. Bogatin to sign checks for any of your companies?
MS. GREENE: Objection, relevance.
THE COURT: Overruled.
You can answer.
A. You know, I'm extremely busy on my business. Actually two businesses. No, I would say three businesses because --
Q. Uh-huh.
A. -- I have to responsible for you full time the past three years. I would say I'm busy, busy, busy, busy, and Jacob

sometimes sign -- and Skin Logic, yes.
Q. Because you gave him --
A. And he sign my name.
Q. Sure.
A. I'm fine and he showed to me, and I approve and I said, yes, you can do that.
Q. And Jacob has access to all of the credit cards, too; doesn't he?
A. Access to -- online, yes.
Q. In fact, when Mr. --
A. I trust Jacob Bogatin 100 percent because we build business togethers -- him.
Q. And you have given Jacob access to BNG's credit cards; isn't that right?
A. BNG -- what BNG credit card you talking about, Ms. Benes?
Q. Well, let's talk. I guess there are a number of BNG credit cards; is that correct?
A. Numbers, no. Could you please tell me what kind?
Q. BNG has an American Express account; doesn't it?
A. Yes.
Q. And Jacob --
A. I'm open it for my manager Jung Eun (ph.).
Q. And --
A. He needs to use the money because we cannot operate without any painting.

Q. And Mr. Bogatin has access to that account; doesn't he?
A. Online, of course. Because --
Q. And --
A. -- he's doing QuickBooks and he needs to recreate and see hows money goes -- everything he needs control. Of course.
Q. And Mr. Bogatin is an authorized user of that American Express card; isn't he?
A. I'm not sure because I have all kinds of credit cards and I'm not sure. I don't think so, but it's maybe.
Q. What about the Home Depot credit card --
A. Yes.
Q. -- in BNG's name? Mr. Bogatin holds that card; doesn't he?
A. Yes, because he is the constructor guy as well. And you know the past three years we build four offices for BNG. And yes, he has a business card for -- from Home Depot because he needs to buy some stuff.
Q. And in fact, you gave Mr. Bogatin authority to submit financial applications in your name; isn't that right?
MS. GREENE: Objection, relevance.
THE COURT: Ms. Benes, where are we going with this in terms of what we need to decide in this hearing --
MS. BENES: Mr. --
THE COURT: -- which is to say alleged spoliation of evidence?
MS. BENES: So the opposition that was filed with the

Court does a lot of finger pointing at Mr. Bogatin and feigns ignorance of Ms. Gunkova. When in fact, Ms. Gunkova not only authorized him to do this stuff, asked him. Was his right-hand woman right along with him. And so therefore, whatever Mr. Bogatin did, Ms. Gunkova's equally guilty for.

MS. GREENE: Well --

THE COURT: Ms. Greene?

MS. GREENE: There's no evidence that there's any instruction by Ms. Gunkova for Mr. Bogatin to do anything. Ms. Benes had the opportunity to question Mr. Bogatin about his action. There's no evidence Mr. Bogatin did any of this.

THE COURT: Right. I'm going to sustain the objection because I think we're now going, as they say, far afield from what we have to decide here today. If on the other hand, you ask him -- ask her did you authorize Mr. Bogatin to use CCleaner, that sort of thing, that's all spoliation evidence.

MS. BENES: Sure.

THE COURT: But I sustain the objection.

MS. BENES: Let me go about it a different way.

BY MS. BENES:

Q. Did you know that Mr. Bogatin was maintaining files on the computer that he used for your companies?

A. I don't know. He works -- there's a computer and he does the documentation. I don't know what he does. And I would say more, I don't have a password from him computer.

Q. Well, and you knew he was maintaining the QuickBooks records for BNG, right?
A. Absolutely.
Q. And he was using his computer to do that, right?
A. Yes. Correct.
Q. You knew that, right?
A. Of course. And I sometimes I would -- I was next to him and see how he does.
Q. Uh-huh.
A. How he works in QuickBooks. He tried to teach me, but I'm so busy I can't take this job as well.
Q. In fact, Mr. Bogatin's computer was the main computer used for BNG's day-to-day operations; isn't that right?
A. Correct.
Q. And you knew that?
A. Yes.
Q. You use the same computer for Aria Medispa and BNG; is that right?
A. Absolutely.
Q. And Jacob uses the same computer for Aria and BNG, right?
A. Yes.
Q. Prior to BNG being in -- placed in a chief restructuring officer, Ms. Shortall, you contended you were sole manager of BNG, right?
A. What's your question? I don't understand.

Q. Prior Ms. Shortall -- do you recall that Ms. Shortall was appointed by the Court as a CRO?
A. Shorter -- Angela you're talking about?
Q. Yes, ma'am.
A. Okay. Okay.
Q. You recall that she was appointed as a CRO?
A. She was appointed by CRO, I --
Q. She was appointed by the Court --
A. Okay. Right now --
Q. -- with your agreement --
A. -- she is the manager -- yes.
Q. Yes.
A. Yes.
Q. To manage BNG.
A. Uh-huh. Yes.
Q. Do you recall that?
A. Of course.
Q. And prior to that you contended that you, Ms. Gunkova, were the sole manager of BNG, right?
A. Yes, fifty percent.
Q. Okay. And you knew that Mr. Eun --
A. Uh-huh.
Q. -- who's the property manager --
A. Uh-huh.
Q. -- of BNG also used a computer in a 2nd floor office,

right?
A. Yes, he --
Q. To conduct BNG business?
A. Yes, we purchase for him computer especially for -- only BNG Company, and he used his computer on the 2nd floor in his office.
Q. Okay. And you knew that you -- BNG used Dropbox, right?
A. I know about Dropbox, yes, but I'm not familiar with this application. I not using --
Q. You didn't do --
A. -- so much. I can open files, understand how it works everything, but I can't tell you a lot about this program.
Q. Okay. Did you ever ask Jacob how to preserve documents in Dropbox?
A. No. He knows his job very well. I don't need to. And I gave him for this little job.
Q. In February of 2021 you received a letter from me on --
A. Okay.
Q. -- behalf of Mr. Kamin; isn't that right?
A. You know, I receive letters from you every single week, so maybe yes.
Q. Every single week, you --
A. Yes, yes.
Q. I would remind you that your --
A. Past two and half years.

Q. -- sworn testimony --

THE COURT: Wait, wait, wait --

MS. GREENE: Your Honor --

THE COURT: We need a question --

THE WITNESS: Yes.

THE COURT: -- and an answer, Madame. Talking to both of you now. Question and answer. Please don't talk over each other or the record will not be a clear record in this case. So let's ask the question again, please? Okay.

Q. You received a letter in February of 2021 from me on behalf of Mr. Kamin; isn't that right?

A. I don't know. Maybe yes. I don't know exactly dates because every -- I can't tell you how many letter I receive from you.

Q. Turn to the plaintiff's exhibit binder in front you.

A. Okay. The biggest or smaller?

Q. Smaller one.

A. Okay. I'm here.

Q. And turn to Plaintiff's Exhibit 2.

A. Exhibit 2. Yes, I'm here.

Q. Do you recall that letter dated February 10th, 2021, from me to you on behalf of Mr. Kamin?

A. It looks like -- yes.

Q. Yes. And in fact you hired an attorney after receiving this letter, right?

A. Yes.
Q. Mr. Curran -- Charles Curran?
A. No, no, it's not correct.
Q. You didn't --
A. Charles, he was hired before actually your letter. I didn't know you were going to sue me for the carpet business. For BNG -- protect BNG interest.
Q. Okay. And you had Mr. Curran respond to my letter on behalf of you; isn't that right?
A. Yes, I ask.
Q. Okay.
A. Yes. Because I didn't know what I supposed to be doing. Have no experience.
Q. Understood. And I don't want to know what your attorneys told you because that's privileged.
A. Okay.
Q. And Mr. Bogatin helped you hire that attorney, right?
MS. GREENE: Objection, relevance.
THE COURT: I'll allow it.
You can answer.
A. Mr. -- yes, because he knows this attorney from a previous owner and he likes how he work.
Q. Okay. And then Mr. Kamin ended up filing his lawsuit against you in March of 2021, right?
A. Yes, he -- he files. Yes.

Q. And then Mr. Bogatin helped you hire a different attorney to represent you in the lawsuit, right?

MS. GREENE: Objection, relevance.

THE COURT: Overruled.

You can answer.

A. Yes, he helps me. We -- we -- actually we're together in the office and he -- we tried to find the firms. And we check attorneys. We check information about this attorneys and we both make a decision if we want to go to -- for interview and see if this attorney good for us.

Q. Okay. And during the litigation that was filed, Mr. Bogatin helped you compile documents for discovery, right?

A. He helps me a lot, yes.

Q. Okay. You allege in your opposition to this motion that whatever spoliation happened is de minimis because you kept Mr. Kamin informed by monthly reports; is that right?

A. Can you please rephrase?

Q. Sure. Is it your position that you kept Mr. Kamin informed through monthly reports?

A. This -- we sent your client monthly report about how we operate. Explain every single step what we did during the months. Yes. Every month we send it to your client report about what we're doing.

Q. And isn't it true that nearly every month my office, on behalf of Mr. Kamin, sent a letter to your attorney telling you

about all of the deficiencies of the monthly reports and asking further questions?
A. I don't know the deficiency. What you're talking about. I don't understand questions.
Q. Let me see if this will help --
A. Yes.
Q. -- refresh your recollection.
THE COURT: Do you want this marked exhibit or do you just want to refresh her recollection with it?
MS. BENES: I'm going to mark it as Exhibit 29, please.
THE COURT: All right. Let's have it marked as Plaintiff's 29. And then she needs a copy on the witness stand, please.
(November 11, 2021 letter was hereby marked for identification as Plaintiff's Exhibit 29, as of this date)
THE WITNESS: Ms. Benes, here's note --
THE COURT: Just wait for a question --
THE WITNESS: -- (indiscernible) --
THE COURT: -- ma'am, please. Thank you.
MS. BENES: The deputy will hand you what has been marked as Exhibit 29.
Q. Was this one of the letters that you received from me? It's dated November 1st, 2021.
A. Okay. Yeah, it's from you, yes.

Q. Okay. Let's --
A. It's --
Q. -- go to number 3. It's highlighted for your convenience.
A. Number 3, page --
Q. The bottom of page 1.
A. Okay. Financial reports, yes.
Q. Uh-huh. The top of the page says, "This letter addresses a number of pending issues in an attempt to amicably resolve the issues and create a way forward for your clients. Number 3, as previously discussed, Mr. Kamin requested that BNG's QuickBooks files be transferred and/or maintained through an online account to ensure that each member has adequate access."
A. So what's your question? I'm --
Q. You had an online QuickBooks account set up; isn't that right?
A. I think so, yes.
Q. And Jacob set that up for you?
A. He's set up a special for Mr. Kamin because he needs to see financial information online. That's why he -- we opened it online -- QuickBooks.
Q. It is true that it was set up, but isn't it also true that no information was ever put into that account?
A. No, it's not true.
Q. Do you have access to an online QuickBooks account for BNG?
A. I don't have access.

Q. Go to number 4. "Mr. Kamin request that Ms. Harper (ph.) be authorized to conduct a full audit of the company's records and tax returns to identify all errors, aid in the filing of necessary amended returns." Do you see that under number 4?
A. Under number 4.
MS. GREENE: Your Honor, objection --
A. Page 4 --
MS. GREENE: -- as to relevance. This is spoliation, not an issue of discovery and dispute. I'm not sure what this goes to in terms of spoliation.
MS. BENES: I'm happy to respond.
THE COURT: Ms. Benes?
MS. BENES: Much of her defense, if not all of it, is that any spoliation that occurred is de minimis because she kept Mr. Kamin informed through monthly reports. In fact, she attempted to paint a very rosy picture of herself and her team when in fact, all along the way, every month, these letters were being sent, that the information it provided was superficial, it did not answer questions, and that when Mr. Kamin had questions, she refused to answer them.
THE COURT: All right.
MS. BENES: So the rosy picture that she paints as her defense is being attacked today.
MS. GREENE: That's not a spoliation issue. That's a discovery dispute issue.

THE COURT: Well, I understand it goes to the defense of, well we provided them with all the information in the monthly reports.

Though, Ms. Benes, I will tell you, I'm not sure that a letter from a lawyer saying the information is sufficient means that the information was insufficient. Do you see what I mean --

MS. BENES: I understand.

THE COURT: -- kind of -- I have no idea what was produced in the way of online QuickBooks or in the way of monthly reports. So the content of those reports -- so this is secondhand information if you will.

MS. BENES: Sure. Let me ask this --

THE COURT: All right --

MS. BENES: -- Ms. Gunkova --

THE COURT: -- so I'll overrule the objection, but you need to understand that just a letter from your office doesn't really answer the question for me.

MS. BENES: Understood. Let me ask a follow up.

THE COURT: All right. You can proceed.

BY MS. BENES:

Q. Okay. Ms. Gunkova, you never authorized Ms. Harper to conduct a full audit of the company's records and tax returns, did you?

A. Can you please remind who is Harper because I have a lot of

business partners and stuff and I'm not -- I'm not sure who is this guy.
Q. Ms. Harper --
A. Yes.
Q. -- was a CPA --
A. CPA.
Q. -- that was hired by Mr. Kamin.
A. Okay.
Q. And Mr. Kamin here, in this letter, requests that Ms. Harper be authorized to conduct a full audit of the company's records. You did not allow that, did you?
A. No. You -- you got all information how I'm -- I did on the lawyer. You got all information.
Q. My question was, you did not allow a full audit by Ms. Harper of the company's books and records, did you?
A. Yes, I didn't -- I did not because I have information from (indiscernible) well and I don't want to share my information. It's not belongs to BNG. Yes, I was disagree.
Q. I'm listening.
A. What?
Q. It sounded like you stopped your answer. Were you done with your answer?
A. I was done.
Q. Okay. Thirty -- I'm going to hand you what will be premarked for identification purposes as Exhibit 30. Thank

you.

THE COURT: All right. This will be marked as Plaintiff's 30.

(Letter written by Ms. Benes was hereby marked for identification as Plaintiff's Exhibit 30, as of this date)

A. You said Exhibit 3?

Q. The deputy -- they --

A. Oh.

Q. -- have to mark it first --

A. Oh okay.

Q. -- and then the deputy will bring it to you.

A. Okay.

THE COURT: Did you want 29 admitted?

MS. BENES: Yes. I move for the admission of 29. Thank you, Your Honor.

THE COURT: Is there any objection?

MS. GREENE: Hearsay.

MS. BENES: I would --

MS. GREENE: Relevance.

MS. BENES: -- I would --

MS. GREENE: Foundation.

THE COURT: Well --

MS. BENES: Are you done?

THE COURT: -- well she --

MS. BENES: I'm happy to --

THE COURT: -- she said that they received the letter, so I overruled the objection -- the foundation objection -- but thank you.

Your response, Ms. --

MS. BENES: As to the relevance, it's exactly what I explained to Your Honor before. It goes to the defense of her position.

THE COURT: Okay. I get the -- I overrule the relevance objection, but what about the hearsay objection?

MS. BENES: It's not being submitted for the truth of the matter. It was being submitted for that she was on notice that Mr. Kamin had these positions and then she subsequently answered that and confirmed the contents.

MS. GREENE: It is absolutely being submitted for the truth of the matter that she was not cooperating in discovery and she was withholding documents and therefore they've been damaged.

THE COURT: All right. I'll overrule the objection and it'll be admitted for purposes of notice as opposed as to for purposes of the truth of what's said in the letter.

MS. BENES: Yes.

THE COURT: All right.

(Letter was hereby received into evidence as Plaintiff's Exhibit 29, as of this date)

BY MS. BENES:

Q. Ms. Gunkova, do you recognize Exhibit 30 -- it's another letter I sent to your attorney? It's dated November 18th, 2021.
A. Yes, if you sent to my attorney, yes, I recognize.
Q. Go to page --
A. It looks like communication with my attorney.
Q. Okay. Go to page 2.
A. Yes. I'm here.
Q. Okay. You were here on Tuesday. You heard Mr. McDaniel talk about wanting to have a professional search everybody's emails -- or not everybody -- you and Mr. Kamin?
MS. GREENE: Objection. Relevance. Improper impeachment. She's attempting to impeach --
MS. BENES: I'm not --
MS. GREENE: -- him for testimony --
THE COURT: Will you let me hear the objection, please?
Would you --
MS. GREENE: -- testimony that Mr. McDaniel gave regarding -- this is -- again, Ms. Benes' rebuttal to Mr. McDaniel's testimony if you look at the paragraph that she's quoting, which was responding to Mr. McDaniel's proposal to bring in joint database emails.
MS. BENES: So perhaps, if I could finish my question, that objection --

THE COURT: Would you please?

MS. BENES: Yes.

Q. We went over this with Mr. McDaniel. Do you see where it says, as I stated to you in your office on the date of Mr. Kamin's deposition, I am not opposed to having a procedure implemented to search our clients' respective emails using keywords.

However, I cannot agree that a professional needs to be hired to do this for my client because such an agreement would unnecessarily incur fees for Mr. Kamin to hire such a professional.

It then goes on -- the final sentence -- as to your client's, I have no objection if they want to hire a professional to run the procedure on their emails. My first question is, do you see that?

A. What was your question?

Q. Do you see what I just read?

A. Yes. Yes.

Q. My second question is, did you hire a professional to run the procedure on your email?

A. I don't know.

MS. BENES: Does that take care of your objection?

THE COURT: Are you moving for the admission of --

MS. BENES: Please?

THE COURT: -- Exhibit 30?

MS. BENES: Yes, please, Your Honor.

MS. GREENE: Objection. Hearsay. Relevance.

MS. BENES: Same response, Your Honor. This goes to the notice that she was on -- notice that Mr. Kamin had this position and her actions she has confirmed through her own testimony now.

MS. GREENE: Your Honor, again, it goes to -- it's improper impeachment. It goes to, again, her attempting to testify without taking the stand as to her conversation with Mr. McDaniel.

THE COURT: All right. I'll admit it for purposes of notice only; 30 will be admitted.

(Letter written by Ms. Benes was hereby received into evidence as Plaintiff's Exhibit 30, as of this date)

Q. Ms. Gunkova, on December 1st, 2021, there was a members meeting of BNG that you had called. Do you recall that?

A. Members meeting? Yes. We had --

Q. Okay.

A. -- the members meeting.

Q. Mr. --

THE COURT: What was the date? I'm sorry.

MS. BENES: December 1st, 2021.

THE COURT: Thank you.

A. December 1st, 2021.

MS. BENES: And that is also on the timeline, Your

Honor.
A. I'm not sure about exactly month because -- I'm sorry, I can't remember.
Q. Okay. Do you recall a member's meeting in the winter of 2021 that you called for BNG?
A. From the way you been here, sound right, yes.
Q. I'm sorry. I didn't understand you.
A. Okay.
Q. What did you say?
A. The members meeting -- you present on this meeting, correct?
Q. Yes, I came --
A. Yes --
Q. -- to the building --
A. -- yes, yes.
Q. -- Mr. Kamin came to the building --
A. Yes, correct.
Q. -- Mr. Racich came to the building.
A. Um-hum. Okay.
Q. And it was a members meeting. Jacob was there --
A. Yes --
Q. -- right?
A. -- yes.
Q. You were there?
A. Um-hum.

Q. And Mr. Racich requested to do a forensic imaging on all the BNG computers. Do you recall that?
A. I think yes.
Q. And you would not allow him to do that, would you?
A. Yes, my attorney advised me to not do that --
Q. Okay.
A. -- and I believe and trust my attorney.
Q. Okay. And in fact, Mr. Kamin attempted to have the computers forensically imaged for many months, didn't he?
A. I don't understand your question.
Q. Well, was the December 1st, 2021, members meeting Mr. Kamin's only request to image the computers? Or did subsequent letters get sent and communications between attorneys, asking for that to be sent out?
A. I don't know. I'm sorry, but yeah, I don't remember --
Q. Let me see if this --
A. -- this information.
Q. -- refreshes your recollection. Exhibit 31. You've been handed what's been marked for identification purposes as Exhibit --
THE COURT: Thank you.
Q. -- 31. And I'll direct your attention to the very last page under number ten. It says, inspection of BNG records. To date, Ms. Gunkova, through you, has denied Mr. Kamins' request to inspect company records and electronic devices that store

company data or are used for company business.

Mr. Kamin will proceed with filing a motion with the Court to request the forensic inspection of all company devices and records. Do you see that?

A. I do, yes.

Q. And this letter was dated April 25th, 2022, right?

A. This was -- where is the date -- April 25th, 2022, correct.

Q. Okay.

MS. BENES: Move for the admition of Exhibit 32 on the same basis of notice.

MS. GREENE: Objection. Hearsay. Relevance.

MS. BENES: Oh I'm sorry --

THE COURT: Thirty --

MS. BENES: -- thirty-one.

THE COURT: -- thirty-one.

MS. BENES: Thirty-one.

MS. GREENE: Objection. Hearsay. Relevance.

THE COURT: Ms. Benes?

MS. BENES: This is the same response, Your Honor. It goes to her defense that she has asserted as to keeping him -- keeping him notified as well as it goes to the relevance of when she became aware that these devices, as early as December 1st, 2021, all the way through 2022 -- she was on notice that these devices were going to be imaged.

THE COURT: All right. It'll be admitted for purposes

of notice only.

(April 25, 2022 Letter was hereby received into evidence as Plaintiff's Exhibit 31, as of this date).

Q. Mr. Kamin then sent a follow up prior to filing his motion to compel the forensic turnover. Do you recall that?

A. I have past three years, so many motions. I can't tell you exactly.

Q. Okay. Is it fair to say that you never agreed to have the computers forensically imaged as requested by Mr. Kamin?

A. I was never agreeing for -- I don't understand. I'm sorry. Can you repeat again?

Q. Let's see if this helps refresh your recollection. Thirty-two. You've been handed what has been marked for identification purposes as Exhibit 32.

THE COURT: Thank you.

Q. I'll direct your attention to the bottom of page 3. It says inspection of BNG records. In accordance with the Court's ruling of October 15th, 2021, Mr. Kamin has repeatedly attempted to obtain information and discovery from Ms. Gunkova.

Yet, Ms. Gunkova's recent response do not comply with the Court's ruling and order of March 18th. Additionally, and as you recall, Mr. Kamin and his expert previously appeared at the property to obtain such information and inspection. All subsequent requests for inspection have similarly been rejected or gone unanswered.

Do you see that?
A. I do see that.
Q. And in fact --
A. What was the question?
Q. -- we attached the draft motion for sanctions. Did you see that? Do you see the draft motion for sanctions attached, Ms. Gunkova?
A. I'm not sure what you're asking. What is supposed to be seen?
Q. Do you see the draft motion for sanctions and to compel inspection that was sent to you?
A. This one? Yes --
Q. Yes.
A. -- I see it.
Q. Okay. And you still didn't agree to allow for the computer forensic imaging and inspection, did you?
A. I'm not sure --
MS. BENES: Move for the --
A. -- because you received all information from our computers. I don't understand why you continue ask me we're not share information. I give you everything what I have in my hands.
Q. So this letter was sent prior to the court ordering the forensic turnover.
A. You did happen so, yes.
Q. Okay. You never agreed to turn over the computer devices

until the court compelled you to do so. In fact, you even filed an opposition to that, right?

A. I wasn't -- yes, I not -- I don't want to say never agree. I was strongly disagree if you can see information from another business and my personal accounts because I use a computer for my personal stuff as well.

MS. BENES: Move for the --

A. And --

MS. BENES: -- admission of Exhibit 32.

THE COURT: Any objection?

MS. GREENE: Yeah, it's going to be the same objection as hearsay and relevance.

THE COURT: All right. It'll be admitted for notice only.

(Letter written by Ms. Benes was hereby received into evidence as Plaintiff's Exhibit 32, as of this date).

Q. Okay. Mr. Kamin filed his motion to compel the inspection on September 9th, 2022, is that right?

A. Maybe. I don't know if that -- dates -- years, I can't tell you. I don't remember.

Q. Do you have the small book in front of you?

A. Yes, I do.

Q. Turn to Tab 6.

A. Six, okay. I'm here.

Q. Go to the very last page -- page 9.

A. I'm here.
Q. Does that refresh your recollection that Mr. Kamin filed his motion on September 9th, 2022?
A. I would then if I see it name of my attorney, yes. That's true document.
Q. Okay. And you filed an opposition to that motion?
A. Possible, yes.
Q. You knew it was -- you knew that motion was pending, right?
A. I don't remember.
Q. You knew that a hearing was going to be held on Mr. Kamin's request, right?
A. I don't remember.
Q. And the hearing was in fact held on October 25th, 2022, wasn't it?
A. I don't remember.
Q. And the Court granted the motion, right?
A. I don't -- I can't answer this question.
Q. And you asked Mr. Bogatin to help you with the forensic process, didn't you?
A. I already told you, yes, we're working together is a Jacob and he helps me a lot in the business -- especial (ph.) computer, financial, and marketing.
Q. Okay. Mr. Jung Eun is the property manager for BNG group, right?
A. Yes --

Q. He did not --
A. -- one hundred percent.
Q. -- you did not turn over the cell phone that is used by Mr. Eun to conduct BNG business, did you?
MS. GREENE: Objection. Assumes facts not in evidence. That it is a BNG versus Mr. Eun's personal phone and therefore she had any control over it.
THE COURT: Does the order compelling -- this would be Exhibit 7 -- compel the production of all electronic devices used to conduct business on behalf of BNG. So I sustain the objection for lack of foundation as to whether Mr. Eun's cell phone was a BNG cell phone.
Q. Was it used to conduct BNG business?
A. Answer?
THE COURT: You can answer.
A. Oh. What's your question?
Q. Was Mr. Eun's phone used to conduct BNG business?
A. Conduct BNG -- Mr. Eun, he's manager of BNG company, yes, he is.
Q. Does he use that phone to do his work for BNG?
A. His cell phone?
Q. Yes.
A. Yes, he does.
Q. And does BNG pay for that cell phone?
A. I'm not sure about this details.

Q. I'm not sure about this what?
A. Detail.
Q. Okay. Isn't it true that BNG pays for Mr. Eun's cell phone through Verizon?
MS. GREENE: Asked and answered.
A. I don't know.
THE COURT: Overruled. She can answer.
A. I said, I don't know.
Q. Okay. And you ended up turning over your cell phone, right?
A. I turn over my cell phone, yes. I use my cell phone every single day. It's my cell phone always with me, yes.
Q. Okay. Prior to the cell phone that you turned over, you had a different cell phone during the litigation, didn't you?
A. No, that's not true.
Q. Turn to Exhibit 10, please, in either binder -- whichever's most convenient for you.
A. Exhibit 10, okay. I'm here.
Q. This is an email from your attorney, Mr. McDaniel, to me, dated November 10th, 2022.
A. From Jay -- yes, I see, from his email, yes.
Q. Go to number 6. Ms. Gunkova's cellular device is prior to her recent upgrade. It reads, Ms. Gunkova no longer has any of her previous cell phones. The most recent upgrade, and as I understand it, at least one other upgrade, has happened during

the existence of BNG occurred in the normal course of business by migrating the entire contents -- I assume that's supposed to be to -- the old phone onto the new phone and returning the old device to cellular carrier.

Does this refresh your recollection as to you did in fact have a prior cell phone during litigation?

A. Listen, I'm not sure about this information, but what I want to tell you if you ask me question, I answer you right now. I use my cell phone like fifteen years already. And I have only one cell phone which I use --

Q. But --

A. -- I don't have any other numbers, and I don't have any other cell phones.

Q. Ms. Gunkova, maybe I'm not asking my question clearly. I'm not asking about your number. I'm asking about the device. You have gotten a cell phone upgrade since March 2021, is that --

A. Yeah.

Q. -- right?

A. That's correct, yes --

Q. Okay.

A. -- I did.

Q. And you turned over to a Vestigant your current cell phone, right? At that time?

A. You know reason why I do that?

Q. Well can you just answer my question first so the record is clear?
A. I did upgrade my model --
Q. Um-hum.
A. -- on cell phone, yes.
Q. And you didn't turn over your old cell phone to Vestigant, right?
A. I didn't turn over -- I don't understand.
Q. Well, it says here that you gave it back to the cellular carrier, right?
A. What I understand clearly, if I want to upgrade my telephone and get a new models, all information -- what I have on the previous cell phone, it's transferred to my new cell phone, which I didn't --
Q. Um-hum.
A. -- and I'm not sure what you're asking, ma'am.
Q. So I'm asking you, your old cell phone, you gave that back to the provider, right?
A. Uh-huh. Yes.
Q. Okay --
A. I did.
Q. -- so then you couldn't give it to Vestigant, right? Because you no longer have it.
A. I didn't provide because they request it.
Q. Right. And so you didn't give it to Vestigant, right?

Prior to turning it back over to the provider --
A. Excuse me, I --
THE COURT: Excuse me, it there an objection?
MS. GREENE: Asked and answered.
THE COURT: Overruled.
You can answer.
A. I just want to explain, your -- I did my upgrade cell phone before you request -- get all information from us. I have no idea it's happens. If I knew that, definitely, I would keep my old device for you. But can --
Q. When did you upgrade your cell phone?
A. I don't remember date. I don't remember a year when I did it.
Q. Okay. Did BNG own the building?
A. Yes, BNG owns building.
Q. No. When you did your upgrade, did BNG own the building?
A. Yes, I think so.
Q. Okay. How long had BNG owned the building for when you did your upgrade?
A. Maybe year.
Q. Okay. So that would put us at --
A. Maybe year and --
Q. -- November of --
A. -- a half.
Q. -- 2021 at the latest -- or the earliest?

A. You know if you want exactly correct answer, I can check out when I did upgrade and I can send you it tonight.

THE COURT: You can just I don't remember --

A. I don't --

THE COURT: -- that's fine.

A. -- I don't remember.

Q. Okay. A year after -- the building was purchased in October of 2020, right?

A. Correct.

Q. And so a year after would be October 2021, right?

A. Maybe.

Q. And Mr. Kamin and you were already involved in litigation then, right?

A. Yes, why? What?

Q. You never turned -- Mr. Bogatin also uses his cell phone to conduct BNG business, isn't that right?

A. Yes, of course.

Q. Okay. And Mr. Bogatin -- you turned over Mr. Bogatin's current cell phone, right?

A. I turn over -- so you -- your question is did Jacob upgrade his cell phone as well?

Q. No, I'm talking about -- I'm sorry, let me be more clear. Did Jacob turn over his cell phone to Vestigant, Mr. Racich, as part of the forensic analysis process?

A. I think Jacob, me -- yes, would give it to you -- cell

phones -- and you are receive full information what we keep in our database.
Q. And Jacob, similar to you, had gotten an upgrade during litigation, didn't he?
A. He did upgrade it was your question?
Q. Right --
A. Okay.
Q. -- and so he -- we --
A. Wait --
Q. -- we did upgrade device.
MS. GREENE: Objection. Calls for hearsay. There's no foundation for her basis of knowledge as to when Mr. Bogatin upgraded a phone -- his phone -- if he did.
THE COURT: I'll sustain that objection.
Q. Do you know if Mr. Bogatin upgraded his cell phone at some point?
A. We -- I think, if I remember right, we upgrade both devices --
Q. Did you go in --
A. -- same time because of the mobile company. They have a great deal, and as a businesswoman, I definitely take opportunities, yeah.
Q. Okay. But you and Mr. Bogatin upgraded your phones at the same time -- probably in November 2021, right?
A. Probably, yes.

Q. Do you know if, like your cell phone, Mr. Bogatin gave his old cell phone back to the carrier?
A. He send cell phone to the company. This is request from the IT -- I mean, mobile company.
Q. Okay. Ms. Gunkova, you used the email address vgunkova@gmail.com (ph.) to conduct BNG business, isn't that right?
A. Of course. I used my private email as I feel very comfortable use a Gmail.
Q. You did not turn over your Gmail credentials to Mr. Racich, did you?
A. Who's Mr. Racich? Oh --
Q. Mr. Racich is --
A. -- I always forgot his name. I'm sorry.
Q. That's okay.
A. So what I want to say you guys got all information from us. What your question again? You're asking --
Q. My question --
A. -- me one every time over and over and over again. I already answered you. We give it to you full information and full access to all emails and computers.
Q. You did not turn over your account credentials for vgunkova@gmail.com to Mr. Racich, did you?
MS. GREENE: Asked and answered.
A. I don't understand.

THE COURT: I sustain that objection.
Q. What about Valeria@ariamedispa.com? You used that email address for BNG business, don't you?
A. Valeria -- Valeria@ariamedispa.com. Yes, I use this email for business, yes.
Q. And you did not turn over your credentials for that account to Mr. Racich, did you?
A. I don't understand the question.
Q. You have a username and password to get into your email, is that right?
A. I do have a username and password, yes.
Q. And you did not give Mr. Racich your username and password for Valeria@ariamedispa.com, did you?
A. I don't know.
Q. Valeria@bnggroupllc.com (ph.). That was an email address created for BNG business, right?
A. Valeria BNG?
Q. @bnggroupllc.com?
A. Possible. I did open this email, but I'm not sure I use it.
Q. You did not give your username and password to Mr. Racich for that account, did you?
A. I don't know.
Q. BNGgroup46@gmail.com (ph.) --
A. BNGgroup46 --

Q. Did you give the username and password for that account to Mr. Racich?
A. I don't know. We give it to you all information. I don't know what you asking me. I don't understand.
Q. Username and password. Do you know what those --
A. You have --
Q. -- are to get into your email, right?
A. -- full information, Ms. Benes.
Q. You understand what a username and password are, right?
A. I understand what this mean -- username and password, yes, I do.
Q. Ariaskincare@gmail.com (ph.). You used that to submit a BNG loan application, didn't you?
A. Possible. I'm not doing this job -- Jacob helps me.
Q. And you did not provide the username or password for ariaskincare@gmail.com to Mr. Racich, did you?
A. I don't think -- I don't know -- I think we provide you full information. I think I have nothing to hide.
Q. Okay. Gershj33@gmail.com (ph.), that's Mr. Bogatin's email address, right?
A. Correct.
Q. And he uses that to conduct BNG business, right?
A. Yes, he does.
Q. And you did not turn over the username and password for that account --

A. Um-hum.
Q. -- to Mr. Racich, did you?
A. I don't know. I think he has everything -- your Mr. Razor (sic).
Q. And harry@ariamedispa.com (ph.) was an email address that Mr. Bogatin created, right?
A. Correct.
Q. Okay. And you did not turn over the credentials for that account to Mr. Racich, did you?
MS. GREENE: Objection. Assumes facts not in evidence that she had any control over that account. Ms. Benes just testified that it was an account Mr. Bogatin created.
THE COURT: I overrule the objection.
You can answer the question.
A. So your questions again?
Q. You were the manager of -- sole manager of BNG, right?
A. Absolutely.
Q. Okay. And Mr. Bogatin did things that you directed him to do, right?
A. No. Sometimes he decide what's good for business, and sometimes he does have a business meeting with the, like, elevator companies. He does, and it's all without my help.
Q. You knew Mr. Bogatin had created the email address harry@ariamedispa.com, right?
A. I know he creates some for your client. Yes. Some emails.

I don't sure exactly name, but I know he did. Okay.
Q. And you knew that emails were being sent by Mr. Bogatin and yourself from that account; don't you?
A. I know, excuse me?
Q. You know that harry@ariamedispa.com was used by you and Mr. Bogatin to send emails specifically for the AUB loan to obtain the building in 2020; isn't that right?
A. I didn't use his email.
Q. You never used the harry@ariamedispa.com email address?
A. I personally, no.
Q. Did you authorize Mr. Bogatin to?
A. Yes. Maybe he used, I don't know.
Q. What about the emails that showed your name and the signature block, and that your personal emails were CCed on?
A. I don't understand.
Q. Did you authorize those to be sent?
A. What email are we talking about? I hope -- I -- you know, I'm right now super confused.
Q. Okay. Let me back up. Harry@ariamedispa.com, let's just stick to the facts. You never provided the username and password for that account to Mr. Racich?
A. I already told you, I have no to do with the email, computers, financial stuff. I don't know. Jacob works with my attorney.
Q. Okay. Grishak301@gmail.com (ph.), that was another email

address that Mr. Bogatin created and used to conduct BNG business; isn't that right?

MS. GREENE: Asked and answered.

MS. BENES: Grishak301 has not been covered, Your Honor.

THE COURT: I think this is a different email address. Overruled. You can answer.

A. Maybe he has his email. Yes. It's sounds very familiar for me. Yes, I -- I heard something about this email.

Q. You never turned over the username and password for grishak301@gmail.com to Mr. Racich, did you?

A. I personally, no.

Q. I understand your position is you did not know CCleaner was run on the various devices; is that accurate?

A. Yes. It's not my position. It's 100 percent truth. I don't know.

Q. Okay. Whose position is it?

A. Jacob Bogatin.

Q. You don't contest that CCleaner was run though, right?

A. I don't know what?

Q. You don't disagree that CCleaner was in fact run, right?

A. I have no idea what they did with the computer systems and everything what related to computer. I don't care, other words, I want to tell you.

Q. You don't care?

A. If you don't understand. I don't understand about the computer stuff, I don't know.

Q. You don't care?

A. I don't care because I trust Jacob 100 percent. And I know he does very good job.

Q. And you don't disagree that there are three external hard drives that you never turned over that were identified by Vestigant, right?

A. I explained to you I have nothing to related any computers. I use my computer in my office. That's it. And sometimes computers on the front desk when I work on the front desk and help my girls.

MS. BENES: No further questions, Your Honor.

THE COURT: Okay. Thank you.

Redirect, Ms. Greene?

MS. GREENE: No, Your Honor.

THE COURT: All right. Thank you for your testimony. You can step down. Will you have any further witnesses, Ms. Greene?

MS. GREENE: I do not.

THE COURT: All right. And are you going to have any rebuttal evidence, Ms. Benes?

MS. BENES: Yes, Your Honor. Short, brief.

THE COURT: Well, that's fine. Why don't we take a break now, and we'll resume at 11:00 a.m.

MS. BENES: Thank you.

MS. GREENE: Thank you, Your Honor.

THE COURT OFFICER: All rise. This honorable court is now in recess.

(Recess from 10:44 a.m. until 11:01 a.m.)

THE COURT OFFICER: You may remain seated. This honorable court is back in session.

THE COURT: Ms. Benes, your witness, please?

MS. BENES: Yes. Thank you, Mr. Christopher Racich.

THE COURT: Mr. Racich, would you return to the witness stand? And I'll just remind you that you're still under oath.

DIRECT EXAMINATION

BY MS. BENES:

Q. Good morning, Mr. Racich. I want to address a number of issues that we've heard previously on Tuesday, following your testimony. Was it your understanding that the forensic order required Vestigant to identify the devices?

A. No.

Q. Ms. Gunkova alleges that she was unaware that external hard drives were required to be produced. Did there come a time when you notified Ms. Gunkova or her attorney that you had identified external hard drives responsive to the order?

A. Yes, I believe in early December. December 1st, I think it was. I sent an email to Mr. McDannell identifying the fact

that -- that we -- we had identified during our analysis that external hard drives and thumb drives had been attached to various computers.
Q. I'm going to hand you what has been pre-marked for identification purposes as Exhibit 33.
A. Thank you.
Q. Mr. Racich, do you recognize Exhibit 33?
A. Yes. This is the email that I just referenced.
Q. Can you tell the Court -- I'm looking at the highlighted language here for convenience. It says, we are also doing the forensic investigation of the devices. While this is not complete, one thing that has come up is the fact that there are a number of USB storage devices that have been attached to the computers up until November of this year. I'm attaching lists of make, model, serial number, if available, of different devices that we should get to image. Did you in fact attach identification of those devices that you had revealed?
A. Yes. For each of the item numbers that were computers, there was a certain type of analysis that could be done to identify the instance ID, serial number of USB devices attached to the computer, if available.
Q. Are those attachments included here in Exhibit 33?
A. Yes.
Q. Were any of the devices that you identified on December 1st, 2022, to Mr. McDannell the first hard drive, or the second

hard drive, or the third hard drive?
A. Yes. So the first hard drive was identified. That's the Western Digital, My Passport hard drive. On the second attachment, there's -- after the emails, there's a first page, and then there's a second page, and that's the -- where -- the first line highlighted where it says model My Passport 2626.
Q. Is that the first hard drive?
A. Yes. Yes, that --
Q. Or what we refer to as the first hard drive?
A. That's correct.
Q. Okay. And what about the second -- what we refer to as the second hard drive?
A. So the second hard drive is the item on the third page, the third attachment page, which is the Western Digital Prod My Passport 0740 device.
Q. Okay. In looking at the identification of devices chart we have here, hopefully you still have on the witness stand.
MS. BENES: And hopefully Your Honor still has that?
A. Yes, I have it.
THE COURT: Where are we now?
MS. BENES: The identification of devices sheet.
THE COURT: Oh, I do have that. Yeah.
MS. BENES: My cheat sheet.
THE COURT: Okay.
A. Yes, I have that.

Q. It appears to me that the serial number on the identification of devices chart differs from the serial number on your attachments. Would you agree with that?

A. Yes.

Q. Can you explain to the Court why it appears that way?

A. Yes. So there are two serial numbers that the hard drives had. One is an instance ID, which is a serial number that's on the chip of the hard drive itself. And the other is the volume serial number. The volume serial number is a serial number that is created when you format the hard drive to accept data. And we utilize the serial number for -- the volume serial number, because that was consistent across all the devices that we had. And we were able to identify that with the utilization of the link file analysis and the Vestigant analysis that we had.

Q. Okay.

MS. BENES: Move for the admission of Exhibit 33.

THE COURT: Any objection?

MS. GREENE: No, Your Honor.

THE COURT: It will be admitted.

(Email written by Mr. Racich was hereby received into evidence as Plaintiff's Exhibit 33, as of this date)

MS. BENES: Your Honor, I also believe that the identification of devices chart, I don't believe I had identified it by number. I would, for the record, identify it

as Exhibit 34. And I would move for the admission of identification of devices Exhibit 34

THE COURT: Is there any objection?

MS. GREENE: I've examined him on it. My objections to it are already in the examination, and they're not evidentiary ones that would be sustainable.

THE COURT: All right. It'll be admitted as Plaintiff's 34.

(The identification of devices sheet was hereby marked and received into evidence as Plaintiff's Exhibit 34, as of this date)

MS. BENES: Thank you, Your Honor.

Q. Did Ms. Gunkova turn over any hard drives after December 1st, 2022, when you sent that email?

A. Yes, there was one hard drive that was turned over.

Q. Do you recall when that was?

A. So what Mr. Cantwell (ph.) went on December 14th to --

Q. Let me stop you for a second. Who's Mr. Cantwell?

A. Sorry, sorry. One of my employees, Kevin (ph.) Cantwell, went on site on December 14th to image all the USB devices that had been identified at -- at BNG. And they -- what was provided were thumb drives. At that point, there was -- based upon conversations with Mr. McDannell, there was a hard drive that had been identified that was supposed to be there on the 14th, but that hadn't -- that wasn't available on the 14th.

Q. And were you told where that hard drive was?
A. Yes. I was told that the hard drive was in Philadelphia.
Q. Was that hard drive eventually produced?
A. Yes. Two days later on December 16th, Ms. Gunkova came to Vestigant's office and provided the hard drive to Mr. Cantwell.
Q. Did the hard drive that was produced match any of the three external hard drives that we have been discussing in this hearing? The first hard drive, the second hard drive, or the third hard drive?
A. No, it was not any of those devices.
Q. Do you know whether any of the external hard drives, the first hard drive, second hard drive, or third hard drive, were still used after the forensic order was entered on October 25th, 2022?
A. Yes. At least one of the hard drives had been attached to one of the computers on November 10th.
Q. Do you have your timeline, which was Plaintiff's Exhibit 25?
A. Yes.
Q. Looking at the timeline, can you explain to us where we see the second hard drive being attached to a device after the forensic order was entered on October 25th, 2022?
A. You can see in the bottom righthand corner at the second box over from the left it says 11/10/2022, CCleaner was run on IT001, and the second hard drive was attached to IT003.

Q. Do you remember -- I'm sorry, do you mean the second box from the right?
A. Yes. Sorry. Yes, yes.
Q. Can you remind the Court, what was IT003?
A. IT003, I believe, was Mr. Eun's computer. It was the main BNG computer.
Q. We heard from Mr. McDannell as to various concerns that he had with the turnover process. Do any of Mr. McDannell's concerns, in your opinion, have merit?
A. No.
Q. Can you explain to the Court your opinion?
A. One of the things that Mr. McDannell said was that we hadn't provided the data in a format that was standard e-discovery, and that's -- I said -- I believe I said when I testified before, that's not correct. We provided data in native format, which is standard with regard to e-discovery. It's, in fact, often preferred. It does, if you're going to be putting it into a relativity database, still have to be ingested into relativity. But at the same time, it's -- it's a fairly standard process.
Q. Why is native format preferred in the industry?
A. Oftentimes, because it gives everything when you provide data in tiff (ph.) with text, someone is making a choice as to what data is going to be produced, the body of the documents are going to be produced. But as far as metadata goes, that's

a choice that is made during the processing. So you might have the author field, but you might not have the -- the creator field. You might have the creation date, but you might not have the last print date. It really depends on what the e-discovery vendor extracts from the -- the data itself. When you have the native file, all that's available, and you can pick and choose what you're going to be looking at.

Q. Were the results that were retrieved by Vestigant turned over to both Mr. Kamin and Ms. Gunkova in the same format?

A. Yes. After the privilege review was done, yes.

Q. Could Ms. Gunkova have hired her own e-discovery vendor to process the results as Mr. McDannell preferred?

MS. GREENE: Objection, exceeds the scope of the direct. It's not a rebuttal case.

THE COURT: Well, I'm going to sustain the objection on the grounds of speculation. I sustain that objection.

Q. Mr. McDannell also mentioned that he could see certain documents on the BNG computer, and he contended that they didn't get captured by Vestigant, including communications with accountant Allan Basman.

A. He did say that, yes.

Q. Is his allegation that the communications with Mr. Bassman not captured by Vestigant, a true allegation?

A. No. All the data was captured on the computers, anything that came up with the search terms or -- or were identified

were turned over to Mr. McDannell and his e-discovery vendor, which I believe was KL Discovery (ph.). And they produced back the information that we were allowed to produce to Mr. Kamin, with exceptions for privilege and other identifications. That particular person, there were emails that were communications that were -- were provided to Mr. McDannell, but they were marked as privileged. So we did not produce those to -- to Mr. Kamin.

Q. Who marked them as privileged?

A. It was through the process. I presume Mr. McDannell or someone on his team would have done so.

MS. GREENE: Move to strike. Calls for speculation, the answer.

THE COURT: Overruled. I'll allow the answer to stand.

Q. Did you turn over the privileged materials to me?

A. No.

Q. Okay.

THE COURT: And why again, were you producing materials to Mr. Kamin? I mean, didn't they come from Mr. Kamin in the first place?

THE WITNESS: No. So the -- they came from the BNG's computers, and devices, and cloud systems that we --

THE COURT: Oh. I'm sorry. Okay. I was confused, but that was entirely my fault. All right.

THE WITNESS: Right. These were part of the process to turn over for him to review. So we could then turn over to Ms. Benes.

THE COURT: Right, yes.

Q. Once you completed your imaging and your analysis, you turned over the results first to Mr. McDannell, right?

A. Yes. That was what the order required.

Q. That was so that he could run a privilege analysis, right?

A. That's correct.

Q. So that none of the privileged material was turned over to Mr. Kamin?

A. That's correct.

Q. And then Mr. McDannell marked certain things as privileged and told you, Vestigant, to withhold those from production; is that right?

A. Yes. There was a number of -- of items that were withheld in that process.

Q. And so we had what I referred to as the privileged bucket and the unprivileged bucket, right?

A. That's correct.

Q. And the unprivileged bucket was turned over to Mr. Kamin eventually, right?

A. Yes.

Q. And the privileged was not?

A. Correct.

Q. Do any of the issues or the concerns that were raised by Mr. McDannell impact your finding that CCleaner was run on IT001?
A. No.
Q. Do any of the concerns raised by Mr. McDannell impact your finding that CCleaner was run on IT002?
A. No.
Q. Do any of the concerns alleged by Mr. McDannell impact the finding, your finding, that CCleaner was run on IT003?
A. No.
Q. Do any of the concerns raised by Mr. McDannell impact a finding that CCleaner was run on IT005?
A. No.
Q. Do any of the concerns raised by Mr. McDannell impact the findings of the secure delete feature was used to delete 122,564 files after the forensic order was entered?
A. No.
Q. Do any of Mr. McDannell's concerns impact your finding that CCleaner was run on IT027?
A. No.
Q. In fact, an hour before was turned over to you, right?
A. That's correct.
Q. Do any of the concerns raised by Mr. McDannell impact your finding that a manual feature was used to delete more than seven gigs of data after the forensic order was entered?

A. The -- on IT027, the unallocated space was wiped using the secure feature.
Q. And let me just make sure I have the answers. Does Mr. McDannell's concerns impact your finding that that was in fact done?
A. No.
Q. Do any of the concerns raised by Mr. McDannell impact your finding that an entire user profile and 85,000 artifacts were placed and emptied in the recycle bin after the forensic order was entered?
A. No.
Q. Do any of the concerns raised by Mr. McDannell resolve the fact or impact the fact that the first hard drive has never been turned over to Vestigant?
A. No.
Q. Do any of the concerns raised by Mr. McDannell resolve the fact that the second hard drive has never been turned over pursuant to the order?
A. No.
Q. Do any of the concerns raised by Mr. McDannell resolve the fact that the third hard drive has never been turned over?
A. No.
Q. Do any of the issues raised by Mr. McDannell resolve the fact that the credentials for nine email accounts were never turned over to Vestigant?

A. No.
Q. Do any of the issues alleged by Mr. McDannell impact your finding that a significant amount of data has been destroyed and is unavailable?
A. No.
MS. BENES: Thank you. I have no further questions at this time.
THE COURT: Okay. Thank you.
Cross-examination, Ms. Greene?
MS. GREENE: Real briefly.
CROSS-EXAMINATION
BY MS. GREENE:
Q. I'm going to direct your attention the big book to Exhibit 50 --
THE COURT: Could you come to the podium, please?
MS. GREENE: Sorry. Yes.
Q. You advised on -- you testified that on December 1st, 2022, you advised Mr. McDannell that there were hard drives and USBs that had been attached to the computers you were imaging, correct?
A. Yes.
Q. Okay. And Mr. McDannell, on December 2nd, the next day, identified eighteen USB drives and one external hard drive, correct?
A. I -- the number for eighteen, I believe that's correct.

Yes.
Q. Can we direct your attention to Exhibit 15 in the defendant's book?
A. Yes, I'm here.
Q. Okay. Can you confirm that it was eighteen sticks and one external hard drive identified the very next day from looking at Defendant's 15?
A. Yes. Mr. McDannell did send that email. Yes.
Q. Okay. And in fact, you testified that when you went to -- your company went to image the additional identified devices, they, in fact, produced a hard drive that you hadn't even identified for them, correct?
A. No, not at that time. No.
Q. On December 14th, they turned over one hard drive that you hadn't listed?
A. No, that's not correct.
Q. And they produced -- went to Philadelphia to provide another hard drive that you were then able to image on December 16th, 2022?
A. Yes. That was the only hard drive that was produced, was the one that was in Philadelphia.
Q. You testified that on December 14th, in addition to the USB drives, they turned over one hard drive?
A. No.
Q. Directing your attention to what is now Exhibit 34. It's

the identification of devices.
A. Plaintiff's 34?
Q. Yes, Plaintiff's 34. Sorry.
A. Yes. Thank you. Yes.
Q. Your identification of devices lists IT027 as Mr. Bogatin's thumb drive?
A. Yes.
Q. Do you have any reason to believe it wasn't Mr. Bogatin's personal thumb drive?
A. I -- that was just what was identified by Mr. McDannell. I don't know one way or the other.
Q. Okay. And turning your direction to IT0003 Mr. Jung Eun's computer?
A. Yes.
Q. Okay. Again we're discuss a little bit before with relation to the hard drive that was attached to IT003 that you also referenced as being attached in a Plaintiff's Exhibit 25 on November 10th, 2022. You don't know the fact that was Mr. Eun's personal hard drive; do you?
A. I don't, I've never been given access to the hard drive, so I can't say with any degree of certainty as to exactly what's on it.
Q. You testified last week that you were assisting Ms. Benes in crafting the list of documents -- I'm sorry, the list of devices in her response to Mr. McDannell's designation of

devices to be produced pursuant to the order, correct?
A. Can you rephrase -- I'm -- yeah.
Q. I acknowledge that was not the best wording. In response, let me direct your attention to in the defendant's book, Defendant's Exhibit 9.
A. Defendant's 9. Yes.
Q. Okay. You testified last week that you had assisted Ms. Benes in responding to Mr. McDannell's designation of devices, correct?
A. I do recognize the letter here. Yes.
Q. Okay. And in nowhere in Exhibit 9 did you list that there had been a failure to designate, or Ms. Benes, email accounts, correct?
A. Not -- I don't have -- cloud based storage would -- would include that, but I don't know specifically.
Q. Going back to your communications, specifically Defendant's Exhibit 15.
A. Yes.
Q. The bottom of it, which is also now Plaintiff's Exhibit 33, in saying that you identified the USB storage devices attached to the computer, nowhere in that email of yours dated December 1st, 2022, did you mention you were missing login information for email accounts; did you?
A. I don't think I had anything in that paragraph that you're referring to about specifically about email data.

Q. Even though if you turn to the second page of Defendant's Exhibit 15, the email dated November 23rd, 2022, from Mr. McDannell, that first bullet point, he's specifically referring to the grishakk301@gmail.com email, correct?
A. As a -- as a search term.
Q. Right. But you didn't say, hey, I need the email -- the access for that account either; did you?
A. Not specifically, no. But under the order it should have been produced.
Q. But you didn't ask for access to the account as part of your December 1st email to Mr. McDannell saying I need access to this information under the order, did you?
A. No, I did not say that.

MS. GREENE: I have no further questions.

THE COURT: Okay. Thank you. Any redirect?

REDIRECT EXAMINATION

BY MS. BENES:

Q. Mr. Racich, the eighteen sticks and one hard drive that was referred to in Mr. McDannell's email, did the hard drive match the first hard drive, second hard drive, or third hard drive?
A. When we got it on the 16th, no, it did not.
Q. We've never had the first hard drive, second hard drive, or third hard drive produced, right?
A. That's correct.
Q. Mr. Bogatin's -- thumb drive IT027, that you had referred

to Mr. McDannell referring to it as Mr. Bogatin's thumb drive, were the search terms run on that device?

A. Yes.

Q. Were there results?

A. Whatever results would have been available, but I don't recall off the top of my head what they were.

MS. BENES: No further questions.

THE COURT: Okay. Thank you for your testimony. And I think you're free to leave now. Any objection to that?

MS. BENES: I don't know. Ms. Ohm already left me. Yes.

THE COURT: All right. Thank you again for your testimony. Any further rebuttal, Ms. Benes?

MS. BENES: No, Your Honor. We are prepared for closing.

THE COURT: All right. Thank you. Why don't we take ten minutes so you can sort of organize your thoughts. We'll come back at 11:40 a.m. for closings. Okay.

MS. BENES: Thank you, Your Honor.

MS. GREENE: Thank you, Your Honor.

THE COURT OFFICER: All rise. This honorable court is now in recess.

(Recess from 11:25 a.m. until 11:41 a.m.)

THE COURT OFFICER: You may remain seated. This honorable court is back in session.

THE COURT: All right, Ms. Benes. I'll hear from you, please.

MS. BENES: Your Honor, we're here on a motion for sanctions due to Ms. Gunkova's spoliation. The standard is four-prong: a duty to preserve; that there was data that was destroyed; that if the destruction was merely the result of negligence, that the data that was destroyed had relevance to the case. If the data that was destroyed was a willful destruction, then relevance can be presumed. And finally, prejudice to the party that sought the information, which was here, Mr. Kamin and BNG.

We are seeking default judgment here because we feel it is more than appropriate. Default judgment is appropriate if either conduct is so egregious, such as intentional conduct, or the prejudice is so high. That's in the situation of negligence. Ms. Gunkova has not contested that she was under a duty to preserve as early as February of 2021.

The timing and volume of the data that was destroyed here are key, and one should remember the timing and volume. It shows that Ms. Gunkova failed to preserve evidence for years. It also shows that evidence was intentionally destroyed to ensure it would be unavailable. The timeline that was admitted into evidence as Plaintiff's 2025 lays it out all very clearly.

Here, Ms. Gunkova's conduct was both so egregious

because it was intentional, and it was also so prejudicial to Mr. Kamin. I'd like to walk the Court through this timeline. February 10th, 2021, Mr. Kamin sent his derivative demand letter to Ms. Gunkova. That demand letter warned of litigation. Ms. Gunkova admits that that put her on notice and under a duty to preserve evidence.

On March 8th, 2021, Mr. Kamin filed his suit against Ms. Gunkova in the Loudoun County Court. On April 10th, 2021, about a month later, the first hard drive was attached to IT002. This is Ms. Gunkova's computer, clearly a device under the order. That hard drive contained a folder named BNG. We heard that testimony from Mr. Racich.

On April 27th, 2021, that same hard drive was again attached to Ms. Gunkova's computer and again attached to Ms. Gunkova's computer on May 1st, 2021, May 2nd, 2021.

On May 31st, 2021, a second hard drive was attached to IT003, which has been referred to as Mr. Eun's computer in the BNG business office, clearly a device under the order.

On June 2nd, Mr. Kamin filed his -- Mr. Kamin had previously filed his motion to compel, and the Loudon Court entered the first compel order. After that compel order was entered -- and Your Honor, that is Plaintiff's Exhibit 3 -- the Court ordered Ms. Gunkova to provide full and complete responses and also reserved plaintiff's request for attorney's fees related to the matter for a later date.

Ms. Gunkova, after that compel order was entered, continued to attach devices to her computer. On June 14th, 2021, she again attached the first hard drive to her computer. On August 2nd, while another motion to compel was pending, the first hard drive was attached to Ms. Gunkova's computer again. Remember, this is the hard drive that has the folder called BNG on it.

On August 4th, 2021, the Loudon Court entered the second compel order. That compel order again found that Ms. Gunkova had failed to comply with her obligations and discovery and compelled her to turn over more documents.

On August 11th, 2021, Ms. Gunkova, after that second compel order had been entered, again attached the first hard drive to her computer.

On September 5th, 2021, she attached the first hard drive again to her computer and again on September 22nd, 2021, and October 10th, 2021. Clearly, this hard drive being attached to Ms. Gunkova's computer so many times was an important one. She continuously attached the first hard drive to her computer throughout the pendency of the Loudoun County litigation and while under numerous compel orders.

On December 1st -- we're at the black box at the top now -- Mr. Kamin appeared at the members meeting and made a request for a forensic analysis of all BNG's devices. He brought with him Mr. Racich in order to complete that analysis.

You heard from Ms. Gunkova today that she had called that meeting, that she was at that meeting, and that she rejected Mr. Kamin's request to have those devices analyzed. At the very least, we know, though, that she was on notice as late as December 1st, 2021, of Mr. Kamin's request for a forensic analysis of all BNG devices.

She was put on notice that in addition to her hard copy files, her devices and BNG's devices were at issue. For months, counsel went back and forth trying to get a forensic analysis agreed to, and Ms. Gunkova refused.

On March 18th, 2022, a third compel order was entered by the Loudoun County Court. Following that third compel order on June 16th, 2022 -- and the timing of this is important, Your Honor, because we heard today and we saw today that by June 16th, 2022, I had sent a draft motion to compel the forensic inspection of the computers to Ms. Gunkova's counsel in May of 2022. So she knew it was coming. And on June 16th, 2022, CCleaner was downloaded and run on Ms. Gunkova's computer. On July 3rd, 2022 --

THE COURT: Is that the first evidence of CCleaner being used in -- on June 16th, to your knowledge?

MS. BENES: I'm not certain as to this specific device. I could look at Mr. Racich's. I believe it was Mr. Bogatin's computer that previously had it installed in 2019, and then he subsequently used that computer for video

surveillance.

THE COURT: Well, it's okay.

MS. BENES: I'm getting a head nod.

THE COURT: All right.

MS. BENES: But yes, that is the first evidence we see of it being run -- installed and run on Ms. Gunkova's computer. On July 3rd -- July 3rd, 2022, CCleaner then was downloaded and run on Mr. Bogatin's computer. And we heard today, as well as the admissions of Mr. McDannell through his various letters that are in evidence before Your Honor, that Mr. Bogatin's computer is BNG's day-to-day operations computer.

Ms. Gunkova testified that's where the financials are kept. That's where the QuickBooks records are kept. That's where his emails are that he utilized to conduct BNG business. She deferred everything to Mr. Bogatin because you heard her testify. She trusts him one hundred percent. She turned it all over to him.

On August 9th, 2022, CCleaner was run again on the BNG Bogatin computer. On September 4th, 2022, CCleaner was run again on Ms. Gunkova's computer. On September 9th, 2022, Mr. Kamin filed his forensic motion seeking to compel an analysis and imaging of the devices.

Knowing that motion was pending, and while drafting and filing an opposition to that very motion, and engaging in quite a heated hearing, Ms. Gunkova on October 1st, 2022, had

CCleaner run on IT001. And we heard from Mr. Racich and in the exhibits that the data shows what the data shows. It was run three times. And we heard Mr. Racich testified that the running of it three times roughly at the same time shows that that was a constant click. That wasn't something that was run on a schedule.

THE COURT: Where are you now? On October --

MS. BENES: 1st, 2022.

THE COURT: Okay.

MS. BENES: So the forensic motion was filed on September 9th.

THE COURT: Right.

MS. BENES: The motion was pending. It was set for hearing on October 25th. Again, while the forensic motion was pending and while she was opposing that motion, CCleaner was run again on Ms. Gunkova's computer on October 11th, 2022. It was run again on Ms. Gunkova's Computer on October 14th, 2022. It was run again on Ms. Gunkova's Computer on 10/15 2022. It was run again on Ms. Gunkova's Computer on 10/19/2022 and again on Ms. Gunkova's Computer on 10/20, 10/21, 10/23, and 10/24 of 2022.

Knowing that motion was about to be ruled upon, we see this uptick, a large uptick in CCleaner being installed and run on devices.

THE COURT: What was the date of the hearing in the

Loudoun County Circuit Court?

MS. BENES: October 25th, 2022, which was --

THE COURT: So the order was entered the same day as the hearing?

MS. BENES: Yes.

THE COURT: Oh.

MS. BENES: And you heard from Mr. McDannell as well as Mr. Racich that at that hearing when the court entered -- when the court granted the forensic motion, myself, Mr. Racich, and Mr. McDannell stayed in the courtroom that day to draft and prepare that order and the process for that order together. The order was entered by the court on that day.

What happens that date later on that day? Look at the times, and you'll see the times and those -- how those become relevant too as far as the contention that this was simply inadvertent. CCleaner was run after the forensic order was entered on October 25th, 2022 -- same day on Ms. Gunkova's computer and on Mr. Bogatin's BNG day-to-day operations main computer.

The very next day -- clearly trying to ensure that everything is gone and that nothing can be captured -- CCleaner was run again on Ms. Gunkova's computer. And that same day -- and we heard from Mr. Racich that this is a -- must have been manually done. An entire user profile in the -- and 85,000 artifacts were placed in the recycle bin and emptied on Ms.

Gunkova's computer.

Now, thankfully, Mr. Racich was able to get those artifacts back. But we heard from Mr. Racich how those artifacts showed that was placed in the recycle bin were subject to the search terms, things like BNG, Harry D. Kamin, Harry's license, the front and back of his license, his passport. That's all in evidence, Your Honor, that you can see what was placed in the recycle bin. Everything that was subject to the forensic order.

On November 1st, the search terms were identified by Mr. Kamin, and that letter was sent to counsel from Ms. Gunkova. On November 8th, after the search terms were identified, in a further step to ensure that CCleaner was wiping everything, we heard that CCleaner was Googled on IT005, BNG's day-to-day operations computers, Mr. Bogatin's computer. Was Googled for CCleaner, it was redownloaded, and not only was it run; it was run using the secure delete function that changed everything to all those funny Zs that we saw, and 122,564 files were intentionally deleted.

The secure delete function is not one that comes as a standard default function in CCleaner. That had to have been chosen by the user. The forensic order had been entered, search terms had been identified, and 122,564 files, at least, were intentionally deleted.

On November 10th, 2022, the second hard drive was then

reattached to IT003 seven times, and that same day CCleaner was then run again on IT001.

On November 16th, the turnover was scheduled for November 22nd, 2022. This is important because the order required Ms. Gunkova to identify all devices and turn them over within a certain time period. We heard from Mr. Racich and the exhibits that on November 1st, when Ms. Gunkova was required to identify all devices used to conduct BNG business, and storage, and iCloud or -- and cloud devices, the wording of that order is very important.

It is all inclusive, and it does not limit it to devices that Ms. Gunkova personally owned. The Loudon Court was certain and made certain that that language was broad because of the years of discovery violations we had had. They wanted to be sure that everything was captured and that she couldn't point the finger at Mr. Bogatin and feign ignorance.

The court entered that order to capture all data on any device used to conduct BNG business. And Ms. Gunkova as the sole manager -- or she contended at that time to be the sole manager of BNG. All of those devices that would be used to conduct BNG business would be in her possession, custody, and control as the manager of BNG.

Ms. Gunkova did not identify all devices used to conduct business at BNG by November 1st pursuant to the Loudon order. In fact, she only identified five. And while there's

been a lot of attempts to place blame on Vestigant of not notifying Ms. Gunkova when subsequent devices were revealed by Vestigant's findings and analysis, it was not Vestigant's responsibility to identify the devices. That responsibility was of Ms. Gunkova. She was under court order to identify and produce those devices.

On November 22nd, she turned over five devices, notwithstanding that her counsel had already identified that there was a Dropbox account that was used to conduct BNG business. The first turnover no Dropbox credentials were turned over. No email credentials were turned over. Vestigant ran the imaging of the devices and identified more devices, although not its responsibility. Identified more devices that had not been turned over that were clearly applicable pursuant to the order.

And so a second turnover was scheduled on December 8th. It was scheduled for December 14th, 2022. Was scheduled for 10 a.m. on December 14th, 2022. And what we see from the evidence in this case is that on December 14th, 2022, beginning about 8:52 a.m., about an hour before this device was supposed to be turned over, CCleaner was run on IT027. It was about to be turned over. And not only was it run, but it was run using another manual feature to make sure that more than seven gigabytes of data were destroyed. Seven gigabytes of data, including unallocated space. So you can't see the file names.

You can't see the volume. You have no idea what is missing.

As if running CCleaner through the default standards wasn't bad enough, manual features were on numerous occasions selected to ensure that data destruction was complete, was successful, and there was no going back. The turnover was completed with the last device, and three devices, nine email addresses and other accounts -- who knows how many -- were not identified and produced by Ms. Gunkova.

On May 4th, the Loudon Court entered a fourth compel order, and that compel order, which was Exhibit 26, specifically found that Ms. Gunkova had failed to comply with the court's January 2nd, 2021, order, August 4th, 2021, order -- I'm sorry, that should be June 2021 order. August 4th, 2021, order, March 18th, 2022, orders.

Further appearing that she had failed to produce and identify all documents to Mr. Kamin's fifth and sixth requests. Found that she had failed to provide -- produce a privilege log and unprivileged documents pursuant to the October 25th forensic order, and compelled her that she had to do so by May 15th.

We see in her May 15th responses that were submitted into evidence today that throughout her responses Ms. Gunkova admits spoliation. She admits she doesn't have Dropbox links files. She can't tell you what was in the Dropbox link files. The accountant import file, couldn't tell you. Doesn't have

those anymore. Yet all of those documents are relevant to the claims here that there's forgery, that there's mismanagement, that there's self-dealing.

Ms. Gunkova had a duty to preserve, and she did nothing. You heard her today. She didn't tell anybody to preserve documents. She completely feigns ignorance. That is not a defense. Not a defense when you allow your right-hand man to manage all of the computer systems, all of the financials, select your attorneys for you, be in communications with your attorneys with you, help you compile documents for discovery, when you let that person take over your documents and your files that you're supposed to preserve.

Whoever clicked the button, whether it be Mr. Bogatin, or whether it be Ms. Gunkova, or whether they did it together -- you heard her testify we do everything together -- is irrelevant. She was under a duty to preserve. She was under numerous court orders, including a compel order regarding forensic devices, and she failed to comply.

Your Honor, it's within your discretion, of course, to determine the credibility of the witnesses as well as to the sanction that is to be imposed. Mr. Racich, I would submit to Your Honor, is highly credible. He's been qualified over fifty times. Those don't even count the times that he didn't testify in court and qualify, but was retained and provided deposition testimony. He has been qualified as an expert in the Eastern

District of Virginia. He's been qualified as an expert in this field in the bankruptcy court. There's a very famous case, the Taylor v. Mitre case. Mr. Racich was the expert in that case.

Mr. Racich doesn't have to lie because the data doesn't lie. That's the wonderful thing about forensics is data doesn't lie. The data is what the data is. On the other hand, we heard from Ms. Gunkova, who attempts to shift the blame to Vestigant for not identifying devices that she was ordered to identify, or not collect devices that she was ordered to identify to produce, or shift the blame to Mr. Kamin. Well, you didn't identify email addresses in your November 9th letter. There's no accountability. Instead, it's shifting the blame to everybody else, ignoring her duty as a defendant in that case and in this to preserve data.

I would similarly submit that Mr. Bolton's credibility is lacking. I'm aware of an order that was entered in this court finding that he had engaged in bankruptcy fraud. Mr. McDannell got up and testified about his opinions. But Mr. McDannell is not an expert. In fact, he's a disqualified lawyer that continued to represent Ms. Gunkova in complete disregard for an order finding that he was not allowed to do so after June 2nd, 2023.

THE COURT: Well, don't you think that -- I mean, this is a small point in the scheme of things, but when an attorney is disqualified in litigation, I think the attorney has a duty,

a professional, ethical duty to cooperate in the transition of the files, et cetera, to the new attorney?

MS. BENES: Absolutely. The invoice --

THE COURT: Right. It wasn't like he was appearing in court and arguing the matter post--

MS. BENES: He --

THE COURT: -- disqualification, am I right?

MS. BENES: So actually, she had actually retained an attorney by June 16. And not only did her new attorney appear at that hearing, Mr. McDannell appeared at that hearing.

THE COURT: Oh, okay. Well, so I was thinking the spoliation motions that the difficult burden for the movant is demonstrating prejudice because inevitably the movant will say but we don't -- we have no idea what was lost, right?

MS. BENES: Um-hum.

THE COURT: We'll never find what was lost. So do I understand correctly that then you would rely on Rule 37(e)(2), that they're -- a finding of intent to deprive the opposing party, as opposed to the prejudice prong? Or perhaps, you could address that for me.

MS. BENES: I think both, Your Honor. She was clearly under a duty to preserve, so the rule does apply. But the various cases that we have cited in our memorandum and support, specifically the Taylor case, as well as the Schlossberg (ph.) case, are very applicable to the action here.

With regards to the prejudice -- and I'm happy to address specific counts and what we don't have as a result of Ms. Gunkova's spoliation. For example, Count I alleges -- Mr. Kamin alleges fraud. He alleges fraudulent inducement. Specifically, the document at issue there is a signed operating agreement, paragraph 98. That document has never been produced by Ms. Gunkova. I would submit to Your Honor it hasn't been produced because CCleaner was run so many times to ensure that that document can't be produced.

There's a difference between pleading a cause of action and proving a cause of action. Thankfully, we were able to find out about all of these various forgeries through subpoenas issued, through FOIA requests to the SBA because that information was not being forthcoming from Ms. Gunkova. But we have the paper copies. What we don't have because of Ms. Gunkova's spoliation and data destruction is the metadata attached to those native files.

Who created those? On what device? What date were they modified? How were they modified? For example, you have an operating agreement. Was that modified during litigation? We saw the chart, Your Honor, that Mr. Racich had testified about, Plaintiff's Exhibit 24, about how all of those relevant documents had been modified during litigation. And those were the only ones that that we have something for.

We have, I believe, the last time, if I'm correct -- I

think it's fifty-nine alleged forgeries. We do not have those native files. We don't have those native files because they were destroyed by Ms. Gunkova and her righthand man, Mr. Bogatin, to ensure that we cannot receive that information because that information would prove when they were created, I submit to you, not when Ms. Gunkova contends they were -- that they were created during litigation to fit a litigation position that they were forged, that signatures were digitally applied, that they lifted Mr. Kamin's signature from one document and using electronic software was able to then put it on others and submit them to banks.

So the fraud alone is easy to establish, that we don't have any of those native documents. The false loan applications were submitted by email. We have nine email accounts that were used to conduct BNG business, including the transmittal of applications and supporting documentation. We don't have those email addresses and the credentials for those to be able to determine the false loan applications. Who submitted the documentation? Because the emails appear to be sent by vgunkova@gmail.com, but Ms. Gunkova's litigation position is she didn't send it.

Or an email appears to be sent from harry@ariamedispa.com. But we know that Mr. Bogatin, through his own admission, created that email address. And then we have an email -- we have an email from that address with a

signature block of Ms. Gunkova.

She contends today that she's never sent an email using that address. Well, the metadata would show us that. Metadata would show us where, when, who, why. Was it changed? That is all very important.

It is extremely prejudicial for Mr. Kamin to not have all of this data that she held. She is the sole manager of BNG maintained, whether it be her or somebody she delegated it to, Mr. Bogatin. And she intentionally deleted that under numerous compel orders, and most egregiously, that compel -- the forensic compel order. She did it because she knew that data was about to be turned over. That data would have proved Mr. Kamin's case, and she could not afford for him to have that.

With regards to BNG, BNG alleges conversion. BNG alleges that Ms. Gunkova converted BNG money to her own personal use, as well as her related entities, Aria, BNG, BNJ (ph.), Sterling, and her boyfriend Mr. Bogatin, yet we don't have BNG -- we don't have full, and complete, and accurate BNG books, and records, and QuickBooks files because those have been destroyed.

Now, one can say, oh well, we sent you QuickBooks records at various times. That doesn't resolve the issue. Not having the full QuickBooks account doesn't allow an audit to be done. An audit would tell you when certain entries were made.

THE COURT: Were you going to object?

MS. GREENE: Yes, Your Honor. Ms. Benes is testifying about a whole lot of evidence that she didn't put on about QuickBooks files that don't exist, about all -- there was none of this testimony presented.

THE COURT: I'll overrule the objection. I'll hear it.

MS. BENES: So a QuickBooks account, when you have access to that, you have the ability to audit it to see when certain entries were made, the user that made them, when they were modified. There was a journal entry, memos. There's an invoice that's attached to it.

THE COURT: Is it possible to serve a third-party subpoena to QuickBooks? I mean, I assume that you looked into that.

MS. BENES: I did, and I was told that -- from QuickBooks that it's not possible to get that data because they had it not on an online account. They had it on their computer. It was a desktop version of QuickBooks.

THE COURT: Okay.

MS. BENES: Right. So we don't have the financials. Mr. Kamin is completely handcuffed from -- and BNG from pursuing their claims. BNG also alleges that there are improper tax records. Communications with the CPA, Mr. Basman, as well as a different accountant that was hired. There was an accounting import file. The accounting import file in Ms.

Gunkova's --

THE COURT: Do we need to make that kind of noise over there, Ms. Greene?

MS. GREENE: Sorry, came down harder than I expected them to.

THE COURT: Okay. Thank you.

MS. BENES: The accountant important file Ms. Gunkova admits in her May 15th, 2023, supplemental responses she doesn't know it was an -- she didn't preserve it. They're gone. So how do we know what the CPA was given? And the CPA didn't preserve his files because he wasn't in litigation.

There's also an allegation of self-dealing. Specifically, Ms. Gunkova after litigation was filed and as her litigation position to try to justify the large amounts of money that were flowing from BNG to Aria, her spa that she owns one hundred percent of. Mr. Kamin is not a member of.

She produced these alleged agreements between BNG and Aria, yet those native files -- where are they? How are we supposed to be able to prove that she made those as a litigation position after she was sued to try to justify her large amounts of money being transferred to Aria if we can't analyze the metadata? Look at the 85,000 files that were placed in the recycle bin on -- was it November 10th? I'm sorry, October 26th, the day after the forensic order was entered. You can see that the search terms are relevant to the

files there.

So to say that there's no prejudice to Mr. Kamin, I can't even imagine where that could stand because we've seen so many times it was run. We have seen that it wasn't done pursuant to a schedule where it was running the first of every month at 5 a.m.

It's not just the timing here as far as when it was run pursuant to the orders or after the orders, but the timing of when it was really run, and therefore, it being manual, it being intentional, it being, oh my gosh, we are under this order and we are about to be outed. We have got to get rid of this.

And it would be an injustice, Your Honor, to allow a defendant to engage in such egregious spoliation of evidence and then look to the plaintiff and say, now, prove your case. I mean, that is a slippery slope. Could you imagine what would come of that? In Taylor v. Mitre, the plaintiff did not admit he ran CCleaner nefariously. He claimed his computer died. What defendant admits that they intentionally ran CCleaner to get rid of evidence?

He then, after he thought that his computer had died, hit the computer with a hammer or a sledge hammer. There's a disagreement there. It doesn't matter. It doesn't matter if you're clicking a button on software that you downloaded, knowing that the data destruction software tool, or it's a

hammer. It does the same thing, has the same effect. It takes away evidence from the plaintiff for their claims.

The party there alleged that negligence -- that he was just simply negligent, yet he had failed to comply with discovery orders. A forensic order was entered. He researched evidence eliminator. He ran CCleaner. He destroyed 16,000 files. And the Eastern District of Virginia found that 16,000 files in the timing, and the fact that he failed to disable CCleaner during litigation was egregious enough to enter default judgment.

The Eastern District of Virginia said this Court cannot and will not tolerate the use of such a program in litigation in the middle of discovery, who had knowledge that his computer was about to be searched pursuant to a court order.

So what we have here, we have Ms. Gunkova, who had failed to comply with discovery, was under numerous compel orders, under a forensic order, and knew in the middle of discovery with knowledge that her computer was about to be searched pursuant to the court order, ran CCleaner on all the various devices. Not only ran it, ran it time, and time, and time, and time again using the manual functions that she selected. Whether it was her or the person that she authorized to do it, it doesn't matter. It was her duty to preserve that evidence.

The Schlossberg case I find very fitting for this case. There it was a husband and wife who had engaged in a business scheme. There were numerous lawsuits, including one from the D.C. Superior Court. The Bankruptcy Court looked at the pre-bankruptcy conduct and found that it was -- the adversary case was a continuation of the State court litigation, similar to what we have here, Your Honor.

In that case, the party failed to comply with discovery. Forensic image was ordered, and a forensic analysis revealed that CCleaner had been run. There, Schlossberg, the husband, blamed it on his wife, said, well, she organized the computer and document filing systems. I didn't do it. She maintained the computers for the business. I didn't do it.

The wife admitted to running CCleaner. Can't really be denied. Like I said, the data is what the data is. She used the white free space and the secure delete function, which are the same two functions here, the unallocated space and the secure delete function. And the Court there found a party to a lawsuit and its agents have an affirmative responsibility to preserve relevant data. A party is not relieved of this responsibility merely because the party did not itself act in bad faith and a third-party to whom the party entrusted the evidence as the one who discarded or lost it. The Court entered default judgment.

That is what we have here. Ms. Gunkova points the

finger at Mr. Bogatin saying, I didn't do it. I have no knowledge of computers. But she failed to comply with discovery. She failed to comply with numerous orders. The court orders say it all. She failed to comply. She sits up here and tries to paint a rosy picture that I've given you everything. Well, clearly the Loudon Court felt differently. It didn't feel differently once. It didn't feel differently twice. They felt differently five times for five different orders, finding that she had not complied.

After the forensic motion was filed, she ran CCleaner on five different devices used to conduct BNG business, not on a schedule, using manual options. Her excuses do not resolve that an enormously large volume of data is gone. We know at least three hard drives, three external hard drives.

You heard Mr. Racich testify about the large volume of data that an external hard drive could hold. Not like a thumb drive. Can hold a lot of data. Three of those nowhere to be found. We know that because in Exhibit 17, which was Ms. Gunkova's discovery responses in this case, she says she doesn't have them anymore. She doesn't know where they are. Doesn't include the email accounts that were never produced. God only knows how many emails and relevant data are there.

And while the recycle bin files were recovered, the Court has been clear that changes to file metadata call the authenticity of files and their content into question and make

them impossible to rely upon. We know 122,564 files were intentionally deleted. We know that key files were deleted through the recycle bin. We know that key files were altered, therefore making any metadata that we do have unreliable. We know that this took place after a duty to preserve. We know that there was an increase in destruction after the forensic motion was filed.

We know that there was further destruction after the forensic order was entered, including up to an hour before the last turnover on December 14th. We know that an enormous amount of data is still missing. Lesser sanctions will not remedy the destruction that Ms. Gunkova allowed. Monetary sanctions are futile. She's in bankruptcy. It would simply place Mr. Kamin and BNG as another one of her creditors in a case where she doesn't have assets to cover her debts anyway.

Any adverse inference or striking of defenses would merely result in further expense to Mr. Kamin to try a case handcuffed and handcuffed because she deleted the evidence that would help him prove his case. Anything less than default judgment does not remedy the spoliation that she engaged in.

Ms. Gunkova should not be allowed to benefit from her intentional destruction over the course of years numerous times. The conduct was both egregious and so prejudicial that default judgment is warranted. Your Honor, I'm happy to answer any questions that you might have of me.

THE COURT: Okay, no. Thank you for your argument.

Ms. Greene?

MS. GREENE: Yes, Your Honor. Litigation or threat thereof does not preclude parties from disposing of every document that comes across their desk or email. This is particularly true in this case, where computers are used to run not only one business, and a second business, and personal effects. Does not impose upon them -- it does impose upon them a duty to take reasonable steps to protect potentially relevant data.

Even then, spoliation does not result merely from negligent loss or destruction of evidence. It's Voldisek (ph.) 71 F.3d at 156. Rather, the alleged destroyer must have known the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence loss or destruction. Beyond the basics, the duty to preserve evidence shall not be analyzed in absolute terms. Requires nuance because the discovery cannot be defined with precision.

Victor Stanley v. Creative Pipe 69 FDR 497, Maryland 210. The duty is not absolute, nor is it intended to cripple organizations. It is a duty based on reasonableness and is owned to the court. The proper application of the distinction informs the court's decision regarding to the appropriate spoliation sanctions where intentionally egregious conduct

leads to spoliation of evidence, but causes no prejudice because the destroyed evidence was not relevant or was merely cumulative to readily available evidence because the same evidence could be obtained from other sources. Then the integrity of the judicial system has been injured far less than a simple negligence results in the total loss of evidence essential for the adversary to prosecute or defend against a claim.

Former instance, the appropriateness of case dispositive sanction is questionable despite the magnitude of culpability, because the harm to the truth finding process is slight and lesser sanctions such as monetary ones will suffice. Again, as Victor -- formulating a proper sanction, Victor Stanley gives the example that a spoliation structure makes little sense when the information loss also could have been beneficial to the destroying party.

The destruction was of ESI and was caused by the automatic deletion function of a program that the party negligently failed to disable once the duty to preserve was triggered. The more logical inference is the party was disorganized, distracted, or technically challenged, or overextended. In short, matching the appropriate sanction to the spoliation conduct is aided by remembering to whom the duty is owed.

Moreover, although Silvestri points to an either/or

test indicating two means to justify the most severe sanctions, the Fourth Circuit has not terminated a case where the spoliator has acted in bad faith absent a showing of substantial prejudice.

Further dismissal should be avoided if lesser sanctions will perform the necessary function. In the instant case, the evidence shows Aria suffered a virus on its server in 2019, and as a result, it installed various anti-malware software, including CCleaner. Was installed by its IT employer, Igor and Ostefrey (ph.).

The settings were not selected by Gunkova. She did not participate in IT operations. Mr. Bogatin's computer then suffered a ransomware attack in 2020. That computer then became Aria's Security server for its videos. Those are Defense Exhibits 4 through 5. The computer BMG and Aria's work was performed on at the time in 2020 was reformatted and put into work.

In this Plaintiff's 34, Mr. Racich refers to devices 3 and 6 as Ms. Gunkova's computer. He says he does have based on Mr. McDannell's designation of those computers that way. However, when you look at Mr. McDannell's designation of the computers, in fact, those are two different computers in his designation. Mr. Racich's -- those are Defendant's Exhibits 8 and 10. Mr. McDannell says the computer 3 was repurposed to video surveillance in 2020. That is the one that suffered the

ransomware attack.

Device 3, Exhibit A. Formerly, BNG/Aria main business computer through late 2020 repurposed as video surveillance. So very shortly thereafter was not identified as Ms. Gunkova's computer.

If you look at Defendant's Exhibit 10, when he talked about under the heading Ms. Gunkova's computers says two computers in Aria's business office. One is device 1, which is the -- then going further down, I have confirmed, however, that Ms. Gunkova does use this, a second computer, to access her BNG email. I identified this as device 6.

Mr. Racich testified -- Mr. Racich testified that none of Vestigant's source of work was to determine who had access to these computers. There's no testimony, and there could be none because it was never part of Vestigant's scope of work as to who had access to these computers and who, in fact, could have run the CCleaner.

Mr. Bogatin and Ms. Gunkova both testified they didn't. So they're asking you to speculate who had access to these computers. So they're asking you to speculate. The computers that were open in the reception area of Aria, where anyone could have access to them, were used for them.

THE COURT: So why would someone be using CCleaner, say, on this -- at the -- of the timeline at December 14th of 2022?

MS. GREENE: I don't know. And one other thing, it's about the same time line as Mr. Gunkova testified that Mr. Igor left, the IT person. And based on the name of that deleted user account, that appears to be Mr. Igor -- I'm going to get his name wrong. The IT person's --

THE COURT: I recalled it.

MS. GREENE: -- user account. Okay. But I don't know. But it certainly doesn't prove that Ms. Gunkova or someone acting at her direction did it, which is what they have to prove for the spoliation, that she intentionally caused it.

THE COURT: Or she failed to prevent it.

MS. GREENE: And that comes negligent, and that impacts the result of the sanction as appropriate. All right? Well, because there's willful spoliation, which is a different thing than numerous spoliation. Okay.

And device 1 again on Exhibit 4 is identified as Mr. Bogatin's computer. Again, Ms. Racich testified, confirmed it was put into service after November 2020, which was the ransomware attack. It is Aria's main computer. Among other things, is Aria's main computer.

Again, on Mr. Racich's identification of device, which is Plaintiff's Exhibit 34, it misquotes Mr. Daniel's [sic] designation. Mr. McDannell in Defendant's Exhibit 8 says it is, quote, the current BNG/Aria main business computer, unquote. And Defendant's Exhibit 10 says it is also used in

Aria's day-to-day operation.

And this is important because while plaintiff makes a big deal about the volume of information that they allege is spoiled, you have to understand that this is parallel businesses running through the same machine, and the order only addresses BNG's operations, right?

The demonstrative fails to reflect the fact that these are dual purpose machines. The difference is Mr. Young's machine, which is one that was only used in BNG's operation. Again, with device 6, it was designated as an Aria machine that Mr. Gunkova occasionally used to access her BNG email.

Vestigant did nothing to do -- Vestigant did nothing to determine who had access to these computers because it was out of its scope. It's not a fault of Vestigant's; it just wasn't asked to do it. But it leaves this Court with the question of, again, who was responsible for it? It's left to speculate. It lumps those two devices together, even though they were two different machines.

The evidence is that the -- Ms. Gunkova offered to allow access and a joint e-discovery plan of the emails as early as November 2021. That's Defense Exhibit 6. That's not consistent with someone who is attempting to avoid or destroy evidence. Provided monthly updates to BNG -- of BNG during the status of this litigation. That's Defense 7.

THE COURT: But Mr. McDannell testified that there was

a huge attorney-client privilege problem, right? So it seemed that his offer to share the data was subject to -- or had to be subject to some kind of protocol to -- for him to protect the attorney-client privilege. And it seems to the Court that the parties just never got to an agreement on that.

MS. GREENE: Right.

THE COURT: Would that be a fair way to say it?

MS. GREENE: Yes, absolutely. But if they were trying to hide everything, right, there would have been resistance to it. And when you look at plaintiff's exhibits that are the Loudoun County discovery orders, right, there's nothing there that is more than the normal discovery disputes.

We think we've given you everything you asked for, everything and anything. And then Ms. Benes comes back and says, well, I want you -- we asked for all financial documents related to BNG. Now, I want you to bifurcate. I want these transactions with Bank Five Nine bifurcated, and you identify them by particular bates numbers.

Those are some of the issues being that -- fought about in the Loudoun Court. And in every single one of those orders lesser sanctions were never used, right? Attorney's fees were deferred, right, for later decisions, but lesser sanctions were never applied against Ms. Gunkova. So this isn't a case like Slossberg where those defendants went to jail multiple times. Right?

So when the Bankruptcy Court was looking at that case, it can -- could reasonably say the prior courts did everything they could, and there was nothing else to do because these are hardened avoidance of discovery people. Right? Those defendants went to jail in multiple cases rather than -- lesser sanctions have never been applied here.

In the forensic imaging, they can argue all they want that USB and hard drives were included, but they're not included on the face of the order. It says electronic devices. Ms. Gunkova identified the electronic devices used in BNG's business pursuant to the order within the seven days. That's Defendant's Exhibit 8. Ms. Benes took eight days to respond to that designation.

And in the interim, before Ms. Benes even responded -- and Your Honor commented this during Mr. McDannell's testimony on November 8th. Before he even heard back from Ms. Benes, he said, hey, I think, Ms. Benes, that you're missing an important search term, which is the Racich 3/01 email. Can we make sure you have that so you can catch that information as well in these search terms?

It's not the defendant who's trying to avoid information being found. So Ms. Benes on November 9th responds with her and Vestigant's information saying, hey, we think you're missing these couple things. What about this? What about the Dropbox? Even though the day before Mr. McDannell

raised, hey, I think you're missing an email account, there's nothing in that correspondence about, hey, you didn't provide us email passwords. There's a communication back and forth, and you can see it in the exhibits about we need the Dropbox credentials. And they were given.

There's nothing anywhere in the communications, there's nothing in the motion to compel about these email credentials. Nothing. We're not here -- and there's no argument that there's spoliation. We're not here on a motion to compel about these email accounts. Within a day of the December 1 email sent for Vestigant saying, hey, we've discovered that certain USB and hard drives were attached. These are the information. Can you find it? This is what we found. We have them available for you. When are you going to come?

And they provided them. In return to the original scheduling, Mr. McDannell provided multiple dates to Vestigant again after he heard back from Ms. Benes on the 9th for them to come in as early as November 15th. Vestigant picked the November 22nd date. And you heard, Mr. Racich said it was based on their need to mobilize and get people there that they picked that date. Right.

There was a lively back and forth. And you saw that in Defendant's Exhibit 12, 13, 14, 17, 18, 20 through 22 about the process of the forensic imaging, concerns about the size of

the files, concern about false hits. Can we do this in a way that allows us to use the data jointly? Can we do this? And moving back and forth.

It was not a process where they were attempting to obstruct the process at all. Ultimately, it ended up turning over 34,571 files, plus over 66,000 pages of discovery. Defendant's Exhibit 25 was the release of the 34,571 files from the forensic imaging.

They supplemented discovery throughout the Loudoun case. The order on the May -- I think it was May. Yeah, May 2nd, 2023, order to compel in front of Judge Fisher, Plaintiff's Exhibit 26. Again, nothing in that order, even though they relate to the forensic order addresses, these hard drives, these USB drives, the email accounts. It just says provide the privilege log the 15th. The privilege log and the supplemental responses were provided by May 15th.

The May 15th response is Defendant's Exhibit 28. We admitted with regards to the alleged forgeries that certain documents were not personally signed by Mr. Kamin when asked for them in requests for admissions. We have continued to respond to discovery issues and since the bankruptcy case was filed.

There's no evidence that any of the documents listed on the hard drives or USBS, which were Plaintiff's 15, 16, 22, were missing from the computers. Vestigant testify -- Mr.

Racich from Vestigant testified that it was not part of his scope of work to look to see if anything that showed up on the search -- the searches were actually still inherent and on the imaged computers. They never looked.

Then searching for them wasn't investing in the Vestigant's scope. Plaintiff's Exhibit 16, which was that search of the hard drive that it was attached to Mr. Eun's computer, IT003, had a My Videos folder dated way back in 2011. It had a folder for judicial drive, which was the prior owner of the building. And Mr. Racich said the Lake Plaza [sic] folder -- he has no idea what Lake Plaza was. There's been no indication that it's in any way, shape, or form connected to this case.

There was a folder there labeled medical. But Vestigant wasn't tasked with looking to see if any of the folders that they were able to trace for those hard drives were actually still -- those files were moved to the computers. The reasonable inference with regard to IT003, the Mr. Eun's computer, was that the device was owned by Mr. Eun and not -- that device is not in Ms. Gunkova's control. There was no --

THE COURT: You're talking about his cellphone?

MS. GREENE: I'm talking about his cellphone. I'm also talking about the hard drive that was attached to IT003, but one of the ones they say is missing.

THE COURT: Okay. Right.

MS. GREENE: There's no CCleaner used on that computer. And that's one that was used solely for BNG business, as opposed to the one that Mr. Bogatin was using and the one that was -- the two that were up in Aria's reception area that were used for both businesses.

Despite Ms. Benes' long testimony or proffer -- however you want to -- as to what the parade of terribles as to evidence as to what they're lost, there's actually no evidence plaintiff has suffered any ability to present their case. They filed a complaint with significant documentation. They have indicated they have over fifty allegedly forged documents. I think she just proffered fifty-nine alleged forgeries, almost sixty documents.

They filed the complaint in the adversary proceeding with a forensic handwriting expert's report. They have filed Mr. Racich's report. You can take judicial notice of in the main case in their -- the Kamin amended plan filed an expert accounting report that's over 140 pages long disavowing Ms. Gunkova's report.

THE COURT: The capital account report?

MS. BENES: The capital account as well as distributions they paid were mispaid to her and her businesses. So the ability to show where the money went has not been hindered in any way, shape, or form. Ms. Benes has issued, I believe, approximately forty subpoenas between the Louden case

and this case to third parties to get the record. She's indicated she issues the subpoenas in her argument, as well as FOIA requested the SPA to get the documents.

As I said, there's no evidence that lesser sanctions would be ineffective because they've never been issued. Right? At best, attorneys' fees were reserved by the Loudon County court in two cases. Yet plaintiffs here are asking for the harshest sanction possible, which is default.

Again, unlike some of the mustache trolling villainy cases cited by plaintiffs, there's simply no evidence that Ms. Gunkova had any intent to hinder discovery or destroy evidence. There's no testimony anyone saw her shredding evidence or taking sledgehammer to a computer. What you have here is a computer software product that was purchased in 2019 that was set up by our IT person. Was set to auto-renew.

Mr. Racish -- Racich did not testify that it was newly downloaded. He, in fact, testified he could not tell if the download was an update or a new install on those computers. Well, some --

THE COURT: But if you look at the timeline of data destruction, which is Exhibit 25 --

MS. GREENE: Yeah.

THE COURT: -- Plaintiff's Exhibit 25, for example, between October 11th and October 24th of 2022, you got three, six, eight applications of it. So I mean, do you ascribe that

to just, you know, it being renewed in the ordinary course like it's on your credit card and it renews, you know, once a month or once every six months, or whatever?

MS. GREENE: I mean, some -- the short answer is I don't know, and I don't think they proved it either. We know at least that there was an auto renewal of the annual subscription. I believe Mr. Bogatin testified to that. And I don't know on the other renewals.

I don't know -- for example, the 11/10/22, the thumb drive, what's been designated as Mr. Bogatin's thumb drive, if it ran on it because it was plugged into the computer to verify what it was before it was turned over to investigate. I don't know. There's no testimony one way or another how that happened, how it was run.

You've heard my client testify. You're going to make your own credibility. I will tell you she's unsophisticated. There's little to no doubt that she is unsophisticated when it comes to this. There's certainly no evidence that she did it or that it was done at her direction.

You heard Mr. Racich testified that when the CCleaner was run, it would overwrite unallocated space. That doesn't mean that there was anything in that space. When Ms. Benes pressed him to try to testify that it ran over and deleted seven gigs worth of data, Mr. Racich very carefully and accurately said, no, it overwrote unallocated space on that

thumb drive.

If there was -- what's interesting about the testimony is that there was intent to destroy all potential evidence or deleted files. The deleted files found it within that Ivich -- Elich (ph.) user account that was found in the recycle bin. CCleaner would have been run after it was put in the recycle bin, which would have destroyed it and made it unrecoverable. Wasn't. Those files were one hundred percent recovered from the front desk path from the Aria computer on IT002. Those were recovered.

In Project management v. DynCorp Intern, LLC, the Fourth Circuit emphasized the following factors must be considered before exercising the inherent power to dismiss a case based on the wrongdoing of a party: the degree of culpability; the extent of the client's blameworthiness; if the wrongful conduct is committed by its attorney, which is not an issue here; the prejudice to the process and the administration of justice; the prejudice to the victim; the availability of other sanctions to punish the culpable persons, compensate the harmed persons, and deter similar conduct in the future in the public interest.

The degree of culpability is negligence. There is nothing that shows before this Court that Ms. Gunkova intentionally deleted or instructed anyone to intentionally delete. Ms. Benes had Mr. Bogatin on the stand and could have

asked him and didn't. There's no testimony that it was done. And unlike cases where in the olden days where you had people with the shredders and people walked in on people shredding paper, right -- oh, so much easier then -- we don't have that testimony.

And we don't have computers that people had sole control over, right? The majority of the computers that are at issue were open source, open access computers. The prejudice is minimal. Like I said, the complaint was pled with specificity. Complaints exhibits 9, 6 -- 9 through 16, 18 through 67 exhibits, many from Ms. Gunkova's production, show documents allegedly to be forged, allegedly to be produced without authority, all supporting plaintiff's claims. Again, she's issued approximately forty subpoenas and has three experts on the issue supporting the claim.

The case of Enzia! [sic], which we cite in our brief, Inc. v. Nguyen [Ezenia! v. Nyugen] 536 Bankruptcy 8 -- 485 New Hampshire 2015 is instructive on the issue of prejudice and sanctions. The court in that case found the Nguyen's spoliation conduct was egregious and that Enzia! [sic] had actually been prejudiced.

However, it found that despite the intentional destruction of evidence, the issue of prejudice was complicated because even in the pre-trial motions, it was far from clear what evidence might be missing and what prejudice any party had

suffered. It had held a pre-trial sanctions motion and continued its ruling until trial. Ultimately, held a twenty day trial between the parties and ruled that it was unclear what harm resulted from the data loss.

Here, too, it is far from clear that the plaintiffs have suffered any actual harm from the data loss. The motion states merely that the information was lost was relevant. Here Ms. Benes in her arguments has argued, well, we've got some stuff. We could have maybe done this. But there was actually no testimony as to prejudice, and their experts haven't had any problem opining.

Again, they have one hundred -- they have an expert opining as to the financial traction. They have a forensic expert on the alleged forgery. They have Mr. Racich on also forgery in his opinion, digital forgery as well as the forensics here. They argue in their motion memo, at 18 that the effect of which can only be presumed to be disastrous. They didn't make any argument in their motion as to actual damage, despite what Ms. Benes tried to argue today, because their ability to prove their case hasn't, in fact, been damaged.

Their reliance is -- the reliance here -- sorry. The relevant standard for motion for sanctions is more stringent than meaning -- than just meeting Federal Rule of Evidence 401. To conclude there was sufficient prejudice to warrant dismissal

or default judgment, the court must examine the record that remains to determine whether it contained enough data for the aggrieved party to build its case. And the court must decide whether a lesser sanction would level the playing field.

In sum, for the Court to order -- and that's Erie Insurance Exchange v. Davenport Insulation, 559 F. Supp. 2.d 701 at 707 District Maryland, 2009. In sum, in order for a court to impose a default judgment, plaintiff must establish either defendant's amounted to egregious acts of willful spoliation or highly prejudicial and denied the only means to establish her case, Samson (ph.) 251 FDR 180.

Neither is true here. Plaintiffs were not denied the only means of building their case. They can't make that condition. The playing field is more than level. Complaint is (indiscernible) sounding in fraud, meaning it had to be played with specificity, which they did. Contained sixty-eight exhibits, one hundred -- over 129 -- 123 allegations, many of which contained multiple subparts.

The sixty-eight exhibits, many of bates numbers indicating they came directly from Ms. Gunkova's production of documents in the Loudoun case. Mr. Gunkova's two depositions in the Loudoun case included questioning over 149 documents. To the extent any documents were, in fact, lost, plaintiff's ability to proceed has not been impaired.

Count I seeks to bar Ms. Gunkova's discharge of her

claimed indebtedness based on fraud in the inducement. There are no allegations that any of this misrepresentations included written documents to him. All verbal representations would have incurred prior to any litigation hold and would not be impacted by the loss of documents.

Count II seeks to bar Mr. Gunkova's discharge of her claimed indebtedness to BNG based on breaches of her fiduciary duty to BNG, including, not limited to, her conversion to BNG, to herself, related entities, and Mr. Bogatin, fabricated documents for jury of Mr. Kamin's signature, co-mingling of assets, and causing BNG's tax records to be improperly filed with false information. That's Complainant 108.

Again, I think I've addressed the evidence they have that relates to this. They'll focus on third-party bank records showing the purported transfers of assets, the improper tax records, the documents, including amendments to office lease loan documents between BNG and Aria, which plaintiffs referenced in the complaint. They already have them. They have subpoenaed or otherwise issued the FOIA request to banks, accountants, IRS. They've suffered no demonstrable prejudice this count.

Count III is Kamin's objection to the discharge for willful and malicious injury. That count fails to specify which actions are alleged to have caused the willful and malicious injury, as it merely incorporates the allegations in

the rest of the complaint. This count also pleads in fraud, and it had to be specifically pleaded. The complaint attaches document, alleges it was forged, and it includes an expert report dated September 8th, 2021, well before the alleged spoliation. That's docket 1-18, related to the alleged forgeries.

Clearly, the alleged spoliation did not hinder plaintiff's ability to have an expert opine more than a year before the forensic examination on this element of the case. Report they have since supplemented. The alleged spoliation will not impact plaintiff's ability to show damages, as what harm, if any, Ms. Kamin has incurred rests solely within his knowledge.

Financial transactions, Kamin contends, were diversions of BNG's assets, of document and bank records, and any spoliation would not have destroyed evidence of these transactions. As to his claims in Count III, Ms. Gunkova breached the management terms for BNG by excluding him from operations.

Again, he is not prejudiced by putting that case forward. He has said that there is a verbal operating agreement, that he believed that there was a -- the written document that he attached to the complaint is not the actual document, that it reflects what they believe was the verbal agreement. It's the position he's taken in the case.

So and at the extent that the written documents were presented to third parties like Atlantic Union Bank, he has subpoenaed Atlantic Union Bank. Those subpoenas, documents are attached to the complaint.

Similarly, the BNG's willful and malicious injury claim in Count IV is also unimpaired. As with Count III, Count IV states a formulaic recitation or legal conclusions incorporating the allegations of the body of the complaint. Review of the body of the complaint is similar to the Kamin, and I won't rehash that.

As noted in Mr. McDannell's communications with Ms. Benes, there were significant concerns with Vestigant's procedures, attempts to agree on a method of review which would benefit parties. There is no evidence that documents on the USB drives weren't copies of files retained on the system. Mr. McDannell was able to locate missing communication with Mr. Basman, the accountant, and was able to retrieve those documents from the computer and use them to supplement the discovery responses in May of 2023.

These documents were present when Vestigant imaged the computers. Plaintiff's inability to locate the documents from the forensic examination raises questions about the resulting report and plaintiff's review of the material. Plaintiffs has shown no prejudice from the alleged data loss.

Dismissal is the harshest possible sanction for

spoliation, and is usually justified only in circumstances of bad faith or other like action. Sylvestri (ph.). The circuit spoliation conducting -- conduct meriting dismissal includes a vast array of missteps and transgressions, but not every case in spoliation merits dismissal. Kettler v. Starbucks, 96 F. Supp. 3d 563 at 568 to 569 EDDA 2015.

THE COURT: The Starbucks case involved a chair, right?

MS. GREENE: It did. Lots of chairs.

THE COURT: It wasn't a computer case?

MS. GREENE: There were originally 1,300 chairs, and by the time it went to trial, Starbucks had 201 chairs left because they destroyed them all. And ultimately, that court has said Starbucks, you're kind of limited to the 200 chairs you have left in your damages claim because Kettler was saying, look, you destroyed it. I can't test, I can't defend myself. And the court -- and that was egregious spoliation. It was 99 percent of the data set was gone, and the Court limited it to it to the one percent that was left.

That case cited Suntrust Mortgage v. United Guard Residential [sic], which was an email destruction and altering -- alteration. That's 508 F appendix -- Federal Appendix 243, 4th Circuit 213 -- 2013. Emails were fraudulently altered, and spoliation did occur. The original emails came to light and were before the Court, so any

prejudice was temporary. Again, denying dismissal of the claim.

Dismissal in the form of striking Ms. Gunkova's defenses and entering judgment against her is not warranted, as the prejudice is slight, and a less severe sanction's more than sufficient if any are warranted.

This Court has wide discretion in creating an appropriate remedy. Entry of default is the harshest possible and should only be resorted to when lesser sanctions would be insufficient. While Sylvestri's written in the disjunctive as a practical matter, courts have only entered default when the conduct has been so egregious as to amount to a forfeiture of the claim and the effect of that conduct has substantially designed denied the other side the ability to prosecute or defend the claim.

To extent there is spoliation, the ESI was cumulative or obtainable from other sources like the banks and lenders at issue. As noted, plaintiffs issued over forty subpoenas between the two cases. They deposed Ms. Gunkova for over fourteen hours, about 149 documents. Their complaint contained nearly seventy exhibits, including two expert reports. Any loss of evidence has clearly not hampered them.

The Court is not required to dismiss a claim or enter default judgment, even in the light of prejudicial spoliation. As we were discussing with the Starbucks case, that Court

determined it fell between the Taylor level of what I've called mustache level twirling villainy and Sylvestri, where it was sort of innocent, but it's still left for the plaintiff with no way to prove their case, and crafted a remedy of limiting the plaintiff to proving with the 201 remaining chairs.

And Sylvestri, again, it was the sole piece of evidence. The car was gone, and there was absolutely no way to prove the case because there was no evidence left. Plaintiffs have ample evidence in this case. Again, prior discovery orders in the Loudon case generally involved objections were sustained in part and denied in part.

The lesser sanctions were never employed and cannot be deemed ineffective in this case, nor can the loss of evidence be deemed to impacted plaintiff's case. In Samson, while the Court found spoliation occurred and did not warrant sanctions because the loss did not impact plaintiff's case, instead, it awarded attorney's fees and costs, not for the spoliation, but because of a misrepresentation in discovery, which then made the plaintiff go into a second forensic examination for a specific hard drive.

So when faced with both egregious spoliation and prejudice, like I said, the Enzia [sic] court only awarded monetary sanctions because the issue of prejudice was unclear. In that case, the court noticed that there were numerous inefficiencies in both sides and ultimately made a post-trial

fee award as the appropriate sanction.

The appropriate remedy in this case is not a default judgment. Over the last three years, Ms. Gunkova has responded to over 220 requests for production of documents between the two cases. She has all the computers for her business, herself, forensic images. She has cooperated in discoveries and provided the documentation she has and explained when she cannot provide the requested documents.

There are problems with Vestigant's process that significantly cast doubts on the results, including files claimed deleted or overwritten. However, plaintiffs have not been prejudiced in the case. If the Court believes some sanction is appropriate, lesser sanctions are more than sufficient to address the insult to the Court and the judicial process' integrity. Thank you.

THE COURT: Okay. Thank you for your argument.

Ms. Benes, I'll give you ten minutes.

MS. BENES: Sure.

Ms. Greene, you have a paper on your -- I don't want to look at your notes.

MS. GREENE: Oh, sure. Thank you.

MS. BENES: You're welcome. Your Honor, I don't know if it was a blessing or a curse that I was the attorney in the Loudon case and have lived this with Mr. Kamin for the past four years. I don't know if it's a blessing because I'm able

to recall what exactly happened and what really happened or if it's cursed because it drives me insane to hear it represented to the Court something that happened that did not happen.

The argument that lesser sanctions were never imposed is a misleading one. Lesser sanctions in the form of attorney's fees were never imposed by the Loudoun County Court because I asked for them to be preserved. I suggested to the Court that we wait until all of Ms. Gunkova's noncompliance had been resolved so that we had one big number at the end instead of doing things piecemeal.

And in fact, Judge Fisher's order of May 2nd, 2023, agreed and noted plaintiff's request for fees and sanctions relating to the motions is hereby preserved to be heard at a later date before the Honorable James P. Fisher. He liked my idea. It was for judicial economy. It was to see what sanction would be appropriate because the noncompliance was persistent and it was continuing. And to simply award attorney's fees in a piecemeal fashion might not have been the most appropriate way forward.

And in fact, we did file a follow-up motion for sanctions that was filed in July of 2023 because Ms. Gunkova's May 15th, 2023, discovery responses were wholly insufficient. That was docketed for hearing, and days later, Ms. Gunkova filed for bankruptcy. Judge Fisher was about to lay the hammer down.

MS. GREENE: Objection.

THE COURT: I sustain that objection.

MS. BENES: It was set before the court for October 2nd, and days after that was scheduled, Ms. Gunkova filed for bankruptcy.

With regards to the argument that Mr. Racich or Vestigant didn't search for similar folders, and therefore, we don't know if there's any prejudice to Mr. Kamin, Your Honor, I believe it was you who said something along the lines of one Bob Smith is not the same as the next Bob Smith or something similar to that.

THE COURT: Well, once again, evidencing my lack of knowledge about these technical computer matters.

MS. BENES: Well, you were absolutely correct, though, Your Honor. One file, just because it has the same file name, does not mean that a similar file with a similar file name has the same metadata. And that's why Mr. Racich testified that it didn't matter. One, he -- that wasn't his responsibility under the order, but two, it didn't matter because just because you find a file somewhere else doesn't mean it's the file that was deleted and the metadata that was deleted with that.

The purpose of the transfers with regards to the conversion of funds is not available to us. While we have subpoenaed bank records -- and I find it interesting that the argument is made that Mr. Kamin and BNG have sufficient

evidence because notwithstanding the egregious spoliation of evidence, Mr. Kamin and BNG have gone to great lengths to try to uncover and discover the extent of Mr. Gunkova's improper actions and fraud.

But because they have gone to that extent and received paper files that that's sufficient, it ignores the importance of metadata. It ignores the importance that all that information shows as far as when documents were created and modified, who did what. Mr. Gunkova in response specifically to the conversion allegation alleges that there was consideration for the transfers.

And so simply seeing a bank statement, which is what Mr. Vogel (ph.) used to track the conversion -- simply using bank statements to see that $50,000 was transferred from BNG's account to Mr. Gunkova's account does not tell us the purpose of that transfer. And when you have a defendant who is alleging that there was a valid reason for that transfer, that's where electronic files like QuickBooks would be relevant, highly relevant, because QuickBooks would have in there, for example, the memo, the invoice number, what the purpose of that transfer was.

Well, if that entry wasn't even in QuickBooks, then that entry would also -- or the lack thereof would also show that there's no support for Ms. Gunkova's defense here to the conversion claims.

The position that CCleaner was downloaded in 2019 and 2020 on Mr. Bogatin's computer, that ended up being an audio surveillance computer, and ignoring all of the subsequent evidence that we have -- and I want to tell you, Your Honor, I noticed you pointed to these various -- the box from 1011 to 1024. It wasn't just eight times it was run. It was some days had a number of different times it was run. I simply ran out of room on this timeline to put it all on here. And it also does not ignore -- and this is in Plaintiff's Exhibit 21 -- that on November 8th CCleaner was Googled. We have the Google search results in Exhibit 21.

On November 8th, CCleaner was Googled. It was redownloaded. This wasn't simply a, oh, the package renewed. Nope, we can see that it was a Google search. That is an active search to put that software on that device. And that is the exact same date and device where the secure delete feature was run. If that's not evidence of intentional data destruction, I don't know what is.

THE COURT: What exhibit was that? 21, did you say?

MS. BENES: Plaintiff's Exhibit 21 is the Google search. And those, Your Honor, are the 122,564 documents in Exhibit 20 that the secure delete feature destroyed forever, stripping it from Mr. Kamin's hands and the evidence of this Court. With regards to the argument that CCleaner was run on October 26th, 2022, on Ms. Gunkova's computer, and that the

Recycle Bin artifacts were able to be retrieved, and that if CCleaner really was run, it would've deleted the Recycle Bin. It's important to note, CCleaner, you can select which files to delete.

You don't have to delete your entire computer. So for example, if you have a folder called BNG financials, you could select that to delete while preserving, for example, a folder that says Aria financials. So there's no doubt about it. And the data shows CCleaner was run. And there's no doubt about it. And the data shows that an entire user profile and 85,000 artifacts were placed in the Recycle Bin on that day. Those are manual transactions. Just because CCleaner was run, doesn't mean that it would affect the Recycle Bin, because, for example, if one places 85,000 artifacts, an entire user profile in the Recycle Bin, and then empties the Recycle Bin and thinks that data is gone, perhaps they don't select the Recycle Bin for the CCleaner run.

THE COURT: Weren't the 85,000 artifacts later recovered in a different way?

MS. BENES: Yes. So Vestigant was able to recover those. However, that metadata is forever changed. So it is unreliable metadata. The importance of the fact that we were able to recover that data, and this is very important, Your Honor, is it shows what the files were. They were all subject to the forensic order. They were the search terms. They were

loan applications. They were Harry's personal financial information. They were his passport, his bank statements.

So those were purposefully put in the Recycle Bin in complete disregard of the forensic order. The argument was also made that Vestigant didn't identify the users of the computer. And that there were computers at the front office. Yes. There were computers at the front office. But the two most important, Ms. Gunkova's and Mr. Bogatin's, you heard her testify, and I believe Mr. Bogatin, as well, that those two computers were in the office that the two of them shared.

Mr. Bogatin and Ms. Gunkova have an office in Arias' spa, and just the two of them are in that office. And just those two computers. These computers, ITO2 and ITO5, were not out at the front desk. Your Honor, the burden shifts to the defendant regarding prejudice, that there was no prejudice. And they have not met that burden. They simply tried to place it on us, to try to place it on Vestigant, and anybody else they can to say, well, you didn't tell us. You didn't point to that.

Pleading a case and a cause of action is not proving it. I went over all of the evidence that is lost that has not been turned over, that is required for the plaintiffs in this case to prove their claims. Yes. We have the paper copies. Paper copies are not the same as metadata. For example, if there's an application that was forged, and Ms. Gunkova

contends that she had nothing to do with it, yet that document was found on her computer, that would show that her defense is meritless. Well, she deleted it. So we couldn't do that.

The failure to preserve evidence does not simply equate to negligence. That would mean that somebody could say, hey, I'm under this duty to preserve. But I'm going to delegate all authority to you, let you deal with everything, what happens with it. I'll turn a blind eye. And then I'll only be held liable for negligence. That's what happened here. At the very least, Ms. Gunkova delegated everything to Mr. Bogatin. She lets him run the show. She knew she had a duty to preserve. She did nothing about it.

She let CCleaner be installed. She let CCleaner continue to be run. To paint her as this defendant who was compliant with discovery obligations is unbelievable given the number of orders in this case. And the orders didn't simply just say, identify things by Bates number. If that were the case, he wouldn't have had five. And the Loudoun Court probably would have laughed us out of court if that was really what we were filing motions over.

There was a dual purpose here of her computers. That was her risk. And in fact, the Loudoun Court found that with regards to the order of disqualification, as well. The fact that she was using funds from her various companies to pay for her attorneys, that's her risk. It's an alter ego thing. The

fact that she chose to use her computers for Aria, for VNJ, for Sterling, for BNG, that's her risk. It is not an excuse for the fact that she had highly relevant and large volumes of data destroyed.

The responsibility was on her as the litigant and the sole manager of BNG. There was resistance all along the way up until the order was entered on October 25th, 2022. There is resistance after in not identifying devices. There was resistance after in not producing documents and devices. At the end of the day, CCleaner was run on IT001 IT002, IT003, IT005. 122,564 files at least, were deleted. Three external hard drives were never produced. We have no idea how much is on there. Secure delete functions were used. Wipe free, deleting out unallocated spaces were used. Recycle Bin features were used.

The fact is that there are an enormous amount of data that is gone. The prejudice can only be imagined. I don't say that because we don't know that none has been. We know that so much has been gone, and so much is still out there that we've spent four years trying to discover the extent.

Your Honor, default judgment is warranted. The timing and volume are key in this case, and they warrant default judgment. We'd ask that you grant default judgment and enter the motion for sanctions.

THE COURT: Okay. Thank you. All right.

Well, the Court -- I am going to take this under advisement. I'm going to issue a ruling in due course. I thank the parties for their presentations, and everybody have a good day. The court stands adjourned.

MS. BENES: Thank you, Your Honor.

MS. GREENE: Thank you, Your Honor.

THE COURT OFFICER: All rise. This honorable Court is now adjourned.

(Whereupon these proceedings were concluded at 1:19 PM)

# I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| FOR THE DEFENDANT: | | | | | |
| Valeria Gunkova | 3 | 12 | | | |
| Christopher Racich | 59 | 71 | 75 | | |

| EXHIBITS: | DESCRIPTION | MARK | ADMIT |
|---|---|---|---|
| FOR THE PLAINTIFF: | | | |
| 29 | November 11, 2021, letter | 28 | 34 |
| 30 | Letter written by Ms. Benes | 33 | 37 |
| 31 | April 25, 2021, letter | | 41 |
| 32 | Letter written by Ms. Benes | | 43 |
| 33 | Email written by Mr. Racich | | 62 |
| 34 | Identification of devices sheet | | 63 |
| FOR THE DEFENDANT: | | | |
| 28 | Plaintiff's supplementation to discovery | | 8 |
| 29 | Plaintiff's response | | 8 |

| RULINGS: | PAGE | LINE |
|---|---|---|
| Matter taken under advisement | 134 | 1 |

C E R T I F I C A T I O N

I, Marielle Arnreich, the court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

July 4, 2024

MARIELLE ARNREICH DATE

## $

**$50,000 (1)**
128:14

## @

**@bnggroupllccom (1)**
53:18

## [

**[Ezenia! (1)**
116:17
**[sic] (6)**
105:22;111:10;116:16,20;122:21;124:22

## A

**ability (8)**
94:8;112:9,23;117:20;118:24;120:8,11;123:14
**able (14)**
62:13;72:18;84:2;91:11;92:10,18;95:19;111:16;121:16,17;125:25;130:1,20,23
**absent (1)**
103:3
**absolute (2)**
101:17,21
**Absolutely (11)**
4:9;12:14;14:20;22:3,19;34:14;55:17;90:3;107:8;124:7;127:14
**accept (1)**
62:10
**access (34)**
14:21,24;15:2,4;16:7,8,11,16;17:4,10;18:9,13;19:7,9,13;20:1;29:12,24,25;52:21;73:20;75:7,10,11;94:8;104:10,13,16,19,22;106:11,13,20;116:8
**accordance (1)**
41:17
**account (32)**
15:1;17:25;19:19;20:1;29:12,14,22,24;52:22;53:6,22;54:1,25;55:9,11,12;56:3,21;75:7,10;86:9;93:23;94:7,17;105:4,7;109:1;112:20,21;115:5;128:15,15
**accountability (1)**
89:12
**accountant (5)**
66:20;87:25;94:24;95:7;121:17
**accountants (1)**
119:20
**accounting (3)**
94:25,25;112:18
**accounts (22)**
14:22,24;16:7,9,12,17;17:4,6,12,23;18:4,10,14;43:5;70:24;74:12,23;87:7;92:15;99:21;109:10;110:14
**accurate (2)**
57:14;93:18
**accurately (1)**
114:25
**acknowledge (1)**
74:3
**across (2)**
62:12;101:5
**act (1)**
98:21
**acted (1)**
103:3
**acting (1)**
105:9
**action (6)**
21:11;90:25;91:11,11;122:2;131:20
**actions (3)**
37:5;119:24;128:4
**active (1)**
129:15
**activities (1)**
14:7
**acts (1)**
118:9
**actual (3)**
117:6,18;120:23
**Actually (10)**
18:21;26:5;27:6;90:8,8;111:3,17;112:8;116:21;117:9
**add (1)**
6:10
**added (1)**
5:14
**addition (2)**
72:22;80:7
**additional (1)**
72:10
**Additionally (1)**
41:21
**address (16)**
52:5;53:3,15;54:20;55:5,23;56:9;57:1,6;59:15;90:20;91:2;92:24,25;93:3;125:14
**addressed (1)**
119:13
**addresses (6)**
29:7;87:7;89:11;92:17;106:6;110:13
**adequate (1)**
29:12
**adjourned (2)**
134:4,8
**administration (1)**
115:17
**administrative (1)**
8:21
**administrator (1)**
3:20
**admission (7)**
8:10;33:14;36:23;43:9;62:17;63:1;92:24
**admissions (5)**
7:14,23;8:16;81:9;110:20
**admit (6)**
6:23;7:2,16;8:7;37:11;96:17
**admition (1)**
40:9
**admits (5)**
78:5;87:23,23;95:8;96:19
**admitted (12)**
8:4,13;33:13;34:19;37:12;40:25;43:13;62:20;63:7;77:23;98:14;110:18
**Adversary (4)**
3:2;98:6;102:7;112:14
**adverse (1)**
100:16
**advised (3)**
39:5;71:17,18
**advisement (1)**
134:2
**affect (1)**
130:13
**affirmative (1)**
98:19
**afford (1)**
93:13
**afield (1)**
21:13
**again (48)**
6:5;25:9;35:20;37:7,8;41:11;52:17,19;55:15;67:19;73:15;76:12;78:13,14;79:3,5,9,13,16,16;81:18,20;82:14,16,17,18,19,19;83:22;85:2;97:22;102:13;105:16,17,21;106:10,16;109:18;110:12;113:9;116:13;117:12;119:13;120:20;123:1;124:6,9;127:12
**against (6)**
4:6;26:24;78:7;102:7;107:23;123:4
**agents (1)**
98:19
**aggrieved (1)**
118:3
**ago (2)**
10:2;16:21
**agree (5)**
36:8;42:15;43:3;62:3;121:13
**agreed (4)**
41:8;42:25;80:10;126:12
**agreeing (1)**
41:10
**agreement (7)**
23:10;36:9;91:6,20;107:5;120:22,25
**agreements (1)**
95:17
**aid (1)**
30:3
**aided (1)**
102:23
**Allan (1)**
66:20
**allegation (4)**
66:22,23;95:12;128:10
**allegations (4)**
118:17;119:2,25;121:8
**allege (2)**
27:14;106:3
**alleged (16)**
20:23;69:8;71:2;92:1;95:17;97:3;101:13;110:18;112:12;117:14;119:24;120:4,5,7,10;121:24
**allegedly (3)**
112:11;116:12,12
**alleges (9)**
59:20;91:3,4,4;93:14,15;94:22;120:3;128:10
**alleging (1)**
128:17
**allow (10)**
26:19;32:11,14;39:4;42:15;67:14;88:7;93:23;96:13;106:20
**allowed (4)**
67:3;89:21;100:12,21
**allows (1)**
110:2
**almost (1)**
112:12
**alone (1)**
92:12
**along (4)**
21:4;30:17;127:9;133:6
**alter (1)**
132:25
**alteration (1)**
122:22
**altered (2)**
100:3;122:24
**altering (1)**
122:22
**although (2)**
86:13;102:25
**always (2)**
46:12;52:14
**amended (4)**
8:4,8;30:4;112:17
**amendments (1)**
119:16
**America (1)**
3:21
**American (2)**
19:19;20:6
**amicably (1)**
29:8
**Among (1)**
105:19
**amount (4)**
71:3;100:11;123:12;133:16
**amounted (1)**
118:9
**amounts (2)**
95:14,21
**ample (1)**
124:9
**analysis (14)**
50:24;60:1,19;62:14,14;68:5,8;79:24,25;80:6,10;81:21;86:3;98:9
**analyze (1)**
95:22
**analyzed (2)**
80:3;101:17
**and/or (1)**
29:11
**Angela (1)**
23:3
**annual (1)**
114:6
**answered (6)**
34:13;46:5;49:4;52:20,24;57:3
**anticipated (1)**
101:14
**anti-malware (1)**
103:8
**anymore (2)**
88:1;99:20

**apparent (1)**
10:18
**appear (2)**
90:9;92:19
**appeared (3)**
41:22;79:23;90:10
**appearing (2)**
87:15;90:4
**appears (4)**
62:1,5;92:22;105:4
**appendix (2)**
122:22,23
**applicable (2)**
86:14;90:25
**application (4)**
24:9;54:13;101:23;131:25
**applications (6)**
20:18;92:14,16,18;113:25;131:1
**applied (3)**
92:9;107:23;108:6
**apply (1)**
90:22
**appointed (4)**
23:2,6,7,8
**approach (1)**
5:15
**appropriate (11)**
77:13,13;101:24;102:22;105:13;123:8;125:1,2,13;126:16,19
**appropriateness (1)**
102:9
**approve (1)**
19:5
**Approximately (3)**
10:2;112:25;116:14
**April (5)**
40:6,7;41:2;78:8,13
**area (3)**
13:3;104:21;112:5
**argue (3)**
108:7;117:16,19
**argued (1)**
117:8
**arguing (1)**
90:5
**argument (10)**
101:1;109:9;113:2;117:18;125:16;126:4;127:6,25;129:24;131:4
**arguments (1)**
117:8
**Aria (22)**
4:2;8:24,24;9:2,24;10:1,6,10;12:9;22:17,20;93:16;95:15,18,21;103:7;104:21;106:10;115:9;119:17;130:8;133:1
**Arias' (1)**
131:11
**Aria's (8)**
9:19;103:14,15;104:8;105:19,20;106:1;112:4
**Ariaskincare@gmailcom (2)**
54:12,16
**arose (1)**
10:12
**array (1)**
122:4
**artifacts (8)**
70:8;83:25;84:3,4;130:1,11,14,18
**ascribe (1)**
113:25
**asserted (1)**
40:20
**assets (4)**
100:15;119:11,15;120:15
**assisted (1)**
74:7
**assisting (1)**
73:23
**assume (2)**
47:2;94:13
**Assumes (2)**
45:5;55:10
**Atlantic (2)**
121:2,3
**attach (2)**
60:16;79:2
**attached (32)**
7:17;8:4,7;42:5,6;60:2,13,20;64:15,21,25;71:19;73:16,17;74:20;78:9,14,14,16;79:3,5,13,15,18,19;91:17;94:11;109:12;111:7,23;120:23;121:4
**attaches (1)**
120:2
**attaching (1)**
60:14
**attachment (2)**
61:4,14
**attachments (2)**
60:22;62:3
**attack (3)**
103:13;104:1;105:19
**attacked (1)**
30:23
**attempt (1)**
29:8
**attempted (3)**
30:16;39:8;41:19
**attempting (4)**
35:13;37:8;106:22;110:4
**attempts (3)**
86:1;89:7;121:13
**attention (8)**
7:6,21;39:22;41:16;71:13;72:2,25;74:4
**attorney (25)**
7:11,15;15:16;25:24;26:17,21;27:1,10,25;35:2,4,6;39:5,7;44:4;46:19;56:24;59:22;89:24,25;90:2,9,9;115:16;125:23
**attorney-client (2)**
107:1,4
**attorneys (8)**
14:10;26:14;27:8,8;39:13;88:9,10;132:25
**attorneys' (1)**
113:6
**attorney's (5)**
78:24;107:21;124:17;126:6,18
**AUB (1)**
56:6
**audio (1)**
129:2
**audit (7)**
30:2;31:23;32:10,14;93:23,24;94:8
**August (6)**
79:4,8,12;81:18;87:12,13
**authenticity (1)**
99:25
**author (1)**
66:2
**authority (7)**
17:11,23;18:3,10;20:17;116:13;132:7
**authorize (3)**
21:15;56:11,16
**authorized (8)**
14:6;18:16;20:6;21:3;30:2;31:22;32:10;97:23
**auto (1)**
114:6
**automatic (1)**
102:18
**auto-renew (1)**
113:15
**availability (1)**
115:18
**available (8)**
60:15,21;63:25;66:6;76:5;102:3;109:14;127:23
**avoid (2)**
106:22;108:21
**avoidance (1)**
108:4
**avoided (1)**
103:5
**award (2)**
125:1;126:17
**awarded (2)**
124:17,22
**aware (3)**
4:6;40:22;89:16
**away (1)**
97:2

## B

**back (22)**
5:6;48:9,17;49:1;52:2;56:19;59:7;67:2;74:16;76:18,25;80:9;84:3,6;87:5;107:14;108:16;109:3,18,23;110:3;111:8
**background (1)**
3:19
**bad (4)**
87:3;98:22;103:3;122:2
**bank (13)**
17:6,23;18:4,10;107:17;119:14;120:15;121:2,3;127:24;128:12,14;131:2
**bankruptcy (9)**
89:2,17;98:4;100:13;108:1;110:21;116:17;126:24;127:5
**banks (4)**
14:12;92:11;119:19;123:17
**bar (2)**
118:25;119:6
**based (9)**
63:22;74:14;101:22;103:19;105:3;109:21;115:14;119:1,7
**basics (1)**
101:16
**basis (2)**
40:10;51:12
**Basman (3)**
66:20;94:23;121:17
**Bassman (1)**
66:22
**bates (3)**
107:18;118:19;132:17
**bearing (2)**
6:24;7:3
**became (2)**
40:22;103:14
**become (1)**
83:14
**begin (1)**
16:16
**beginning (1)**
86:19
**behalf (7)**
14:7;24:19;25:10,22;26:9;27:25;45:10
**believes (1)**
125:12
**belongs (2)**
4:3;32:18
**beneficial (1)**
102:16
**benefit (2)**
100:21;121:14
**BENES (131)**
4:25;8:12;11:20,21,24;12:3,5,7,8;18:11;19:15;20:20,22,25;21:10,17,19,20;28:10,17,21;30:11,12,13,22;31:4,8,13,15,19,21;33:4,14,18,20,23,25;34:5,10,21,25;35:14,24;36:2,22,24;37:1,3,13,22,25;40:9,12,14,16,18,19;42:18;43:7,9,15;54:8;55:11;57:4;58:13,22,23;59:1,8,9,14;61:18,21,23;62:17,23;63:12;68:3;71:6;73:23;74:8,12;75:17;76:7,10,13,14,19;77:1,3;80:22;81:3,5;82:8,10,13;83:2,5,7;90:3,6,8,15,21;94:1,7,15,20;95:7;107:14;108:12,14,16,17,22;109:18;112:21,24;114:22;115:25;117:8,19;121:12;125:17,18,22;127:3,14;129:20;130:20;134:5
**Benes' (2)**
35:20;112:6
**best (2)**
74:3;113:6
**Bethany (1)**
12:8
**Beyond (1)**
101:16
**bifurcate (1)**
107:16
**bifurcated (1)**
107:17
**big (4)**
6:15;71:13;106:3;126:9
**bigger (1)**
4:20
**biggest (1)**
25:16
**bin (18)**
70:9;83:25;84:4,8;95:23;99:23;100:3;115:5,7;130:1,2,11,13,15,15,16;131:3;

133:14
**binder (3)**
4:19;25:15;46:16
**binders (2)**
4:23;5:13
**bit (2)**
16:5;73:15
**black (1)**
79:22
**blame (4)**
86:1;89:8,10,13
**blamed (1)**
98:11
**blameworthiness (1)**
115:15
**blessing (2)**
125:23,25
**blind (1)**
132:8
**block (2)**
56:14;93:1
**BMG (1)**
103:15
**BNG (110)**
3:25;10:6,14,19,21;11:3,12,16;14:4;19:15,15,16,19;20:14;22:2,17,20,22,24;23:14,19,25;24:3,5,7;26:7,7;29:24;32:18;37:16;38:5;39:2,23;41:17;44:23;45:4,6,10,12,13,17,18,18,20,24;46:3;47:1;49:14,15,16,18;50:16;52:6;53:3,16,17;54:13,22;55:16;57:1;63:21;65:6;66:18;77:11;78:11,18;79:6;80:6;81:14,18;83:18;84:5;85:8,18,20,21,22,24;86:9;92:15;93:7,14,14,14,15,16,18,18;94:21,22;95:15,17;99:11;100:14;104:10;106:11,23,23;107:16;112:2;119:7,8,8,17;120:18;127:25;128:2;130:6;133:2,6
**BNG/Aria (2)**
104:2;105:24
**BNGgroup46 (1)**
53:25
**BNGgroup46@gmailcom (1)**
53:24
**BNG's (20)**
10:10,12,24;11:6;19:13;20:12;22:13;29:10;67:22;79:24;80:8;81:11;84:15;106:6,9;108:10;119:11;120:15;121:5;128:14
**BNJ (1)**
93:16
**Bob (2)**
127:10,10
**body (3)**
65:24;121:8,9
**Bogatin (67)**
9:12,18;11:2;12:12,15,18,23,24;13:8;14:6,21,24;17:4,11;18:3,9,11,14,16;19:11;20:1,6,12,17;21:1,5,9,10,11,15,21;26:17;27:1,12;44:18;50:15,18;51:12,15,23;52:1;55:6,12,18,23;56:2,6,11;57:1,18;81:15,19;85:16;88:13;92:4,23;93:9,17;99:1;104:18;112:3;114:7;115:25;119:9;131:9,11;132:11
**Bogatin's (17)**
22:12;50:18;54:19;73:5,8;75:25;76:1;80:24;81:8,10;83:18;84:15;103:12;105:17;114:10;129:2;131:8
**Bolton's (1)**
89:15
**book (5)**
6:15;43:21;71:13;72:3;74:4
**books (3)**
4:20;32:15;93:19
**both (11)**
25:6;27:9;51:17;66:9;77:25;90:21;100:23;104:18;112:5;124:21,25
**bottom (4)**
29:5;41:16;64:23;74:19
**box (4)**
64:24;65:1;79:22;129:5
**boyfriend (1)**
93:17
**breached (1)**
120:18
**breaches (1)**
119:7
**break (1)**
58:25
**brief (2)**
58:23;116:16
**briefly (1)**
71:10
**bring (2)**
33:11;35:23
**broad (1)**
85:13
**brokers (1)**
14:14
**brought (1)**
79:25
**bucket (3)**
68:18,19,21
**build (3)**
19:11;20:14;118:3
**building (11)**
38:14,16,18;49:14,15,16,18;50:7;56:7;111:10;118:13
**bullet (1)**
75:3
**burden (3)**
90:12;131:14,16
**Business (55)**
3:20;9:9;10:10,14;11:6,16;12:15,18;13:11;15:1,1;18:14,15,21;19:11;20:15;24:3;26:6;32:1;40:1;43:5;44:21;45:4,10,13,17;47:1;50:16;52:6;53:3,5,16;54:22;55:20,21;57:2;78:18;81:14;85:8,18,21,24;86:10;92:15;98:3,13;99:11;101:7,7;104:2,8;105:24;108:11;112:3;125:5
**businesses (6)**
13:1;18:22,22;106:5;112:5,22
**businessman (1)**
13:12
**businesswoman (1)**
51:21
**busy (6)**
18:21,25,25,25,25;22:11
**button (2)**
88:13;96:24
**buy (1)**
20:16
**buying (1)**
10:5

## C

**call (2)**
10:3;99:24
**called (8)**
4:2;10:9;37:16;38:5;79:6;80:1;124:1;130:6
**Calls (2)**
51:11;67:12
**Came (10)**
7:11;38:12,16,18;64:4;66:25;67:22;95:4;118:20;122:25
**can (64)**
3:17;5:15;7:10;9:9;10:15,25;12:17;13:20;16:10;17:19,20;18:20;19:6;24:11;26:20;27:5,17;31:20,25;41:11;43:4;45:15;46:7;48:1;49:6,10;50:1,2,3;55:14;57:7;58:18;60:9;62:5;64:20,23;65:4,11;66:6;72:2,5;74:2;76:17;77:9;83:21;84:7;93:21;95:25;99:17;108:2,7,18,19;109:4,13;110:1,2;112:16;117:17;124:13;129:14;130:3;131:18;133:17
**Cantwell (4)**
63:17,18,19;64:5
**capital (2)**
112:20,21
**capture (1)**
85:17
**captured (5)**
66:19,23,24;83:21;85:15
**car (1)**
124:7
**card (6)**
19:15;20:7,10,12,15;114:2
**cards (4)**
19:7,13,17;20:8
**care (5)**
36:22;57:23,25;58:3,4
**carefully (1)**
114:24
**carpet (1)**
26:6
**carrier (3)**
47:4;48:10;52:2
**case (75)**
4:6,13;6:3,21,23;7:2,14;10:9;25:8;66:14;77:8;86:19;89:2,3,3,14;90:24,25;93:13;96:15;98:1,2,6,8;99:19;100:15,17,19;101:6,15;102:9;103:2,7;107:24;108:1;110:10,21;111:13;112:9,17,25;113:1;115:14;116:16,19;117:20;118:3,11,13,21,22;120:9,20,25;122:4,7,10,20;123:25;124:4,8,9,10,13,14,16,24;125:2,12,24;131:20,23;132:16,18;133:22
**cases (7)**
90:23;108:5;113:7,10;116:2;123:19;125:5
**cast (1)**
125:10
**catch (1)**
108:19
**cause (3)**
91:10,11;131:20
**caused (3)**
102:17;105:10;119:24
**causes (1)**
102:1
**causing (1)**
119:11
**CCed (1)**
56:14
**CCleaner (57)**
10:9;11:5,8;21:16;57:13,19,21;64:24;69:2,6,9,12,19;80:18,20;81:7,18,19;82:1,15,23;83:16,21;84:13,14,16,21;85:1;86:21;87:2;91:8;96:18,19;97:6,9,20;98:10,14;99:10;103:9;104:17,23;112:1;114:20;115:6;129:1,10,12,24;130:2,3,9,12,17;132:13,13;133:10
**cell (35)**
45:3,11,12,21,24;46:3,9,11,11,12,13,14,24;47:6,9,10,13,16,23;48:5,6,13,13,17;49:7,11;50:15,19,21,23,25;51:15;52:1,2,3
**cellphone (2)**
111:21,22
**cellular (3)**
46:22;47:4;48:9
**certain (19)**
4:14;6:23;7:2,16;8:4,7;10:10;14:6;60:19;66:17;68:13;80:22;85:6,13,13;93:24;94:9;109:12;110:18
**certainly (2)**
105:8;114:18
**certainty (1)**
73:21
**cetera (1)**
90:2
**chair (1)**
122:7
**chairs (5)**
122:9,11,12,14;124:5
**challenged (1)**
102:21

**change (1)**
9:22
**changed (3)**
84:18;93:4;130:21
**changes (1)**
99:24
**Charles (2)**
26:2,5
**chart (4)**
61:16;62:2,24;
91:21
**cheat (1)**
61:23
**check (3)**
27:7,8;50:1
**checks (3)**
18:14,15,16
**chief (1)**
22:22
**chip (1)**
62:8
**choice (2)**
65:23;66:1
**choose (1)**
66:7
**chose (1)**
133:1
**chosen (1)**
84:22
**Christopher (1)**
59:9
**Circuit (5)**
83:1;103:2;115:12;
122:2,23
**circumstances (1)**
122:1
**cite (1)**
116:16
**cited (3)**
90:23;113:10;
122:20
**claim (8)**
102:8;116:15;
121:6;122:15;123:2,
13,15,23
**claimed (4)**
96:18;119:1,7;
125:11
**claims (7)**
88:2;94:22;97:2;
116:13;120:17;
128:25;131:23
**clarify (1)**
18:1
**clear (6)**
25:8;48:2;50:22;
99:24;116:24;117:5
**clearly (12)**
47:14;48:11;77:24;
78:10,18;79:17;
83:20;86:14;90:21;
99:6;120:7;123:22
**CLERK (1)**
3:1
**click (1)**
82:5
**clicked (1)**
88:13
**clicking (1)**
96:24
**client (5)**
27:20,22;36:9;
55:25;114:15
**clients (1)**
29:9
**clients' (1)**
36:6
**client's (2)**
36:13;115:15
**closing (1)**
76:15
**closings (1)**
76:18
**cloud (3)**
67:23;74:14;85:9
**collect (1)**
89:9
**comfortable (1)**
52:9
**coming (1)**
80:17
**co-mingling (1)**
119:10
**commented (1)**
108:15
**committed (1)**
115:16
**communication (3)**
35:6;109:3;121:16
**communications (9)**
39:13;66:19,22;
67:5;74:16;88:9;
94:23;109:6;121:11
**companies (8)**
3:25;13:6,8;14:7;
18:17;21:22;55:22;
132:24
**Company (10)**
24:5;39:25;40:1,1,
3;45:18;51:20;52:3,4;
72:10
**company's (4)**
30:2;31:23;32:10,
15
**compel (27)**
41:5;42:10;43:17;
45:9;78:20,21,21;
79:1,4,9,9,13,21;
80:11,12,15;81:21;
87:9,10;88:17;93:10,
10,11;97:17;109:7,
10;110:11
**compelled (3)**
43:1;79:11;87:19
**compelling (1)**
45:8
**compensate (1)**
115:19
**compile (2)**
27:12;88:10
**Complainant (1)**
119:12
**complaint (15)**
7:17;8:5,8;112:10,
14;116:9;118:14;
119:18;120:1,2,23;
121:4,8,9;123:20
**Complaints (1)**
116:10
**complete (7)**
60:12;78:23;79:25;
87:4;89:20;93:18;
131:4
**completed (2)**
68:5;87:6
**completely (2)**
88:6;94:21
**compliant (1)**
132:15
**complicated (1)**
116:23
**complied (1)**
99:9
**comply (10)**
41:20;79:10;87:11;
88:18;97:4,17;98:8;
99:2,3,4
**computer (97)**
8:25;9:2,3,4,4,19;
21:22,23,25;22:4,12,
12,17,20;23:25;24:4,
5;42:15,25;43:5;
44:22;57:22,23;58:2,
10;60:21;65:5,6;
66:18;73:13;74:21;
78:10,14,15,17;79:2,
3,5,14,16,18,20;
80:18,24,25;81:6,8,
11,11,19,20;82:16,17,
18,19,20;83:18,19,22;
84:1,15;88:8;94:18;
96:18,21,22;97:14,19;
98:12;103:12,13,15,
19,24;104:3,5,10;
105:17,19,20,24;
111:8,19;112:2;
113:13,14;114:11;
115:9;121:18;122:10;
127:13;129:2,3,25;
130:5;131:6;132:2
**computers (53)**
10:6,10;11:6,9,13,
16;39:2,9,12;41:9;
42:19;52:21;56:23;
58:9,11;60:3,14,18;
64:16;66:24;67:23;
71:19;80:16;84:15;
98:13;99:2;101:6;
103:20,22,22;104:7,8,
14,16,20,21;106:13;
110:25;111:4,17;
113:18;116:6,7,8;
121:21;125:5;131:6,
7,10,13,13;132:21;
133:1
**concern (1)**
110:1
**concerns (16)**
65:7,9;69:1,5,8,11,
14,18,23;70:4,7,12,
16,20;109:25;121:12
**conclude (1)**
117:25
**concluded (1)**
134:9
**conclusions (1)**
121:7
**condition (1)**
118:14
**conduct (36)**
14:6;24:3;30:2;
31:23;32:10;45:4,10,
13,17,18;50:16;52:6;
54:22;57:1;77:14,14,
25;81:14;85:8,18,21,
24;86:9;92:15;98:5;
99:11;100:23;101:15,
25;102:23;115:16,20;
116:20;122:3;123:12,
13
**conducting (1)**
122:3
**confirm (1)**
72:5
**confirmed (4)**
34:13;37:5;104:9;
105:17
**confused (2)**
56:18;67:24
**connected (1)**
111:12
**consideration (1)**
128:11
**considered (1)**
115:13
**consistent (2)**
62:12;106:22
**constant (1)**
82:5
**constructor (1)**
20:13
**contained (5)**
78:11;118:2,16,18;
123:20
**contended (4)**
22:23;23:18;66:18;
85:19
**contends (4)**
92:6;93:2;120:14;
132:1
**content (2)**
31:11;99:25
**contention (1)**
83:15
**contents (2)**
34:13;47:2
**contest (1)**
57:19
**contested (1)**
77:16
**continuation (1)**
98:6
**continue (2)**
42:20;132:14
**continued (4)**
79:2;89:20;110:20;
117:2
**continuing (1)**
126:17
**continuously (1)**
79:19
**control (6)**
20:5;45:7;55:11;
85:22;111:20;116:7
**convenience (2)**
29:3;60:10
**convenient (1)**
46:17
**conversation (1)**
37:9
**conversations (1)**
63:23
**conversion (6)**
93:14;119:8;
127:23;128:10,13,25
**converted (1)**
93:15
**cooperate (1)**
90:1
**cooperated (1)**
125:6
**cooperating (1)**
34:15
**copies (4)**
91:15;121:15;
131:23,24
**copy (2)**
28:13;80:8
**corner (1)**
64:23
**correctly (1)**
90:17
**correspondence (1)**
109:2
**costs (1)**
124:17
**counsel (4)**
80:9,16;84:11;86:8
**count (12)**
88:23;91:3;118:25;
119:6,21,22,23;120:1,
17;121:6,6,6
**counts (1)**
91:2
**County (12)**

4:7,11;6:21;7:14;10:8;78:8;79:20;80:12;83:1;107:11;113:6;126:6
**couple (1)**
108:24
**course (17)**
4:15;13:5;14:3,5,13;18:2;20:2,5;22:7;23:17;47:1;50:17;52:8;88:19;100:22;114:1;134:2
**COURT (225)**
3:3,7,9,13;5:16,20,23;6:2,6;8:13,21;11:19,22;12:1,2;13:19;15:18,20;17:17;18:19;20:20,23;21:1,7,12,18;23:2,8;25:2,4,6;26:19;27:4;28:8,12,18,20;30:12,21;31:1,9,14,16,20;33:2,13,16,22,24;34:1,8,18,22;35:16;36:1,23,25;37:11,21,23;39:21;40:2,13,15,18,25;41:15;42:22;43:1,10,13;44:16;45:8,15;46:7;49:3,5;50:3,5;51:14;53:1;55:13;57:6;58:14,17,21,24;59:3,3,6,7,8,10;60:9;61:20,22,24;62:5,18,20;63:3,7;65:4,11;66:15;67:14,19,24;68:4;71:8,15;75:15;76:8,12,16,21,21,24,25;77:1;78:2,8,20,23;79:8;80:12,20;81:2,4;82:7,9,12,25;83:1,3,6,8,9,12;85:12,17;86:5;87:9;88:17,24;89:2,17,23;90:4,5,7,11,16;93:25;94:5,12,19;95:2,6;97:11,14,20;98:4,4,6,18,23;99:4,6,24;101:1,23;104:23;105:6,11;106:15,25;107:4,7,20;108:1;111:21,25;112:20;113:7,20,23;115:23;116:19;118:1,3,5,8;122:7,10,13,17,18,25;123:7,23,25;124:15,22,24;125:12,14,16;126:3,6,8;127:2,3,12;129:19,24;130:18;132:18,19,22;133:25;134:1,4,7,7
**courtroom (1)**
83:10
**courts (2)**
108:2;123:11
**Court's (5)**
11:21;41:17,21;87:12;101:24
**cover (1)**
100:15
**covered (1)**
57:4
**CPA (5)**
32:5,6;94:23;95:10,10
**crafted (1)**
124:4
**crafting (1)**
73:24
**create (1)**
29:9
**created (11)**
53:16;55:6,12,23;57:1;62:10;91:18;92:5,7,24;128:8
**creates (1)**
55:25
**creating (1)**
123:7
**creation (1)**
66:3
**Creative (1)**
101:20
**creator (1)**
66:2
**credentials (10)**
52:10,22;53:6;55:8;70:24;86:10,11;92:17;109:5,8
**credibility (3)**
88:20;89:15;114:16
**credible (1)**
88:22
**credit (7)**
19:7,13,15,16;20:8,10;114:2
**creditors (1)**
100:14
**cripple (1)**
101:21
**CRO (3)**
23:2,6,7
**CROSS-EXAMINATION (3)**
12:4;71:9,11
**culpability (3)**
102:11;115:15,22
**culpable (1)**
115:19
**cumulative (2)**
102:3;123:16
**Curran (3)**
26:2,2,8
**current (3)**
47:23;50:19;105:24
**curse (1)**
125:23
**cursed (1)**
126:2
**custody (1)**
85:21

## D

**damage (1)**
117:19
**damaged (2)**
34:17;117:21
**damages (2)**
120:11;122:15
**Daniel's (1)**
105:22
**data (57)**
40:1;62:10;65:13,15,23,24;66:5,24;69:25;71:3;74:25;77:5,7,8,18;82:2,2;85:17;86:24,24;87:4;89:4,6,6,6,14;91:16;93:7,11,12;94:16;96:25;98:15,15,20;99:13,16,17,22;100:11;101:10;107:2;110:2;113:20;114:24;117:4,6;118:2;121:24;122:18;129:17;130:9,10,16,23;133:3,16
**database (3)**
35:23;51:2;65:18
**date (24)**
8:17;28:16;33:5;34:24;36:4;37:14,21;39:24;40:7;41:3;43:16;49:12;62:22;63:11;66:3,4;78:25;82:25;83:13;91:18;109:20,22;126:14;129:16
**dated (9)**
25:21;28:24;35:2;40:6;46:20;74:21;75:2;111:8;120:4
**dates (3)**
25:12;43:19;109:17
**Davenport (1)**
118:6
**day (19)**
15:24;46:12;71:22;72:6;83:3,10,12,13,17,20,22;85:1;95:24;108:25;109:10;117:3;130:11;133:10;134:4
**days (7)**
64:4;108:11,12;116:2;126:23;127:4;129:6
**day-to-day (5)**
22:13;81:11;83:18;84:15;106:1
**DC (1)**
98:4
**de (2)**
27:15;30:14
**deal (3)**
51:21;106:3;132:7
**debts (1)**
100:15
**December (28)**
37:15,22,24;39:11;40:22;59:24,24;60:24;63:13,17,20;64:4;71:17,22;72:14,18,22;74:21;75:11;79:22;80:5;86:16,17,18,19;100:10;104:24;109:11
**decide (4)**
20:21;21:14;55:20;118:3
**decision (2)**
27:9;101:24
**decisions (1)**
107:22
**deemed (2)**
124:13,14
**default (18)**
77:12,13;84:21;87:2;97:10;98:24;100:19,24;113:8;118:1,8;123:8,11,24;125:2;133:21,22,23
**defend (3)**
102:7;122:16;123:15
**defendant (7)**
89:14;96:14,19;108:21;128:16;131:15;132:14
**defendants (2)**
107:24;108:5
**Defendant's (20)**
6:16;7:6;8:15,17;72:3,7;74:4,5,6,16;75:1;103:23;104:6;105:23,25;108:12;109:24;110:7,17;118:9
**defense (12)**
30:13,23;31:1;34:6;40:20;88:7,7;103:15;106:21,24;128:24;132:2
**defenses (2)**
100:16;123:4
**defer (2)**
12:21,25
**deferred (2)**
81:15;107:22
**deficiencies (1)**
28:1
**deficiency (1)**
28:3
**defined (1)**
101:18
**Definitely (3)**
17:3;49:9;51:21
**degree (3)**
73:21;115:14,22
**delegate (1)**
132:7
**delegated (2)**
93:8;132:10
**delete (16)**
11:13,15;69:15,15,24;84:17,20;98:16,18;115:25;129:16,22;130:4,5,7;133:13
**deleted (17)**
84:19,24;93:9;100:2,2,18;105:3;114:23;115:4,4,24;125:11;127:21,21;130:2;132:3;133:11
**deleting (1)**
133:14
**deletion (1)**
102:18
**demand (2)**
78:3,4
**demonstrable (1)**
119:20
**demonstrating (1)**
90:13
**demonstrative (1)**
106:7
**denied (6)**
39:24;98:15;118:10,12;123:14;124:11
**denying (1)**
123:1
**department (1)**
4:4
**depends (1)**
66:4
**deposed (2)**
15:5;123:19
**deposition (4)**
15:8;16:1;36:5;88:24
**depositions (1)**
118:21
**Depot (2)**
20:10,15
**deprive (1)**
90:18
**deputy (3)**
28:21;33:7,11
**derivative (1)**
78:3
**designate (1)**
74:12
**designated (2)**
106:10;114:10
**designation (7)**
73:25;74:8;103:20,

21,23;105:23;108:13
**designed (1)**
123:14
**desk (5)**
58:11,11;101:5;
115:9;131:14
**desktop (1)**
94:18
**despite (4)**
102:10;112:6;
116:22;117:19
**destroy (3)**
106:22;113:11;
115:3
**destroyed (17)**
71:3;77:6,7,8,18,
21;86:24;92:3;93:20;
97:6;102:2;115:7;
120:16;122:13,16;
129:22;133:4
**destroyer (1)**
101:13
**destroying (1)**
102:16
**destruction (16)**
77:6,9;87:4;91:16;
96:25;100:6,8,12,22;
101:12,16;102:17;
113:21;116:23;
122:21;129:18
**Detail (1)**
46:2
**details (1)**
45:25
**deter (1)**
115:20
**determine (5)**
88:20;92:18;
104:13;106:13;118:2
**determined (1)**
124:1
**device (25)**
46:22;47:4,15;
49:10;51:10;61:15;
64:21;76:2;78:10,18;
80:23;85:18;86:20;
87:6;91:18;104:2,8,
11;105:16,21;106:10;
111:19,20;129:15,16
**devices (65)**
39:25;40:3,22,24;
42:25;45:9;51:18;
57:14;59:18;60:11,
13,16,17,20,24;61:16,
21;62:2,12,24;63:2,9,
20;64:10;67:23;
72:10;73:1,5,25;74:1,
8,20;79:2,24;80:3,6,8,
8;81:22;82:24;85:5,8,
9,12,20,23;86:2,4,6,7,
12,12,13;87:6;88:18;
89:8,9;97:21;99:11;
103:18;106:17;108:9,
10;133:8,9
**died (2)**
96:18,21
**difference (2)**
91:10;106:8
**different (13)**
21:19;27:1;46:14;
57:6;60:15;94:24;
99:8,11;103:22;
105:14;106:18;129:7;
130:19
**differently (4)**
99:6,7,7,8
**differs (2)**
16:25;62:2
**difficult (1)**
90:12
**Digital (3)**
61:3,14;117:15
**digitally (1)**
92:8
**DIRECT (11)**
3:15;6:15;7:6,21;
39:22;41:16;59:13;
66:14;71:13;72:2;
74:4
**directed (1)**
55:18
**Directing (1)**
72:25
**direction (3)**
73:12;105:9;114:19
**directly (1)**
118:20
**disable (2)**
97:8;102:19
**disagree (4)**
32:18;43:4;57:21;
58:6
**disagreement (2)**
10:19;96:23
**disappear (1)**
10:3
**disastrous (1)**
117:17
**disavowing (1)**
112:18
**discarded (1)**
98:23
**discharge (3)**
118:25;119:6,22
**discover (2)**
128:3;133:20
**discovered (1)**
109:12
**discoveries (1)**
125:6
**discovery (36)**
4:14;6:3,4,20;8:14;
27:12;30:9,25;34:15;
41:19;65:14;66:5;
67:2;79:10;85:14;
88:11;97:5,13,17,19;
98:9;99:3,19;101:18;
107:11,12;108:4;
110:6,9,21;113:11;
121:19;124:9,18;
126:22;132:15
**discretion (2)**
88:19;123:7
**discuss (1)**
73:15
**discussed (1)**
29:10
**discussing (2)**
64:7;123:25
**disjunctive (1)**
123:10
**dismiss (2)**
115:13;123:23
**dismissal (7)**
103:5;117:25;
121:25;122:3,5;
123:1,3
**disorganized (1)**
102:21
**disposing (1)**
101:4
**dispositive (1)**
102:10
**dispute (3)**
10:12;30:9,25
**disputes (1)**
107:12
**disqualification (2)**
90:7;132:23
**disqualified (2)**
89:19,25
**disregard (2)**
89:21;131:4
**distinction (1)**
101:23
**distracted (1)**
102:21
**distributions (1)**
112:22
**District (4)**
89:1;97:7,11;118:7
**diversions (1)**
120:15
**docket (2)**
3:1;120:5
**docketed (1)**
126:23
**document (17)**
5:14;6:11;7:10,11,
12;44:5;91:5,6,9;
92:10;98:12;101:5;
120:3,15,23,24;132:1
**documentation (5)**
21:24;92:16,19;
112:10;125:7
**documents (52)**
4:14;5:7,9;6:24;7:2,
17;8:4,7;10:14,22;
24:13;27:12;34:16;
65:24;66:18;73:24;
79:11;87:16,18;88:1,
6,10,11;91:23;92:13;
107:15;110:19,23;
112:11,13;113:3;
116:12;118:21,22,23;
119:3,5,10,16,17;
121:1,3,14,18,20,21;
123:20;125:4,8;
128:8;129:21;133:9
**done (13)**
32:21,23;33:23;
60:19;66:10;67:11;
70:5;83:24;93:24;
96:4;114:19;116:1;
117:9
**doubt (3)**
114:17;130:8,9
**doubts (1)**
125:10
**down (5)**
15:22;58:18;95:4;
104:9;126:25
**download (1)**
113:18
**downloaded (5)**
80:18;81:7;96:24;
113:17;129:1
**draft (5)**
42:5,6,10;80:15;
83:10
**drafting (1)**
81:23
**drive (72)**
60:25;61:1,1,2,3,7,
9,12,13;62:8,10;
63:15,23;64:1,2,3,5,6,
8,8,9,12,12,12,21,25;
70:13,17,21;71:23;
72:6,11,14,18,20,23;
73:6,9,16,19,20;
75:18,19,20,20,20,22,
22,23,25;76:1;78:9,
11,13,16;79:3,5,6,14,
16,17,19;84:25;99:16,
17;111:7,9,23;114:10,
10;115:1;124:20
**drives (25)**
58:7;59:21,23;60:2,
2;62:6;63:13,22;64:7,
11,15;71:18,23;
72:23;99:14,14;
108:8;109:12;110:14,
14,24;111:16;121:15;
126:2;133:12
**Dropbox (9)**
24:7,8,14;86:9,10;
87:23,24;108:25;
109:4
**dual (2)**
106:8;132:21
**due (2)**
77:4;134:2
**during (14)**
27:11,21;46:14,25;
47:6;51:3;60:1;66:1;
91:20,23;92:7;97:9;
106:23;108:15
**duties (1)**
4:1
**duty (20)**
77:5,17;78:6;88:4,
16;89:13,25;90:1,22;
97:24;100:5;101:9,
16,21,22;102:19,23;
119:8;132:6,11
**DynCorp (1)**
115:11

## E

**e- (2)**
65:13;66:4
**earlier (1)**
8:23
**earliest (1)**
49:25
**early (5)**
40:22;59:24;77:17;
106:21;109:19
**easier (1)**
116:4
**Eastern (3)**
88:25;97:7,11
**easy (1)**
92:12
**economy (1)**
126:15
**EDDA (1)**
122:6
**e-discovery (4)**
65:16;66:11;67:1;
106:20
**educational (1)**
3:19
**effect (3)**
97:1;117:17;123:13
**effects (1)**
101:8
**ego (1)**
132:25
**egregious (12)**
77:14,25;96:14;
97:9;100:23;101:25;
116:20;118:9;122:17;
123:12;124:21;128:1
**egregiously (1)**
93:10
**eight (3)**
108:12;113:25;
129:6
**eighteen (4)**
71:23,25;72:5;
75:18
**either (5)**
46:16;75:7;77:14;

114:5;118:9
**either/or (1)**
102:25
**electronic (6)**
39:25;45:9;92:10;
108:9,10;128:18
**element (1)**
120:9
**elevator (1)**
55:22
**Elich (1)**
115:5
**eliminator (1)**
97:6
**else (4)**
89:13;108:3;
127:20;131:17
**email (67)**
14:21,24;15:1,2,3,
4;16:9;36:20;46:19,
21;52:5,8;53:2,4,9,15,
19;54:7,19;55:5,23;
56:8,9,17,22,25;57:6,
8,9;59:25;60:8;62:21;
63:14;70:24;72:8;
74:12,21,23,25;75:2,
4,6,11,19;86:11;87:6;
89:11;92:14,14,17,22,
24,25,25;93:2;99:21;
101:5;104:11;106:11;
108:18;109:1,3,7,10,
11;110:14;122:21
**emails (18)**
35:11,23;36:6,14;
52:21;55:25;56:2,6,
13,14;61:4;67:5;
81:14;92:19;99:22;
106:20;122:23,25
**emphasized (1)**
115:12
**employed (3)**
3:22,23;124:12
**employee (1)**
4:4
**employees (1)**
63:19
**employer (1)**
103:10
**emptied (2)**
70:9;83:25
**empties (1)**
130:15
**end (2)**
126:9;133:10
**ended (4)**
26:23;46:9;110:5;
129:2
**engage (1)**
96:14
**engaged (4)**
89:17;98:2;100:20;
101:15
**engaging (1)**
81:24
**enormous (2)**
100:10;133:16
**enormously (1)**
99:13
**enough (3)**
87:3;97:9;118:2
**ensure (7)**
29:12;77:22;83:20;
84:13;87:4;91:8;92:4
**enter (3)**
97:9;123:23;133:23
**entered (25)**
64:13,22;69:16,25;
70:10;78:21,22;79:1,
8,13;80:11;83:3,8,12,
17;84:22;85:17;87:9;
89:16;95:25;97:5;
98:24;100:9;123:11;
133:7
**entering (1)**
123:4
**entire (6)**
47:2;70:8;83:24;
130:5,10,14
**entirely (1)**
67:25
**entities (2)**
93:16;119:9
**entries (2)**
93:24;94:9
**entrusted (1)**
98:22
**entry (5)**
6:4;94:10;123:8;
128:22,23
**Enzia (1)**
124:22
**Enzia! (2)**
116:16,20
**equally (1)**
21:5
**equate (1)**
132:5
**equipment (1)**
4:5
**Erie (1)**
118:5
**errors (1)**
30:3
**ESI (2)**
102:17;123:16
**especial (1)**
44:21
**especially (1)**
24:4
**essential (1)**
102:7
**establish (3)**
92:12;118:8,11
**estate (1)**
14:14
**et (1)**
90:2
**ethical (1)**
90:1
**Eun (6)**
19:22;23:21;44:23;
45:4,18;111:19
**Eun's (10)**
45:6,11,17;46:3;
65:5;73:12,19;78:17;
111:7,18
**even (15)**
11:8;43:1;72:11;
75:1;88:23;96:3;
101:11;106:17;
108:14,16,25;110:12;
116:24;123:24;
128:22
**eventually (2)**
64:3;68:22
**everybody (4)**
3:3;35:11;89:13;
134:3
**everybody's (1)**
35:10
**evidence (72)**
8:15,17;20:24;21:8,
11,16;34:23;37:14;
41:2;43:16;45:6;
55:10;58:22;62:22;
63:10;77:20,21,23;
78:6;80:20;81:5,10;
84:7;86:19;87:22;
94:2;96:14,20;97:2,6,
25;98:23;100:18;
101:12,14,16,17;
102:1,2,3,4,6;103:7;
106:19,23;110:23;
112:8,8;113:4,10,11,
12;114:18;115:3;
116:23,25;117:24;
119:13;120:16;
121:14;123:22;124:7,
8,9,13;128:1,2;129:4,
17,23;131:21;132:4
**evidencing (1)**
127:12
**evidentiary (1)**
63:6
**exact (1)**
129:16
**exactly (8)**
25:12;34:5;38:2;
41:7;50:1;56:1;73:21;
126:1
**EXAMINATION (7)**
3:15;59:13;63:5;
75:16;120:9;121:22;
124:19
**examine (1)**
118:1
**examined (1)**
63:4
**example (10)**
91:3,19;102:14;
113:23;114:9;128:20;
130:6,7,14;131:24
**exceeds (1)**
66:13
**exceptions (1)**
67:4
**Exchange (1)**
118:6
**excluding (1)**
120:18
**Excuse (4)**
49:2,3;56:4;133:2
**excuses (1)**
99:12
**exercising (1)**
115:13
**exhibit (75)**
4:19;5:6,8;6:1,16;
7:6,21;8:15,17;25:15,
19,20;28:8,10,16,22;
32:25;33:5,6;34:24;
35:1;36:25;37:14;
39:18,20;40:9;41:3,
14;43:9,16;45:9;
46:16,18;60:5,7,22;
62:17,22;63:1,2,10;
64:17;71:13;72:2,25;
73:17;74:5,11,17,19;
75:2;78:22;87:10;
91:22;99:18;104:2,6;
105:16,22,23,25;
106:21;108:12;
109:24;110:7,12,17;
111:6;113:21,23;
129:9,11,19,20,22
**Exhibits (12)**
8:10;82:2;85:7;
103:15,23;107:10;
109:4;116:10,11;
118:17,19;123:21
**exist (1)**
94:3
**existence (1)**
47:1
**expected (1)**
95:4
**expense (1)**
100:17
**experience (2)**
13:11;26:13
**expert (11)**
41:22;88:25;89:1,3,
19;112:17;117:12,14;
120:3,8;123:21
**experts (2)**
116:15;117:10
**expert's (1)**
112:15
**Explain (5)**
27:21;49:7;62:5;
64:20;65:11
**explained (3)**
34:6;58:9;125:7
**Express (2)**
19:19;20:7
**extent (7)**
115:15;118:23;
121:1;123:16;128:3,
5;133:20
**external (11)**
58:6;59:20,23;60:2;
64:7,11;71:23;72:6;
99:14,16;133:11
**extracts (1)**
66:5
**extremely (2)**
18:21;93:6
**eye (1)**
132:8

## F

**F3d (1)**
101:13
**fabricated (1)**
119:9
**face (1)**
108:9
**faced (1)**
124:21
**fact (48)**
12:15;14:21;17:9,
11;19:10;20:17;21:2;
22:12;25:24;30:15,
17;39:8;42:3;43:1;
44:13;47:5;57:21;
59:25;60:12,16;
65:17;69:21;70:4,13,
13,17,21,24;72:9,11;
73:18;85:25;89:19;
97:8;103:22;104:16;
106:7;113:17;117:20;
118:23;126:11,20;
130:22;132:22,23;
133:1,3,16
**factors (1)**
115:12
**facts (3)**
45:5;55:10;56:20
**failed (15)**
77:20;79:10;87:11,
15,17;88:18;97:4,8,
17;98:8;99:2,3,4;
102:19;105:11
**fails (2)**
106:7;119:23
**failure (2)**
74:12;132:4
**fair (3)**
14:19;41:8;107:7
**fairly (1)**
65:20
**faith (3)**
98:22;103:3;122:2
**false (4)**

92:13,18;110:1;
119:12
**familiar (2)**
24:8;57:8
**famous (1)**
89:2
**far (8)**
21:13;65:25;83:15;
96:7;102:5;116:24;
117:5;128:8
**fashion (1)**
126:18
**fault (2)**
67:25;106:14
**favorite (1)**
11:24
**FDR (2)**
101:20;118:11
**feature (6)**
69:15,24;70:2;
86:23;129:16,22
**features (2)**
87:3;133:15
**February (5)**
24:17;25:10,21;
77:17;78:3
**Federal (2)**
117:24;122:22
**fee (1)**
125:1
**feel (4)**
52:8;77:12;99:7,7
**fees (8)**
36:10;78:25;
107:22;113:6;124:17;
126:6,12,18
**feign (1)**
85:16
**feigns (2)**
21:1;88:6
**fell (1)**
124:1
**felt (2)**
99:6,8
**fiduciary (1)**
119:7
**field (5)**
66:2,3;89:2;118:4,
14
**fifteen (1)**
47:9
**fifth (1)**
87:16
**fifty (3)**
23:20;88:22;112:11
**fifty-nine (2)**
92:1;112:12
**file (15)**
62:14;66:6;86:25;
87:25;94:25,25;95:7;
99:24;126:20;127:15,
15,16,16,20,20
**filed (25)**
4:6;10:8;20:25;
27:11;43:2,17;44:2,6;
78:7,19,20;81:21;
82:10;95:13;99:10;
100:7;110:22;112:10,
14,15,17;119:11;
126:21,24;127:4
**files (42)**
21:21;24:11;26:25;
29:11;69:16;80:8;
84:19,23;87:24,24;
88:12;90:2;91:17;
92:2,2;93:19;94:3;
95:11,18,22;96:1;
97:7,8;99:23,25;
100:1,2,3;110:1,6,7;
111:17;115:4,4,8;
121:15;125:10;128:6,
18;130:3,24;133:11
**filing (7)**
26:23;30:3;40:2;
41:4;81:24;98:12;
132:20
**final (1)**
36:12
**finally (1)**
77:9
**financial (11)**
13:3;17:4;20:18;
29:6,19;44:22;56:23;
107:15;117:13;
120:14;131:1
**financials (5)**
81:12;88:9;94:20;
130:6,8
**find (7)**
27:7;90:16;91:12;
98:1;109:13;127:20,
24
**finding (15)**
69:2,6,9,9,12,18,24;
70:4,8;71:3;89:17,21;
90:18;99:9;102:11
**findings (2)**
69:15;86:3
**fine (4)**
3:13;19:5;50:5;
58:24
**finger (3)**
21:1;85:16;99:1
**finish (1)**
35:24
**Finnish (1)**
3:20
**firms (1)**
27:7
**first (31)**
7:13,22;8:2;33:9;
36:14;48:1;60:25;
61:2,4,6,7,9;64:8,12;
67:21;68:6;70:13;
75:3,20,22;78:9,21;
79:3,5,13,15,19;
80:20;81:5;86:10;
96:5
**Fisher (3)**
110:11;126:14,24
**Fisher's (1)**
126:11
**fit (1)**
92:7
**fitting (1)**
98:1
**five (7)**
85:25;86:7;99:8,8,
11;107:17;132:18
**floor (2)**
23:25;24:5
**flowing (1)**
95:15
**focus (1)**
119:14
**FOIA (3)**
91:13;113:3;119:19
**folder (8)**
78:11;79:6;111:8,9,
11,14;130:6,7
**folders (2)**
111:16;127:7
**follow (2)**
31:19;41:4
**following (3)**
59:16;80:12;115:12
**follow-up (1)**
126:20
**forensic (48)**
39:1;40:3;41:5;
42:16,23;44:18;
50:24;59:17;60:11;
64:13,22;69:16,25;
70:9;79:24;80:6,9,15;
81:21;82:10,14;83:9,
16;84:9,22;87:19;
88:18;93:11;95:24;
97:5,18;98:9,9;99:10;
100:6,9;108:7;
109:25;110:8,13;
112:15;117:13;120:9;
121:22;124:19;125:6;
130:25;131:4
**forensically (2)**
39:9;41:9
**forensics (2)**
89:5;117:16
**forever (2)**
129:22;130:21
**forfeiture (1)**
123:12
**forged (5)**
92:8;112:11;
116:12;120:3;131:25
**forgeries (5)**
91:12;92:1;110:18;
112:12;120:6
**forgery (4)**
88:2;117:14,15,15
**forgot (1)**
52:14
**form (11)**
13:6,8,14,16,23,25;
14:4;111:12;112:24;
123:3;126:5
**format (5)**
62:10;65:13,16,21;
66:9
**Former (1)**
102:9
**Formerly (1)**
104:2
**formulaic (1)**
121:7
**formulating (1)**
102:13
**forth (4)**
80:9;109:3,23;
110:3
**forthcoming (1)**
91:14
**forty (3)**
112:25;116:14;
123:18
**forward (4)**
3:9;29:9;120:21;
126:19
**fought (1)**
107:19
**found (16)**
79:9;87:11,17;97:7;
98:5,18;99:18;
108:22;109:14;115:4,
5;116:19,22;124:15;
132:2,22
**Foundation (4)**
33:21;34:2;45:11;
51:12
**four (3)**
20:14;125:25;
133:20
**four-prong (1)**
77:5
**fourteen (1)**
123:20
**fourth (3)**
87:9;103:2;115:12
**fraud (7)**
89:17;91:4;92:12;
118:15;119:1;120:1;
128:4
**fraudulent (1)**
91:4
**fraudulently (1)**
122:24
**free (3)**
76:9;98:16;133:13
**front (12)**
4:20;5:9;25:15;
43:21;58:11,11;84:6;
110:11;115:9;131:6,
7,14
**full (13)**
18:24;30:2;31:23;
32:10,14;51:1;52:20,
21;54:8,18;78:23;
93:18,23
**function (7)**
84:17,20,21;98:16,
18;102:18;103:6
**functions (3)**
97:22;98:17;133:13
**funds (2)**
127:23;132:24
**funny (1)**
84:18
**further (14)**
11:18;28:2;58:13,
18;71:6;75:14;76:7,
13;84:13;87:15;
100:8,17;103:5;104:9
**futile (1)**
100:13
**future (1)**
115:20

**G**

**gave (10)**
14:21,24;17:4;19:2;
20:17;24:16;35:19;
48:9,17;52:1
**generally (1)**
124:10
**Gershj33@gmailcom (1)**
54:19
**gigabytes (2)**
86:24,24
**gigs (2)**
69:25;114:24
**girls (1)**
58:12
**given (7)**
19:13;73:20;95:10;
99:5;107:13;109:5;
132:15
**gives (2)**
65:22;102:14
**glad (1)**
12:1
**Gmail (2)**
52:9,10
**God (1)**
99:22
**goes (11)**
20:5;30:10;31:1;
34:6;36:12;37:3,7,8;
40:20,21;65:25
**Good (9)**
3:3;12:6,7;13:12;
27:10;55:20;58:5;
59:15;134:4
**Google (3)**
129:10,14,20
**Googled (4)**

84:14,16;129:10,12
**gosh (1)**
96:10
**grant (1)**
133:23
**granted (2)**
44:16;83:9
**great (2)**
51:21;128:2
**Greene (82)**
3:4,6,8,16;5:1,15,18,20,22,24;8:10,18,20;11:18;13:18;17:13,15;18:18;20:19;21:6,7,8;25:3;26:18;27:3;30:6,8,24;33:17,19,21;34:14;35:12,15,19;37:2,7;40:11,17;43:11;45:5;46:5;49:4;51:11;52:24;55:10;57:3;58:15,16,19,20;59:2;62:19;63:4;66:13;67:12;71:9,10,12,16;75:14;76:20;94:1;95:3,4;101:2,3;105:1,7,12;107:6,8;111:22;112:1;113:22;114:4;122:9,11;125:19,21;127:1;134:6
**Grishak301 (1)**
57:4
**Grishak301@gmailcom (2)**
56:25;57:11
**grishakk301@gmailcom (1)**
75:4
**grounds (1)**
66:16
**Group (2)**
14:4;44:23
**Guard (1)**
122:20
**guess (1)**
19:16
**guilty (1)**
21:5
**Gunkova (88)**
3:2,8,9,17,18;8:22;12:6,8;21:2,2,9;23:18;31:15,22;35:1;37:15;39:24;41:19;42:7;46:23;47:14;52:5;59:20,22;63:13;64:4;66:9,11;77:16,20;78:4,5,8,23;79:1,10,12;80:1,10;81:12,25;84:12;85:5,7,12,18,23;86:2,5;87:8,11,22;88:4,14;89:7,20;91:7,14;92:3,6;93:1,15;95:7,13;97:16;98:25;100:12,21;103:11;104:10,18;105:2,8;106:11,19;107:23;108:10;113:11;115:23;120:17;123:19;125:3;126:23;127:4;128:9;131:11,25;132:10
**Gunkova's (45)**
21:5;41:20;46:22;77:4,25;78:10,14,15;79:5,18;80:16,18;81:6,20;82:16,17,18,19,20;83:17,22;84:1;91:3,16;92:20;95:1;99:19;103:19;104:4,7;111:20;112:19;116:11;118:20,21,25;119:6;123:3;126:8,21;128:3,15,24;129:25;131:8
**guy (2)**
20:13;32:2
**guys (1)**
52:16

**H**

**half (2)**
24:25;49:24
**hammer (4)**
96:22,22;97:1;126:24
**hampered (1)**
123:22
**Hampshire (1)**
116:18
**hand (6)**
3:10;21:14;28:21;32:24;60:4;89:7
**handcuffed (3)**
94:21;100:18,18
**handed (2)**
39:19;41:13
**hands (2)**
42:21;129:23
**handwriting (1)**
112:15
**happen (2)**
42:24;126:3
**happened (8)**
10:2;27:15;46:25;114:14;126:1,1,3;132:9
**happens (3)**
49:9;83:13;132:8
**happy (4)**
30:11;33:25;91:1;100:24
**hard (82)**
58:6;59:20,23;60:2,25;61:1,1,2,3,7,9,12,13;62:6,8,10;63:13,15,23;64:1,2,3,5,6,7,8,8,9,11,12,12,12,15,21,25;70:13,17,21;71:18,23;72:6,11,14,18,20,23;73:16,19,20;75:18,19,20,20,20,22,22,23;78:9,11,13,16;79:3,5,6,13,15,17,19;80:7;84:25;99:14,14,16;108:8;109:12;110:13,24;111:7,16,23;124:20;133:12
**hardened (1)**
108:4
**harder (1)**
95:4
**harm (4)**
102:11;117:4,6;120:12
**harmed (1)**
115:20
**Harper (6)**
30:1;31:22,25;32:3,10,15
**Harry (3)**
4:7,11;84:5
**harry@ariamedispacom (6)**
55:5,24;56:5,9,19;92:23
**Harry's (2)**
84:6;131:1
**harshest (3)**
113:8;121:25;123:8
**head (2)**
76:6;81:3
**heading (1)**
104:7
**hear (5)**
13:7;35:16;77:1;94:5;126:2
**heard (27)**
35:9;57:9;59:16;65:7;78:12;80:1,14;81:8,15;82:1,3;83:7,23;84:3,14;85:6;88:5,15;89:7;99:15;108:16;109:18,20;114:15,20;126:13;131:8
**hearing (12)**
20:21;44:10,13;64:8;81:25;82:14,25;83:4,8;90:10,10;126:23
**Hearsay (7)**
33:17;34:9;37:2;40:11,17;43:12;51:11
**heated (1)**
81:25
**held (6)**
44:10,13;93:7;117:1,2;132:9
**help (6)**
28:5;44:18;55:22;58:12;88:10;100:19
**helped (10)**
13:6,8,14,16,23,25;14:2;26:17;27:1,12
**helps (7)**
12:12;13:12;27:6,13;41:12;44:21;54:14
**hereby (11)**
8:14,16;28:15;33:4;34:23;37:13;41:2;43:15;62:21;63:9;126:13
**here's (1)**
28:17
**herself (3)**
30:16;119:9;125:6
**hey (7)**
75:6;108:17,23;109:1,2,11;132:6
**hide (2)**
54:18;107:9
**high (1)**
77:15
**highlighted (3)**
29:3;60:9;61:6
**highly (4)**
88:22;118:10;128:19;133:3
**hinder (2)**
113:11;120:7
**hindered (1)**
112:24
**hire (5)**
26:17;27:1;36:10,13,19
**hired (6)**
25:24;26:5;32:7;36:9;66:11;94:24
**hit (1)**
96:22
**hits (1)**
110:1
**hold (3)**
99:16,17;119:4
**holds (1)**
20:12
**Home (2)**
20:10,15
**Honor (50)**
3:6;5:15;8:12;25:3;30:6;33:15;34:6;37:1,3,7;38:1;40:19;57:5;58:13,16,23;59:2;61:18;62:19,23;63:12;76:14,19,20;77:3;78:22;80:14;81:10;84:7;88:19,22;90:21;91:7,21;94:1;96:13;98:7;100:24;101:3;108:15;125:22;127:8,15;129:4,21;130:24;131:14;133:21;134:5,6
**honorable (6)**
59:3,7;76:21,25;126:14;134:7
**hope (1)**
56:17
**hopefully (2)**
61:17,18
**hour (3)**
69:21;86:20;100:9
**hours (1)**
123:20
**hows (1)**
20:5
**huge (2)**
13:11;107:1
**Huh-uh (1)**
11:10
**hundred (6)**
45:2;81:16;95:16;115:8;117:12;118:17
**husband (2)**
98:2,11

**I**

**iCloud (1)**
85:9
**ID (2)**
60:20;62:7
**idea (10)**
10:11,25;31:9;49:9;57:22;87:1;90:14;111:11;126:15;133:12
**identification (16)**
28:16;32:25;33:5;39:19;41:14;60:5,17;61:16,21;62:2,24;63:2,9;73:1,5;105:21
**identifications (1)**
67:4
**identified (27)**
58:7;59:23;60:1,24;61:2;62:25;63:21,24;66:25;71:23;72:6,10,12;73:10;74:20;84:10,13,23;85:25;86:8,12,13;87:8;104:4,11;105:16;108:10
**identify (18)**
7:10;30:3;59:18;60:20;62:13,25;85:5,8,23;86:4,5;87:16;89:9,10,11;107:17;131:5;132:17
**identifying (3)**
59:25;89:8;133:8
**ignorance (3)**
21:2;85:16;88:6
**ignore (1)**
129:9
**ignores (2)**
128:6,7

**ignoring (2)** 89:13;129:3
**Igor (4)** 9:15;103:10;105:2,4
**II (1)** 119:6
**III (3)** 119:22;120:17;121:6
**image (6)** 39:12;60:16;63:20;72:10,18;98:9
**imaged (5)** 39:9;40:24;41:9;111:4;121:20
**images (1)** 125:6
**imagine (2)** 96:3,16
**imagined (1)** 133:17
**imaging (9)** 39:1;42:16;68:5;71:19;81:22;86:12;108:7;109:25;110:8
**impact (13)** 69:2,5,8,11,14,18,23;70:4,7,13;71:2;120:11;124:16
**impacted (2)** 119:5;124:14
**impacts (1)** 105:13
**impaired (1)** 118:24
**impeach (1)** 35:13
**impeachment (2)** 35:13;37:8
**implemented (1)** 36:6
**import (3)** 87:25;94:25,25
**importance (3)** 128:6,7;130:22
**important (11)** 79:19;80:13;85:4,10;93:5;95:7;106:2;108:17;130:3,23;131:8
**impose (3)** 101:8,8;118:8
**imposed (3)** 88:21;126:4,6
**impossible (1)** 100:1
**Improper (5)** 35:12;37:8;94:23;119:15;128:3
**improperly (1)** 119:11
**inability (1)** 121:21
**inadvertent (1)** 83:16
**Inc (1)** 116:17
**include (3)** 8:24;74:15;99:21
**included (5)** 60:22;108:8,9;118:22;119:2
**includes (2)** 120:3;122:3
**including (11)** 66:19;86:25;88:17;92:15;98:3;100:9;103:9;119:8,16;123:21;125:10
**inclusive (1)** 85:11
**incorporates (1)** 119:25
**incorporating (1)** 121:8
**increase (1)** 100:6
**incur (1)** 36:10
**incurred (2)** 119:4;120:12
**indebtedness (2)** 119:1,7
**indicated (2)** 112:11;113:2
**indicating (2)** 103:1;118:20
**indication (1)** 111:12
**indiscernible (4)** 5:19;28:19;32:17;118:15
**inducement (2)** 91:4;119:1
**indulgence (1)** 11:21
**industry (2)** 13:12;65:21
**ineffective (2)** 113:5;124:13
**inefficiencies (1)** 124:25
**inevitably (1)** 90:13
**inference (3)** 100:16;102:20;111:18
**information (50)** 10:14,22;11:1,2,13,15;27:8;29:19,22;30:18;31:2,5,6,12;32:12,13,16,17;39:17;41:19,23;42:19,21;43:4;47:7;48:12;49:8;51:1;52:16,20;54:3,8,18;67:3;74:22;75:12;77:10;91:14;92:4,5;102:15;106:3;108:19,22,23;109:13;117:7;119:12;128:8;131:2
**informed (4)** 13:21;27:16,18;30:15
**informs (1)** 101:24
**ingested (1)** 65:19
**inherent (2)** 111:3;115:13
**injured (1)** 102:5
**injury (3)** 119:23,25;121:5
**injustice (1)** 96:13
**innocent (1)** 124:3
**insane (1)** 126:2
**inspect (1)** 39:25
**inspection (9)** 39:23;40:3;41:17,23,24;42:11,16;43:17;80:16
**install (1)** 113:18
**installed (7)** 10:10;80:24;81:6;82:23;103:8,9;132:13
**instance (3)** 60:20;62:7;102:9
**instant (1)** 103:6
**Instead (3)** 89:12;124:16;126:9
**institution (1)** 3:21
**instruct (1)** 11:15
**instructed (1)** 115:24
**instruction (1)** 21:9
**instructive (1)** 116:18
**insufficient (3)** 31:6;123:10;126:22
**Insulation (1)** 118:6
**insult (1)** 125:14
**Insurance (1)** 118:6
**integrity (2)** 102:5;125:15
**intended (1)** 101:21
**intent (3)** 90:18;113:11;115:3
**intentional (6)** 77:14;78:1;96:10;100:22;116:22;129:17
**intentionally (11)** 11:12;77:21;84:19,24;93:9;96:19;100:2;101:25;105:10;115:24,24
**interest (2)** 26:7;115:21
**interesting (2)** 115:2;127:24
**interim (1)** 108:14
**Intern (1)** 115:11
**interview (1)** 27:9
**into (22)** 5:21;8:15,16;29:22;34:23;37:13;41:2;43:15;53:9;54:7;62:21;63:10;65:18,19;77:23;87:22;94:13;99:25;103:17;105:18;114:11;124:19
**inventory (1)** 4:5
**investigate (1)** 114:12
**investigation (1)** 60:11
**investing (1)** 111:5
**Investment (2)** 13:14,15
**invoice (3)** 90:3;94:11;128:20
**involved (3)** 50:12;122:7;124:10
**irrelevant (1)** 88:16
**IRS (1)** 119:20
**issue (16)** 11:11;30:9,24,25;80:8;91:5;93:22;101:14;115:17;116:8,15,18,23;123:18;124:23;134:2
**issued (6)** 91:13;112:24;113:5;116:14;119:19;123:18
**issues (9)** 29:8,9;59:16;69:1;70:23;71:2;107:19;110:21;113:2
**IT0003 (1)** 73:12
**IT001 (5)** 64:25;69:3;82:1;85:2;133:10
**IT002 (4)** 69:6;78:10;115:9;133:10
**IT003 (11)** 64:25;65:4,5;69:9;73:16;78:17;85:1;111:8,18,23;133:10
**IT005 (3)** 69:12;84:14;133:11
**IT027 (5)** 69:19;70:1;73:5;75:25;86:21
**Item (3)** 3:1;60:18;61:13
**items (1)** 68:16
**ITO2 (1)** 131:13
**ITO5 (1)** 131:13
**IV (2)** 121:6,7
**Ivich (1)** 115:4

## J

**Jacob (33)** 9:5,8,8,9,12;11:1;13:8;16:6,8,11,16;17:22;18:3,9,11,25;19:7,11,13,21;22:20;24:13;29:17;38:20;44:20;50:20,23,25;51:3;54:14;56:23;57:18;58:4
**jail (2)** 107:24;108:5
**James (1)** 126:14
**January (1)** 87:12
**Jay (1)** 46:21
**job (7)** 3:24;4:1;22:11;24:15,16;54:14;58:5
**joint (2)** 35:23;106:20
**jointly (1)** 110:2
**journal (1)** 94:10
**Judge (3)** 110:11;126:11,24
**judgment (14)** 77:12,13;97:10;98:24;100:20,24;118:1,8;123:4,24;

125:3;133:21,23,23
**judicial (5)** 102:5;111:9; 112:16;125:14; 126:15
**July (4)** 80:19;81:7,7; 126:21
**June (9)** 78:19;79:2;80:13, 14,17,21;87:13; 89:22;90:9
**Jung (3)** 19:22;44:23;73:12
**jury (1)** 119:10
**justice (1)** 115:18
**justified (1)** 122:1
**justify (3)** 95:14,20;103:1

## K

**Kamin (72)** 3:1;4:7,11,13;7:18; 8:5,8;10:12,18;11:11; 24:19;25:11,22; 26:23;27:16,18,25; 29:10,18;30:1,15,20; 32:7,9;34:12;35:11; 36:10;37:4;38:16; 39:8;40:2;41:4,9,18, 22;43:17;44:2;50:12; 66:9;67:3,8,20,21; 68:11,21;77:11;78:2, 3,7,19,19;79:23; 81:21;84:5,11;89:11; 91:4;93:6;94:21; 95:16;96:2;100:14, 17;110:19;112:17; 120:12,14;121:9; 125:24;127:8,25; 128:2
**Kamins' (1)** 39:24
**Kamin's (14)** 6:24;7:3,13;36:5; 39:12;44:10;80:3,5; 87:16;92:9;93:13; 119:10,22;129:23
**keep (5)** 5:21;11:2,23;49:9; 51:1
**keeping (4)** 10:14,22;40:20,21
**kept (5)** 27:15,18;30:15; 81:13,13
**Kettler (2)** 122:5,15
**Kevin (1)** 63:19
**key (4)** 77:19;100:2,3; 133:22
**keywords (1)** 36:7
**kind (5)** 19:18;31:9;95:2; 107:3;122:14
**kinds (1)** 20:8
**KL (1)** 67:2
**knew (15)** 22:1,6,15;23:21; 24:7;44:8,8,10;49:9; 55:23;56:2;80:17; 93:11;97:18;132:11
**Knowing (3)** 81:23;82:22;96:25
**knowledge (7)** 51:12;80:21;97:13, 19;99:2;120:13; 127:13
**known (1)** 101:13
**knows (4)** 24:15;26:21;87:7; 99:22

## L

**labeled (1)** 111:14
**lack (3)** 45:11;127:12; 128:23
**lacking (1)** 89:16
**Lake (2)** 111:10,11
**language (2)** 60:10;85:13
**large (6)** 82:23;95:14,21; 99:13,15;133:3
**last (12)** 5:8;9:16;15:10; 39:22;43:25;66:4; 73:23;74:7;87:6; 91:25;100:10;125:3
**late (2)** 80:5;104:3
**later (8)** 64:4;78:9,25;83:13; 107:22;126:14,23; 130:18
**latest (1)** 49:25
**laughed (1)** 132:19
**lawsuit (3)** 26:23;27:2;98:19
**lawsuits (1)** 98:3
**lawyer (3)** 31:5;32:13;89:20
**lay (1)** 126:24
**lays (1)** 77:23
**leads (1)** 102:1
**lease (1)** 119:17
**least (8)** 46:25;64:15;80:4; 84:23;99:14;114:6; 132:10;133:11
**leave (1)** 76:9
**leaves (1)** 106:15
**left (9)** 64:24;76:10;105:3; 106:16;122:12,15,19; 124:3,8
**legal (1)** 121:7
**lenders (1)** 123:17
**lengths (1)** 128:2
**less (3)** 100:19;102:5;123:5
**Lesser (13)** 100:11;102:12; 103:5;107:21,22; 108:5;113:4;118:4; 123:9;124:12;125:13; 126:4,5
**lets (1)** 132:11
**letter (29)** 15:3;24:17;25:10, 13,21,25;26:5,8; 27:25;28:15;29:7; 31:5,17;32:9;33:4; 34:1,20,23;35:2; 37:13;40:6;41:2; 42:22;43:15;74:10; 78:4,4;84:11;89:12
**letters (5)** 24:20;28:23;30:17; 39:13;81:9
**level (4)** 118:4,14;124:1,2
**liable (1)** 132:9
**license (2)** 84:6,6
**lie (3)** 89:4,5,6
**lifted (1)** 92:9
**light (2)** 122:25;123:24
**liked (1)** 126:14
**likely (1)** 4:5
**likes (1)** 26:22
**limit (1)** 85:11
**limited (3)** 119:8;122:14,18
**limiting (1)** 124:4
**line (2)** 61:6;105:2
**lines (1)** 127:9
**link (2)** 62:14;87:24
**links (1)** 87:23
**list (3)** 73:24,24;74:11
**listed (2)** 72:15;110:23
**Listen (1)** 47:7
**listening (1)** 32:19
**lists (2)** 60:14;73:5
**litigant (1)** 133:5
**litigation (23)** 27:11;46:14;47:6; 50:12;51:4;78:5; 79:21;89:25;91:20, 23;92:7,7,20;95:11, 13,14,20;97:9,13; 98:7;101:3;106:24; 119:4
**little (5)** 16:5;24:16;73:15; 102:15;114:17
**lived (1)** 125:24
**lively (1)** 109:23
**LLC (12)** 3:25;4:1;13:14,16, 23,25;14:4;16:19; 18:4,5,14;115:11
**loan (6)** 54:13;56:6;92:13, 18;119:17;131:1
**locate (2)** 121:16,21
**log (3)** 87:17;110:15,15
**Logic (9)** 3:25;4:1;13:25; 16:19;18:4,5,10,14; 19:1
**logical (1)** 102:20
**login (1)** 74:22
**long (3)** 49:18;112:6,18
**longer (2)** 46:23;48:23
**look (14)** 4:19;6:1;35:21; 80:23;83:13;95:22; 96:15;103:21;104:6; 107:10;111:2;113:20; 122:16;125:20
**looked (3)** 94:13;98:4;111:4
**looking (8)** 7:16;60:9;61:16; 64:20;66:7;72:6; 108:1;111:15
**looks (2)** 25:23;35:6
**loose (4)** 5:6,9,11,14
**loss (11)** 101:12,16;102:6, 15;117:4,6;119:5; 121:24;123:22; 124:13,16
**lost (7)** 90:14,16;98:23; 112:8;117:7;118:23; 131:21
**lot (14)** 12:23,24,25;13:2, 13,13;21:1;24:12; 27:13;31:25;44:21; 86:1;94:2;99:17
**Lots (1)** 122:9
**Loudan (4)** 6:21,23;7:14;10:8
**Louden (1)** 112:25
**Loudon (10)** 6:6;78:20;79:8; 85:12,24;87:9;99:6; 113:6;124:10;125:24
**Loudoun (15)** 4:7,11;6:2;78:8; 79:20;80:12;83:1; 107:11,20;110:9; 118:21,22;126:6; 132:18,22
**lumps (1)** 106:17

## M

**ma'am (3)** 23:4;28:20;48:16
**machine (3)** 106:5,9,10

**machines (2)**
106:8,18
**Madame (1)**
25:6
**magnitude (1)**
102:10
**main (8)**
22:12;65:5;83:18;104:2;105:19,20,24;112:17
**maintained (3)**
29:11;93:8;98:13
**maintaining (2)**
21:21;22:1
**majority (1)**
116:7
**makes (2)**
102:14;106:2
**making (2)**
65:23;100:4
**malicious (3)**
119:23,25;121:5
**man (3)**
14:19;88:8;92:3
**manage (2)**
23:14;88:8
**management (12)**
4:3;8:23,24,24;9:2,3,19;12:9;13:16,23;115:11;120:18
**manager (14)**
19:22;22:23;23:11,19,23;44:23;45:18;55:16,16;85:19,20,22;93:7;133:6
**manual (7)**
69:24;86:23;87:3;96:9;97:22;99:12;130:12
**manually (1)**
83:24
**many (11)**
25:13;39:9;41:6;79:18;87:7;91:8;96:4;99:22;116:11;118:17,19
**March (6)**
26:24;41:21;47:16;78:7;80:11;87:14
**mark (2)**
28:10;33:9
**marked (13)**
5:10;28:8,12,15,22;33:2,4;39:19;41:13;63:9;67:7,9;68:13
**marketing (2)**
13:3;44:22
**Maryland (2)**
101:20;118:7
**master (1)**
3:21
**match (2)**
64:6;75:19
**matching (1)**
102:22
**material (2)**
68:10;121:23
**materials (2)**
67:16,20
**matter (10)**
34:11,15;78:25;90:5;96:23,23;97:24;123:11;127:18,19
**matters (1)**
127:13
**May (26)**
5:2,6;6:2,6,21;15:5,10,12;59:6;76:24;78:15,15,16;80:16;87:9,19,21;95:8;110:10,10,10,16,17;121:19;126:11,22
**maybe (12)**
16:5;20:9;24:21;25:12;43:19;47:14;49:20,22;50:11;56:12;57:8;117:9
**McDaniel (5)**
35:9,19;36:3;37:10;46:19
**McDaniel's (2)**
35:21,22
**McDannell (43)**
59:25;60:25;63:23;65:7,12;66:12,17;67:1,6,10;68:6,13;69:2,5,8,11,14,23;70:7,12,16,20,23;71:2,18,22;72:8;73:10;75:3,11;76:1;81:9;83:7,10;89:18,19;90:10;103:24;105:23;106:25;108:25;109:17;121:16
**McDannell's (10)**
65:8;69:18;70:4;73:25;74:8;75:19;103:20,21;108:15;121:11
**mean (18)**
5:3;14:23;17:6;31:7;52:4;54:10;65:1;67:20;89:23;94:13;96:16;113:25;114:4,22;127:16,20;130:13;132:5
**meaning (2)**
117:24;118:15
**means (5)**
7:12;31:6;103:1;118:10,13
**medical (1)**
111:14
**Medispa (1)**
22:17
**meeting (13)**
37:16,17,19;38:4,10,10,20;39:11;55:21;79:23;80:2,2;117:24
**member (2)**
29:12;95:16
**members (7)**
37:15,17,19;38:10,20;39:11;79:23
**member's (1)**
38:4
**memo (2)**
117:16;128:20
**memorandum (1)**
90:23
**memos (1)**
94:10
**mention (1)**
74:22
**mentioned (2)**
8:23;66:17
**merely (7)**
77:6;98:21;100:17;101:11;102:2;117:7;119:25
**merit (1)**
65:9
**meriting (1)**
122:3
**meritless (1)**
132:3
**merits (1)**
122:5
**met (2)**
12:8;131:16
**metadata (13)**
65:25;91:16;93:3,4;95:22;99:24;100:4;127:17,21;128:7;130:21,22;131:24
**method (1)**
121:13
**microphone (1)**
5:21
**middle (2)**
97:13,18
**might (8)**
5:2;66:1,2,3,3;100:25;116:25;126:18
**migrating (1)**
47:2
**minimal (1)**
116:9
**minimis (2)**
27:15;30:14
**minutes (2)**
76:17;125:17
**misleading (1)**
126:5
**mismanagement (1)**
88:2
**mispaid (1)**
112:22
**misquotes (1)**
105:22
**misrepresentation (1)**
124:18
**misrepresentations (1)**
119:2
**missing (10)**
74:22;87:1;100:11;108:17,24;109:1;110:25;111:24;116:25;121:16
**missteps (1)**
122:4
**Mitre (2)**
89:3;96:17
**mobile (2)**
51:20;52:4
**mobilize (1)**
109:21
**model (3)**
48:3;60:15;61:6
**models (1)**
48:12
**modified (6)**
91:19,19,20,23;94:10;128:9
**Monetary (3)**
100:12;102:12;124:23
**money (6)**
19:24;20:5;93:15;95:15,21;112:23
**month (7)**
27:22,24;30:17;38:2;78:9;96:6;114:2
**monthly (8)**
27:16,19,20;28:1;30:15;31:3,11;106:23
**months (4)**
27:22;39:9;80:9;114:3
**more (21)**
4:8;6:10;7:1;10:15;12:17;16:10;21:25;50:22;69:24;77:13;79:11;86:12,13,23;102:20;107:12;117:23;118:14;120:8;123:5;125:13
**Moreover (1)**
102:25
**morning (4)**
3:3;12:6,7;59:15
**Mortgage (1)**
122:20
**most (9)**
4:5;10:25,25;46:17,24;93:10;103:1;126:19;131:8
**motion (36)**
10:8;27:14;40:2;41:4;42:5,6,10;43:17;44:3,6,8,16;77:3;78:20;79:4;80:15;81:21,23,24;82:10,13,14,15,22;83:9;99:10;100:7;109:7,9;117:1,6,16,18,23;126:20;133:24
**motions (5)**
41:6;90:12;116:24;126:13;132:20
**movant (2)**
90:12,13
**move (8)**
8:10;33:14;40:9;42:18;43:7;62:17;63:1;67:12
**moved (1)**
111:17
**moving (2)**
36:23;110:3
**much (6)**
24:11;30:13;116:4;133:12,19,19
**multiple (5)**
10:3;107:25;108:5;109:17;118:18
**must (6)**
83:23;101:13;115:12;118:1,3,8
**mustache (2)**
113:9;124:2
**myself (2)**
83:9;122:16

## N

**name (14)**
3:17;9:14,16;19:3;20:12,18;44:4;52:14;56:1,13;105:3,5;127:15,16
**named (1)**
78:11
**names (1)**
86:25
**Nancy (2)**
4:8;7:19
**native (8)**
65:16,21;66:6;91:17;92:2,2,13;95:18
**nearly (2)**
27:24;123:21
**necessary (2)**
30:4;103:6
**need (9)**
20:21;24:15;25:4;31:17;75:6,11;95:2;109:4,21
**needs (7)**
19:24;20:4,5,16;28:13;29:18;36:8

**nefariously (1)**
96:18
**negligence (7)**
77:7,16;97:3;102:6;115:22;132:5,9
**negligent (3)**
97:4;101:12;105:12
**negligently (1)**
102:19
**Neither (1)**
118:12
**new (7)**
47:3;48:12,13;90:2,9;113:18;116:17
**newly (1)**
113:16
**next (7)**
3:4;7:8;22:7;71:22;72:6;83:20;127:10
**Nguyen (1)**
116:17
**Nguyen's (1)**
116:19
**nine (4)**
70:24;87:6;92:14;107:17
**nod (1)**
81:3
**noise (1)**
95:2
**noncompliance (2)**
126:8,16
**none (5)**
68:10;94:3;104:12,15;133:18
**Nope (1)**
129:14
**nor (2)**
101:21;124:13
**normal (2)**
47:1;107:12
**note (2)**
28:17;130:3
**noted (3)**
121:11;123:18;126:12
**notes (1)**
125:20
**notice (14)**
11:11;34:11,19;37:4,4,12;40:10,23;41:1;43:13;78:5;80:4,7;112:16
**noticed (2)**
124:24;129:5
**notified (2)**
40:21;59:22
**notifying (1)**
86:2
**notwithstanding (2)**
86:8;128:1
**November (28)**
28:15,24;35:2;46:20;49:23;51:24;60:14;64:16;73:18;75:2;84:10,12,25;85:3,4,7,24;86:7;89:12;95:23;105:18;106:21;108:16,22;109:19,20;129:10,12
**nowhere (3)**
74:11,21;99:17
**nuance (1)**
101:18
**number (33)**
7:10;17:12;19:16;29:3,4,8,9;30:1,4,5;39:23;46:22;47:15;59:15;60:13,15,20;62:1,2,7,9,9,9,11,12,25;68:16;71:25;126:9;128:20;129:7;132:16,17
**Numbers (6)**
19:18;47:12;60:18;62:6;107:18;118:19
**numerous (10)**
79:21;87:3;88:17;93:9;97:17;98:3;99:3;100:22;105:15;124:24
**Nyugen] (1)**
116:17

## O

**oath (1)**
59:12
**object (1)**
93:25
**objection (46)**
8:12;13:18;17:13,17;18:18;20:19;21:12,18;26:18;27:3;30:6;31:16;33:16;34:2,2,9,9,18;35:12,16,25;36:13,22;37:2;40:11,17;43:10,11;45:5,11;49:3;51:11,14;53:1;55:10,13;62:18;63:3;66:13,15,16;76:9;94:5;119:22;127:1,2
**objections (2)**
63:4;124:10
**obligations (2)**
79:10;132:15
**obstruct (1)**
110:5
**obtain (3)**
41:19,23;56:6
**obtainable (1)**
123:17
**obtained (1)**
102:4
**occasionally (1)**
106:11
**occasions (1)**
87:3
**occur (1)**
122:24
**occurred (3)**
30:14;47:1;124:15
**October (21)**
41:18;44:13;50:8,10;64:13,22;79:17;81:25;82:7,14,16,17;83:2,17;87:18;95:24;113:24,24;127:3;129:25;133:7
**off (1)**
76:6
**offer (1)**
107:2
**offered (1)**
106:19
**office (17)**
15:5;23:25;24:6;27:7,24;31:17;36:4;58:10;64:5;78:18;104:8;119:16;131:6,7,10,11,12
**officer (6)**
22:23;59:3,6;76:21,24;134:7
**offices (1)**
20:14
**often (1)**
65:17
**Oftentimes (1)**
65:22
**Ohm (1)**
76:10
**old (6)**
47:3,3;48:6,17;49:10;52:2
**olden (1)**
116:2
**Ome (2)**
11:22;12:3
**Once (7)**
10:18;68:5;99:7;102:19;114:2,3;127:12
**one (68)**
3:1;4:8;5:3,6,8,8,10,13,13;7:1;10:2,15;12:17;16:7,10,12;25:17;28:23;42:12;45:2;46:25;47:10;52:19;60:12;62:7;63:15,19;64:15,16;65:12;71:23;72:5,14,21,23;73:11;75:18;77:19;79:19;81:16;84:20;92:9;93:21;95:16;98:3,23;100:14;101:7;103:25;104:8;105:1;106:9;107:20;111:24;112:2,3,4;114:13;115:8;117:12;118:17;122:19;126:5,9;127:9,15,18;130:14
**ones (5)**
5:13;63:6;91:24;102:12;111:24
**Online (12)**
17:8,10;18:13;19:9;20:2;29:11,14,19,20,24;31:10;94:17
**only (27)**
21:2;24:4;37:12;39:12;41:1;43:14;47:10;72:20;84:16;85:25;86:22;90:9;91:24;97:21;99:22;101:7;106:5,9;117:17;118:10,13;122:1;123:9,11;124:22;132:9;133:17
**onto (1)**
47:3
**open (6)**
19:22;24:11;53:19;104:21;116:8,8
**opened (2)**
16:19;29:19
**operate (2)**
19:24;27:21
**operating (3)**
91:5,20;120:21
**operation (3)**
10:13;106:1,9
**operations (9)**
10:24;11:12;22:13;81:11;83:18;84:15;103:12;106:6;120:19
**opine (1)**
120:8
**opining (2)**
117:11,13
**opinion (3)**
65:9,11;117:15
**opinions (1)**
89:18
**opportunities (1)**
51:22
**opportunity (1)**
21:10
**opposed (4)**
34:19;36:5;90:19;112:3
**opposing (2)**
82:15;90:18
**opposition (5)**
20:25;27:14;43:2;44:6;81:24
**options (1)**
99:12
**order (75)**
5:2;6:2,4,21;41:21;45:8;59:17,23;64:13,22;68:7;69:16,25;70:9,18;74:1;75:8,12;78:11,18,21,21;79:1,9,9,13,25;80:11,12;83:3,11,11,12,16;84:9,22;85:4,9,17,25;86:5,15;87:10,10,12,13,13,14,19;88:17;89:16,21;93:11;95:24;96:11;97:5,15,18,20;100:9;106:5;108:9,11;110:10,11,12,13;118:5,7;126:11;127:19;130:25;131:4;132:23;133:7
**ordered (4)**
78:23;89:9,10;98:9
**ordering (1)**
42:22
**orders (16)**
79:21;87:14;88:17;93:10;96:8,8;97:5,18;99:3,4,9;107:11,21;124:10;132:16,16
**ordinary (1)**
114:1
**organizations (1)**
101:22
**organize (1)**
76:17
**organized (1)**
98:11
**original (2)**
109:16;122:24
**originally (1)**
122:11
**Ostefrey (1)**
103:10
**others (1)**
92:11
**otherwise (1)**
119:19
**Oussenko (4)**
9:17,18,18,24
**out (10)**
39:14;50:2;77:23;91:12;106:14;129:7;131:14;132:19;133:14,19
**outed (1)**
96:11
**over (74)**
25:7;36:3;42:25;45:3,7;46:9,11,13;47:23;48:6,8;49:1;50:18,20,23;52:10,19,19,19,22;53:6;54:24;55:8,11;57:10;58:7;63:13,15;64:24;66:9;67:1,16;68:2,2,6,10,21;69:21;70:14,17,21,

25;72:14,23;79:11;81:17;85:5;86:7,11,11,14,21,22;88:11,22;93:12;95:2;100:22;110:6,6;112:11,18;114:12,23;116:7;118:17,22;123:18,19;125:3,4;131:21,22;132:20
**overextended (1)** 102:22
**overrule (5)** 31:16;34:8,18;55:13;94:5
**Overruled (9)** 13:19;17:18;18:19;27:4;34:2;46:7;49:5;57:7;67:14
**overwrite (1)** 114:21
**overwritten (1)** 125:11
**overwrote (1)** 114:25
**owed (1)** 102:24
**own (7)** 37:5;49:14,16;66:11;92:24;93:15;114:16
**owned (4)** 49:18;85:12;101:23;111:19
**owner (2)** 26:22;111:9
**owns (2)** 49:15;95:15

**P**

**package (1)** 129:13
**page (16)** 7:22;29:4,5,7;30:7;35:5,7;39:23;41:16;43:25,25;61:4,5,13,14;75:1
**pages (2)** 110:6;112:18
**paid (1)** 112:22
**paint (3)** 30:16;99:5;132:14
**painting (1)** 19:25
**paints (1)** 30:22
**paper (6)** 91:15;116:4;125:19;128:6;131:23,24
**parade (1)** 112:7
**paragraph (3)** 35:21;74:24;91:6
**parallel (1)** 106:4
**part (7)** 50:24;68:1;75:10;104:15;111:1;124:11,11
**participate (1)** 103:12
**particular (2)** 67:5;107:18
**particularly (1)** 101:6
**parties (7)** 101:4;107:5;113:1;117:3;121:2,14;134:3
**partner (1)** 9:9
**partners (1)** 32:1
**party (14)** 77:10;90:19;97:3;98:8,18,20,21,22;102:16,18,20;115:14;116:25;118:3
**Passport (5)** 61:3,6,15;84:7;131:2
**password (13)** 21:25;53:9,11,12,21;54:1,5,9,10,15,24;56:21;57:10
**passwords (1)** 109:3
**past (5)** 18:24;20:14;24:25;41:6;125:24
**path (1)** 115:9
**pay (2)** 45:24;132:24
**pays (1)** 46:3
**penalty (2)** 15:25;18:8
**pendency (1)** 79:20
**pending (6)** 29:8;44:8;79:4;81:23;82:13,15
**people (9)** 10:13,21,23;108:4;109:21;116:2,3,3,6
**percent (10)** 19:11;23:20;45:2;57:15;58:4;81:16;95:16;115:8;122:18,19
**perform (1)** 103:6
**performed (1)** 103:16
**perhaps (3)** 35:24;90:19;130:16
**period (1)** 85:6
**perjury (2)** 15:25;18:8
**persistent (1)** 126:17
**person (7)** 9:7,14;67:5;88:11;97:23;105:3;113:15
**personal (12)** 15:1,2,3;43:5,6;45:6;56:14;73:9,19;93:16;101:7;131:1
**personally (12)** 6:24;7:3,17;8:5,8;10:5;11:4,5;56:10;57:12;85:12;110:19
**persons (2)** 115:19,20
**person's (1)** 105:5
**ph (25)** 9:15,17;11:22;19:22;30:1;44:21;52:6;53:15,24;54:12,19;55:5;56:25;63:17,19;65:23;67:2;90:24;93:17;101:12;103:10;115:5;118:11;122:2;128:13
**Philadelphia (3)** 64:2;72:17,21
**phone (39)** 45:3,6,12,12,17,20,21,24;46:3,9,11,11,12,13,14;47:3,3,6,9,10,16,23;48:5,6,13,14,17;49:7,11;50:15,19,21,23;51:13,13,15;52:1,2,3
**phones (4)** 46:24;47:13;51:1,23
**pick (1)** 66:7
**picked (2)** 109:19,22
**picture (3)** 30:16,22;99:5
**piece (1)** 124:6
**piecemeal (2)** 126:10,18
**Pipe (1)** 101:20
**place (6)** 67:21;86:1;100:5,14;131:16,17
**placed (7)** 22:22;70:9;83:25;84:4,8;95:23;130:11
**places (1)** 130:14
**plaintiff (9)** 96:15,17;97:2;106:2;112:9;118:8;124:3,5,19
**plaintiffs (10)** 113:7,10;117:5;118:12;119:17;121:23;123:18;124:8;125:11;131:22
**plaintiff's (46)** 4:19,25;5:1;6:1;8:14,16;25:15,19;28:13,16;33:3,5;34:23;37:14;41:3;43:16;62:22;63:8,10;64:17;73:2,3,17;74:19;77:23;78:22,24;91:22;103:18;105:22;107:10;110:12,24;111:6;113:23;116:13;118:23;120:8,11;121:21,23;124:14,16;126:12;129:9,20
**plan (2)** 106:20;112:17
**played (1)** 118:15
**playing (2)** 118:4,14
**Plaza (2)** 111:10,11
**pleaded (1)** 120:2
**pleading (2)** 91:10;131:20
**pleads (1)** 120:1
**please (27)** 3:9,14,17;4:8;5:16,21;6:5;7:1;10:15;12:17;16:10;19:18;25:7,9;27:17;28:11,14,20;31:25;35:17;36:1,24;37:1;46:16;59:8;71:15;77:2
**pled (1)** 116:9
**plugged (1)** 114:11
**plus (1)** 110:6
**PM (1)** 134:10
**podium (1)** 71:15
**point (6)** 51:16;63:22;75:3;85:16;89:24;131:18
**pointed (1)** 129:5
**pointing (1)** 21:1
**points (2)** 98:25;102:25
**position (12)** 27:18;34:7;37:5;57:13,15,17;92:8,21;95:14,20;120:25;129:1
**positions (1)** 34:12
**possession (1)** 85:21
**Possible (8)** 44:7;53:19;54:14;94:12,16;113:8;121:25;123:8
**post- (1)** 90:5
**post-trial (1)** 124:25
**potential (1)** 115:3
**potentially (1)** 101:9
**power (1)** 115:13
**practical (1)** 123:11
**pre-bankruptcy (1)** 98:5
**precision (1)** 101:19
**preclude (1)** 101:4
**preferred (3)** 65:17,21;66:12
**prejudice (26)** 77:10,15;90:13,19;91:1;96:2;102:1;103:4;115:17,18;116:8,18,23,25;117:10,25;119:20;121:24;123:1,5;124:22,23;127:8;131:15,15;133:17
**prejudiced (3)** 116:21;120:20;125:12
**prejudicial (5)** 78:1;93:6;100:23;118:10;123:24
**premarked (1)** 32:25
**pre-marked (1)** 60:4
**prepare (1)** 83:11
**prepared (2)** 3:4;76:14
**present (4)** 3:4;38:10;112:9;121:20

**presentations (1)** 134:3
**presented (2)** 94:4;121:2
**preserve (21)** 24:13;77:5,17,20;78:6;88:4,6,12,16;89:14;90:22;95:9,11;97:24;98:20;100:5;101:17;102:19;132:4,6,12
**preserved (2)** 126:7,13
**preserving (1)** 130:7
**president (1)** 3:25
**pressed (1)** 114:23
**presume (1)** 67:10
**presumed (2)** 77:9;117:17
**pre-trial (2)** 116:24;117:1
**prevent (1)** 105:11
**previous (3)** 26:21;46:24;48:13
**previously (5)** 29:10;41:22;59:16;78:20;80:24
**print (1)** 66:4
**Prior (13)** 22:22;23:1,18;41:4;42:22;46:13,22;47:6;49:1;108:2;111:9;119:4;124:9
**private (1)** 52:8
**privilege (8)** 66:10;67:4;68:8;87:17;107:1,4;110:15,15
**privileged (8)** 26:15;67:7,9,16;68:10,13,18,24
**probably (3)** 51:24,25;132:19
**problem (3)** 16:4;107:1;117:11
**problems (1)** 125:9
**procedure (3)** 36:5,14,20
**procedures (1)** 121:13
**proceed (3)** 31:20;40:2;118:24
**proceeding (1)** 112:14
**proceedings (1)** 134:9
**process (17)** 4:5,14;44:19;50:24;65:8,20;66:12;67:10;68:1,17;83:11;102:11;109:25;110:4,5;115:17;125:9
**process' (1)** 125:15
**processing (1)** 66:1
**Prod (1)** 61:14
**produce (6)** 67:3,7;86:6;87:15,17;89:10
**produced (21)** 31:10;59:21;64:3,6;65:24,25;67:2;72:11,17,20;74:1;75:9,23;87:8;91:6,8,9;95:17;99:21;116:12;133:12
**producing (2)** 67:19;133:9
**product (1)** 113:14
**production (5)** 45:9;68:14;116:11;118:20;125:4
**professional (6)** 35:10;36:8,11,14,19;90:1
**proffer (1)** 112:6
**proffered (1)** 112:12
**profile (4)** 70:8;83:24;130:10,14
**program (4)** 10:9;24:12;97:12;102:18
**programs (1)** 10:6
**Project (1)** 115:11
**prong (1)** 90:19
**proper (2)** 101:23;102:13
**property (3)** 23:23;41:23;44:23
**proposal (1)** 35:22
**prosecute (2)** 102:7;123:14
**protect (3)** 26:7;101:9;107:3
**protocol (1)** 107:3
**prove (10)** 92:5;95:19;96:15;100:19;105:8,10;117:20;124:4,8;131:23
**proved (2)** 93:12;114:5
**provide (12)** 4:14,16;48:24;54:15,17;65:22;72:17;78:23;87:17;109:2;110:15;125:8
**provided (14)** 30:18;31:2;56:20;63:22;64:5;65:13,15;67:6;88:24;106:23;109:16,17;110:16;125:7
**provider (2)** 48:18;49:1
**proving (3)** 91:11;124:5;131:20
**provision (1)** 18:13
**public (1)** 115:21
**punish (1)** 115:19
**purchase (1)** 24:4
**purchased (2)** 50:7;113:14
**purported (1)** 119:15
**purpose (5)** 106:8;127:22;128:15,21;132:21
**purposefully (1)** 131:3
**purposes (8)** 32:25;34:19,20;37:11;39:19;40:25;41:14;60:5
**pursuant (11)** 6:21;70:18;74:1;85:24;86:14;87:18;96:5,8;97:14,20;108:11
**pursuing (1)** 94:22
**put (12)** 29:22;49:21;78:5;80:7;92:10;94:2;103:16;105:18;115:6;129:8,15;131:3
**putting (2)** 65:18;120:20

**Q**

**qualified (3)** 88:22,25;89:1
**qualify (1)** 88:24
**questionable (1)** 102:10
**QuickBooks (20)** 20:4;22:1,10;29:10,14,20,24;31:10;81:13;93:19,21,23;94:3,7,13,16,18;128:18,19,22
**quite (1)** 81:25
**quote (1)** 105:24
**quoting (1)** 35:22

**R**

**Racich (51)** 38:18;39:1;50:23;52:10,12,13,23;53:7,12,21;54:2,16;55:2,9;56:21;57:11;59:9,10,15;60:7;62:21;75:18;78:12;79:25;82:1,3;83:8,9,23;84:2,3;85:6;88:21;89:3,4;91:21;99:15;103:18;104:12,12;105:17;108:18;109:20;111:1,10;113:16;114:20,24;117:14;127:6,17
**Racich's (4)** 80:23;103:23;105:21;112:16
**Racish (1)** 113:16
**raise (1)** 3:10
**raised (11)** 69:1,5,11,14,23;70:7,12,16,20,23;109:1
**raises (1)** 121:22
**ran (11)** 86:12;96:18,19;97:6,20,21,21;99:10;114:11,23;129:7
**ransomware (3)** 103:13;104:1;105:19
**Rather (2)** 101:13;108:5
**Razor (1)** 55:3
**read (3)** 8:2;16:10;36:17
**readily (1)** 102:3
**reads (1)** 46:23
**real (2)** 14:14;71:10
**really (9)** 9:3;11:1;31:18;66:4;96:9;98:14;126:1;130:2;132:19
**reason (3)** 47:25;73:8;128:17
**reasonable (2)** 101:9;111:18
**reasonableness (1)** 101:22
**reasonably (1)** 108:2
**reattached (1)** 85:1
**rebuttal (4)** 35:20;58:22;66:14;76:13
**recall (20)** 6:13;15:5,7,8,16,24;16:8,25;23:1,6,16;25:21;37:16;38:4;39:2;41:5,22;63:16;76:6;126:1
**recalled (1)** 105:6
**receive (4)** 24:20;25:13;51:1;92:4
**received (14)** 8:15,16;24:17;25:10;28:23;34:1,23;37:13;41:2;42:19;43:15;62:21;63:10;128:5
**receiving (1)** 25:24
**recent (3)** 41:20;46:23,24
**reception (2)** 104:21;112:4
**recess (4)** 59:4,5;76:22,23
**recitation (1)** 121:7
**recognize (4)** 35:1,4;60:7;74:10
**recognizes (1)** 12:1
**recollection (7)** 8:3;28:7,9;39:18;41:12;44:2;47:5
**record (7)** 3:17;25:8,8;48:1;62:25;113:1;118:1
**records (18)** 22:2;30:2;31:23;32:11,15;39:23,25;40:4;41:17;81:13;93:19,22;94:23;119:11,15,16;120:15;127:24
**recover (2)** 130:20,23
**recovered (4)** 99:23;115:8,10;

130:19
**recreate (1)**
20:4
**recycle (18)**
70:9;83:25;84:4,8;95:23;99:23;100:3;115:5,6;130:1,2,11,13,15,15,16;131:3;133:14
**Redirect (3)**
58:15;75:15,16
**redownloaded (2)**
84:16;129:13
**refer (2)**
61:9,11
**referenced (3)**
60:8;73:17;119:18
**referred (4)**
68:18;75:19,25;78:17
**referring (4)**
4:25;74:25;75:3;76:1
**refers (1)**
103:18
**reflect (1)**
106:7
**reflects (1)**
120:24
**reformatted (1)**
103:16
**refresh (6)**
8:3;28:7,9;41:12;44:2;47:5
**refreshes (1)**
39:18
**refused (2)**
30:20;80:10
**regard (2)**
65:16;111:18
**regarding (5)**
10:12;35:20;88:17;101:24;131:15
**regards (7)**
91:1;93:14;110:18;127:6,22;129:24;132:23
**rehash (1)**
121:10
**rejected (2)**
41:24;80:3
**relate (1)**
110:13
**related (11)**
10:14,24;11:2,12;57:23;58:9;78:25;93:16;107:16;119:9;120:5
**relates (1)**
119:14
**relating (1)**
126:13
**relation (3)**
10:21;18:15;73:16
**relativity (2)**
65:18,19
**release (1)**
110:7
**relevance (18)**
13:18;17:15;18:18;20:19;26:18;27:3;30:8;33:19;34:5,9;35:12;37:2;40:11,17,21;43:12;77:7,9
**relevant (14)**
83:15;88:1;91:22;95:25;98:20;99:22;101:9,14;102:2;117:7,23;128:19,19;133:3
**reliance (2)**
117:22,22
**relieved (1)**
98:20
**rely (2)**
90:17;100:1
**remain (2)**
59:6;76:24
**remaining (1)**
124:5
**remains (1)**
118:2
**remedy (5)**
100:12,20;123:8;124:4;125:2
**remember (14)**
38:3;39:15;43:20;44:9,12,15;49:12,12;50:3,6;51:17;65:1;77:19;79:6
**remembering (1)**
102:23
**remind (4)**
24:24;31:25;59:11;65:4
**renewal (1)**
114:6
**renewals (1)**
114:8
**renewed (2)**
114:1;129:13
**renews (1)**
114:2
**repeat (3)**
4:8;12:17;41:11
**repeatedly (1)**
41:18
**rephrase (5)**
4:10;6:5;10:15;27:17;74:2
**report (10)**
27:20,22;112:15,16,18,19,20;120:4,10;121:23
**reporter (2)**
15:18,20
**reports (9)**
27:16,19;28:1;29:6;30:15;31:3,11,11;123:21
**represent (2)**
27:2;89:20
**representations (1)**
119:3
**represented (1)**
126:2
**repurposed (2)**
103:24;104:3
**request (17)**
4:13;7:13,22;30:1;39:12,24;40:3;44:11;48:24;49:8;52:3;78:24;79:24;80:3,5;119:19;126:12
**requested (5)**
29:10;39:1;41:9;113:3;125:8
**requests (7)**
4:17;32:9;41:24;87:16;91:13;110:20;125:4
**required (7)**
59:18,21;68:7;85:5,7;123:23;131:22
**Requires (1)**
101:18
**requiring (1)**
6:2
**researched (1)**
97:5
**reserved (2)**
78:24;113:6
**Residential (1)**
122:21
**resistance (4)**
107:9;133:6,8,9
**resolve (7)**
29:8;70:12,16,20,23;93:22;99:12
**resolved (1)**
126:9
**resorted (1)**
123:9
**respective (1)**
36:6
**respond (4)**
26:8;30:11;108:12;110:21
**responded (2)**
108:14;125:3
**responding (2)**
35:22;74:8
**responds (1)**
108:22
**response (13)**
6:11;7:13,22;8:2,16;34:4;37:3;40:19;41:20;73:25;74:3;110:17;128:9
**responses (11)**
4:16;6:3,4;78:24;87:21,22;95:8;99:19;110:16;121:19;126:22
**responsibility (8)**
9:4;86:4,4,13;98:19,21;127:18;133:5
**responsible (4)**
9:19;10:5;18:24;106:16
**responsive (1)**
59:23
**rest (1)**
120:1
**restructuring (1)**
22:22
**rests (1)**
120:12
**result (6)**
77:6;91:2;100:17;101:11;103:8;105:13
**resulted (1)**
117:4
**resulting (2)**
101:15;121:22
**results (8)**
66:8,12;68:6;76:4,5;102:6;125:10;129:11
**resume (1)**
58:25
**retained (3)**
88:24;90:8;121:15
**retrieve (1)**
121:17
**retrieved (2)**
66:8;130:1
**return (2)**
59:10;109:16
**returning (1)**
47:3
**returns (3)**
30:3,4;31:23
**revealed (3)**
60:17;86:2;98:10
**review (5)**
66:10;68:2;121:9,13,23
**rid (2)**
96:11,20
**right (140)**
3:3,7,10,13;9:25;12:10,13,16,19;13:1,6,10,25;14:4,8,15,17;17:12,24;18:4;19:14;20:18;21:4,12;22:2,4,6,13,18,20,24;23:9,19;24:1,7,19;25:11,25;26:9,17,24;27:2,12,16;28:12;29:15;30:21;31:14,20;33:2;34:18,22;37:11;38:6,22;40:6,25;43:2,13,18;44:8,11,16,24;46:10;47:8,19,24;48:7,10,18,22,25,25;50:8,10,13,16,19;51:6,17,24;52:7;53:10,16;54:7,9,20,22;55:6,16,19,24;56:7,18;57:2,19,21;58:8,17,21;63:7;65:2;67:25;68:1,4,6,8,15,19,22;69:21;75:6,23;76:12,16;77:1;81:4;82:12;90:4,7,14;94:20;105:13;106:6;107:1,6,9,11,21,22,25;108:4;109:22;111:25;113:5;116:4,7;122:8;133:25
**righthand (2)**
64:23;92:3
**right-hand (3)**
14:19;21:3;88:7
**rise (3)**
59:3;76:21;134:7
**risk (3)**
132:22,25;133:2
**room (1)**
129:8
**rosy (3)**
30:16,22;99:5
**roughly (1)**
82:4
**Rule (3)**
90:17,22;117:24
**ruled (2)**
82:22;117:3
**ruling (4)**
41:18,21;117:2;134:2
**run (59)**
11:5,8,16;36:14,19;57:14,19,21;64:24;68:8;69:2,6,9,12,19;76:2;80:18;81:6,6,8,18,19;82:1,2,5,16,17,18,19,23;83:16,22;84:17,17;85:2;86:21,22,22;91:8;96:4,8,9;98:10;101:6;104:17;114:14,21;115:6;129:6,7,17,24;130:2,9,12,17;132:11,14;133:10
**running (5)**
82:4;87:2;96:5;98:14;106:5
**Russia (1)**
3:20

**S**

**same (27)**
22:17,20;37:3;40:10,19;43:11;51:20,24;65:19;66:9;78:13;82:4;83:3,17,22;85:1;97:1,1;98:17;102:3;105:2;106:5;127:10,15,17;129:16;131:24
**Samson (2)**
118:11;124:14
**sanction (11)**
88:21;102:10,13,22;105:13;113:8;118:4;121:25;125:1,13;126:16
**sanctions (29)**
10:8;42:5,6,10;77:4;100:11,13;101:25;102:12;103:1,6;107:21,23;108:6;113:4;115:19;116:19;117:1,23;123:9;124:12,15,23;125:13;126:4,5,12,21;133:24
**sanction's (1)**
123:5
**saw (5)**
80:14;84:18;91:21;109:23;113:12
**saying (7)**
31:5;74:20;75:11;99:1;108:23;109:11;122:15
**SBA (1)**
91:13
**schedule (3)**
82:6;96:5;99:12
**scheduled (5)**
85:3;86:16,17,17;127:4
**scheduling (1)**
109:17
**scheme (2)**
89:24;98:3
**Schlossberg (3)**
90:24;98:1,10
**scope (5)**
66:13;104:15;106:14;111:2,6
**screaming (1)**
16:4
**search (20)**
35:10;36:6;66:25;75:5;76:2;84:5,10,12,23;95:25;108:18,20;111:3,7;127:7;129:11,14,15,21;130:25
**searched (2)**
97:14,20
**searches (1)**
111:3
**searching (1)**
111:5
**seated (2)**
59:6;76:24
**second (26)**
36:19;60:25;61:3,5,11,12,13;63:18;64:8,12,21,23,25;65:1;70:17;75:1,20,22;78:16;79:9,12;84:25;86:16;101:7;104:10;124:19
**secondhand (1)**
31:12
**secure (9)**
69:15;70:2;84:17,20;98:16,18;129:16,22;133:13
**Security (1)**
103:14
**seeing (2)**
6:5;128:12
**seeking (2)**
77:12;81:21
**seeks (2)**
118:25;119:6
**seemed (1)**
107:1
**seems (1)**
107:4
**select (4)**
88:9;130:3,7,16
**selected (3)**
87:4;97:23;103:11
**self-dealing (2)**
88:3;95:12
**send (7)**
15:3;27:22;50:2;52:3;56:6;72:8;92:21
**sense (1)**
102:15
**sent (22)**
27:20,25;30:18;35:2,4;39:13,14;41:4;42:11,22;56:2,16;59:25;63:14;78:3;80:15;84:11;92:20,22;93:2,21;109:11
**sentence (1)**
36:12
**September (8)**
43:18;44:3;79:15,16;81:19,20;82:11;120:4
**serial (11)**
60:15,20;62:1,2,6,7,9,9,9,11,11
**serve (1)**
94:12
**server (2)**
103:7,14
**service (1)**
105:18
**session (2)**
59:7;76:25
**set (9)**
29:14,17,18,21;82:13;113:15,15;122:18;127:3
**settings (1)**
103:11
**seven (6)**
69:25;85:1;86:23,24;108:11;114:24
**seventy (1)**
123:21
**severe (2)**
103:1;123:5
**shall (1)**
101:17
**shape (2)**
111:12;112:24
**share (4)**
11:1;32:17;42:20;107:2
**shared (1)**
131:10
**sheet (3)**
61:21,23;63:9
**shift (2)**
89:7,10
**shifting (1)**
89:13
**shifts (1)**
131:14
**Short (3)**
58:23;102:22;114:4
**Shortall (3)**
22:23;23:1,1
**shorter (2)**
10:15;23:3
**shortly (1)**
104:4
**show (8)**
93:3,4;112:23;116:11;120:11;128:23;132:2,11
**showed (4)**
19:5;56:13;84:4;111:2
**showing (2)**
103:3;119:15
**shown (1)**
121:24
**shows (11)**
77:20,21;82:2,2,4;103:7;115:23;128:8;130:9,10,24
**shredders (1)**
116:3
**shredding (2)**
113:12;116:3
**sic (1)**
55:4
**side (1)**
123:14
**sides (1)**
124:25
**sign (4)**
18:13,16;19:1,3
**signature (10)**
6:24;7:3;17:11,22;18:3,9;56:14;92:9;93:1;119:10
**signatures (1)**
92:8
**signed (7)**
6:25;7:3,17;8:5,8;91:5;110:19
**significant (3)**
71:3;112:10;121:12
**significantly (1)**
125:10
**Silvestri (1)**
102:25
**similar (8)**
51:3;98:7;115:20;121:9;127:7,11,16,16
**similarly (3)**
41:24;89:15;121:5
**simple (1)**
102:6
**simply (12)**
83:15;97:4;100:13;113:10;126:17;128:12,13;129:7,13;131:16;132:4,16
**single (5)**
24:20,22;27:21;46:12;107:20
**site (1)**
63:20
**sits (1)**
99:4
**situation (1)**
77:15
**Six (3)**
43:24;113:25;114:3
**sixth (1)**
87:16
**sixty (1)**
112:13
**sixty-eight (2)**
118:16,19
**size (1)**
109:25
**Skin (9)**
3:25;4:1;13:25;16:19;18:3,5,10,14;19:1
**sledge (1)**
96:22
**sledgehammer (1)**
113:13
**slight (2)**
102:12;123:5
**slippery (1)**
96:16
**slope (1)**
96:16
**Slossberg (1)**
107:24
**small (2)**
43:21;89:24
**smaller (3)**
4:23;25:16,17
**Smith (2)**
127:10,10
**software (6)**
92:10;96:24,25;103:9;113:14;129:15
**sole (9)**
22:23;23:19;55:16;85:19,20;93:7;116:6;124:6;133:6
**solely (2)**
112:2;120:12
**somebody (2)**
93:8;132:5
**someone (5)**
65:23;67:11;104:23;105:9;106:22
**sometimes (6)**
16:4;19:1;22:7;55:20,21;58:10
**somewhere (1)**
127:20
**soon (1)**
16:19
**sorry (28)**
4:22,22;5:17;7:19;13:7,22;15:2,7;37:21;38:2,7;39:15;40:12;41:10;50:22;52:14;63:19,19;65:1,3;67:24;71:16;73:3,24;87:13;95:4,24;117:22
**sort (3)**
21:16;76:17;124:3
**sought (1)**
77:10
**sound (1)**
38:6
**sounded (1)**
32:21
**sounding (1)**
118:15
**sounds (1)**
57:8
**source (2)**
104:13;116:8
**sources (2)**
102:4;123:17
**spa (3)**
95:15;113:3;131:12
**space (7)**
70:1;86:25;98:16,17;114:21,22,25
**spaces (1)**
133:14
**speak (5)**
5:21;14:10,12,14,

17
**special (1)** 29:18
**specific (3)** 80:22;91:2;124:20
**specifically (12)** 56:6;74:15,16,25;75:3,8;87:11;90:24;91:5;95:13;120:2;128:9
**specificity (2)** 116:10;118:16
**specify (1)** 119:23
**speculate (3)** 104:19,20;106:17
**speculation (2)** 66:16;67:12
**spent (1)** 133:20
**spoiled (1)** 106:4
**spoliation (40)** 20:23;21:16;27:15;30:8,10,14,24;77:4;87:23;90:12;91:3,16;96:14;100:20;101:11,25;102:1,14,23;105:10,14,15;109:9;116:20;118:10;120:5,7,10,16;122:1,3,5,17,24;123:16,24;124:15,17,21;128:1
**spoliator (1)** 103:3
**staff (2)** 4:5;11:1
**stand (8)** 3:14;28:14;37:9;59:11;61:17;67:15;96:3;115:25
**standard (6)** 65:13,16,20;77:4;84:21;117:23
**standards (1)** 87:2
**stands (1)** 134:4
**Stanley (2)** 101:20;102:14
**Starbucks (5)** 122:5,7,12,14;123:25
**start (1)** 16:17
**state (2)** 3:17;98:6
**stated (1)** 36:4
**statement (1)** 128:12
**statements (2)** 128:14;131:2
**states (2)** 117:7;121:7
**status (1)** 106:24
**stayed (1)** 83:10
**step (4)** 3:9;27:21;58:18;84:13
**steps (1)** 101:9
**Sterling (4)** 13:14,15;93:17;133:2
**stick (1)** 56:20
**sticks (2)** 72:5;75:18
**still (12)** 9:24;42:15;59:11;61:17,18;64:13;65:18;100:11;111:3,17;124:3;133:19
**stop (2)** 10:1;63:18
**stopped (1)** 32:21
**storage (4)** 60:13;74:14,20;85:8
**store (1)** 39:25
**strike (1)** 67:12
**striking (2)** 100:16;123:3
**stringent (1)** 117:23
**stripping (1)** 129:23
**strongly (1)** 43:4
**structure (1)** 102:14
**struggling (1)** 11:25
**stuff (10)** 9:5;12:23,24;20:16;21:3;32:1;43:6;56:23;58:2;117:9
**subject (5)** 84:5,9;107:2,3;130:24
**submit (7)** 20:17;54:12;88:21;89:15;91:7;92:6,11
**submitted (6)** 34:10,11,14;87:21;92:14,19
**subparts (1)** 118:18
**subpoena (1)** 94:13
**subpoenaed (3)** 119:19;121:3;127:24
**subpoenas (6)** 91:13;112:25;113:2;116:14;121:3;123:18
**subscription (1)** 114:7
**subsequent (4)** 39:12;41:24;86:2;129:3
**subsequently (2)** 34:12;80:25
**substantial (1)** 103:4
**substantially (1)** 123:13
**successful (1)** 87:5
**sue (1)** 26:6
**sued (2)** 4:11;95:20
**suffered (7)** 103:7,13,25;112:9;117:1,6;119:20
**suffice (1)** 102:12
**sufficient (6)** 31:5;117:25;123:6;125:14;127:25;128:6
**suggested (1)** 126:7
**suit (1)** 78:7
**sum (2)** 118:5,7
**Suntrust (1)** 122:20
**super (1)** 56:18
**superficial (1)** 30:19
**Superior (1)** 98:4
**Supp (2)** 118:6;122:6
**supplement (4)** 6:3,4,10;121:18
**supplemental (2)** 95:8;110:16
**supplementation (2)** 6:20;8:14
**supplemented (2)** 110:9;120:10
**support (2)** 90:23;128:24
**supporting (3)** 92:16;116:13,15
**supposed (7)** 26:12;42:8;47:2;63:24;86:20;88:12;95:19
**sure (33)** 5:11,17;7:2,5,19,19;10:16;13:2;16:11;19:4;20:8,9;21:17;27:18;30:9;31:4,13;32:1;38:2;42:8,17;45:25;46:1;47:7;48:16;53:19;56:1;70:3;85:15;86:23;108:18;125:18,21
**surveillance (4)** 81:1;103:25;104:3;129:3
**sustain (8)** 21:12,18;45:10;51:14;53:1;66:15,16;127:2
**sustainable (1)** 63:6
**sustained (1)** 124:11
**swore (1)** 15:24
**sworn (2)** 3:11;25:1
**Sylvestri (3)** 122:2;124:2,6
**Sylvestri's (1)** 123:10
**system (6)** 9:2,3,4,19;102:5;121:15
**systems (5)** 8:25;57:22;67:23;88:8;98:12

## T

**Tab (6)** 4:22,22,22,23;7:8;43:23
**talk (4)** 13:4;19:16;25:7;35:10
**talked (1)** 104:6
**talking (11)** 10:23;17:25;19:15;23:3;25:6;28:3;50:22;56:17;111:21,22,23
**tasked (1)** 111:15
**tax (5)** 30:3;31:23;94:23;119:11,16
**Taylor (4)** 89:3;90:24;96:17;124:1
**teach (2)** 13:13;22:10
**team (2)** 30:16;67:11
**technical (1)** 127:13
**technically (1)** 102:21
**telephone (1)** 48:12
**telling (2)** 16:8;27:25
**temporary (1)** 123:1
**Ten (4)** 16:21;39:23;76:17;125:17
**tenants (1)** 14:17
**term (2)** 75:5;108:18
**terminated (1)** 103:2
**terms (13)** 20:21;30:10;66:25;76:2;84:5,10,12,23;95:25;101:17;108:20;120:18;130:25
**terribles (1)** 112:7
**test (2)** 103:1;122:16
**testified (23)** 12:9;55:12;65:15;71:17;72:9,22;73:23;74:7;81:12;82:3;89:18;91:21;104:12,12,18;105:2,17;106:25;111:1;113:17;114:7,20;127:17
**testify (10)** 37:9;81:16;88:15,23;99:15;110:25;113:16;114:15,23;131:9
**testifying (1)** 94:1
**testimony (25)** 16:25;17:1,22;18:8;25:1;35:15,19,21;37:6;58:17;59:17;76:8,13;78:12;88:25;94:4;104:14;108:15;112:6;113:12;114:13;115:2;116:1,5;117:10
**thankfully (2)** 84:2;91:11
**thereafter (2)** 101:15;104:4
**therefore (6)** 21:4;34:16;45:7;96:9;100:4;127:7
**thereof (2)** 101:4;128:23
**thinking (2)** 17:24;90:11
**third (12)**

61:1,13,14;64:9,12;70:21;75:20,23;80:11,12;113:1;121:2
**third-party (3)** 94:12;98:22;119:14
**Thirty (2)** 32:24;40:13
**Thirty- (1)** 41:12
**thirty-one (3)** 40:14,15,16
**Though (8)** 31:4;57:19;75:1;80:4;106:17;108:25;110:13;127:14
**thought (1)** 96:21
**thoughts (1)** 76:17
**threat (1)** 101:3
**threats (1)** 16:5
**three (16)** 18:22,24;20:14;41:6;58:6;64:6;82:3,4;87:6;99:14,14,17;113:24;116:14;125:3;133:11
**throughout (3)** 79:20;87:22;110:9
**thumb (10)** 60:2;63:22;73:6,9;75:25;76:1;99:16;114:9,10;115:1
**tiff (1)** 65:23
**timeline (8)** 37:25;64:17,20;77:22;78:2;104:24;113:20;129:8
**times (17)** 10:3;79:18;82:3,4;83:14,14;85:1;88:23,23;91:8;93:22;96:4;99:8;100:23;107:25;129:6,7
**timing (7)** 77:18,19;80:13;96:7,8;97:8;133:21
**today (11)** 17:1;21:14;30:23;80:1,14,14;81:8;87:22;88:5;93:2;117:19
**today's (1)** 3:1
**together (8)** 13:24;14:18;27:6;44:20;83:11;88:15,15;106:17
**togethers (1)** 19:12
**told (9)** 11:24;18:11;26:15;44:20;56:22;64:1,2;68:14;94:15
**tolerate (1)** 97:12
**tonight (1)** 50:2
**took (2)** 100:5;108:12
**tool (1)** 96:25
**top (3)** 29:7;76:6;79:22
**total (1)** 102:6
**trace (1)** 111:16
**track (2)** 11:23;128:13
**traction (1)** 117:13
**transactions (4)** 107:17;120:14,17;130:12
**transfer (3)** 128:16,17,21
**transferred (4)** 29:11;48:13;95:21;128:14
**transfers (3)** 119:15;127:22;128:11
**transgressions (1)** 122:4
**transition (1)** 90:1
**transmittal (1)** 92:16
**trial (3)** 117:2,3;122:12
**tried (4)** 22:10;27:7;117:19;131:16
**tries (1)** 99:5
**triggered (1)** 102:20
**trolling (1)** 113:9
**true (11)** 17:3;27:24;29:21,21,23;44:5;46:3,15;66:23;101:6;118:12
**trust (3)** 19:11;39:7;58:4
**trusts (1)** 81:16
**truth (7)** 15:24;16:3;34:10,15,20;57:15;102:11
**try (8)** 5:20;16:3;95:14,20;100:17;114:23;128:2;131:17
**trying (5)** 80:9;83:20;107:8;108:21;133:20
**Tuesday (2)** 35:9;59:16
**Turn (24)** 25:15,19;42:25;43:23;45:3;46:11,16;48:6,8;50:20,23;52:10,22;53:6;54:24;55:8;63:13;67:16;68:2,2;75:1;79:11;85:5;132:8
**turned (29)** 46:13;47:23;50:15,18;57:10;58:7;63:15;66:8;67:1;68:6,10,21;69:21;70:14,17,21,25;72:14,23;81:16;86:7,11,11,14,21,22;93:12;114:12;131:22
**turning (4)** 46:9;49:1;73:12;110:5
**turnover (8)** 41:5;42:23;65:8;85:3;86:10,16;87:5;100:10
**twenty (1)** 117:2
**twice (1)** 99:8
**twirling (1)** 124:2
**two (24)** 4:20;18:21;24:25;41:13;62:6;64:4;98:17;103:1,22;104:7;106:17,18;112:4;113:7;118:21;123:19,21;125:5;127:19;131:7,9,10,12,13
**type (1)** 60:19

**U**

**Ultimately (4)** 110:5;117:2;122:13;124:25
**Um-hum (6)** 38:19,25;48:4,15;55:1;90:15
**unallocated (6)** 70:1;86:25;98:17;114:21,25;133:14
**unanswered (1)** 41:25
**unavailable (2)** 71:4;77:22
**unaware (1)** 59:20
**unbelievable (1)** 132:15
**unclear (2)** 117:3;124:23
**uncover (1)** 128:3
**under (28)** 7:22,22;15:25;16:5;18:8;30:4,5;39:23;59:12;75:8,12;77:16;78:6,10,18;79:21;86:5;88:16,17;90:22;93:9;96:10;97:17,18;104:7;127:18;132:6;134:1
**Understood (2)** 26:14;31:19
**unimpaired (1)** 121:6
**Union (2)** 121:2,3
**United (1)** 122:20
**university (1)** 3:20
**unlike (2)** 113:9;116:2
**unnecessarily (1)** 36:10
**unprivileged (3)** 68:19,21;87:18
**unquote (1)** 105:25
**unrecoverable (1)** 115:7
**unreliable (2)** 100:4;130:22
**unsophisticated (2)** 114:16,17
**up (22)** 5:21;26:23;29:14,17,18,21;31:19;41:4;46:9;56:19;60:12,14;66:25;89:18;99:4;100:9;110:5;111:2;112:4;113:15;129:2;133:6
**update (1)** 113:18
**updates (2)** 4:16;106:23
**upgrade (16)** 46:23,24,25;47:16;48:3,11;49:7,11,16,19;50:2,20;51:3,5,10,17
**upgraded (3)** 51:13,15,23
**upon (5)** 63:23;82:22;100:1;101:8,8
**uptick (2)** 82:23,23
**USB (10)** 60:13,20;63:20;71:23;72:22;74:20;108:8;109:12;110:14;121:15
**USBs (2)** 71:18;110:24
**use (20)** 15:4;19:24;21:15;22:17;43:5;45:20;46:11;47:9,10;52:9;53:4,19;56:8;58:10;93:16;97:12;104:10;110:2;121:18;133:1
**used (49)** 10:6,10;11:6,16;21:22;22:12;23:25;24:5,7;40:1;45:3,10,13,17;52:5,8;53:2;54:12;56:5,9,12;57:1;64:13;69:15,24;80:21,25;85:8,18,20,23;86:9;92:15;98:16;99:11;101:6;104:22;105:25;106:9,11;107:21;108:10;112:1,2,5;128:13;133:13,14,15
**user (10)** 20:6;70:8;83:24;84:22;94:9;105:4,7;115:5;130:10,14
**username (12)** 53:9,11,12,21;54:1,5,9,10,15,24;56:20;57:10
**users (1)** 131:5
**uses (3)** 22:20;50:15;54:22
**using (14)** 22:4;24:9;36:6;70:1;84:17;86:22;92:10;93:3;97:22;99:12;104:23;112:3;128:13;132:24
**usually (1)** 122:1
**utilization (1)** 62:13
**utilize (1)** 62:11
**utilized (1)** 81:14

**V**

**Valeria (4)** 3:8,18;53:4,17
**Valeria@ariamedispacom (3)** 53:2,4,13

**Valeria@bnggroupllccom (1)**
53:15
**valid (1)**
128:17
**various (14)**
13:6,8;14:7;57:14;60:3;65:7;81:9;90:23;91:12;93:22;97:21;103:8;129:5;132:24
**vast (1)**
122:4
**vendor (3)**
66:5,11;67:1
**ventures (2)**
12:16,18
**verbal (3)**
119:3;120:21,24
**verify (1)**
114:11
**Verizon (1)**
46:4
**version (1)**
94:18
**versus (1)**
45:6
**Vestigant (30)**
47:23;48:6,22,25;50:23;58:8;59:18;62:14;66:8,19,23;68:14;70:14,25;86:1,11;89:8;106:12,12;109:11,17,19;110:25;111:1,15;121:20;127:7;130:20;131:5,17
**Vestigant's (10)**
64:5;86:3,3;104:13,15;106:14;108:23;111:6;121:12;125:9
**vgenkova@gmailcom (1)**
16:17
**vgunkova@gmailcom (3)**
52:6,23;92:20
**victim (1)**
115:18
**Victor (3)**
101:20;102:13,13
**video (3)**
80:25;103:25;104:3
**videos (2)**
103:14;111:8
**villainy (2)**
113:9;124:2
**violations (1)**
85:14
**Virginia (5)**
4:7,11;89:1;97:7,11
**virus (1)**
103:7
**VNJ (4)**
13:16,17,23;133:1
**Vogel (1)**
128:13
**voice (1)**
5:21
**Voldisek (1)**
101:12
**volume (10)**
62:8,9,11;77:18,19;87:1;99:13,15;106:3;133:22
**volumes (1)**
133:3

## W

**wait (8)**
17:17,17;25:2,2,2;28:18;51:9;126:8
**walk (1)**
78:2
**walked (1)**
116:3
**warned (1)**
78:4
**warrant (3)**
117:25;124:15;133:22
**warranted (4)**
100:24;123:4,6;133:21
**way (21)**
21:19;29:9;30:17;31:10,10;38:6;40:23;62:5;73:11;103:20;107:7;110:1;111:8,12;112:24;114:13;124:4,7;126:19;130:19;133:6
**week (4)**
24:20,22;73:23;74:7
**welcome (1)**
125:22
**weren't (2)**
121:15;130:18
**Western (2)**
61:3,14
**What's (14)**
3:24;8:1;10:4;13:21;16:24;22:25;29:13;34:20;39:19;45:16;55:20;73:21;114:10;115:2
**Whereupon (1)**
134:9
**whichever's (1)**
46:16
**white (1)**
98:16
**whole (1)**
94:2
**wholly (1)**
126:22
**who's (5)**
3:7;23:23;52:12;63:18;108:21
**Whose (1)**
57:17
**wide (1)**
123:7
**wife (3)**
98:2,11,14
**willful (6)**
77:8;105:14;118:9;119:23,24;121:5
**willfully (1)**
101:15
**winter (1)**
38:4
**Wipe (1)**
133:13
**wiped (1)**
70:1
**wiping (1)**
84:14
**withheld (1)**
68:16
**withhold (1)**
68:14
**withholding (1)**
34:16
**within (6)**
85:6;88:19;108:11;109:10;115:4;120:12
**without (5)**
11:25;19:24;37:9;55:22;116:13
**witness (16)**
3:5,11,12,14;5:17;8:19;17:20;25:5;28:13,17,19;59:8,11;61:17;67:22;68:1
**witnesses (2)**
58:18;88:20
**woman (1)**
21:4
**wonderful (1)**
89:5
**wording (2)**
74:3;85:9
**words (1)**
57:24
**work (15)**
4:4,4;9:24;10:25;12:15,18;14:18;26:22;45:20;58:11;103:15,17;104:13,15;111:2
**worked (1)**
13:24
**working (2)**
10:1;44:20
**works (5)**
13:2;21:23;22:10;24:11;56:23
**worry (1)**
8:20
**worth (1)**
114:24
**written (8)**
33:4;37:13;43:15;62:21;119:3;120:22;121:1;123:10
**wrong (2)**
16:5;105:5
**wrongdoing (1)**
115:14
**wrongful (1)**
115:16

## Y

**year (8)**
10:2;49:12,20,22;50:7,10;60:14;120:8
**years (13)**
16:21;18:25;20:14;24:25;41:6;43:19;47:9;77:21;85:14;100:22;125:3,25;133:20
**Young's (1)**
106:8

## Z

**Zs (1)**
84:18

## 0

**0740 (1)**
61:15

## 1

**1 (4)**
29:5;104:8;105:16;109:11
**1,300 (1)**
122:11
**1:19 (1)**
134:9
**10 (6)**
46:16,18;86:18;103:24;104:6;105:25
**10/15 (1)**
82:18
**10/19/2022 (1)**
82:19
**10/20 (1)**
82:20
**10/21 (1)**
82:20
**10/23 (1)**
82:20
**10/24 (1)**
82:20
**10:44 (1)**
59:5
**100 (3)**
19:11;57:15;58:4
**1011 (1)**
129:5
**1024 (1)**
129:6
**108 (1)**
119:12
**10th (9)**
25:21;46:20;64:16;73:18;78:3,8;79:17;84:25;95:23
**11 (1)**
28:15
**11/10/2022 (1)**
64:24
**11/10/22 (1)**
114:9
**11:00 (1)**
58:25
**11:01 (1)**
59:5
**11:25 (1)**
76:23
**11:40 (1)**
76:18
**11:41 (1)**
76:23
**1-18 (1)**
120:5
**11th (3)**
79:12;82:16;113:24
**12 (1)**
109:24
**122,564 (6)**
69:16;84:19,23;100:1;129:21;133:11
**123 (1)**
118:17
**129 (1)**
118:17
**13 (1)**
109:24
**14 (1)**
109:24
**140 (1)**
112:18
**149 (2)**
118:22;123:20
**14th (13)**
63:17,20,25,25;72:14,22;79:2;82:17;86:17,18,19;100:10;104:24
**15 (5)**
72:2,7;74:17;75:2;110:24
**156 (1)**
101:13
**15th (9)**
41:18;87:20,21;95:8;109:19;110:15,16,17;126:22
**16 (4)**

90:9;110:24;111:6;116:10
**16,000 (2)** 97:6,7
**16th (8)** 64:4;72:19;75:21;80:13,15,17,21;85:3
**17 (2)** 99:18;109:24
**18 (3)** 109:24;116:10;117:16
**180 (1)** 118:11
**18th (4)** 35:2;41:21;80:11;87:14
**1st (20)** 28:24;37:15,22,24;39:11;40:23;59:24;60:25;63:14;71:17;74:22;75:11;78:15;79:22;80:5;81:25;82:8;84:10;85:7,24

## 2

**2 (3)** 25:19,20;35:7
**20 (2)** 109:24;129:22
**200 (1)** 122:14
**2009 (1)** 118:7
**201 (2)** 122:12;124:5
**2011 (1)** 111:8
**2013 (1)** 122:23
**2015 (2)** 116:18;122:6
**2019 (4)** 80:24;103:8;113:14;129:1
**2020 (9)** 9:20;50:8;56:7;103:13,16,25;104:3;105:18;129:2
**2021 (39)** 24:17;25:10,21;26:24;28:15,24;35:3;37:15,22,24;38:5;39:11;40:23;41:18;47:16;49:25;50:10;51:24;77:17;78:3,7,8,13,15,15,16;79:3,8,12,15,16,17;80:5;87:12,12,13,14;106:21;120:4
**2022 (45)** 40:6,7,23;41:2;43:18;44:3,13;46:20;60:25;63:14;64:14,22;71:17;72:19;73:18;74:22;75:2;80:11,13,15,17,17,19;81:7,18,19,20,25;82:8,16,17,18,21;83:2,17;84:25;85:4;86:17,18,19;87:14;104:25;113:24;129:25;133:7
**2023 (13)** 5:2;6:2,8,21;15:6,12;89:22;95:8;110:11;121:19;126:11,21,22
**2025 (1)** 77:23
**21 (4)** 129:9,11,19,20
**210 (1)** 101:21
**213 (1)** 122:23
**22 (2)** 109:24;110:24
**220 (1)** 125:4
**22nd (4)** 79:16;85:4;86:7;109:20
**23-01062 (1)** 3:2
**23rd (1)** 75:2
**24 (2)** 5:8;91:22
**243 (1)** 122:23
**24th (1)** 113:24
**25 (6)** 41:2;64:18;73:17;110:7;113:21,23
**251 (1)** 118:11
**25th (10)** 40:6,7;44:13;64:14,22;82:14;83:2,17;87:18;133:7
**26 (7)** 4:23;5:6,8,10;6:1;87:10;110:12
**2626 (1)** 61:6
**26th (2)** 95:24;129:25
**27th (1)** 78:13
**28 (6)** 6:16;8:10,15,19,19;110:17
**29 (15)** 7:6,7,10,21,24;8:11,17,19;28:10,13,16,22;33:13,14;34:24
**2d (1)** 118:6
**2nd (14)** 5:2;6:2,21;23:25;24:5;71:22;78:15,19;79:4;87:12;89:22;110:11;126:11;127:4

## 3

**3 (9)** 29:3,4,9;33:6;41:16;78:22;103:18,24;104:2
**3/01 (1)** 108:18
**30 (7)** 32:25;33:3,5;35:1;36:25;37:12,14
**31 (3)** 39:18,22;41:3
**31st (1)** 78:16
**32 (4)** 40:9;41:14;43:9,16
**33 (6)** 60:5,7,22;62:17,22;74:19
**34 (9)** 63:1,2,8,10;72:25;73:2,3;103:18;105:22
**34,571 (2)** 110:6,7
**37e2 (1)** 90:17
**3d (1)** 122:6
**3rd (3)** 80:19;81:7,7

## 4

**4 (6)** 30:1,4,5,7;103:15;105:16
**401 (1)** 117:24
**485 (1)** 116:17
**497 (1)** 101:20
**4th (6)** 79:8;81:19;87:9,12,14;122:23

## 5

**5 (2)** 96:6;103:15
**50 (1)** 71:14
**508 (1)** 122:22
**536 (1)** 116:17
**559 (1)** 118:6
**563 (1)** 122:6
**568 (1)** 122:6
**569 (1)** 122:6
**5th (1)** 79:15

## 6

**6 (7)** 43:23;46:22;103:19;104:11;106:10,21;116:10
**66,000 (1)** 110:6
**67 (1)** 116:11
**69 (1)** 101:20

## 7

**7 (2)** 45:9;106:24
**701 (1)** 118:7
**707 (1)** 118:7
**71 (1)** 101:13

## 8

**8 (4)** 103:23;105:23;108:12;116:17
**8:52 (1)** 86:20
**85,000 (6)** 70:8;83:24;95:22;130:10,14,18
**8th (7)** 78:7;84:12;86:17;108:16;120:4;129:10,12

## 9

**9 (6)** 43:25;74:5,6,11;116:10,10
**96 (1)** 122:5
**98 (1)** 91:6
**99 (1)** 122:17
**9th (10)** 15:5,12;43:18;44:3;81:18,20;82:11;89:12;108:22;109:18